1  Steven T. Gubner - State Bar No. 156593
Robyn B. Sokol - State Bar No. 159506
2  Talin Keshishian – State Bar No. 201830
**EZRA BRUTZKUS GUBNER LLP**
3  21650 Oxnard Street, Suite 500
Woodland Hills, California  91367
4  Telephone:  (818) 827-9000
Facsimile:   (818) 827-9099
5  Email:     sgubner@ebg-law.com
rsokol@ebg-law.com
6          tkeshishian@ebg-law.com

7  [Proposed] Reorganization counsel for
Debtor and Debtor-in-Possession
8

9          **UNITED STATES BANKRUPTCY COURT**

10         **CENTRAL DISTRICT OF CALIFORNIA**

11         **SAN FERNANDO VALLEY DIVISION**

12  In re                                    Case No. 1:10-bk-18827 GM

13  **PACIFICA MESA STUDIOS, LLC,**          Chapter 11
a New Mexico limited liability company,
14                                           **EMERGENCY MOTION FOR ORDERS:**
              Debtor and Debtor in Possession.   **(A) AUTHORIZING POST-PETITION**
15                                           **FINANCING AND GRANTING SECURITY**
                                             **INTERESTS AND SUPERPRIORITY**
16                                           **ADMINISTRATIVE EXPENSE STATUS**
                                             **PURSUANT TO 11 U.S.C. §§ 361, 362, AND**
17                                           **364; (B) AUTHORIZING USE OF CASH**
                                             **COLLATERAL; (C) MODIFYING THE**
18                                           **AUTOMATIC STAY PURSUANT TO 11**
                                             **U.S.C. § 362; (D) GRANTING ADEQUATE**
19                                           **PROTECTION PURSUANT TO 11 U.S.C.**
                                             **§§361, 362, 363 AND 364; AND (E)**
20                                           **SCHEDULING AND ESTABLISHING**
                                             **DEADLINES RELATING TO INTERIM**
21                                           **AND FINAL HEARINGS PURSUANT TO**
                                             **FEDERAL RULE OF BANKRUPTCY**
22                                           **PROCEDURE 4001; MEMORANDUM OF**
                                             **POINTS AND AUTHORITIES; AND**
23                                           **DECLARATION IN SUPPORT THEREOF**

24                                           **[GENERAL ORDER 02-02; LOCAL**
                                             **BANKRUPTCY RULE 2081-1]**
25
                                             Date:  July 23, 2010
26                                           Time:  10:00 a.m.
                                             Place: Courtroom 303
27                                                  21041 Burbank Blvd.
                                                    Woodland Hills, CA 91367
28

284840.doc                                   1

1  **TO THE HONORABLE GERALDINE MUND, UNITED STATES BANKRUPTCY**

2  **JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; THE 20 LARGEST**

3  **UNSECURED CREDITORS; SECURED CREDITORS AND THEIR COUNSEL; AND**

4  **OTHER INTERESTED PARTIES:**

5        Pacifica Mesa Studios, LLC., a California limited liability company, the debtor and

6  debtor in possession in the above-captioned chapter 11 case (the "Debtor"), by this Motion and

7  pursuant to Local Rule of Bankruptcy Procedure 2081-1 hereby seeks an Order from this Court:

8  (1) authorizing post-petition financing and granting security interests and superpriority administrative

9  expense status pursuant to 11 U.S.C. §§ 361, 362, and 364 by and among the Debtor and LV Holdings,

10  LLC, as successor in interest to Amalgamated Bank of New York, as trustee of Longview Ultra I

11  Construction Loan Investment Fund ("Amalgamated"); (2) authorizing use of Amalgamated's cash

12  collateral; and, (3) modifying the automatic stay pursuant to 11 U.S.C. § 362 with respect to

13  Amalgamated; and (4) granting Amalgamated adequate protection pursuant to 11 U.S.C. §§361, 362, 363

14  and 364 as set forth in the [Proposed] Interim Order (I) Authorizing Debtor (A) To Obtain

15  Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, (B) To Use Cash Collateral

16  Pursuant To 11 U.S.C. § 363, (II) Granting Certain Protections To Prepetition Lender Pursuant To 11

17  U.S.C. §§ 361, 362, 363, And 364, And (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules

18  4001(b) And (c) ("Interim Order"), attached hereto as Exhibit "1." Approval of this agreement for use of

19  cash collateral and post-petition financing as set forth in the Interim Order and the Debtor-in Possession

20  Financing Agreement (attached to the Interim Order as Exhibit "A") ("Stipulation") will allow the

21  Debtor to use Amalgamated's cash collateral and provide the Debtor with essential post-petition

22  financing so that it may continue to operate as a "going concern" and protect the value of its

23  assets.

24       **A.**    <u>**Grounds for the Emergency**</u>.

25       **THIS MOTION IS BROUGHT ON AN <u>EMERGENCY BASIS</u> PURSUANT TO**

26  **GENERAL ORDER 02-02 AND LOCAL BANKRUPTCY RULE 2081-1 BECAUSE**

27  **WITHOUT THE PROPOSED POSTPETITION FINANCING AND USE OF CASH**

28  **COLLATERAL, THE DEBTOR WILL NOT BE ABLE TO CONTINUE ITS**

1 **OPERATIONS INCLUDING THE RENTAL OF ITS FACILITIES, TO THE**

2 **DETRIMENT OF THE ESTATE AND ITS CREDITORS.**

3       This Motion is being brought at the earliest possible time following documentation of the

4 financing arrangement and related documents and the completion of negotiations. It is essential

5 that proposed Debtor in Possession Financing and use of cash collateral (collectively,

6 "Financing") be approved as soon as possible as payroll is due the Debtor's employees on July

7 23, 2010. While Amalgamated consents to the use of its cash collateral and has agreed to debtor

8 in possession financing, such consent is subject to Court approval.  As adequate protection,

9 Amalgamated requires that a chief reorganization officer be appointed.  Amalgamated also

10 requires adequate protection payments.

11       By this Emergency Motion, the Debtor seeks approval of a financing arrangement with

12 Amalgamated as set forth in the Interim Order.  Specifically, the Debtor seeks authority from this

13 Court, on an interim emergency basis, to obtain advances from Amalgamated so that the Debtor

14 has sufficient working capital to continue operating without disruption.  It is crucial that this

15 Emergency Motion be heard at the earliest possible opportunity.  For the reasons explained in

16 more detail below, the detriment to the Debtor's business increases each day that post-petition

17 financing is not approved.

18       The Debtor does not have sufficient cash with which to satisfy its ongoing business

19 expenses.  Without interim financing, the Debtor will not be able to pay its employees on July

20 23, 2010, the company's next regularly scheduled pay day. The Debtor estimates that payroll,

21 other overhead, rent, utility expense, service and maintenance agreement expenses, security and

22 advertising expenses will approximate $100,638, due and payable on or before July 23, 2010,

23 with an additional amount of approximately $214,128 due on or before July 30, 2010, and an

24 additional $204,774 due on or before August 6, 2010.  Accordingly, the Debtor estimates that it

25 needs approximately $307,000 to operate through August 12, 2010 excluding interest payments

26 due Amalgamated, DIP Fee, Amalgamated Interest, DIP Interest, Amalgamated Legal Fees and

27 Bankruptcy Counsel fees[1].  Absent approval of the Stipulation which provides for post-petition

28

---

[1] The Budget attached to the Interim Order provides for operating expenses of $280,628 for week ending July 23, 2010; $214,128 for week ending July 30, 2010; and $204,774 for week ending August 13, 2010.

1   financing and the Debtor's continued use of Amalgamated's cash collateral, the Debtor has no

2   other source of operating capital to cover its costs.    The Debtor cannot continue its operations

3   by merely using cash collateral. See Declaration of Harold A. **Katersky** ("**Katersky** Decl."). A

4   detailed break down of the Debtor's anticipated operating expenses for July 2010 through

5   October 8, 2010 is attached hereto as Exhibit "3" and incorporated herein by this reference (the

6   "Budget"). Without the requested funding, the Debtor will be forced to terminate its business

7   operations to the detriment of all of its creditors, interested parties, and employees as well as all

8   of those benefitting from service contracts with the Debtor.  The termination of the Debtor's

9   business operations will have a dramatic negative economic impact to those it employees and

10  does business with.

11          For the same reason that the Debtor requires the immediate interim approval of the

12  Debtor-in Possession Financing Agreement and all supporting documentation ("Financing"),

13  namely the need for operating capital, the Debtor also requires immediate interim approval of the

14  use of Amalgamated's cash collateral.  The Debtor seeks use of the cash collateral through and

15  including December 2010, subject to Amalgamated receiving a replacement lien in the Debtor's

16  assets with the same extent, priority and validity as Amalgamated's pre-petition secured claim.

17          **B.      Specific Relief Sought By This Motion.**

18          The Debtor by this Motion hereby:

19          (1)     Seeks the Court's authorization, pursuant to Bankruptcy Code Sections 105,

20  364(c) and 364(d) and Rules 4001, 2002 and 9014 of the Federal Rules of Bankruptcy Procedure

21  ("Rules") for the Debtor to obtain funds in an amount not to exceed $ 2,700,000 as set forth in

22  the Budget of which $700,000 is sought on an Interim basis, pursuant to the terms set forth in the

23  Interim Order  (Exhibit "1"), and the "Debtor in Possession Financing Agreement" ("DIP

24  Facility") a draft of which is attached as Exhibit "A" to the Interim Order to satisfy ongoing

25  operating expenses;

26          (2)     Requests, pursuant to 11 U.S.C. § 364(c) and (d), that the financing provided

27  under the Financing be provided superpriority status, have priority over any and all

28  administrative expenses, including, without limitation, those specified in Bankruptcy Code

4

1  sections 105, 362, 330, 3331, 503(b), 506(c), 507(a), 507(a), 507(b) and 726, of whatever kind or

2  nature, real or personal, whether acquired pre- or postpetition, including claims and other

3  property recovered by or on behalf of the Debtor or its estate pursuant to 11 U.S.C. §§ 542, 544,

4  545, 547, 548, 549, 550, 551, 553(b) or 724(a), except for the claims of Debtor's counsel in an

5  amount as approved by the Bankruptcy Court and provided for in the Budget and restricted by the

6  Interim Order;

7      (3)    Request, pursuant to Bankruptcy Rule 4001, that a final hearing be held before

8  this Court to consider entry of a final order authorizing the Financing and the Debtor's use of

9  cash collateral as set forth in the Interim Order on a final basis on or before August 13, 2010.

10  **C.    Evidence in Support of Motion.**

11      The Motion is based on this Motion, the attached Memorandum of Points and

12  Authorities, and the Declaration of Harold Katersky, the exhibits attached hereto, and such other

13  and further evidence and matters as may be presented at or before the hearing on this Motion.

14  **D.    Requisite Disclosures in Accordance With LBR 4001-2.**

15      Pursuant to LBR 4001-2, the Debtor makes the following disclosures regarding the

16  Financing and cash collateral agreement, the Stipulation, as set forth in the Interim Order:

17      1.    The Interim Order does not contain provisions that deem pre-petition secured debt

18  to be post-petition debt. The Interim Order does provide for the use of post-petition loans from a

19  pre-petition secured creditor to pay part or all of that secured creditor's pre-petition debt.

20      2.    The Interim Order does not grant cross-collateralization protection (other than

21  replacement liens or other adequate protection) to Amalgamated.

22      3.    The Interim Order does bind the estate with respect to the validity, perfection or

23  amount of Amalgamated's prepetition lien and debt. The Debtor does not believe any grounds

24  exist to dispute the validity perfection or amount of Amalgamated's secured pre-petition lien.

25      4.    The Interim Order does waive the estate's rights under 11 U.S.C. § 506(c).

26      5.    The Interim Order does grant Amalgamated liens on the Debtor's claims and

27  causes of action under 11 U.S.C. §§ 544, 545, 547, 548, or 549.

28

5

1       6.     The Interim Order does not deem prepetition secured debt to be postpetition debt.

2 The Interim Order does provide for the use of postpetition loans from a prepetition secured

3 creditor to pay part or all of that secured creditor's prepetition debt.

4       7.     The Interim Order does not provide for payment for the professionals retained by a

5 creditors' committee.

6       8.     By and through the Financing, Amalgamated is priming its own lien.

7       **E.**     **Notice.**

8        Accordingly, the Debtor requests an emergency, preliminary hearing on this Motion and

9 at the direction of the Court will provide notice of the hearing on this Motion. The Debtor has

10 already served a copy of the Motion upon all secured creditors, the twenty (20) largest unsecured

11 creditors, the Office of the United States Trustee and all parties requesting special notice by

12 email and facsimile. The Debtor will provide a copy of the Motion to any other party appearing

13 at the emergency hearing on the Motion or otherwise requesting a copy of the Motion.

14        WHEREFORE, the Debtor respectfully requests that this Court:

15       1.     Approve the proposed Stipulation on an interim basis to prevent immediate and

16 irreparable harm to its estate and creditors pending entry of a final order;

17       2.     Schedule a final hearing on this Motion and direct that service of the Interim

18 Order on all creditors asserting secured claims, all creditors listed in the Debtor's list of 20

19 largest unsecured creditors, the Office of the United States Trustee and all parties requesting

20 special notice shall, together with the prior service of this Motion on such parties, constitute

21 adequate notice of such final hearing;

22       3.     Following such final hearing, enter a final order approving the Stipulation on a

23 final basis, authorizing the granting of super-priority claims and replacement liens and other

24 relief consistent with the Interim Order, on a final basis.

25 ///

26 ///

27 ///

28 ///

1    4.    Grant such other and further relief as is just and appropriate.

2

3    DATED: July 21, 2010                    EZRA BRUTZKUS GUBNER LLP

4                                            By:    /s/ Robyn B. Sokol
                                                    Robyn B. Sokol
5                                            [Proposed] Attorneys for Debtor and Debtor-in-
                                             Possession, Pacifica Mesa Studios, LLC, a
6                                            California limited liability company

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

### A.    Background Facts.

The Debtor filed a voluntary petition under chapter 11 of Title 11 of the United States Code on July 20, 2010 ("Petition Date"). The Debtor is a California Limited Liability Company formed for the purpose of developing and running a state-of-the art production complex in Albuquerque, New Mexico. The Debtor is owned on a 50/50 basis by members Harold Katersky ("Katersky") and Dana Arnold ("Arnold") See Katersky Decl.

The Debtor owns and runs a production complex in Albuquerque, New Mexico comprised of eight large soundstages – four 24,000 sq. ft. stages with 55-foot clear height, two 18,000 sq. ft. stages with 45-foot clear height and two 18,000 sq. ft. stages with 35-foot clear height – plus office space, back lot space, mill, storage and set construction space, an HD digital screening room, fitness center and the full spectrum of production support services, all situated on a 28-acre campus setting.

The Debtor is the largest film studio in New Mexico. The Debtor currently employs 12 people and hires 20 to 30 full time employees that work for other companies on site. Plus, each production brings anywhere form 50 to 100 jobs to Albuquerque, New Mexico. The Debtor serves the major Hollywood studios, as well as independent producers, and all members of the entertainment community who create, finance and produce and distribute media content.

The Debtor funded its studio with an initial loan from Amalgamated in the amount of $58,700,000. This loan was later increased to $75,300,000. The Amalgamated loan is secured by all assets of the Debtor and guarantees from Katersky and Arnold. The balance on the Amalgamated loan is approximately $84,000,000. The Debtor also executed a Participating Loan Agreement with Workers Realty Trust II, L.P., a Delaware limited partnership ("Workers"), dated as of April 12, 2006 ("Workers Loan Agreement") pursuant to which Workers agreed to lend the Debtor up to $16.2 million.

1    Workers, the Debtor and Amalgamated are each a party to the Amended and Restated

2    Intercreditor and Subordination Agreement, a true and correct copy of the Intercreditor

3    Agreement is attached hereto as Exhibit "2" and incorporated herein by this reference.  Under the

4    Intercreditor Agreement, Workers has subordinated its lien in the asserted amount of

5    approximately $23,804,380 to Amalgamated except with respect to the New Market Tax Credit

6    Proceeds.  As Amalgamated holds a first position lien secured by all of the Debtor's assets in the

7    amount of approximately $75.3 million and the Debtor's assets are worth significantly less than

8    $75.3 million, Workers is an unsecured creditor.  The Debtor believes its personal property and

9    real property has a value of approximately $54 million.  Moreover, under the terms of the

10   Intercreditor Agreement which is described more fully below, Workers has subordinated in all

11   respects its liens and security interests to Amalgamated except with respect to the New Market

12   Tax Credit Proceeds. See Exhibit "2," p. 3, ¶1, ¶ 13, ¶ 16.

13       In 2008, the Debtor generated income from operations including but not limited to stage

14   rentals, facility rentals, lighting & grip, telecom/DSA/copier, and production services of

15   $10,507,184.00.  In 2009, due to the poor economy and the significant decline in work and

16   projects in the entertainment industry, the Debtor generated only $5,891,815 in income.  The

17   Debtor continues to operate and currently holds deposits for a number of high profile projects for

18   major television and movie productions involving Dream Works SKG, Touchstone ABC, and

19   Sony Pictures Television.

20       The Debtor continues in possession of its property and operates and manages its business

21   as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

22   **B.    Causes of Bankruptcy Filing**.

23       Upon the completion of the studio, the economy "tanked" and the Debtor is no longer

24   able to honor its commitments to Amalgamated and Workers.  The Debtor diligently searched for

25   investors but was unsuccessful.  During this time, Debtor's former officers were among other

26   things breaching their fiduciary duty and interfering with the Debtor's economic advantage by

27   profiting (receiving fees and compensation) for placing shows in facilities that competed with the

28   Debtor; using the Debtor's client lists to solicit customers for their own benefit and not the

9

1  benefit of the Debtor and wrongfully using the Debtor's name, resources and confidential and

2  proprietary information to solicit and direct the Debtor's customers and potential customers to

3  facilities that competed with the Debtor. These actions directly impacted the Debtor's business

4  operations and significantly impacted the need for the Debtor to seek bankruptcy protection. A

5  lawsuit currently is pending against the Debtor's former officers and others in the Superior Court

6  of the State of California, Los Angeles County, Case No. SC107724, titled <u>Pacifica Mesa</u>

7  <u>Studios, LLC v. Nick Smerigan, Jeremy Hariton, Jason Hariton, Roadtown Enterprise, LTD,</u>

8  <u>Number Two, Inc.</u>

9        Another factor that lead to the decline in business operations was the uncertainly created

10  by Workers' repeated notices to foreclose upon and sell 100% of the ownership interests of the

11  Debtor. Since April 2010, Workers has been noticing foreclosure sales for the membership

12  interests of the Debtor. The next sale is noticed to occur on Friday, July 23, 2010. These actions

13  on the part of Workers have created uncertainty in the entertainment industry and have directly

14  harmed the Debtor's business operations.

15        **C.    <u>Secured Debt</u>**.

16        **1.    Amalgamated** – On or about June 17, 2006, the Debtor and Amalgamated

17  entered into a Construction Loan Agreement dated June 17, 2006 ("Senior Lender Loan

18  Agreement") pursuant to which Amalgamated agreed to lend the Debtor up to $58.7 million.

19  ("Amalgamated Loan"). This loan is evidenced by a Promissory Note in the amount of $58.7

20  million ("Amalgamated Note"). As security for the Amalgamated Loan, the Debtor executed a

21  Mortgage, Security Agreement, Financing Statement and Assignment of Rents (Construction

22  Mortgage) and an Absolute Assignment of Rents and Leases on or about July 7, 2006 and

23  recorded UCC Financing Statements in the Office of the Recorder of Deeds of Bernalillo County,

24  New Mexico and the Secretary of State of New Mexico. Thus, the Amalgamated Loan was

25  secured by essentially all assets of the Debtor. In addition, Katersky and Arnold each executed a

26  Payment Guaranty Agreement and a Completion Guaranty Agreement on July 7, 2006.

27        On or about January 31, 2008, Amalgamated and the debtor amended the Amalgamated

28  Note by and through the First Amendment and Restatement of Promissory Note ("Amendment").

10

1    The Amendment increased the original principal amount of the Amalgamated Loan by $16.6

2    million for a total loan amount of $75.3 million.  Contemporaneously with the execution of the

3    Amendment, the Debtor and Amalgamated entered into the First Supplement to Mortgage,

4    Security Agreement, Financing Statement and Assignment of Rents (Construction Mortgage),

5    First Amendment to Construction Loan Agreement and Reaffirmation of Absolute Assignments

6    of Leases and Rents.  Amalgamated's secured claim is currently in excess of $84 million.

7            On or about January 31, 2008, the Debtor, Amalgamated and Workers executed and

8    entered into an intercreditor and subordination agreement entitled "Amended and Restated

9    Intercredtior and Subordination Agreement" ("Intercreditor Agreement"). Exhibit "2."  The

10   Intercreditor Agreement essentially provides that Amalgamated is the senior secured creditor and

11   with the exception of proceeds arising from the sale or monetization of New Market Tax Credits

12   ("NMTC Proceeds"), Workers subordinates any and all claims and liens it holds against the

13   Debtor and the guarantors to the liens and security interests of Amalgamated.  Exhibit "2," ¶ 1.

14           **2.      Workers** – Workers asserted a claim secured by all assets of the Debtor

15   and the guarantees of Arnold and Katersky in the amount of $23,804,380.34.  On or about April

16   12, 2006, Workers loaned the Debtor $16.2 million pursuant to the Agreement for Participating

17   Loan.  This loan is evidenced by a Promissory Note dated April 12, 2006, in the original amount

18   of $16,200,000 ("Workers Note").  The Workers Note is secured by essentially all assets of the

19   Debtor and Workers and guarantees from Katersky and Arnold.  Any secured claim of Workers

20   is junior to Amalgamated with the exception of security in the New Market Tax Credit Proceeds

21   in accordance with the Intercreditor Agreement.  As Amalgamated holds a valid properly

22   perfected senior secured claim in the amount of at least $75.3 million and the Debtor's assets are

23   valued at significantly less than $75.3 million, Workers is an unsecured creditor.

24           To secure the Note, Katersky and Arnold pledged and collaterally assigned to Workers

25   their membership interests in and to the Debtor.  Workers has provided notice that it intends to

26   sell at public auction to the highest qualified bidder 100% of the membership interests in the

27   Debtor on Friday, July 23, 2010 at 10:00 a.m. (prevailing New Mexico time) at the offices of

28   Louis Puccini, Jr., 11200 Lomas Boulevard, NE, Suite 200, Albuquerque, New Mexico.  The

1  Debtor will move this Court (pursuant to a separate motion) to enjoin this foreclosure sale. The

2  Intercreditor Agreement provides that if the Debtor is in bankruptcy, Workers shall assign to

3  Amalgamated all rights that it has (except as to any NMTC Proceeds) to Amalgamated. Exhibit

4  "2" ¶ 16. Thus, with the filing of the bankruptcy petition on July 20, 2010, Workers right to

5  conduct a foreclosure sale with respect to the ownership interests has been assigned to

6  Amalgamated. Id. Additionally, under the Financing a default occurs if Workers forecloses on

7  the membership interests of the Debtor. In other words, if Workers forecloses on the

8  membership interests in the Debtor, Amalgamated will be entitled to relief from the automatic

9  stay.

10              3.      The Intercreditor Agreement

11      The Intercreditor Agreement provides among other things, the following:

12

13      1. Except as to the NMTC Proceeds defined in Paragraph 8 below, the Workers
        Indebtedness and the liens and security interests created by the Workers Loan
14      Documents, are hereby made and shall continue to be subject and subordinate in
        all respects to the liens and security interests created by the Senior Lender Loan
15      Documents as well as to all terms, covenants and conditions contained in the
        Senior Lender Loan Documents, and to any and all amendments, modifications,
16      extensions, replacements or renewals of the Senior Lender Loan Documents, and
        to any and all advances heretofore made or hereafter made under the Senior
17      Lender Loan Documents permitted pursuant to the terms thereof (but not in excess
18      of Seventy-Five Million Three Hundred Thousand and 00/100 Dollars
        ($75,300,000.00)...
19

20      6. Except as to the NMTC Proceeds (as defined in Paragraph 8 below), the
        Workers Indebtedness which includes all amounts payable under any of the
21      Workers Loan Documents, is subordinate and junior in right of payment to the
        Senior Lender Indebtedness.
22

23      13. In the event of any of the following (a "Borrower Bankruptcy"):

24              A. any insolvency, bankruptcy, ...

25      all of the Senior Lender Indebtedness... shall first be paid in full before any
        payment or distribution, whether in cash, securities or other property, shall be
26      made to any holder of any of the Workers Indebtedness on account of any of the
27      Workers Indebtedness. Except as to any NMTC Proceeds, any payment or
        distribution (except any NMTC Proceeds), whether in cash, securities or other
28      property, which would otherwise (but for the subordination provision of this
        Agreement) be payable and deliverable in respect of the Workers Indebtedness

                                        12

shall be received by Senior Lender as Trustee for Senior Lender's benefit and shall immediately be paid or delivered directly to the holders of the Senior Lender Indebtedness until the Senior Lender Indebtedness is paid in full according to the original terms and provisions of the Senior Lender Loan Documents without reference to any plan of reorganization or readjustment…

16. Workers agrees that in the event of a Borrower Bankruptcy, Workers assigns to [Amalgamated] all rights that Workers has (except as to any NMTC Proceeds) as a creditor in the Borrower Bankruptcy.

Exhibit "2".

### D.    The Postpetition Security Agreement and Debtor in Possession Financing Agreement.

On or about July 20, 2010, Amalgamated provided the Debtor with the Summary of Terms and Conditions Proposed Use of Cash Collateral and Debtor-in Possession Facility ("Term Sheet") outlining the terms by which Amalgamated will consent to use of cash collateral and provide a term loan or a revolver ("DIP Financing") to the Debtor.  Attached hereto as Exhibit "4" and incorporated herein by this reference is a true and correct copy of the Term Sheet.  The Interim Order with all of its exhibits incorporates the terms outlined in the Term Sheet and sets forth the Stipulation.  The Financing provides for the following:

| | |
|---|---|
| **AMOUNT:** | Initially, $2,700,000 million will be available to the Debtor for loans under the DIP Financing. Not more than $800,000 will be provided on an interim basis. |
| **INTEREST RATE:** | 12% per annum, payable monthly in arrears |
| **DEFAULT INTEREST RATE:** | Subsequent to an event of default, and continuing until all events of default shall be cured, interest on the DIP Facility shall accrue at a rate of five percent (5.00%) per annum in excess of rate otherwise accruing. |
| **COLLATERAL:** | To secure all obligations of the Debtor, Amalgamated will receive, pursuant to Sections 364(c)(1), (2) and (3) and Section 364(d)(1) of the U.S. Bankruptcy Code, through the final documents and Interim and Final Orders acceptable to the Amalgamated, a super-priority administrative expense claim and a perfected first priority pledge of all personal and real property of the Debtor, including any avoidance actions. |
| | The obligations under the DIP Facility will have priority over any and all other administrative expenses pursuant to Section 364(c)(1) of the U.S. Bankruptcy Code. |

**ADEQUATE
PROTECTION:** All obligations of the Debtor to Amalgamated in respect of the Pre-Petition Debt shall, as adequate protection for the use of cash collateral, be secured by (i) superpriority administrative expense status under 11 U.S.C. § 364(c)(1), junior only to the superpriority claims of Amalgamated in its capacity as Amalgamated under the DIP Facility; (ii) replacement first priority liens and security interests on all property, including without limitation after-acquired property, but excluding avoidance actions, subject only to the liens and security interests arising in connection with the DIP Facility; and (iii) the current payment of interest, fees, costs and expenses accruing on or arising in connection with the Pre-Petition Debt.

**EVENTS OF
DEFAULT INCLUDE:**

- Debtor's Case is dismissed or converted to Chapter 7 case, or a Chapter 11 trustee or an examiner with enlarged powers shall be appointed;

- Any super-priority administrative expense claim which is senior to or pari passu with Amalgamated's claims shall be granted;

- Any order approving the DIP Financing or the financing shall be stayed, amended, modified, reversed or vacated;

- The Debtor submits, supports, or files any plan other than that approved by Amalgamated or that does not indefeasibly pay in full in cash all obligations owed to Amalgamated;

- The entry of the Interim Order shall not have occurred within 5 days after the filing of the Debtor's Case;
- The entry of the Final Order shall not have occurred within 30 days after the entry of the first Interim Order;

- The assertion of any claim arising under Section 506(c) of the Bankruptcy Code against Amalgamated or any of Amalgamated's pre- or post-petition collateral or the commencement of other actions adverse to the Amalgamated or its respective rights and remedies under the DIP Facility or any Court order;

- The Debtor shall fail to comply with any line item in the DIP Budget;

- There shall be any material adverse change in the business, assets, operations, financial condition or prospects of the Debtor or any Personal Guarantor, taken as a whole, other than those customarily caused by a filing of a Chapter 11 case;

- The entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any assets of the Debtor or any Personal Guarantor;

14

- The Debtor or the statutory committee of unsecured creditors (if any) shall assert any claim, file a complaint or initiate any other action against the Amalgamated or otherwise file an objection to the Lender's claims or file any similar pleading which seeks to affect Amalgamated's claims or the Collateral;

- The filing of a motion seeking approval of the sale of all or substantially all of the Debtor's assets unless consented to by Amalgamated;

- **Any foreclosure by any lender (other than Amalgamated) on any membership interests in the Debtor;**

- The Debtor shall fail to reach an agreement within 45 days of the petition date for an equity infusion of at least $10 million with a counterparty and on terms acceptable to Amalgamated; or

- Harold A. **Katersky** shall cease to function as managing member and chief executive or Dana Arnold shall cease to function as president of the Debtor, or any challenge to the control of either such principal of the Debtor shall not be dismissed within [30] days of the date of such challenge.

**STAY MODIFICATION:**   Upon the occurrence of a default or event of default, (a) Amalgamated shall have the right to file its own plan at any time and (b) the automatic stay will be modified and lifted to permit Amalgamated to foreclose on all of its Collateral.

### D.   The Financing is Beneficial to the Estate and Should be Approved.

As noted, the alternative to the requested relief is the cessation of the Debtor's operations as a going concern.  It is imperative that the Debtor's operations continue.  The proposed financing will provide the Debtor sufficient funds to sustain its operations.  See Arnold Decl. and Exhibit "3".

### II.

### ARGUMENT

The Stipulation should be approved as the Debtor has satisfied the legal requirements for approval of the Financing and the use of Amalgamated's cash collateral. Amalgamated has consented by and through the Stipulation to the use of its cash collateral and the Financing. Thus, in accordance with 11 U.S.C. § 363(c)(2) the Debtor may use Amalgamated's "cash collateral" because it has obtained Amalgamated's consent.  With respect to the post-petition financing Bankruptcy Code section 364 provides that a debtor in possession that is authorized to operate its business may obtain financing either in the ordinary course of business or outside of

15

1  the ordinary course of business. See 11 U.S.C. §364(a) and (b). Bankruptcy Code section 364(b)

2  provides that financing may be allowable as an administrative expense under Bankruptcy Code

3  section 503(b)(1). If the debtor in possession is unable to obtain unsecured credit on this basis,

4  Bankruptcy Code section 364(c)(1) authorizes the debtor in possession to obtain credit or to incur

5  debt that has priority over administrative expenses of the kind specified in Bankruptcy Code

6  sections 503(b) or 507(b). 11 U.S.C. § 364(c)(1). In addition, after notice and a hearing, the

7  Court may authorize the obtaining of credit or the incurring of debt secured by a senior lien on

8  property of the estate if the debtor in possession is unable to obtain such credit otherwise and

9  "there is adequate protection of the interest of the holder of the lien on the property of the estate

10  on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B).

11  Approval of the proposed Financing, therefore, requires that Debtor demonstrate that it

12  was unable to obtain sufficient credit on an unsecured basis and that the "priming" aspect of the

13  proposed Financing adequately protects the interest of the junior lenders, in this case Workers.

14  As demonstrated herein and in the accompanying Declaration and Exhibits, these requirements

15  are satisfied.

16  A.    **The Only Source of Funding for Debtor's Continued Operations is on a**

17  **Senior Secured Basis.**

18  Despite the Debtor's best efforts, Debtor has been unable to obtain sufficient unsecured

19  credit to finance its operations. Amalgamated has agreed not only to the continued use of its cash

20  collateral, essentially any and all assets of the Debtor, but to provide the necessary funding to

21  keep the Debtor afloat until the Debtor can be restructured through a plan of reorganization. The

22  Debtor believes that reorganizing through bankruptcy will provide the Debtor's creditors with a

23  far greater return than a foreclosure on the assets by Amalgamated. Without this funding, the

24  Debtor's operations will come to a halt and Amalgamated will move to foreclose on its collateral

25  after obtaining relief from the automatic stay leaving nothing for any of the other creditors. See

26  Arnold Decl.

27

28

16

**B.**     **The Terms Of The Proposed Financing Are Fair And Adequate And Reflect An Appropriate Exercise Of The Debtor's Business Judgment.**

Bankruptcy courts give broad deference to the business decisions of chapter 11 debtors, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). As the court noted in In re Ames Dept. Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990), a "court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the debtor in possession financing does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest." In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); See In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[o]nly in circumstances where there are allegations of, and a real potential for, abuse by corporate insiders should the court scrutinize the actions of the corporation.").

A debtor in possession's power to incur secured debt necessarily follows from the debtor in possession's general power to operate its business in the exercise of it business judgment. See 11 U.S.C. § 1108. Without the ability to incur secured debt, the debtor in possession is placed at a significant competitive disadvantage and its efforts to reorganize will be seriously impaired.

Here, Debtor's decision to enter into the Financing represents an exercise of sound business judgment. Without the Financing, the Debtor simply cannot conduct its operations, much less hope to successfully reorganize. The Financing addresses these needs by providing the Debtor with the funds necessary to meet ongoing operating expenses.

Furthermore, Debtor has negotiated the best financing arrangement that it can realistically expect to obtain under the circumstances. The costs to the estate of failing to approve the Financing (in terms of loss and going concern value) will be far greater than the costs associated with the Financing. See, e.g., In re Western Pacific Airlines, Inc., 223 B.R. 567, 570-71 (Bankr. D. Colo. 1997).

The proposed borrowing in the instant case reflects the exercise of sound and prudent business judgment by the Debtor. The terms of this proposed borrowing are more favorable than

1  any other financing alternative available to the Debtor. Further, such financing provides the

2  Debtor with sufficient capital to service its current clients, finance payroll, pay on-going

3  operating expenses such as utilities, security, waste management, insurance, and to pay

4  extraordinary administrative costs during the case, including professional fees. Without approval

5  of the Financing, this case will almost certainly be converted to one under chapter 7, which

6  would severely impair the value of the Debtor's assets, all to the detriment of secured and

7  unsecured creditors alike.

8  **C.    Authorizing The Post-Petition Financing Under Section 364(c)(1), (2) and (3)**

9  **Of The Bankruptcy Code Is Justified Because Of The Tangible Benefits That**

10  **The Bankruptcy Estate Will Reap From Such Financing.**

11  Section 364(c) of the Bankruptcy Code authorizes the obtaining of credit (1) with priority

12  over all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b)

13  or 507(b); (2) secured by a lien on unencumbered property of the estate; and (3) secured by a

14  junior lien on property of the estate that is subject to a pre-existing lien. In order to obtain credit

15  on this basis, such credit must be unavailable on an unsecured basis under section 503(b)(1) of

16  the Bankruptcy Code.

17  The Debtor has canvassed the available credit market in search of post-petition financing

18  and has been unsuccessful in procuring financing commitments from banks on terms as favorable

19  as those that can be obtained through the proposed financing with Amalgamated. For all these

20  reasons, it is appropriate to approve the Financing, which affords Amalgamated a superpriority

21  claim under section 364(c)(1), as well as a superpriority lien under section 364(c)(2) and (3), for

22  amounts advanced under the Financing.

23  **D.    The Court Should Authorize Interim Financing Pending A Final Hearing To**

24  **Avoid Immediate And Irreparable Harm To The Debtor's Business.**

25  Pending a final hearing on approval of the Financing, the Debtor urges the Court to

26  authorize, pursuant to Rule 4001 of the Federal Rule of Bankruptcy Procedure, the advances

27  contemplated thereby, on an interim basis. The Debtor anticipates that it will require up to

28  approximately $310,000 to cover operating expenses through August 13, 2010 excluding interest

1  payments and fees due Amalgamated, and bankruptcy related professional fees, of this amount

2  approximately $100,638 is needed for operating expenses including employee wages that are due

3  on July 23, 2010.  In accordance with the Budget approved by Amalgamated and attached to the

4  Interim Order, the Debtor requires $700,000 of Financing on an interim basis to be used in

5  accordance with the Budget attached to the Interim Order.  Without approval of Financing in the

6  amount up to $700,000 on an interim basis the Debtor cannot protect the value of its assets and

7  continue to service its clients.

8           As noted by the court in In re Ames Dept. Stores, 115 B.R. at 36, n.2, the immediate and

9  irreparable harm standard applied to a business that hopes to reorganize, is satisfied by the

10 threatened loss of the business.  That standard is surely met in this case.  Failure to obtain interim

11 financing through the Stipulation will force the Debtor to cease operations.  The termination in

12 the Debtor's business operations will cause tremendous harm to its creditors, employees and

13 those contractors and service providers it employs in Albuquerque, New Mexico.  The Debtor's

14 business has significantly more value as a going concern.

15          E.    **The Secured Creditors are Adequately Protected.**

16          Bankruptcy Code section 364(d)(1)(B) requires the furnishing of adequate protection in

17 favor of senior lenders, which assert an interest in collateral.  Neither this nor any other

18 Bankruptcy Code provision specifically defines the term "adequate protection."  Bankruptcy

19 Code section 361, however, provides that adequate protection is to be furnished to the extent the

20 debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in

21 such property."  11 U.S.C. § 361(1), (2), (3) (emphasis added).  Stated succinctly, adequate

22 protection protects a secured creditor against a decrease in the value of its collateral.  See, e.g., In

23 re Planned Systems, Inc., 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987); Metropolitan Life Ins.

24 Co. v. Monroe Park (In re Monroe Park), 17 B.R. 934, 937 (D.Del. 1982)(Debtor must propose

25 some form of relief that will protect the secured party against any postpetition erosion in the

26 value of its collateral);  See also, In re Cumberland Farms, Inc., 162 B.R. 62 (Bankr.D.Mass

27 1993)(holding that a postpetition decline in value of collateral must occur to warrant adequate

28 protection)(citing In re Ledgemere Land Corp., 125 B.R. 58, 61 (Bankr.D.Mass. 1991); In re

1    Robbins, 119 B.R. 1, 3 (Bankr.D.Mass. 1990); and In re Lane, 108 B.R. 6 (Bankr.D.Mass.

2    1989)). The purpose of requiring adequate protection is merely to preserve the secured creditor's

3    position as it existed at the time of the bankruptcy filing. *See,* In re Melson, 44 B.R. 455

4    (Bankr.D.Del. 1984).   This standard applies equally with respect to "priming" financing under

5    11 U.S.C. § 364(d)(1)(B). See, e.g., In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr.

6    E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor

7    to obtain financing secured by liens senior to all other interests is to safeguard the secured

8    creditor from diminution in the value of its interests."); In re Aqua Assoc., 123 B.R. 192, 196

9    (Bankr. E.D. Pa. 1991); In re Beker Ind. Corp., 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

10    **Accordingly, secured creditors are only entitled to adequate protection with respect**

11    **to any erosion in the value of their collateral since the filing of the Petition. Debtor submits**

12    **that no such erosion will occur if the Financing is approved.** Thus, to the extent that Workers

13    is a secured creditor, it is adequately protected as the continued operations of the Debtor will

14    prevent further erosion of its collateral. Moreover, a requirement of the Financing is that a Chief

15    Restructuring Officer be put in place. This will provide Workers with adequate protection to the

16    extent it is entitled to receive adequate protection.

17    Here, the Financing plainly protects Workers against a decline in its interests in the

18    collateral of the Debtor, if any. As demonstrated in the Budget, the borrowings will be used to

19    pay necessary ongoing business expenses.  See Katersky Decl. and Exhibit "3." The use of the

20    funds for these expenses will directly increase the value of the collateral. As a result of the

21    Financing, therefore, the secured creditors' interests in the collateral will be substantially

22    enhanced and improved. The Financing will enable the Debtor to avoid liquidation and preserve

23    going concern value, which will directly benefit all of the Debtor's creditors and allow the

24    Debtor to reorganize.  These factors alone have been found to constitute adequate protection for

25    "priming" purposes. See In re 495 Cent. Park. Ave Corp., 136 B.R. 626, 631.

26    ///

27    ///

28    ///

20

1

## III.

2

## <u>CONCLUSION</u>

3    Based on the foregoing, the Debtor respectfully requests that the Court enter an order (i)

4    granting this Motion, (ii) approving the Financing on an interim basis, (iii) setting a Final hearing

5    for approval of the Financing, (iv) approve Debtor's use of cash collateral as set forth in the

6    Stipulation and, (v) granting such other and further relief at this Court deems just and proper.

7

8    DATED: July 21, 2010                     EZRA BRUTZKUS GUBNER LLP

9

10                                            By:  ___/s/ Robyn B. Sokol_____
                                                        Robyn B. Sokol
11                                                 Attorneys for Debtor and Debtor-in-
                                                   Possession, Isabella Fiore, LLC, a Delaware
12                                                 Limited Liability Company

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    ### DECLARATION OF HAROLD A. KATERSKY[2]

2    I, Harold A. Katersky, declare as follows:

3    1.    I am the Managing Member and Chief Executive Officer of the Debtor, Debtor

4    and Debtor-in-Possession herein.  I am involved and responsible for the handling of the Debtor's

5    financial documents and the analysis of the Debtor's financial affairs.   By virtue of my position

6    and pursuant to the specific responsibilities granted to me, I am authorized to make this

7    declaration.

8    2.    I make this declaration in support of the foregoing Motion.  I have personal

9    knowledge of the facts set forth herein and if called as witness, I could and would competently

10   testify thereto.

11   3.    The Debtor is owned on a 50/50 basis by the two members, Arnold ("Arnold")

12   and myself.

13   4.    The Debtor's production complex in Albuquerque, New Mexico is comprised of

14   eight large soundstages – four 24,000 sq. ft. stages with 55-foot clear height, two 18,000 sq. ft.

15   stages with 45-foot clear height and two 18,000 sq. ft. stages with 35-foot clear height – plus

16   office space, back lot space, mill, storage and set construction space, an HD digital screening

17   room, fitness center and the full spectrum of production support services, all situated on a 28-

18   acre campus setting (the "Studio").

19   5.    I am informed and believe that the Studio is the largest film studio in New

20   Mexico.  The Debtor's clients are major Hollywood studios, as well as independent producers,

21   and all members of the entertainment community who create, finance and produce and distribute

22   media content.  Debtor currently employs 12 people to manage and administer the Studio.  In

23   addition, the Debtor's customers, the production companies, hire hundreds of people that work at

24   the studio in the production of their films and television programs.

25   6.    I am further informed and believe that in addition based upon a study completed

26   by Ernst and Young that the Studio is responsible for the creation of 9300 jobs in the

27   Albuquerque.

28   ---

[2] All initial capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

7.      The Debtor obtained an initial loan to fund the Studio from Amalgamated in the amount of $58,700,000, which later was increased to $75,300,000. The Amalgamated loan is secured by all assets of the Debtor and guarantees from Arnold and myself, and that the balance on the Amalgamated loan is approximately $84,000,000.

8.      The Debtor entered into the Workers Loan Agreement, pursuant to which Workers agreed to lend the Debtor up to $16.2 million.

9.      A true and correct copy of the Intercreditor Agreement between Workers, the Debtor and Amalgamated Bank is attached hereto as Exhibit "2" and incorporated herein by this reference.

10.     The Debtor generated income in 2008 from operations including but not limited to stage rentals, facility rentals, lighting & grip, telecom/DSA/copier, and production services of $10,507,184.00. The Debtor's income in 2009 was only $5,891,815 due I believe to the poor economy and the significant decline in work and projects in the entertainment industry in general. The Debtor continues to operate and currently holds deposits for a number of high profile projects for major television and movie productions involving Dreamworks SKG, Touchstone ABC, Sony Pictures Television.

11.     The Debtor has searched diligently for investors but was unsuccessful.

12.     The Debtor's business operations also were negatively impacted by the actions of the Debtor's former officers. These former officers were among other things breaching their fiduciary duty and interfering with the Debtor's economic advantage by profiting (receiving fees and compensation) for placing shows in facilities that competed with the Debtor; using the Debtor's client lists to solicit customers for their own benefit and not the benefit of the Debtor and wrongfully using the Debtor's name, resources and confidential and proprietary information to solicit and direct the Debtor's customers and potential customers to facilities that competed with the Debtor. These actions directly impacted the Debtor's business operations and significantly impacted the need for the Debtor to seek bankruptcy protection. A lawsuit is pending against the Debtor's former officers and others in the Superior Court of the State of

1 | California, Los Angeles County, Case No. SC107724, titled <u>Pacifica Mesa Studios, LLC v. Nick</u>

2 | <u>Smerigan, Jeremy Hariton, Jason Hariton, Roadtown Enterprise, LTD, Number Two, Inc.</u>

3 |     13.    Another factor that led to the decline in business operations was the uncertainty

4 | created by Workers' repeated notices to foreclose upon and sell 100% of the ownership interests

5 | of the Debtor.

6 |     14.    This Motion is brought on an <u>emergency basis</u> with a request to be heard at the

7 | earliest possible opportunity because without the proposed postpetition financing and use of cash

8 | collateral, the Debtor will not be able to continue its operations including the rental of its

9 | facilities, to the detriment of the estate and its creditors.

10 |     15.    This Motion is being brought at the earliest possible time following

11 | documentation of the financing arrangement and related documents and the completion of

12 | negotiations. It is essential that the proposed Financing be approved as soon as possible as

13 | payroll is due the Debtor's employees on July 23, 2010. I am informed and believe that

14 | Amalgamated consents to the use of its cash collateral and agreed to debtor in possession

15 | financing. As adequate protection, Amalgamated is requiring that the Debtor's current

16 | management remain in place and that a chief reorganization officer be appointed. Amalgamated

17 | also requires adequate protection payments.

18 |     16.    For the reasons explained in more detail below, the detriment to the Debtor's

19 | business increases each day that post-petition financing is not approved.

20 |     17.    The Debtor does not have sufficient cash with which to satisfy its ongoing

21 | business expenses. The Debtor's next regular pay day is July 23, 2010. Estimated expenses

22 | between now and August 6, 2010 for payroll, other overhead, rent, utility expenses, service and

23 | maintenance agreement expenses, security and advertising expenses required to operate through

24 | August 12, 2010 will be approximately $307,000 <u>excluding interest payments due Amalgamated,</u>

25 | <u>professional fees associated with the bankruptcy, DIP Financing Fees,</u> are as follows:

26 |             a.  $100,648 by July 23, 2010

27 |             b.  $108,500 by July 30, 2010

28 |             c.  $98,700 by August 6, 2010

1         18.    Attached hereto as **Exhibit "3"** and incorporated herein by this reference is a

2    detailed break down of the Debtor's anticipated operating expenses for July 2010 through

3    December 2010 (the "Budget"), which I prepared.

4         19.    Debtor will be forced to terminate its business operations without the requested

5    funding.

6         20.    I have spent considerable time and energy investigating alternative sources of

7    funding for the Debtor, but have been unable to obtain unsecured credit in an amount sufficient

8    to meet the Debtor's needs over the next two months.  Without funding from Amalgamated, I

9    believe the Debtor's operations will come to a halt.

10         I declare under penalty of perjury under the laws of the United States of America that the

11    foregoing is true and correct and executed this 21st day of July, 2010, at Woodland Hills,

12    California.

13

14                                              Harold A. Katersky

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PACIFICA MESA STUDIOS LLC, | ) | Case No. 10- (   ) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## INTERIM ORDER (I) AUTHORIZING DEBTOR (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364, (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING CERTAIN PROTECTIONS TO PREPETITION LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Upon consideration of the motion (the "Motion")[1], dated July 21, 2010, of Pacifica Mesa Studios, LLC (the "Debtor" or the "Borrower") in the above-captioned case (the "Chapter 11 Case") pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules for the Bankruptcy Court for the Central District of California, San Fernando Valley Division, seeking, among other things:

(i)       The Court's authorization for the Debtor to obtain postpetition financing (the "Financing"), consisting of a superpriority priming term and revolving loan facility (the "DIP Facility") in an aggregate principal amount of up to $85,000,000 (the "DIP Commitment"), to be secured by liens on all of the property, assets and interests in property or assets of the Debtor and the Debtor's "estate" (as defined in the Bankruptcy Code), in each case of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general

---

[1]       Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Loan Agreement, as applicable.

intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases (and proceeds from the disposition thereof), money, investment property, deposit accounts, all commercial tort claims and other causes of action (including any and all actions arising under the Bankruptcy Code), Cash Collateral (as that term is defined below), and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of the collateral described above (collectively, with respect to all such entities, the "Collateral"), and entered into among the Debtor, as debtor and debtor-in-possession under the Bankruptcy Code, LV Holdings, LLC, as successor in interest to Amalgamated Bank of New York, as trustee of Longview Ultra I Construction Loan Investment Fund (the "DIP Lender"), a portion of which Financing shall be used to refinance the Prepetition Indebtedness (as defined herein);

(ii)     The Court's authorization for the Debtor and the Guarantors (collectively, the "Obligors"), as the case may be, to execute and deliver additional final documentation consistent with the terms of (or as may be required by) the Debtor-In-Possession Financing Agreement (as the same may be amended or modified, the "DIP Loan Agreement") in the form attached to this Order (the "Interim Order") as Exhibit A, the Guaranties (the "Guaranties") and all additional documentation (the "DIP Loan Documents" and together with the DIP Loan Agreement and the Guaranties, the "DIP Documents"), and to perform such other and further acts as may be required in connection with the DIP Documents;

(iii)    The Court's authorization for the use of proceeds of the Financing extended to the Borrower as expressly provided in the DIP Documents (A) to pay costs, fees and expenses of the DIP Lender and the Prepetition Lender, as provided for in this Interim Order and the DIP Documents, as well as all scheduled payments of interest and principal thereunder, (B) to provide working capital and for other general corporate purposes of the Borrower, and (C) to pay administration costs of this Chapter 11 Case and claims or amounts approved by the Bankruptcy Court; provided, that payments under clause (A) above shall be made from the proceeds of the DIP Facility irrespective of the then-applicable Budget;

- 2 -

(iv)    The Court authorizing the grant to the DIP Lender and any other parties referred to in the collateral documents (collectively, the "DIP Secured Parties") with respect to the DIP Obligations (as defined below), in accordance with the relative priorities as set forth more fully below:

(a) pursuant to Bankruptcy Code section 364(c)(1), joint and several superpriority administrative expense claim status in the Chapter 11 Case, which claims in respect of the DIP Facility shall be superior to any and all other claims;

(b) pursuant to Bankruptcy Code section 364(c)(2), a first priority lien on all unencumbered assets of the Borrower and its estate (now or hereafter acquired and all proceeds thereof);

(c) pursuant to Bankruptcy Code section 364(c)(3), a junior lien on all encumbered assets (except as set forth in subparagraph (d) below) of the Borrower and its estate (now or hereafter acquired and all proceeds thereof); and

(d) pursuant to Bankruptcy Code section 364(d), a first priority priming lien on all assets of the Borrower and its estate (now or hereafter acquired and all proceeds thereof) that were subject to the liens of the Prepetition Primed Obligations (as defined below) as of the Filing Date (as defined below);

(v)    The Court granting protection to the secured parties whose liens and security interests are being primed by the Financing as set forth below (such parties, the "Lender Protection Parties");

(vi)    The Court's authorization for the Debtor to use any Cash Collateral in which Lender Protection Parties may have an interest and the granting of certain protections to the Lender Protection Parties with respect to, inter alia, use of their Cash Collateral in accordance

- 3 -

with the Budget and the use (and any Diminution in Value (as defined below)) of their collateral;

(vii)    The Court vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(viii)    The Court waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(ix)    Pursuant to Bankruptcy Rule 4001, the Court order that an interim hearing on the Motion be held before this Court to consider entry of this Interim Order, authorizing that during the period commencing on the date (the "Interim Order Entry Date") of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order and (b) the occurrence of the DIP Loan Maturity Date (as defined in the DIP Loan Agreement) (such period, the "Interim Period"), a portion of the DIP Commitments shall be borrowed by the Borrower (the "Initial Availability"), subject to (i) delivery by the Borrower of the Budget, and (ii) compliance with the terms, conditions and covenants contained in the definitive documents relating to the DIP Facility, including, without limitation, the credit agreements, guarantees, security agreements, pledge agreements and all other DIP Documents, in an amount equal to the lesser of $8,100,000 or such other amount as may be approved by order of this Court, to be made available during the Interim Period in accordance with the Budget; and

(x)    The Court schedule a final hearing (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and DIP Documents filed with this Court.

The interim hearing on the Motion having been held on July __, 2010 (the "Interim Hearing"); and based upon all of the pleadings filed with the Court, the evidence presented at the Interim Hearing and the entire record herein; and the Court having heard and resolved or

- 4 -

KL2 2660018.2

overruled all objections to the interim relief requested in the Motion; and the Court having noted

the appearances of all parties in interest; and it appearing that the relief requested in the Motion

is in the best interests of the Debtor, its estate and its creditors; and the Debtor having provided

notice of the Motion as set forth in the Motion and it appearing that no further or other notice of

the Motion need be given; and after due deliberation and consideration, and sufficient cause

appearing therefor:

**BASED ON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE
COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:[2]**

      A.    Filing Date.  On July 20, 2010 (the "Filing Date"), the Borrower

commenced its Chapter 11 Case by filing a voluntary petition for relief under the Bankruptcy

Code.  The Borrower is operating its business and managing its affairs as a debtor-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been

appointed in the Chapter 11 Case.

      B.    Jurisdiction; Venue.  The Court has jurisdiction over this case, the parties

and the Debtor's property pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28

U.S.C. §157(b)(2)(D).  Venue of the Chapter 11 Case and the Motion is proper under 28 U.S.C.

§§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361,

362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 and

the Local Bankruptcy Rules.

      C.    Committee Formation.  No official committee of unsecured creditors (the

"Creditors' Committee") has yet been appointed in this Chapter 11 Case.

      D.    Prepetition Loan Documents.  The Borrower is Borrower under that certain

Construction Loan Agreement dated as of June 17, 2006 (as amended, restated, supplemented or

otherwise modified from time to time, the "Prepetition Loan Agreement" and, together with the

Security Documents (as defined therein), the "Prepetition Loan Documents"), between the

---

[2]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as
findings of fact, pursuant to Bankruptcy Rule 7052.

KL2 2660018.2

Debtor and Amalgamated Bank of New York, as Trustee of Longview Ultra I Construction Loan Investment Fund (the "Prepetition Lender"). Pursuant to the Prepetition Loan Documents, the Prepetition Lender provided the Debtor with loans in the aggregate principal amount of approximately $74,135,131.40. For purposes of this Interim Order, the term "Prepetition Indebtedness" shall mean all amounts owed, as of the Filing Date, to the Prepetition Lender under the Prepetition Loan Documents, including, without limitation, all Obligations (as defined in the Prepetition Loan Agreement) of the Debtor thereunder.

E.    Stipulations.  In requesting the Financing under the DIP Documents, the Debtor permanently, immediately and irrevocably acknowledges, represents, stipulates and agrees that, in each case subject to paragraph 19 of this Interim Order:

(i)    in entering into the DIP Documents, and as consideration therefor, the Debtor hereby agrees that until such time as all DIP Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments are terminated in accordance with the terms of the DIP Documents, the Debtor will not (except as expressly permitted by this Interim Order, the DIP Documents and the Prepetition Loan Documents) in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens, security interests or claims provided under this Interim Order or the Prepetition Loan Documents to the DIP Lender or the Prepetition Lender by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364 of the Bankruptcy Code or otherwise;

(ii)    as of the Filing Date, (A) the aggregate principal amount of the Prepetition Indebtedness is not less than $ 74,135,131.40, plus all accrued and unpaid interest, plus all fees, costs and expenses incurred in connection therewith, and all other Obligations under the Prepetition Loan Agreement, (B) all of the Prepetition Indebtedness is unconditionally owing by the Debtor to the Prepetition Lender, and (C) none of the claims in respect of the Prepetition Indebtedness is or shall be subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claims, recoupment, defense, disallowance, impairment or any other challenges under the Bankruptcy

- 6 -

Code or any other applicable law or regulation by any person or entity, and the Prepetition Loan Documents constitute the legal, valid and binding obligations of the Debtor and its estate and are enforceable against the Debtor and its estate in accordance with the terms of the Prepetition Loan Documents;

      (iii)    the liens securing the Prepetition Indebtedness (the "Existing Liens") (A) constitute valid, binding, enforceable and perfected first priority liens on the collateral as described in the Prepetition Loan Documents (the "Prepetition Collateral") that, prior to the entry of this Interim Order, were subject only to the Permitted Encumbrances (as defined in the Mortgage (as defined in the Prepetition Loan Agreement) and (B) are not, and shall not be, subject to avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment or any other challenges under the Bankruptcy Code or any other applicable law or regulation by any person or entity;

      (iv)    neither the DIP Lender nor the Prepetition Lender is a control person or insider of the Debtor by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Documents and/or the Prepetition Loan Documents;

      (v)    as of the date hereof, there exists no claim or cause of action against the Prepetition Lender or the DIP Lender with respect to, in connection with, related to, or arising from the Prepetition Loan Agreement or the Financing that may be asserted by any Obligor or any other person or entity;

      (vi)    as of the date hereof, there were no other liens on or security interests in the Collateral except for the Existing Liens, liens in favor of Workers Realty Trust II, L.P., which liens are contractually subordinated to the Existing Liens (the "Workers Lien"), and, to the extent such liens are determined to be valid, perfected, binding and enforceable, the Permitted Encumbrances; and

      (vii)    the Obligors forever and irrevocably release, discharge and acquit the former, current or future DIP Lender and Prepetition Lender, and each of their respective former,

- 7 -

current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses and judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, including, without limitation, all legal and equitable theories of recovery arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Financing, the DIP Documents, the Prepetition Loan Documents, the Prepetition Primed Obligations or the transactions contemplated hereunder or thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Lender and/or the DIP Lender.

      F.    Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in which the Prepetition Lender under the Prepetition Loan Agreement has a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests), whether existing on the Filing Date, arising pursuant to this Interim Order or otherwise.  The Debtor requires the use of Cash Collateral to operate its business. Without the use of Cash Collateral, the Debtor will not be able to meet its cash requirements for working capital needs and an immediate shutdown of the Debtor's business will ensue.  The DIP Lender and the Prepetition Lender do not consent to the use of Cash Collateral except on the terms and for the purposes specified herein.

KL2 2660018.2

G.    <u>Lender Protection</u>.  The Lender Protection Obligations (as defined below) are sufficient to protect the interests of the Lender Protection Parties in the collateral securing the Prepetition Primed Obligations (as defined below) and no further adequate protection is presently required under sections 363, 364 or any other provision of the Bankruptcy Code.

H.    <u>Purpose and Necessity of Financing</u>.  The Borrower requires the financing described in the Motion and as expressly provided in the DIP Documents (i) to pay costs, fees and expenses of the DIP Lender and the Prepetition Lender as provided for in the Interim Order and the DIP Documents, as well as all scheduled payments of interest and principal thereunder, (ii) to provide working capital and for other general corporate purposes of the Debtor, and (iii) to pay administration costs of this Chapter 11 Case and claims or amounts approved by the Bankruptcy Court, <u>provided</u> that payments of the above-described amounts shall be made from the proceeds of the DIP Facility irrespective of the then-applicable Budget.  If the Borrower does not obtain authorization to borrow under the DIP Loan Agreement and the DIP Loans are not approved, the Borrower will suffer immediate and irreparable harm.  The Borrower is unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Documents.  A loan facility in the amount provided by the DIP Documents is not available to the Borrower without granting the DIP Lender superpriority claims, liens and security interests, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Documents.  After considering all alternatives, the Borrower has concluded, in the exercise of its prudent business judgment, that the loan facility provided under the DIP Documents represents the best and only working capital financing available to it at this time.  The DIP Facility is the only loan available to the Borrower and the Borrower has been unsuccessful in its attempts to find any alternative financing.  Additionally, the terms of the Financing and the use of Cash Collateral are fair and reasonable and reflect the Borrower's exercise of prudent business judgment consistent with its fiduciary duties.

- 9 -

KL2 2660018.2

35

I.    Good Cause.  Based upon the record presented to the court by the Debtor, it appears that the ability of the Debtor to obtain sufficient working capital and liquidity under the DIP Documents, and use of Cash Collateral, is vital to the Debtor, its estate and its creditors. The liquidity to be provided under the DIP Documents and through the use of the Cash Collateral will enable the Debtor to continue to operate its business in the ordinary course and preserve the value of its business.  The Debtor's estate will be immediately and irreparably harmed if this Interim Order is not entered.  Good cause has, therefore, been shown for the relief sought in the Motion.

J.    Good Faith.  The Financing and the DIP Documents have been negotiated in good faith and at arm's-length among the Obligors and the DIP Lender, and all of the obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, all loans made to and guarantees issued by the Obligors pursuant to the DIP Documents, and any other obligations under the DIP Documents (all of the foregoing collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the Postpetition Liens (as defined below), the Superpriority Claim (as defined below), and the Lender Protection Obligations shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits and privileges of this Interim Order regardless of whether this Interim Order is subsequently reversed, vacated, modified or otherwise is no longer in full force and effect or the Chapter 11 Case is subsequently converted or dismissed.

K.    Consideration.  The Borrower will receive and has received fair consideration and reasonably equivalent value in exchange for access to the DIP Loans, the use of Cash Collateral and all other financial accommodations provided under the DIP Documents and this Interim Order.

KL2 2660018.2

L.    <u>Immediate Entry of Interim Order</u>.  The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The permission granted herein to enter into the DIP Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtor.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the continued flow of supplies and services to the Debtor necessary to sustain the operation of the Debtor's existing business and further enhance the Debtor's prospects for a successful restructuring.  Based upon the foregoing findings, acknowledgements and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED:**

1.    <u>Disposition</u>.  The Motion is granted on an interim basis and on the terms set forth herein.  Any objections to the Motion that have not previously been withdrawn, waived, settled, or resolved and all reservations of rights included therein are hereby denied and overruled on their merits with prejudice.

2.    <u>Effectiveness</u>.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Filing Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

3.    <u>Authorization of the Financing and DIP Loan Agreement</u>.

(a)    The Debtor is hereby authorized to execute and enter into the DIP Documents, and the DIP Documents are hereby approved and incorporated herein by reference in their entirety.  The DIP Documents and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtor by the DIP Lender.

- 11 -

(b)       The Borrower is hereby authorized to borrow money pursuant to the DIP Documents during the Interim Period in an amount not to exceed $8,100,000, which shall be used solely as expressly provided in the DIP Documents and the Budget (i) to pay costs, fees and expenses of the DIP Lender and the Prepetition Lender as provided for in the Interim Order and the DIP Documents, as well as the scheduled payments of principal and interest thereunder, (ii) to provide working capital and for other general corporate purposes of the Debtor, (iii) to pay administration costs of this Chapter 11 Case and claims or amounts approved by the Bankruptcy Court, and (iv) to refinance $7,000,000 of the Prepetition Indebtedness; provided that payments under clause (i) shall be made from the proceeds of the DIP Facility irrespective of the then-applicable Budget.

(c)       In furtherance of the foregoing and without further approval of this Court, the Borrower and the Prepetition Lender are authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be required or necessary for the Debtor's performance of its obligations under the Financing, including, without limitation:

(i) the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Loan Agreement, any guarantees, any security and pledge agreements and any mortgages contemplated thereby,

(ii) the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lender, in each case in such form as the Debtor and the DIP Lender may agree;

- 12 -

(iii) the non-refundable payment of the fees referred to in the DIP

Documents and costs and expenses as may be due in accordance with the DIP

Documents, provided, however, that the fees and expenses of professionals

employed pursuant to the DIP Documents are subject to the conditions contained

in paragraph 7(a) of this Interim Order, and

(iv) the performance of all other acts required under or in connection with

the DIP Documents.

(d)      The DIP Documents constitute valid, binding and non-avoidable

obligations of the Obligors enforceable against each person or entity party thereto in

accordance with their respective terms and the terms of this Interim Order for all

purposes during the Chapter 11 Case, any subsequently converted case of the Debtor

under chapter 7 of the Bankruptcy Code or after the dismissal of this Chapter 11 Case.

No obligation, payment, transfer or grant of security under the DIP Documents or this

Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the

Bankruptcy Code or under any applicable law (including without limitation, under

sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state

Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute

or common law), or subject to any avoidance, reduction, setoff, recoupment, offset,

recharacterization, subordination (whether equitable, contractual or otherwise),

counterclaims, cross-claims, defenses, disallowance, impairment or any other challenges

under the Bankruptcy Code or any other applicable law or regulation by any person or

entity.

4.      Reserved.

5.      Superpriority Claims.  The DIP Lender is hereby granted an allowed superpriority

administrative expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the

- 13 -

Bankruptcy Code for all DIP Obligations, having priority over any and all other claims against the Debtor and its estate, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and its estate and all proceeds thereof.  Except as expressly set forth herein, no other superpriority claims shall be granted or allowed in this Chapter 11 Case.  For the avoidance of doubt, the Superpriority Claim may be satisfied from the proceeds of the Avoidance Actions (as defined herein), provided however, that no person or entity (other than the DIP Lender in accordance with this paragraph) shall receive the proceeds of Avoidance Actions until such time as all DIP Obligations have been satisfied in full.  For the avoidance of doubt, nothing in this paragraph shall abrogate, limit or otherwise diminish, alter, modify or otherwise impact or affect any other term or condition of this Interim Order or any right of the DIP Lender (or any finding with respect thereto) pursuant to this Interim Order (including, without limitation, paragraphs F, G, H, I, J, K, L, M, 2, 3, 5, 6, 8, 11,16 or 32 hereof), the Bankruptcy Code (including, without limitation section 364(e) of the Bankruptcy Code) or applicable law.

      6.    <u>Postpetition Liens</u>.

      (a)    To secure the DIP Obligations, the DIP Lender is hereby granted:

      i.    a first priority, perfected security interest in and lien on, under section 364(c)(2) of the Bankruptcy Code, all of the Collateral of the Debtor and the Debtor's estate that, on or as of the Filing Date, is not subject to valid, perfected and non-avoidable liens; <u>provided</u> <u>however</u>, that any such lien shall not extend to any leasehold where the terms of the

- 14 -

lease would prohibit the imposition of such lien, but provided further that such lien shall extend to the proceeds of any such leasehold;

ii.      a second priority, perfected security interest in and lien on, under section 364(c)(3) of the Bankruptcy Code, upon all of the Collateral of the Debtor and of the Debtor's estate that is, as of the Filing Date, subject to valid, perfected and non-avoidable liens in favor of third parties except as set forth in subparagraph (iii) below;

iii.      a first priority, perfected priming security interest in and lien on, under section 364(d)(1) of the Bankruptcy Code, all Collateral that also constitutes Prepetition Collateral, in all cases senior to (A) the Existing Liens, (B) the Working Lien and (C) all other liens and obligations secured by the Prepetition Collateral on a *pari passu* or junior basis to the Existing Liens (collectively the "Prepetition Primed Obligations").

(b)      The liens created as described in clauses (i), (ii) and (iii) above (the "Postpetition Liens") shall cover all property and assets of the Debtor and its estate (now or hereafter acquired and all proceeds thereof), including (x) property or assets that do not secure the Prepetition Primed Obligations, and (y) claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions") and the proceeds thereof.

(c)      The Postpetition Liens shall be effective immediately upon the entry of this Interim Order.

(d)      Except as provided in this Interim Order, the Postpetition Liens shall not at any time be (i) made subject or subordinated to or made *pari passu* with any other lien, security interest or claim existing as of the Filing Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, or (ii) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code.

KL2 2660018.2

(e)    The Postpetition Liens shall be and hereby are fully perfected liens and security interests, effective and perfected upon the date of this Interim Order without the necessity of execution by the Debtor or the filing or recordation of mortgages, security agreements, pledge agreements, financing agreements, financing statements or other agreements, such that no additional steps need be taken by the DIP Lender to perfect such interests. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for the Debtor to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting the DIP Lender a priority security interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof, by the Debtor in favor of the DIP Lender, in accordance with the terms of the DIP Loan Agreement and the other DIP Documents.

(f)    The Postpetition Liens, Superpriority Claim and other rights, benefits and remedies granted under this Interim Order to the DIP Lender shall continue in this Chapter 11 Case, in any superseding case under the Bankruptcy Code resulting from conversion of this Chapter 11 Case (the "Superseding Case") to the extent permitted by applicable law, and, to the extent permitted by applicable law, following any dismissal of this Chapter 11 Case, and such liens and claims shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lender's commitments have been terminated in accordance with the DIP Documents.

7.    Authorization to Use Cash Collateral. Subject to the terms of this Interim Order and the Budget, the Debtor is authorized to use Cash Collateral in which the Prepetition Lender

- 16 -

KL2 2660018.2

may have an interest, but only in accordance with the terms, conditions and limitations set forth

in this Interim Order and/or the DIP Documents.  Any dispute in connection with the use of Cash

Collateral shall be heard by the Court.  Notwithstanding anything in this Interim Order to the

contrary, the Debtor's authority to use Cash Collateral shall not begin until such time as all

conditions precedent to the initial borrowing under the DIP Facility have been satisfied and shall

automatically terminate without any further action by this Court or the DIP Lender, and the

Debtor shall be immediately prohibited from using such Cash Collateral upon the earliest to

occur of (the "Cash Collateral Termination Date"): (a) 30 days after the date of entry of this

Interim Order, unless the Final Order shall have been entered by the Court on or before such date

in accordance with the DIP Loan Agreement, (b) such earlier date on which the DIP Loans shall

become due and payable in accordance with the terms of this Interim Order and/or the DIP

Documents, and (c) the date on which all commitments have been terminated under this Interim

Order and/or the DIP Documents as a result of the occurrence of an Event of Default.

      (a)     Fees.  All fees paid and payable and costs and/or expenses reimbursed or

reimbursable by the Debtor to the DIP Lender are hereby approved.  The Debtor shall promptly

pay all such fees, costs and expenses on demand, without the necessity of any further application

with the Court for approval or payment of such fees, costs or expenses.   Notwithstanding

anything to the contrary herein, the fees, costs and expenses (other than those of professionals

retained by the DIP Lender) of the DIP Lender, whether incurred prior to or after the Filing Date

shall be deemed fully earned, non-refundable, irrevocable and non-avoidable as of the date of

this Interim Order; provided that with respect to fees and expenses of professionals of the DIP

Lender, such professionals shall submit copies of their invoices to the Debtor, the Creditors'

Committee and the United States Trustee and, provided that no objection to such fees or

expenses is raised within 10 days of the provision of such invoice, the Debtor shall promptly pay

such fees and expenses which shall, upon payment, be deemed fully earned, non-refundable,

- 17 -

KL2 2660018.2

43

irrevocable and non-avoidable. All unpaid fees, costs and expenses shall be included and

constitute part of the principal amount of the DIP Obligations and be secured by the Postpetition

Liens. For the avoidance of doubt, and without limiting any of the forgoing or any other

provision of this Interim Order, the fees referenced in section 2.10 of the DIP Loan Agreement

are, upon entry of this Interim Order, and irrespective of any subsequent order approving or

denying the Financing or any other financing pursuant to section 364 of the Bankruptcy Code,

fully entitled to all protections of section 364(e) of the Bankruptcy Code, and deemed fully

earned, indefeasibly paid, non-refundable, irrevocable and non-avoidable as of the date of this

Interim Order.

8.    Authority to Execute and Deliver Necessary Documents.

(a)    All of the Postpetition Liens and Lender Protection Liens described

herein shall be effective and perfected as of the Interim Order Entry Date and without the

necessity of the execution of mortgages, security agreements, pledge agreements,

financing statements or other agreements.

(b)    The Debtor is hereby further authorized to perform all of its obligations

under the DIP Documents and such other agreements as may be required by the DIP

Documents to give effect to the terms of the financing provided for therein and in this

Interim Order, and to perform all acts required under the DIP Documents and this Interim

Order.

(c)    The Debtor shall execute all documents and take all actions required to

effectuate the DIP Documents.

(d)    All obligations under the DIP Documents shall constitute valid and

binding obligations of each of the Obligors enforceable against each of them, and each of

their successors and assigns, in accordance with their terms and the terms of this Interim

Order. No obligation, payment, transfer or grant of a security under the DIP Documents

- 18 -

KL2 2660018.2

44

or this Interim Order shall be stayed, restrained, voidable or recoverable under the

Bankruptcy Code or under any applicable law or subject to avoidance, reduction, setoff,

recoupment, offset, recharacterization, subordination (whether equitable, contractual or

otherwise), counterclaims, cross-claims, defenses, disallowance, impairment or any other

challenges under the Bankruptcy Code or any other applicable law or regulation by any

person or entity.

9.    Amendments, Consents, Waivers and Modifications.  The Debtor, with the

express written consent of the DIP Lender, may enter into any amendments, consents, waivers or

modifications to the DIP Documents that are not materially adverse to the Debtor without the

need for further notice and hearing or any order of this Court, provided that such amendments,

consents, waivers or modifications do not (i) shorten maturity, (ii) increase commitments or the

rate of interest payable under the DIP Documents, (iii) require the payment of any new or

additional fee, or (iv) change any Event of Default, add any covenants or amend the covenants in

the DIP Documents, in each case as applicable to the Obligors, in any such case to be materially

more restrictive; provided, however, that a copy of any such amendment, consent, waiver or

other modification shall be filed with the Court and served by the Debtor on the U.S. Trustee and

the Creditors' Committee.  No consent shall be implied by any other action, inaction or

acquiescence of the DIP Lender.

10.    Protections for Prepetition Lender.  Subject to subsequent Court order on

entitlement to adequate protection and the application of the components of adequate protection

that has been provided, the Prepetition Lender is hereby granted the following protections

(collectively, the "Prepetition Lender Protection"), pursuant to sections 361, 507, 363(e) and

364(d)(1) of the Bankruptcy Code or otherwise, with respect to its prepetition security interests

in the Prepetition Collateral for the consent of such Prepetition Lender to (i) the priming

effectuated by the DIP Facility, (ii) the use of their Prepetition Collateral (including Cash

- 19 -

KL2 2660018.2

Collateral), and (iii) the transactions contemplated by the DIP Facility, and as adequate

protection for the diminution in the value (each such diminution, a "Diminution in Value") of the

Existing Liens, whether or not such Diminution in Value results from the sale, lease or use by the

Debtor of the Prepetition Collateral (including, without limitation, Cash Collateral), the priming

of the Existing Liens or the stay of enforcement of any prepetition security interest arising from

section 362 of the Bankruptcy Code or otherwise ((a) through (c) below shall be referred to

collectively as the "Lender Protection Obligations"):

> (a)    Lender Protection Liens.  The Prepetition Lender shall be granted, for the
>
> reasons set forth above in this paragraph 10, effective and perfected as of the date of this
>
> Interim Order and without the necessity of the execution of mortgages, security
>
> agreements, pledge agreements, financing statements or other agreements, valid,
>
> perfected, postpetition security interests in and liens on all of the Collateral of the Debtor
>
> and its estate, including without limitation the Avoidance Actions and the proceeds
>
> thereof (together, the "Lender Protection Liens"), subject and subordinate only to (x) the
>
> Permitted Encumbrances and (y) the Postpetition Liens securing the DIP Facility.  The
>
> Lender Protection Liens shall not at any time be (i) made subject or subordinated to, or
>
> pari passu with, any other lien, security interest or claim existing as of the Filing Date or
>
> created under section 363 or 364(d) of the Bankruptcy Code or otherwise, or (ii) subject
>
> to paragraph 21 hereof, subject to any lien or security interest that is avoided and
>
> preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy
>
> Code.

> (b)    Superpriority Administrative Expense Claim.  The Prepetition Lender
>
> shall be granted, for the reasons set forth above in this paragraph 10, a superpriority
>
> administrative expense claim immediately junior to the Superpriority Claim held by the
>
> DIP Lender, provided that no entity shall receive or retain any payments, property or

- 20 -

other amounts in respect of superpriority claims relating to such Prepetition Primed

Obligations unless and until the obligations under the DIP Facility have indefeasibly been

paid in cash in full.  For the avoidance of doubt, the superpriority claim set forth in this

paragraph 10(b) may be satisfied from the proceeds of the Avoidance Actions if the DIP

Obligations have been satisfied in full, provided however, that no person or entity (other

than the DIP Lender) shall receive the proceeds of Avoidance Actions until such time as

all Lender Protection Obligations have been satisfied in full.  For the avoidance of doubt,

nothing in this subparagraph shall abrogate, limit or otherwise diminish, alter, modify or

otherwise impact or affect any other term or condition of this Final DIP Order or any

right of the DIP Lender or the Prepetition Lender (or any finding with respect thereto)

pursuant to this Final Order (including, without limitation, paragraphs F, G, H, I, J, K, L,

M, 2, 3, 5, 6, 8, 11,16 or 32 hereof), the Bankruptcy Code (including, without limitation

section 364(e) of the Bankruptcy Code) or applicable law.

      (c)     As further compensation for the consensual use of the Prepetition

Collateral (including Cash Collateral) by the Debtor for the reasons set forth above in this

paragraph 10, and in accordance with sections 361, 363(e) and 364(d) of the Bankruptcy

Code, the Prepetition Lender or the respective professional identified below shall receive

from the Debtor or the Debtor shall comply with the following covenants (as applicable):

        i.     <u>Interest Payments.</u>  The Prepetition Lender shall receive from the
Debtor (i) upon the entry of the Interim Order, immediate cash
payment of all accrued and unpaid interest and fees at the non-
default rates provided for in the Prepetition Loan Documents and
all other accrued and unpaid fees and disbursements owing to the
Prepetition Lender under the Prepetition Loan Documents and
incurred prior to the Filing Date, and (ii) on the first business day
of each month beginning on August 2, 2010, all accrued but unpaid
interest and fees under the Prepetition Loan Documents for the
preceding calendar month with respect to the Prepetition
Indebtedness that has not been refinanced with the proceeds of the
DIP Facility at the non-default contract rate applicable on the
Filing Date under the Prepetition Loan Documents; provided that

the Prepetition Lender reserves the right to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Prepetition Loan Documents, and for the payment of any other amounts provided for in the Prepetition Loan Documents;

ii.      Fees and Expenses.  Current cash payments payable under the Prepetition Loan Agreement shall be made to the Prepetition Lender under the Prepetition Loan Agreement for of all reasonable fees and expenses payable to any agent under the Prepetition Loan Agreement, including, but not limited to, the fees and disbursements of professionals, including, without limitation Kramer Levin Naftalis & Frankel LLP and each local counsel of the Prepetition Lender, in each case in connection with the Prepetition Lender under the Prepetition Loan Documents, and in each case promptly upon receipt of invoices; provided that with respect to fees and expenses of professionals, such professionals shall submit copies of their invoices to the Debtor, the Creditors' Committee and the United States Trustee and, provided that no objection is raised to such fees or expenses within 10 days of the provision of such invoice, the Debtor shall promptly pay such fees and expenses which shall, upon payment be deemed fully earned, non-refundable, irrevocable and non-avoidable;

iii.     Plan Timeline.  The Debtor shall file with the Court on or before August 12, 2010, a plan of reorganization and related disclosure statement that are acceptable in all respects to the Lender; such disclosure statement shall be approved by this Court not later than the date that is 36 days after such plan of reorganization and disclosure statement are so filed; an order of this Court confirming such plan of reorganization shall be entered not later than the date that is 36 days after the disclosure statement is so approved; and such plan of reorganization shall be substantially consummated pursuant to such confirmation order not later than the date that is 10 days after such confirmation order is so entered.

iv.      Chief Restructuring Officer.  The Debtor shall file a motion on or before July 29, 2010, seeking authority to retain a chief restructuring officer or similar individual, the identity and terms of which are acceptable to the Prepetition Lender in all respects, and an order authorizing such retention shall be entered not later than August 27.

v.       Financial Reporting.  The Debtor shall continue to provide the Prepetition Lender with financial and other reporting substantially in compliance with the Prepetition Loan Agreement and any reporting described herein or in the DIP Documents.

- 22 -

(d)    <u>Reservation of Rights</u>.  Notwithstanding any other provision hereof to the contrary, the grant of Lender Protection Obligations to the Prepetition Lender pursuant hereto is without prejudice to the right of the Prepetition Lender to seek different or additional adequate protection.  Except as expressly provided herein, nothing contained in this Interim Order (including without limitation, the authorization to use any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Prepetition Lender.  The consent of the Prepetition Lender to the priming of the Existing Liens by the DIP Liens (a) is limited solely to the DIP Financing and does not extend to any other postpetition financing the Debtor may subsequently propose to enter into and (b) does not constitute, and shall not be construed as constituting, an acknowledgement or stipulation by the Prepetition Lender that, absent such consent, its interests in the Prepetition Collateral would be adequately protected pursuant to this Interim Order.  Nothing in this Interim Order shall constitute an admission that the Prepetition Lender is not entitled to payment under section 506(b) of the Bankruptcy Code.

11.    <u>Perfection of Postpetition Liens and Lender Protection Liens</u>.

(a)    The DIP Lender and the Prepetition Lender are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, in each case without the necessity to pay any mortgage recording fee or similar fee or tax. Whether or not the DIP Lender or the Prepetition Lender shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and

- 23 -

security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Interim Order. The Debtor shall, if requested, execute and deliver to the DIP Lender and the Prepetition Lender all such agreements, mortgages, financing statements, instruments and other documents as the DIP Lender and the Prepetition Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the Postpetition Liens and the Lender Protection Liens. All such documents will be deemed to have been recorded and filed as of the Filing Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording.

12.    Application of Proceeds. The Debtor is hereby directed to remit (as and when required by the DIP Documents and this Interim Order) to the DIP Lender one-hundred percent (100%) of all collections on, and proceeds of, the Collateral (including without limitation the Prepetition Collateral), including, but not limited to, all accounts receivable collections, proceeds of sales of inventory, fixed assets and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Filing Date come into the possession or control of the Debtor or to which the Debtor shall become entitled at any time, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Lender to retain and apply all collections, remittances and proceeds of the Collateral in accordance with the DIP Documents, without further order of this Court.

- 24 -

13.    Access to Collateral. Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Lender contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, upon one (1) business day's written notice to the landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Documents or a default by the Debtor of any of its obligations under this Interim Order has occurred and is continuing, the DIP Lender (i) may, subject only to any separate agreement by and between the applicable landlord or licensor and the DIP Lender (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtor for the purpose of exercising any remedy with respect to Collateral located thereon, and (ii) subject to applicable law, shall be entitled to all of the Debtor's rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of the Debtor, which are owned by or subject to a lien of any third party and which are used by the Debtor in its business, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder, provided, however, that the DIP Lender shall pay only rent and additional rent, fees, royalties or other obligations of the Debtor that first arise after the DIP Lender's written notice referenced above and that are payable during the period of such occupancy or use by the DIP Lender, as the case may be, calculated on a *per diem* basis. To the extent applicable law prohibits the forgoing access or use of rights, the DIP Lender shall have the right to an expedited hearing on one (1) business day's notice to obtain Court authorization to obtain such access and/or use such rights. Nothing herein shall require the Debtor or the DIP Lender to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Lender in this paragraph.

- 25 -

KL2 2660018.2

14.   <u>Cash Management Systems</u>. The Debtor is authorized to maintain its cash management system in a manner consistent with the DIP Documents and the order of this Court approving the maintenance of the Debtor's cash management system, <u>provided</u>, <u>however</u>, that such order is on terms and conditions (i) acceptable to the DIP Lender, and (ii) to the extent that it is not inconsistent with the terms specified herein, consistent with the DIP Documents.

15.   <u>Automatic Stay Modified</u>. The automatic stay provisions of section 362 of the Bankruptcy Code hereby are, to the extent applicable, vacated and modified to the extent necessary without the need for any further order of this Court:

(a)   whether or not a default, Default, an Event of Default under the DIP Documents, or a default by the Debtor of any of its obligations under this Interim Order has occurred, to require all cash, checks or other collections or proceeds from Collateral received by the Debtor to be deposited in accordance with the requirements of the DIP Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lender, under the DIP Documents in accordance with any requirements of the DIP Documents without further order of this Court; and

(b)   following a default, Default or an Event of Default under the DIP Documents or a default by the Debtor of any of its obligations under this Interim Order, the DIP Lender is authorized to exercise any and all of their rights and remedies in accordance with the terms of the DIP Documents, and to take all actions required or permitted by the DIP Documents without necessity of further Court orders; provided that the DIP Lender shall give three business days notice to the Debtor, the U.S. Trustee and the Creditors' Committee of such action if such action is being taken against any Collateral; provided further however, that this Interim Order shall not prejudice the rights of any party-in-interest to oppose the exercise of the DIP Lender's remedies; and provided further, that the only issue that may be raised by any entity in opposition thereto

- 26 -

KL2 2660018.2

shall be whether a default, Default or Event of Default has in fact occurred and is

continuing, and all entities hereby waive their right to seek any relief, whether under

section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or

restrict or delay the exercise or benefit of, the rights and remedies of the DIP Lender

under the DIP Documents or this Interim Order.

16.     Subsequent Reversal or Modification.  This Interim Order is entered pursuant to,

inter alia, section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting

the DIP Lender all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all

of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that

action will not affect (i) the validity of any obligation, indebtedness or liability incurred

hereunder by the Borrower to the DIP Lender and the Prepetition Lender prior to the date of

receipt by the DIP Lender of written notice of the effective date of such action or (ii) the validity

and enforceability of any lien, claim or priority authorized or created under this Interim Order or

pursuant to the DIP Documents.  Notwithstanding any such reversal, stay, modification or

vacatur, any postpetition indebtedness, obligation or liability incurred by the Borrower to the

DIP Lender or the Prepetition Lender prior to written notice to the DIP Lender of the effective

date of such action, shall be governed in all respects by the original provisions of this Interim

Order, and the DIP Lender and the Prepetition Lender shall be entitled to all the rights, remedies,

privileges and benefits granted herein and in the DIP Documents with respect to all such

indebtedness, obligations or liability.

17.     Restriction on Use of Lenders' Funds.  Notwithstanding anything herein to the

contrary, no Collateral, proceeds thereof, Cash Collateral, Prepetition Collateral, proceeds

thereof, proceeds of the Financing may be used by the Debtor, its estate, the Creditors'

Committee, any trustee or examiner appointed in this Chapter 11 Case or any chapter 7 trustee,

or any other person, party or entity, in any jurisdiction, directly or indirectly (a) to request

- 27 -

KL2 2660018.2

authorization to obtain postpetition financing (whether equity or debt) or other financial

accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other

than (i) from the DIP Lender or (ii) if such financing is sufficient to indefeasibly pay all DIP

Obligations in full in cash and such financing is immediately so used; (b) to assert, join,

commence, support, investigate or prosecute any action for any claim, counter-claim, action,

cause of action, proceeding, application, motion, objection, defense or other contested matter

seeking any order, judgment, determination or similar relief against, or adverse to the interests

of, in any capacity, the Releasees, with respect to any transaction, occurrence, omission or

action, including, without limitation, (i) any action arising under the Bankruptcy Code; (ii) any

so-called "lender liability" claims and causes of action; (iii) any action with respect to the

validity and extent of the DIP Obligations, the Superpriority Claims, the Lender Protection

Obligations or the Prepetition Indebtedness, or the validity, extent, perfection and priority of the

Postpetition Liens, the Existing Liens or the Lender Protection Liens; (iv) any action seeking to

invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable,

contractual or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims or

counter claims or raise any other challenges under the Bankruptcy Code or any other applicable

law or regulation against or with respect to the Postpetition Liens, the Superpriority Claims,  the

Lender Protection Obligations, the Prepetition Liens or the Lender Protection Liens in whole or

in part; (v) appeal or otherwise challenge this Interim Order, the Final Order, the DIP Documents

or any of the transactions contemplated herein or therein; and/or (vi) any action that has the

effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Lender or the

Prepetition Lender in respect of their liens and security interests in the Collateral or the

Prepetition Collateral or any of their rights, powers or benefits hereunder or in the Prepetition

Loan Documents or the DIP Documents; and/or (c) to pay any claim of a prepetition creditor

except in accordance with the DIP Documents and the Budget.  Any claim incurred in

KL2 2660018.2

connection with any activities described in subparagraph (b) of this paragraph 17 shall not constitute an allowed administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

18.     <u>No Liens</u>.  No lien or security interest shall be granted by the Debtor with respect to any Collateral, including without limitation the Avoidance Actions and proceeds thereof, without the prior written consent of the DIP Lender and further order of this Court.

19.     <u>Claims Stipulation Investigation Period Reservation of Rights</u>.  Except as expressly set forth below in the immediately following sentence, the stipulations set forth in paragraph E of this Interim Order (together the "<u>Claims Stipulation</u>") and all of the terms and conditions hereof shall be immediately and irrevocably binding on all persons and entities. Notwithstanding anything herein or in the DIP Documents to the contrary, until the day that is 45 days from the Filing Date (as such date may be extended by the DIP Lender or by the Court for cause shown, the "<u>Investigation Termination Date</u>"), the Creditors' Committee and any other party in interest with proper standing shall be entitled to investigate the accuracy of the Claims Stipulation (but solely with respect to the Debtor and its estate) against the Prepetition Lender;[3] <u>provided</u>, <u>however</u>, that nothing contained in this paragraph shall alter the restrictions contained in paragraph 17 hereof.  Any assertion of claims or causes of action of the Debtor or its estate against the Prepetition Lender must be made by (i) commencing an adversary proceeding or (ii) filing motion to obtain standing to pursue such an action (which motion attaches the complaint or pleading that would initiate such action) on or before the Investigation Termination Date, and each Claim Stipulation shall remain binding and in full force and effect until a final order has been entered invalidating such Claim Stipulation, and following the entry of such a final order, such Claim Stipulation shall be invalidated only to the extent provided for in such final order.  If

---

[3]     Nothing herein shall be interpreted as conferring on any person or entity standing to pursue any claim, cause of action or take any action on behalf of the Debtor or its estate.

no such action or motion is filed on or before the Investigation Termination Date, all persons and

entities shall be forever barred from bringing or taking such action and the Claims Stipulations

shall be permanently and irrevocably binding upon all persons and entities. Any Claim

Stipulation that is not expressly challenged in an adversary proceeding (or with respect to which

authority to obtain standing has not been requested as set forth above) or contested matter, as

appropriate, before the Investigation Termination Date shall remain in full force and effect and

shall permanently and irrevocably bind all entities and persons, despite the filing of any other

adversary proceeding or motion in accordance with this paragraph.

     20.   <u>Collateral Rights</u>. In the event that any person or entity that holds a lien or

security interest in Collateral of the Debtor or its estate or Prepetition Collateral, which lien or

security interest is junior and/or subordinate to the Postpetition Liens in such Collateral of the

Debtor or its estate or Prepetition Collateral, receives or is paid the proceeds of such Collateral of

the Debtor or its estate or Prepetition Collateral, or receives any other payment or distribution

with respect thereto from any other source, prior to indefeasible payment in full in cash and the

complete satisfaction of all DIP Obligations under the DIP Documents and the Prepetition

Indebtedness under the Prepetition Loan Documents, and termination of the commitments in

accordance with the DIP Documents and the Prepetition Loan Documents, such junior or

subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such

Collateral of the Debtor or its estate  in trust for the DIP Lender, and shall immediately turnover

such proceeds to the DIP Lender for application in accordance with the DIP Documents and this

Interim Order.

     21.   <u>Prohibition on Additional Liens</u>. Except as provided in the DIP Documents

and/or this Interim Order, the Debtor shall be enjoined and prohibited from, at any time during

this Chapter 11 Case until such time as the DIP Obligations have been indefeasibly paid in full,

granting liens on the Collateral or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, pari passu with or junior to the liens granted to the DIP Lender, the Lender Protection Liens or the Existing Liens, except in accordance with the DIP Documents, the Prepetition Loan Documents and this Interim Order.

22.    No Waiver. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender or the Prepetition Lender may have to bring or be heard on any matter brought before this Court.

23.    Sale/Conversion/Dismissal/Plan.

(a)    No order providing for either the sale of the ownership of the stock of the Debtor or the sale of all or substantially all of the assets of the Debtor under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, the proceeds of such sale shall be used to satisfy, in cash, the DIP Obligations in accordance with the DIP Documents; and (ii) such sale is expressly permitted under the DIP Documents.

(b)    No motion shall be filed by the Debtor seeking dismissal or conversion of this Chapter 11 Case under section 305 or 1112 of the Bankruptcy Code, or seeking appointment of a chapter 11 trustee or an examiner with expanded powers, unless and until (x) the DIP Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Documents are terminated in accordance therewith, or (y) the DIP Lender expressly consents in writing. If an order dismissing or converting this Chapter 11 Case under section 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered, and unless otherwise agreed to by the DIP Lender, such order shall provide that (i) the Postpetition Liens, Superpriority Claim and the Lender Protection Obligations granted hereunder and in the DIP Documents shall continue in full force and effect,

- 31 -

remain binding on all parties-in-interest, and maintain their priorities as provided in this

Interim Order until all DIP Obligations and Prepetition Indebtedness are indefeasibly

paid in full in cash and completely satisfied and the commitments under the DIP

Documents and the Prepetition Loan Documents are terminated in accordance with the

DIP Documents and the Prepetition Loan Documents, (ii) this Court shall retain

jurisdiction, notwithstanding such dismissal, for purposes of enforcing the Postpetition

Liens, the Lender Protection Liens, the Superpriority Claim and the Lender Protection

Obligations, and (iii) all postpetition indebtedness, obligation or liability incurred by the

Debtor to the DIP Lender and the Prepetition Lender prior to the date of such order,

including without limitation, the DIP Obligations, shall be governed in all respects by the

original provisions of this Interim Order, and the Lender and the Prepetition Lender shall

be entitled to all the rights, remedies, privileges and benefits granted herein and in the

DIP Documents with respect to all such indebtedness, obligations or liability.

24.     Priority of Terms.  To the extent of any conflict between or among (a) the express

terms or provisions of any of the DIP Documents, the Motion, any other order of this Court or

any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on

the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as

more fully described in" the DIP Documents, the terms and provisions of this Interim Order shall

govern.

25.     No Third Party Beneficiary.  Except as explicitly set forth herein, no rights are

created hereunder for the benefit of any third party, any creditor or any direct, indirect or

incidental beneficiary.

26.     Rights Under Section 363(k).  The full amount of the DIP Obligations may be

used to "credit bid" for the assets and property of the Debtor as provided for in section 363(k) of

- 32 -

KL2 2660018.2

the Bankruptcy Code, in accordance with the terms of the DIP Loan Agreement without the need for further Court order authorizing the same.

27.    Headings. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

28.    Final Hearing Date. The Final Hearing to consider the entry of the Final Order approving the relief sought in the Motion shall be held on August __, 2010, at __:__ _.m. before the Honorable Geraldine Mund, at the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division.

29.    No Consent. No action, inaction or acquiescence by the DIP Lender or the Prepetition Lender, including funding the Debtor's ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lender or the Prepetition Lender to a charge against the Collateral pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code. In no event shall either the DIP Lender or the Prepetition Lender be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

30.    Waiver. Effective upon entry of this Interim Order, no person or entity shall be entitled, directly or indirectly (a) except as expressly provided by paragraph 4 of this Interim Order, to charge or recover from the Collateral, whether by operation of section 105, 506(c) or 552(b) of the Bankruptcy Code or otherwise, with respect to the DIP Obligations, the Prepetition Primed Obligations, the Existing Liens on the Prepetition Collateral, or the liens or claims granted in paragraphs 5, 6 and 10 of this Interim Order, or (b) to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of Collateral or Property after an Event of Default under the DIP Documents, or termination or breach under the DIP Documents or this Interim Order. For the avoidance of doubt no party shall be entitled to charge or recover against the Collateral or otherwise receive a

- 33 -

distribution pursuant to sections 105, 506(c) or 552(b) of the Bankruptcy Code until such time as all DIP Obligations have been satisfied in full.

31.    <u>Adequate Notice</u>. The notice given by the Debtor of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the Local Bankruptcy Rules, and was adequate and sufficient. Under the circumstances, no further notice of the request for the relief granted at the Interim Hearing is required. The Debtor shall promptly mail copies of this Interim Order and notice of the Final Hearing to the Notice Parties, any known entity effected by the terms of the Final Order, and any other entity requesting notice after the entry of this Interim Order. Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be <u>actually received</u> no later than seven (7) days prior to the Final Hearing by the following: (i) counsel to the Debtor, Ezra Brutzkus Gubner LLP, 21650 Oxnard Street , Suite 500, Woodland Hills, CA 91367, Attn: Robyn B. Sokol; (ii) counsel to the DIP Lender, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Robert T. Schmidt, and Landau Gottfried & Berger LLP, 1801 Century Park East, Suite 1460, Los Angeles, California 90067, Attn: Michael I. Gottfried; (iii) counsel to the United States Trustee, the Office of the United States Trustee, 21051 Warner Center Lane, Suite 115, Woodland Hills, CA 91367; and (iv) any counsel to the Creditors' Committee.

32.    <u>Binding Effect; Successors and Assigns</u>. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties-in-interest in this Chapter 11 Case, including, without limitation, the Borrower, the DIP Lender, the Lender Protection Parties, any Committee or examiner appointed in this Chapter 11 Case, and the Debtor, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor), whether in this Chapter 11 Case, in any Successor Case or upon any dismissal of

- 34 -

any such chapter 11 or chapter 7 case, and shall inure to the benefit of the DIP Lender, the Lender Protection Parties and the Debtor and their respective successors and assigns, *provided*, *however*, that the consent of the DIP Lender and the Prepetition Lender to permit the use of Cash Collateral and the agreement of the DIP Lender to extend financing shall terminate upon the appointment of any chapter 7 or 11 trustee, examiner with expanded powers, or similar responsible person appointed for the Debtor's estate.  In determining to make any loan (whether under the DIP Loan Agreement, a promissory note or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Lender, the Prepetition Lender and the Lender Protection Parties shall not (i) subject to the entry of the Final Order, be deemed to be in control of the operations of the Borrower, or (ii) owe any fiduciary duty to the Borrower or its creditors, shareholders or estate.  Except as expressly provided in paragraph 19 of this Interim Order, each stipulation, admission and agreement contained in this Interim Order shall also be binding upon all other parties in interest, including without limitation the Creditors' Committee, under all circumstances and for all purposes.

33.    Retention of Jurisdiction.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

KL2 2660018.2