1  STEVEN T. GUBNER - Bar No. 156593
   RICHARD D. BURSTEIN - Bar No. 56661
2  ROBYN SOKOL - Bar No. 159506
   TALIN KESHISHIAN - Bar No. 201830
3  EZRA BRUTZKUS GUBNER LLP
   21650 Oxnard Street, Suite 500
4  Woodland Hills, CA  91367
   Telephone:  818.827.9000
5  Facsimile:  818.827.9099
   Email:    sgubner@ebg-law.com
6            rburstein@ebg-law.com
             rsokol@ebg-law.com
7            tkeshishian@ebg-law.com

8  Attorneys for Debtor, Pacifica Mesa Studios, LLC

9            **UNITED STATES BANKRUPTCY COURT**

10           **CENTRAL DISTRICT OF CALIFORNIA**

11           **SAN FERNANDO VALLEY DIVISION**

12
   In re                                    Case No. 1:10-bk-18827-GM
13
   PACIFICA MESA STUDIOS, LLC, dba          Chapter 11
14 Albuquerque Studios dba ABQ Studios,
                                            **EXHIBIT A AND B IN SUPPORT OF**
15      Debtor and Debtor-in-Possession     **FINAL ORDER (I) AUTHORIZING**
                                            **DEBTOR (A) TO OBTAIN**
16                                          **POSTPETITION FINANCING**
                                            **PURSUANT TO 11 U.S.C. §§ 105, 361, 362,**
17                                          **AND 364, (B) TO USE CASH**
                                            **COLLATERAL PURSUANT TO 11 U.S.C.**
18                                          **§ 363, AND (II) GRANTING CERTAIN**
                                            **PROTECTIONS TO PREPETITION**
19                                          **LENDER PURSUANT TO 11 U.S.C. §§ 361,**
                                            **362, 363, AND 364**
20
21
22                                          **Date:**  August 13, 2010
                                            **Time:**  9:00a.m.
23                                          **Place:**  Courtroom 303
                                                    United States Bankruptcy Court
24                                                    21041 Burbank Boulevard
                                                    Woodland Hills, CA 91367
25
26
27
28

**EXECUTION COPY**

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of July 21, 2010, among PACIFICA MESA STUDIOS, LLC and LV HOLDINGS, LLC, as successor in interest to Amalgamated Bank of New York, as Trustee of the Longview Ultra Construction Loan Investment Fund.

WHEREAS, the Borrower (as defined below) has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, and the Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Case (as defined below), Pre-Petition Lender (as defined below) made loans and advances and provided other financial or credit accommodations to the Borrower secured by substantially all assets and properties of the Borrower as set forth in the Existing Credit Agreement (as defined below) and the Existing Guaranty (as defined below);

WHEREAS, the Bankruptcy Court (as defined below) has entered a Financing Order (defined below) pursuant to which the Lender (as defined below) may make post-petition loans and advances, and provide other financial accommodations, to the Borrower secured by substantially all the assets and properties of Borrower as set forth in the Financing Order and the Credit Documents (as defined below);

WHEREAS, the Financing Order provides that as a condition to the making of such postpetition loans, advances and other financial accommodations, the Borrower shall execute and deliver this Agreement;

WHEREAS, the Borrower desires to reaffirm its obligations to Pre-Petition Lender pursuant to the Existing Credit Agreement and acknowledge its continuing liabilities to Pre-Petition Lender thereunder; and

WHEREAS, the Borrower has requested that the Lender make post-petition loans and advances and provide other financial or credit accommodations to the Borrower, and the Lender is willing to do so, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lender and the Borrower mutually covenant, warrant and agree as follows:

## ARTICLE I: DEFINITIONS

Section 1.1. Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Agreement" means this Credit Agreement.

"Bankruptcy Code" means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

1

EXHIBIT    A

"Bankruptcy Court" means the United States Bankruptcy Court or the United States District Court for the Central District of California, San Fernando Valley Division.

"Budget" means the initial budget delivered to the Lender in accordance with Sections 4.1(c) and 5.11 hereof, setting forth the Projected Information for the periods covered thereby, a copy of which is annexed hereto as Schedule 4.1(c), together with any subsequent or amended budget(s) thereto delivered to the Lender, in form and substance satisfactory to the Lender, in accordance with the terms and conditions hereof.

"Borrower" means Pacifica Mesa Studios, LLC, a limited liability company organized under the laws of the State of California.

"Breakfunding Costs" has the meaning set forth in Section 2.4(d).

"Business Day" means a day other than a Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required by law to close.

"Chapter 11 Case" means the Chapter 11 case of the Borrower which is being administered under the Bankruptcy Code and is pending in the Bankruptcy Court.

"Closing Date" means the date on which the conditions specified in Section 4.1 are satisfied, which date is August 5, 2010.

"Collateral" has the meaning set forth in Section 2.7.

"Commitment" means $3,000,000, as such amount may be reduced from time to time pursuant to the terms of this Agreement.

"Credit Documents" means this Agreement, the Notes, the Security Agreement, the Mortgage and any other documents hereafter delivered to the Lender by the Borrower evidencing, guarantying or securing the Loans or the Collateral.

"CRO" has the meaning set forth in Section 5.12(a).

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Dollars" or "$" means the lawful money of the United States of America.

"Event of Default" has the meaning set forth in Article VI.

"Existing Credit Agreement" means, collectively, the Construction Loan Agreement, dated as of June 26, 2006, by and among the Borrower and the Pre-Petition Lender, and the Note, dated as of June 26, 2006, by the Borrower to the order of the Pre-Petition Lender, as each is amended, modified or supplemented from time to time and otherwise as in effect immediately prior to the Petition Date.

"Existing Guaranty" means the Guaranty, dated as of June 26, 2006, by Guarantors in favor of Pre-Petition Lender, as amended, modified or supplemented from time to time and otherwise as in effect immediately prior to the Petition Date.

2

"Existing Mortgage" means the Mortgage, Security Agreement, Financing Statement and Assignment of Rents, dated as June 26, 2006, between the Borrower and the Pre-Petition Lender , as amended, modified or supplemented from time to time and otherwise as in effect immediately prior to the Petition Date.

"Final Borrowing Date" means the date of the borrowing of Loans under Section 2.1 on the date of the Permanent Financing Order.

"Financial Statements" means consolidated and consolidating balance sheets, statements of income, retained earnings and cash flows of the Borrower prepared in accordance with generally accepted accounting principles consistently applied, in reasonable detail.

"Financing Order" means the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by the Lender to the Borrower on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantor" means Harold A. Katersky, Dana Arnold and any other guarantors under the Existing Guaranty.

"Guaranty Reaffirmation" means the reaffirmation of the Existing Guaranty, in form and substance satisfactory to the Lender.

"Indemnitee" has the meaning set forth in Section 7.3(b).

"Initial Borrowing Date" means the date of the borrowing of Loans under Sections 2.1(a) and (b) on or after the date of the Interim Financing Order.

"Interim Financing Order" means the interim order, in form and substance acceptable to the Lender in its sole discretion, (a) authorizing Borrower (i) to obtain post-petition financing pursuant to 11 U.S.C. Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3)(1) and 364(e) and (ii) to utilize cash collateral pursuant to 11 U.S.C. Section 363, (b) granting adequate protection to prepetition secured parties pursuant to 11 U.S.C. Sections 361, 362, 363 and 364 and (c) scheduling a final hearing pursuant to Bankruptcy Rules 4001(b) and (c) entered by the Bankruptcy Court on or about the date hereof).

"Lender" means LV Holdings, LLC, as successor in interest to the Pre-Petition Lender.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loans" means any Loan made pursuant to Section 2.1(a).

"Losses" has the meaning set forth in Section 7.3(b).

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or financial condition of the Borrower or (b) the ability of the Borrower to perform any obligations under any Credit Document.

"Material Budget Deviation" has the meaning set forth in Section 5.11(c).

"Material Indebtedness" means indebtedness of the Borrower either (a) owing to the Lender or its affiliates or (b) in an aggregate principal amount exceeding $50,000.

"Maturity Date" means the earliest to occur of (a) 90 days after the Closing Date; (b) the date of the termination of the Commitment or the acceleration of any outstanding Loans; (c) the date that is 30 days after the entry of the Interim Financing Order if the Permanent Financing Order has not been entered by such date; (d) the first business day on which the Interim Financing Order expires by its terms or is terminated, unless the Permanent Financing Order shall have been entered and become effective prior thereto; and (e) the effective date of a plan of reorganization in the Chapter 11 Case; provided, that, this Agreement and all other Credit Documents must be terminated simultaneously.

"Mortgage" means each mortgage, debenture (together with a debenture delivery agreement), deed of trust or deed to secure debt required to be delivered with respect to all real property owned by the Borrower pursuant to the terms of this Agreement, together with any assignment of leases and rents to be executed in connection therewith (as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof).

"Note" has the meaning set forth in Section 2.5.

"Obligations" means any now existing or hereafter arising obligations of the Borrower to the Lender, whether primary or secondary, direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not, liquidated or unliquidated, arising by operation of law or otherwise (a) under any Credit Document whether for principal, interest, fees, expenses or otherwise, (b) with respect to commercial credit cards, stored value cards, purchasing cards and treasury, depositary or cash management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services) or any similar transaction, and (c) under any documents evidencing any interest rate swap, cap, collar or similar transactions relating to any loans under the Credit Documents, in each case, together with all costs of collection or enforcement, including, without limitation, reasonable attorneys' fees incurred in any collection efforts or in any action or proceeding.

"PBGC" has the meaning set forth in Section 3.7.

"Permanent Financing Order" has the meaning set forth in Section 2.12.

"Person" means any natural person, corporation, limited liability company, limited partnership, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" means the date of the commencement of the Chapter 11 Case.

4

"Pre-Petition Indebtedness" means the obligations under the Existing Credit Agreement outstanding on the Petition Date prior to the effectiveness of this Agreement.

"Pre-Petition Lender" means Amalgamated Bank of New York, as Trustee of the Longview Ultra Construction Loan Investment Fund.

"Pre-Petition Loan Documents" means the Existing Credit Agreement and the Junior Loan Construction Agreement, dated as of June 26, 2006, between the Borrower and Workers Realty Trust II, L.P., as lender.

"Pre-Petition Released Claim" has the meaning set forth in Section 7.13.

"Projected Information" has the meaning set forth in Section 4.1(c).

"Releasee" has the meaning set forth in Section 7.13.

"Security Agreement" means (a) the Pledge and Security Agreement dated as of the date hereof executed by the Borrower in favor of the Lender, and (b) any pledge and security agreement entered into from time to time by the Borrower in favor of the Lender in connection with the Loans.

"Tax Returns" means the federal and state tax returns of Borrower.

"Transactions" means the execution, delivery, and performance by the Borrower of the Credit Documents, the borrowing and repayment of the Loans, the pledge, assignments or grant of the security interests in the Collateral pursuant to the Credit Documents, the payment of interest and fees thereunder and the use of the proceeds of the Loans.

Section 1.2. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, and Schedules shall be construed to refer to Articles and Sections of, and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and general intangibles.

Section 1.3. Specified Times and Dates; Determinations. All times specified in this Agreement shall be determined, unless stated specifically herein to the contrary, on the basis of the prevailing time in New York City. Unless stated specifically herein to the contrary, if any day or date specified in this Agreement for any notice, action or event is not a Business Day, then the due date for such notice, action or event shall be extended to the immediately succeeding Business Day; provided that interest shall accrue on any payments due by Borrower which are extended by the operation of this Section 1.3. Any determination by the Lender hereunder shall, in the absence of manifest error, be

5

conclusive and binding. Unless stated specifically herein to the contrary, any determination by the Lender may be made in the Lender's sole discretion.

Section 1.4. <u>Accounting Terms</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, generally accepted accounting principles, applied in a manner consistent with that used in preparing the Financial Statements of the Borrower referred to in Section 3.4 delivered to the Lender prior to the Closing Date.

## ARTICLE II: <u>**THE LOANS**</u>

Section 2.1. <u>Loans</u>.

(a) <u>Loans</u>. Subject to the terms and conditions and relying upon the representations and warranties herein set forth, the Lender hereby agrees to make loans to the Borrower in (i) a single drawing on the Initial Borrowing Date in an aggregate principal amount equal to the lesser of $8,100,000 and such other amount as may be approved in the Interim Financing Order, and (ii) one or more drawings on and after the Final Borrowing Date not to exceed amounts set forth for each week in the Budget and only for the purposes set forth in the Budget (it being understood that any amounts not borrowed in any week may not be added to any amounts budgeted for any subsequent week and any amounts not borrowed for any item in the Budget shall not be borrowed for any other item in the Budget). The outstanding Loans shall be in an aggregate principal amount not exceeding the amount of the Commitment on such date (as adjusted in accordance with the definition thereof) minus the aggregate principal amount of Loans previously borrowed, in each case for the purposes described in Section 5.9. Subject to the terms and conditions hereof, the Borrower may borrow, repay in whole or in part, and reborrow on a revolving basis, up to the maximum amount of the Commitment.

(b) <u>Borrowing Procedure</u>. All requests for Loans shall be made by Borrower by delivering a borrowing request to the Lender in writing at least two Business Days (or such shorter period as shall be agreed to by the Lender) before the requested borrowing date for each Loan. Such request shall be irrevocable and shall specify the requested borrowing date (which shall be a Business Day).

Section 2.2. <u>Repayment of Loans</u>. Any principal of any Loan not previously paid shall be payable on the Maturity Date.

Section 2.3. <u>Interest</u>.

(a) <u>Loans</u>. The Loans shall bear interest on the unpaid principal amount thereof from the borrowing date thereof until payment in full thereof. Interest on the Loans shall be payable in arrears on each of (i) the first Business Day of each calendar month for the preceding calendar month; (ii) the date of each prepayment (on the principal amount prepaid) and (iii) the Maturity Date.

(b) <u>Interest Rate</u>. The interest rate for each Loan shall be equal to 12% per annum.

(c) <u>Default Interest; Late Payments</u>. After the occurrence and during the continuation of an Event of Default, to the extent permitted by applicable law, Borrower shall pay on demand, on the principal amount of the outstanding Loans, interest at a rate per annum equal to 5% per annum <u>plus</u> the interest rate applicable to the Loans. All such increases may be applied, at Lender's

discretion, retroactively to the date of the occurrence of the Event of Default. Borrower agrees that the default rate payable to Lender is a reasonable estimate of Lender's damages and is not a penalty. Borrower also promises to pay a late payment charge of five cents ($.05) for each dollar ($1.00) of each payment that is made more than fifteen (15) days after the due date thereof, which charge shall be due and payable with each such late payment.

    (d)   <u>Maximum Interest Rate</u>. Notwithstanding anything in any Credit Document to the contrary, in no event shall the interest charged under any Credit Document exceed the maximum rate of interest permitted under applicable law. Any payment made which if treated as interest would cause the interest charged to exceed the maximum rate permitted shall instead be held by the Lender to the extent of such excess as additional Collateral hereunder and applied to future interest payments as and when such amount becomes due and payable hereunder.

    (e)   <u>Calculations</u>. Interest shall be calculated on the basis of a year of 360 days. In computing interest on the Loans (or interest on such interest), the date of the making of the Loans shall be included and the date of payment of the Loans shall be excluded.

    Section 2.4.  <u>Prepayment of Loans; Reduction of Commitment</u>.

    (a)   <u>Optional</u>. Borrower shall have the right to prepay the Loans at any time and from time to time in whole or in part. Borrower shall have the right to reduce or terminate the Commitment at any time and from time to time.

    (b)   <u>Mandatory</u>. The Borrower shall prepay the Loans on any day on which the aggregate outstanding principal amount of all Loans exceeds the Commitment in an amount equal to such excess.

    (c)   <u>Notices</u>. Any prepayment pursuant to Section 2.4(a) may only be made on at least two Business Days' (or such shorter period as shall be agreed to by the Lender) irrevocable prior written notice to the Lender.

    (d)   <u>Breakfunding Costs</u>. In the event the Borrower prepays all or any portion of the Loans, whether as a result of acceleration or otherwise, the Borrower will pay to the Lender, a break funding charge to cover loss, cost and expense attributable to such an event ("<u>Breakfunding Costs</u>"). Such Breakfunding Costs shall be specified in a certificate delivered by the Lender which sets out in reasonable detail the basis therefor.

    Section 2.5.  <u>Note</u>. The Loans made by the Lender to Borrower shall be evidenced by one or more Notes, duly executed by or on behalf of the Borrower, delivered and payable to the Lender in an aggregate principal amount equal to the amount borrowed (each a "<u>Note</u>"). Additional terms and conditions relating to the Loans are set forth in the Note. Each Note is hereby referenced and incorporated herein as if set forth in their entirety. The Lender shall maintain its records to reflect the amount and date of the Loans and of each payment of principal and interest thereon. All such records shall, absent manifest error, be conclusive as to the outstanding principal amount hereof; <u>provided</u>, <u>however</u>, that the failure to make any notation to the Lender's records shall not limit or otherwise affect the obligations of Borrower to repay the Loans.

    Section 2.6.  <u>Payments</u>. All payments by Borrower shall be payable on the due date thereof, in immediately available funds in Dollars, without any setoff, counterclaim, withholding or deduction of any kind. The Borrower hereby authorizes the Lender to charge any of the Borrower's

accounts for payments of principal, interest and other amounts due hereunder. All payments shall be applied by the Lender as follows: first, to the payment of all accrued but unpaid fees, costs or expenses under the Credit Documents; second, to the payment of all accrued but unpaid interest under the Credit Documents; third, to the repayment of then outstanding principal amount of the Loans; and fourth, the balance, if any, to the Borrower or to whomsoever may be entitled to such amounts as determined by Lender in its reasonable discretion.

        Section 2.7. <u>Collateral</u>. The Obligations of the Borrower under the Credit Documents shall be secured by all personal and real property of the Borrower and such additional assets pledged to, or with respect to which a Lien is granted to, the Lender by the Borrower from time to time after the Closing Date (the "<u>Collateral</u>").

        Section 2.8. <u>Capital Adequacy</u>. If the Lender shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of law, but if not having the force of law, the compliance with which is in accordance with the general practice of the Lender for borrowers similarly situated to Borrower with respect to extensions of credit of the type contemplated by this Agreement) of any such Governmental Authority has or would have the effect of reducing the rate of return on the capital of the Lender (or any Person controlling the Lender (its "<u>Parent</u>")) as a consequence of the Lender's obligations hereunder to a level below that which the Lender (or its Parent) could have achieved but for such adoption, change or compliance (taking into consideration the Lender's policies with respect to capital adequacy) by an amount deemed by the Lender to be material, then from time to time, within 15 days after demand by the Lender, Borrower shall pay to the Lender (or its Parent, as the case may be) such additional amount or amounts as will compensate the Lender (or its Parent, as the case may be) for such reduction. Lender agrees that it will not request payment from the Borrower under this Section 2.8 unless it makes a request for payment from all of Lender's similarly situated customers under provisions of the type described in this Section 2.8.

        Section 2.9. <u>Taxes</u>. (a) Any and all payments made by Borrower hereunder shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges, or withholdings, and all liabilities with respect thereto to the extent attributable to the Loans or the Collateral, excluding (i) taxes imposed on net income and (ii) all income and franchise taxes of the United States of America, any political subdivisions thereof, and any state of the United States of America, and any political subdivisions thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "<u>Taxes</u>"). (b) If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.9) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. (c) The Borrower shall pay and hereby indemnifies the Lender from any documentary stamp Taxes in connection with the execution or delivery of any Credit Document. Within 30 days after the date of any payment of Taxes, Borrower will furnish the Lender with evidence of payment thereof. Borrower hereby indemnifies the Lender for the full amount of Taxes (including, without limitation, any Taxes imposed by any jurisdiction on amounts payable under this Section) paid by the Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

8

Payment pursuant to this indemnification shall be made upon written demand thereof. The obligations of Borrower under this paragraph shall survive the termination of this Agreement.

Section 2.10. <u>Fees</u>. The Borrower agrees to pay to the Lender a closing fee in an amount equal to $75,000 on the Closing Date.

Section 2.11. <u>Bankruptcy Matters</u>.

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and proper notice for (i) the motion seeking approval of the Credit Documents and the Financing Order, (ii) the hearing for the approval of the Interim Financing Order and (iii) the hearing for the approval of the Permanent Financing Order has been given. The Borrower shall give, on a timely basis as specified in the Financing Order, all notices required to be given to all parties specified in the Financing Order.

(b)    After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Permanent Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever.

(c)    After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Permanent Financing Order, the Obligations will be secured by a perfected first priority Lien on all of the Collateral, subject to the terms of the Financing Orders and senior in priority to any other Liens on the Collateral.

(d)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Financing Order or the Permanent Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Credit Documents and (i) so long as it is effective, the Interim Financing Order and (ii) upon its entry, the Permanent Financing Order.

Section 2.12. <u>Permanent Financing Order</u>. Prior to the expiration of the Interim Financing Order, the Borrower shall have obtained a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Agreement, granting to the Lender the senior security interests and liens and super-priority administrative expense claims as specifically provided in the Interim Financing Order and approved by the Lender, and modifying the automatic stay and other provisions required by the Lender and its counsel ("<u>Permanent Financing Order</u>"). The Lender shall not provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order and the time to appeal or to contest such order shall have expired.

Section 2.13. <u>Mortgage</u>. The Borrower hereby (i) reaffirms its obligations under the Existing Mortgage, attached hereto as Exhibit A and (ii) upon request of the Lender, agrees to execute a Mortgage in recordable form in substantially the form of Exhibit A (together with evidence that counterparts of the Mortgages have been delivered to the title insurance company insuring the lien of such

9

Mortgage for recording in all places to the extent necessary, unless otherwise agreed by the Lender). The Borrower hereby reaffirms its grant under the Existing Mortgage on the Mortgaged Property defined therein to secured the Secured Obligations defined therein. The Borrower does hereby grant, bargain, sell, mortgage, transfer, assign and convey unto the Lender the Mortgaged Property described in the Existing Mortgage to secure the Obligations. The Borrower shall at all times comply with the terms and provisions of the Existing Mortgage, including, without limitation, the representations, warranties and covenants in Articles 3, 4 and 5 therein, which are hereby incorporated herein.

## ARTICLE III:  **REPRESENTATIONS AND WARRANTIES**

The Borrower represents and warrants to the Lender on the date hereof and on the date of the making of each Loan that:

Section 3.1.  Organization; Powers; Authorization; Enforceability, Etc. (a) The Borrower is duly organized or formed, validly existing and in good standing (if and to the extent applicable) under the laws of the jurisdiction of its organization or formation, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in every jurisdiction where such qualification is required. (b) The Transactions are within the powers of the Borrower and have been duly authorized by all necessary action for the Borrower. (c) Each Credit Document has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. (d) The Transactions (i) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, (ii) will not violate any applicable law or regulation (except where the failure, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect) or the charter, by-laws, trust agreement or other organizational documents of the Borrower or any order of any Governmental Authority binding on the Borrower, (iii) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower to the extent that such violation, or such default or right to payment could be reasonably expected to result in a Material Adverse Effect, and (iv) will not result in the creation or imposition of any Lien on any asset of the Borrower other than pursuant to the Credit Documents. (e) There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower, other than the Chapter 11 Case, (i) as to which there is a reasonable possibility of an adverse determination or that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve the Credit Documents, the Collateral or the Transactions. (f) The Borrower is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, to the extent that any noncompliance therewith could be reasonably expected to result in a Material Adverse Effect. (g) No Default has occurred and is continuing.

Section 3.2.  Investment Company Status. The Borrower is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

Section 3.3.  Certain Information. The state of organization and any names used within the past five years of the Borrower is set forth on **Schedule I.**

10

Section 3.4. <u>Financial Condition; No Material Adverse Change</u>. The Financial Statements delivered to the Lender prior to the Closing Date and those delivered pursuant to Section 5.1 present fairly the financial condition of the Borrower identified therein as of the date thereof. Since each such date, there has been no material adverse change in the financial condition of the Borrower.

Section 3.5. <u>Taxes</u>. (a) The Borrower has timely filed or caused to be filed all tax returns and reports required to have been filed (giving effect to any extensions) and has paid or caused to be paid all taxes required to have been paid by it, if any, except taxes that are being contested in compliance with Section 5.4. The Tax Returns delivered to the Lender prior to the Closing Date, if any, are the true, correct and complete tax returns of the Borrower identified therein as of the date thereof. (b) Borrower does not intend to and shall not treat the Loans and related transactions as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4). In the event the Borrower determines to take any action inconsistent with such intention or treatment, (i) Borrower will promptly notify the Lender thereof and (ii) Borrower acknowledges that the Lender may treat the Loans as part of a transaction that is subject to Internal Revenue Code Section 6112 and the Treasury Regulations thereunder, and that the Lender may file such IRS forms or maintain such lists and other records to the extent required by such statute and regulations. No part of the proceeds of any Loan will be used directly or indirectly in connection with any "listed transaction" (within the meaning of Treasury Regulation Section 1.6011–4(b)(2)).

Section 3.6. <u>Disclosure</u>. All agreements, instruments and corporate or other restrictions, and all other matters known to the Borrower (and not generally to general economic conditions), that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect have been disclosed to the Lender. None of the written reports, financial statements, certificates or other written information (other than financial projections and *pro forma* information) furnished by or on behalf of the Borrower to the Lender in connection with the negotiation of the Credit Documents or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Section 3.7. <u>ERISA</u>. The Borrower, to the best of its knowledge hereby represents and warrants with, to and in favor of the Lender that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower or Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of the Borrower and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of the Borrower.

## ARTICLE IV: <u>CONDITIONS</u>

Section 4.1. <u>Closing Date</u>. The obligations of the Lender to make any Loan to the Borrower hereunder shall not become effective until each of the following conditions is satisfied:

(a)    The Lender shall have received the following documents:

(i)    Counterpart of this Agreement executed by the Borrower;

(ii)    Note executed by the Borrower;

(iii)    Security Agreement executed by the Borrower in favor of the Lender;

11

    (iv) Officer's Certificate of the Borrower, attaching or certifying as to its: (a) certificate of incorporation, (b) by-laws, (c) resolutions authorizing the Transactions, (d) operating agreement and (e) incumbency of officers signing the Credit Documents;

    (v) Guaranty Reaffirmation, other than with respect to the notarization of the signature page of Randee Arnold, which shall be subject to Section 5.12 hereof; and

    (vi) Legal opinion of counsel to the Borrower.

  (b) The Lender shall have received such documents, certificates and legal opinions regarding the Borrower as to the organization or formation, existence and good standing (if and to the extent applicable) of the Borrower, the authorization of the Transactions, the execution and delivery of the Credit Documents, as requested by the Lender and all in form and substance satisfactory to the Lender and its counsel.

  (c) The Borrower shall have prepared and delivered to the Lender the Budget. The initial Budget shall have been reviewed by the Borrower and sets forth for the periods covered thereby: (i) projected weekly operating cash receipts and revenues for each week commencing with the week ending July 30, 2010, (ii) projected weekly operating cash disbursements for each week commencing with the week ending July 30, 2010, (iii) projected aggregate principal amount of outstanding Loans for each week commencing with the week ending as of July 30, 2010, and (iv) projected weekly amounts of Loans available to the Borrower under the terms, conditions and formulae of this Agreement for each week commencing with the week ending July 30, 2010 (collectively, the "Projected Information"). The Budget shall include adequate protection payments to the Pre-Petition Lender consisting of interest payments on the Pre-Petition Indebtedness and reimbursement of fees, costs and expenses.

  (d) The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory in the sole discretion of the Lender, on such prior notice as may be satisfactory to the Lender in its sole discretion, the Interim Financing Order no later than five (5) Business Days after the date of commencement of the Chapter 11 Case, approving and authorizing this Agreement, all provisions hereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance satisfactory to the Lender and its counsel in their sole discretion.

  (e) The Interim Financing Order and the Credit Documents shall be in full force and effect and shall not (in whole in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

  (f) The Borrower shall be in compliance in all respects with the Interim Financing Order and the Initial Order.

  (g) The Lender shall have received on or prior to the Closing Date each engagement letter (or amended engagement letter) for each of the Borrower's professionals that have been or that will be retained under section 327(a), 327(e), 328 or 363 of the Bankruptcy Code, and each has been executed in form and substance acceptable to the Lender, and each has been dated the Closing Date unless otherwise indicated or agreed to by the Lender, and all fees in connection therewith shall be acceptable to the Lender, in form and substance satisfactory to the Lender.

  Section 4.2. Additional Conditions to Loans. On the date on which each Loan is to be made: (a) the Lender shall have received a request for such Loan executed by the Borrower; (b) the

representations and warranties set forth in Article III hereof and in any documents delivered herewith, shall be true and correct with the same effect as though made on and as of such date; (c) the Lender shall be satisfied that no event has occurred which could have a Material Adverse Effect; (d) the Borrower shall be in compliance with all the terms and provisions contained herein and in the Credit Documents to be observed or performed; and (e) no Default shall have occurred and be continuing.

## ARTICLE V: <u>COVENANTS</u>

Until the termination of the Commitment and the principal of and interest on the Loans and all fees and other Obligations payable under the Credit Documents shall have been paid in full, the Borrower covenants and agrees with the Lender that:

Section 5.1. <u>Reporting Requirements</u>. Each of the following shall be furnished to the Lender:

(a)    promptly, upon any change of any of the information set forth in **Schedule I**, written notice thereof;

(b)    promptly and in any event within 120 days after the end of the Borrower's fiscal year, Financial Statements certified by independent public accountants acceptable to the Lender;

(c)    promptly and in any event within 45 days after the end of each fiscal quarter other than the end of the fiscal year, Financial Statements consisting only of the balance sheet and the income statement;

(d)    promptly and in any event within 30 days after the end of each calendar month, Financial Statements consisting only of the balance sheet and the income statement for such calendar month;

(e)    each Monday, a weekly statement of the Borrower's cash flow; and

(f)    as soon as practicable in advance of filing with the Bankruptcy Court, the Interim Financing Order, the Permanent Financing Order and copies of all other proposed orders and pleadings related to this Agreement (which must be, in each case, in form and substance satisfactory to the sole discretion of the Lender), any pleading relating to a Chapter 11 plan, and/or any disclosure statement or other summary documents related to or copies of such Chapter 11 plan.

Section 5.2. <u>Information and Notices</u>. The Borrower will furnish or will cause to be furnished to the Lender promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of the Credit Documents, as the Lender may reasonably request. The Borrower hereby agrees to cooperate with the Lender and provide true, accurate and complete information in response to any reasonable request by the Lender to enable the Lender to comply with the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 Title III of Pub. L. 107-56 (signed into law October 26, 2001). The Borrower will furnish to the Lender prompt written notice of the following: (a) the occurrence of any Default; (b) the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect; and (c) any other development that results in, or could reasonably be expected in the Borrower's reasonable judgment to result in, a Material

13

Adverse Effect. Each notice delivered under this Section shall be accompanied by a statement of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.3. <u>Books and Records; Inspection Rights; Access</u>. The Borrower will keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. The Borrower will permit any representatives designated by the Lender, at any time and upon 12 hours' prior notice, to visit and inspect its properties including all Collateral, to examine and make extracts from its books and records, and to directly discuss its affairs, finances and condition with its partners or trustees (or its designee), officers and independent accountants, as applicable.

Section 5.4. <u>Existence; Payment of Obligations; Compliance with Laws</u>. The Borrower will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business. The Borrower will pay its liabilities including tax liabilities, that, if not paid, could reasonably be expected to result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower has set aside on its books adequate reserves with respect thereto and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. The Borrower will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.5. <u>Liens</u>. The Borrower shall not permit any Liens to exist on the Collateral except Liens created pursuant to the Credit Documents and Liens in favor of the Lender, except Liens created under the Pre-Petition Loan Documents (except to the extent such Liens are released by the Financing Order or by the transactions contemplated hereby or thereby).

Section 5.6. <u>Indebtedness</u>. The Borrower shall not incur any indebtedness; <u>provided however</u>, the Borrower may incur any of the following indebtedness: (a) indebtedness under this Agreement, (b) indebtedness to the Lender; (c) indebtedness with the prior written consent of the Lender; and (d) indebtedness outstanding on the date hereof and listed on Schedule 5.6(e).

Section 5.7. <u>Fundamental Changes</u>. (a) The Borrower shall not merge or consolidate with any other Person, or permit any other Person to merge or consolidate with it. (b) The Borrower shall not sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired). (c) The Borrower shall not distribute, sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) any Collateral, other than as approved by the Lender. (d) The Borrower shall not enter into any agreement or undertaking restricting the right or ability of the Borrower or the Lender to sell, assign or transfer any of the Collateral or proceeds thereof. (e) The Borrower shall not alter, amend, modify or change its certificate of formation, operating agreement, trust agreement or other organizational documents in any manner which could have a Material Adverse Effect. Notwithstanding anything to the contrary herein or the other Credit Documents, the Borrower shall not assume, reject or assign any leasehold interest or enter into any agreement to return inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise, without the prior written consent of the Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the Lender) except for sales in the ordinary course of business.

14

Section 5.8. <u>Further Assurances</u>. The Borrower shall upon request by the Lender (a) promptly correct any material defect or error that may be discovered in any Credit Document or in the execution, acknowledgement or recordation thereof and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, estoppel certificates, financing statements and continuation thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Lender may require from time to time in order to (i) carry out more effectively the purposes of this Agreement or any other Credit Documents, (ii) subject to the Liens and security interests created by any of the Credit Documents any of the Borrower's properties, rights or interests covered or now or hereafter intended to be covered by any of the Credit Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Credit Documents and the Liens and security interests intended to be created thereby and (iv) better assure, convey, grant, assign, transfer, preserve, protect and confirm unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Credit Document.

Section 5.9. <u>Use of Proceeds</u>.

(a)     Loans provided by the Lender to the Borrower, pursuant to the Financing Order, this Agreement or otherwise, shall be used by the Borrower (i) for working capital and other general corporate purposes, (ii) to pay interest hereunder and (iii) for budgeted transaction costs, fees, and expenses of the Borrower, including adequate protection payments (in the form of current interest payments on Pre-Petition Indebtedness and all fees, costs and expenses incurred by the Pre-Petition Lender in connection therewith) and agreed-upon professional fees, in each case in accordance with the Budget pursuant to Section 5.11.

(b)     Unless authorized by the Bankruptcy Court and approved by the Lender in writing, no part of the proceeds of any Loan will be used directly or indirectly (i) to pay any portion of any administrative expense claim or other claim relating to the Chapter 11 Case, other than those administrative expense claims and other claims relating to the Chapter 11 Case directly attributable to the operation of the business of the Borrower in the ordinary course of such business in accordance with the Credit Documents, (ii) to investigate or prosecute any claims against the Lender, the Collateral or any rights of the Lender, or (iii) for the purpose of purchasing or carrying margin stock within the meaning of Regulations T, U, or X of the Federal Reserve Board.

Section 5.10. <u>Compliance with Milestones</u>. Unless otherwise waived by the Lender in its sole and absolute discretion, the Borrower shall achieve the milestones set forth below by the dates specified (or such later date as may be agreed to by the Lender):

(a)     plan of reorganization that is acceptable in all respects to the Lender filed by August 25, 2010;

(b)     approval of a disclosure statement with respect to such plan of reorganization by a date that is 36 days after the date in the immediately preceding clause;

(c)     confirmation of such plan by a date that is 36 days after the date in the immediately preceding clause; and

(d)     effectiveness of such plan pursuant to a final confirmation order by a date that is 10 days thereafter.

15

Section 5.11. Budget.

(a)     By no later than 5:00 p.m. on the Monday of each week commencing on July 30, 2010, the Borrower shall furnish to the Lender, in form and substance satisfactory to the Lender, an updated Budget and a report in the form attached hereto as schedule 5.11(a) that sets forth for the immediately preceding week and on a cumulative basis a comparison of the actual cash receipts, revenues, cash disbursements, and Loan balances to the corresponding items in the Projected Information for such weekly periods set forth in the Budget on a cumulative, weekly roll-forward basis, together with a certification from the chief financial officer of the Borrower that no disbursements, other than as set forth on the Budget, have been made and no Material Budget Deviation has occurred.

(b)     The Borrower acknowledges, confirms and agrees that commencing with the trailing one (1) week period ending on July 30, 2010, and for the trailing two (2) week period ending on the Friday of each week thereafter: (i) each of the actual aggregate weekly cash collections net of discounts and allowances during such period shall not be less than the projected aggregate weekly cash collections during such period in the Budget, (ii) each of the actual aggregate weekly forecasted revenues during such period shall not be less than the projected aggregate weekly forecasted revenues during such period in the Budget, (iii) the actual aggregate weekly cash disbursements for each line item in the Budget during such period shall not be more than the projected aggregate weekly cash disbursements for each such line item set forth in the Budget during such period, (iv) the actual aggregate weekly cash disbursements for all line items in the Budget during such period shall not be more than the projected aggregate weekly cash disbursements for all such line items set forth in the Budget during such period, (v) the actual aggregate amount of Loans available to the Borrower as of the end of such period under the terms, conditions and formulae of this Agreement shall not be less than the projected amount of Loans available to Borrower as of the end of such period, or (vi) the actual aggregate principal amount of outstanding Loans as of the end of such period shall not be more than the projected aggregate principal amount of outstanding Loans as of the end of such period. Notwithstanding the foregoing, any unused amount of cash disbursements for each line item may be carried forward so long as such carry-forward is authorized by the CRO and consented to by the Lender.

(c)     The Borrower hereby confirms, acknowledges and agrees that (i) a failure to maintain the minimum deviations in the Budget as set forth in Section 5.11(b) shall constitute a material deviation from the Budget and an additional Event of Default (each, a "Material Budget Deviation") and (ii) the failure to deliver any Budget or any reports with respect to any Budget, in form and substance satisfactory to the Lender, as provided in Sections 4.1(c) and 5.11(a), shall constitute an Event of Default.

(d)     Notwithstanding the foregoing, any and all Loans with respect to items listed on the Budget as "Contingencies" shall only be made by the Lender, in its sole discretion, after receipt of a specific request for such Loan by the Borrowers.

Section 5.12. Chief Restructuring Officer.

(a)   The Borrower shall file a motion on or before July 29, 2010, seeking authority to retain a Person acceptable to the Lender to act as the Borrower's Chief Restructuring Officer ("CRO''), and an order authorizing such retention shall be entered not later than August 27, 2010.

(b)     The agreement providing for the retention of the CRO shall not be amended, modified, supplemented or terminated without the prior written consent of the Lender. The CRO and the scope and nature of the engagement of the CRO shall at all times be acceptable to the Lender, including, without limitation, the CRO's authority to manage the Borrower's operations and financial affairs in

16

connection with conducting the Borrower's operations and in connection with the process with respect to the equity investment in the Borrower. The Borrower agrees to provide the CRO with complete and full access to all of its books and records and premises and agree to cooperate fully with the CRO. The Borrower hereby authorizes and directs (which authorization and direction shall be irrevocable during the term of the CRO's retention agreement) the CRO to share with the Lender, all budgets, records, projections, financial information, reports and other information relating to the Collateral and the financial condition or operations of the business of the Borrower.

(c)     The parties hereto acknowledge and agree that it should be an additional Event of Default if the CRO resigns or is terminated by the Borrower and is not promptly replaced with another firm acceptable to the Lender, on terms and conditions acceptable to the Lender.

Section 5.13.   Guaranty Reaffirmation.  The Borrower shall deliver on or before August 6, 2010, the notarization of Randee Arnold's signature page to the Guaranty Reaffirmation.

## ARTICLE VI: **EVENTS OF DEFAULT**

Section 6.1.  If any of the following events ("Events of Default") shall occur:

(a)   Borrower shall fail to pay any principal of or interest on the Loans when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)   Borrower shall fail to pay any fee or any other amount (other than an amount referred to in clause (a) of this Section 6.1) payable under any Credit Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days after the receipt of written notice of the date on which the same shall become due and payable (it being understood that invoices by the Lender to Borrower shall constitute such written notice);

(c)   any representation or warranty made or deemed made by or on behalf of the Borrower in or in connection with any Credit Document or any amendment or modification thereof, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Credit Document or any amendment or modification hereof shall prove to have been incorrect in any material respect when made or deemed made;

(d)   the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Sections 2.11, 2.12, 2.13, 5.1, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 5.10, 5.11, 5.12 and 5.13;

(e)   the Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Credit Document (other than those specified in clause (a), (b), (c) or (d) of this Section 6.1), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Lender to the Borrower;

(f)   any Event of Default (as such term is defined in the Existing Mortgage) shall occur in the Existing Mortgage;

(g)   the Borrower shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness (which was incurred after the Petition Date or where payment thereof by the Borrower or enforcement, acceleration or termination thereof by

17

the holder(s) of such Material Indebtedness was not otherwise subject to a stay of proceedings in the Chapter 11 Case), when and as the same shall become due and payable, after the expiration of any grace or cure periods;

(h)   any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such indebtedness;

(i)   an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)   the Borrower shall, other than the Chapter 11 Case, (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) of this Section 6.1, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or for a substantial part of their assets, (iv) file an answer admitting the material allegations of a petition filed against them in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(k)   the Borrower shall become unable, admit in writing or fail generally to pay its debts as they become due;

(l)   one or more judgments for the payment of money in an aggregate amount in excess of $50,000 shall be rendered against the Borrower and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower to enforce any such judgment;

(m)   any material provision of any Credit Document shall, for any reason, cease to be valid and binding on the Borrower, or the Borrower shall so state in writing; or any Credit Document shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or any Lien granted to the Lender shall cease to be a perfected first priority Lien, or the Borrower shall so state in writing;

(n)   the occurrence of any condition or event which permits the Lender to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in the Financing Order);

18

(o)   the termination or non-renewal of the Credit Documents as provided for in the Financing Order;

(p)   the Borrower suspends or discontinues or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee, receiver or custodian is appointed for the Borrower, or any of its respective properties;

(q)   conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(r)   dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(s)   the grant of a lien on or other interest in any property of the Borrower, other than a lien or encumbrance permitted by Section 5.5 hereof or by the Financing Order, or an administrative expense claim other than such administrative expense claim permitted by the Financing Order or this Agreement by the grant of or allowance by the Bankruptcy Court, which is superior to or ranks in parity with the Lender's security interest in or lien upon the Collateral or its superpriority claim;

(t)   the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the Lender (and no such consent shall be implied from any other authorization or acquiescence by the Lender);

(u)   the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(v)   the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(w)   the filing of a plan of reorganization or liquidation by or on behalf of the Borrower, to which the Lender has not consented in writing, which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein; or

(x)   the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of the Borrower, to which the Lender has not consented to in writing, which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(y)   an application shall be made by the Borrower seeking an order by the Bankruptcy Court, or an order shall be entered by the Bankruptcy Court, with respect to a plan of reorganization that does not propose to pay all Obligations in full in cash on the effective date of such plan or such an application shall have been made by any other Person that is not contested in good faith by the Borrower;

(z)   the entry of a Permanent Financing Order shall not have occurred within 30 days after the filing of the Chapter 11 Case;

19

(aa)  the assertion of any claim arising under Section 506(c) of the Bankruptcy Code against the Lender or any of the Lender's pre- or post-petition collateral or the commencement of other actions adverse to the Lender or its respective rights and remedies under this Agreement or any Bankruptcy Court order;

(bb)  the Borrower shall fail to comply with any line item in the Budget;

(cc)  there shall be any Material Adverse Effect as it relates to the Borrower or a Material Adverse Effect as it relates to any Guarantor, taken as a whole, other than those customarily caused by a filing of a Chapter 11 case;

(dd)  the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any assets of the Borrower or any Guarantor;

(ee)  the Borrower or the statutory committee of unsecured creditors (if any) shall assert any claim, file a complaint or initiate any other action against the Lender or otherwise file an objection to the Lender's claims or file any similar pleading which seeks to affect the Lender's claims or the Collateral;

(ff)  the filing of a motion seeking approval of the sale of all or substantially all of the Borrower's assets unless consented to in writing by the Lender;

(gg)  any foreclosure by any Person (other than the Lender) on any membership interests in the Borrower;

(hh)  the Borrower shall fail to reach an agreement within 45 days of the Petition Date for an equity infusion of at least $10,000,000 with a counterparty and on terms acceptable to the Lender;

(ii)  Harold A. Katersky shall cease to function as managing member or Dana Arnold shall cease to function as chief executive officer of the Borrower, or any challenge to the control of either such principal of the Borrower shall not be dismissed within 30 days of the date of such challenge; or

(jj)  the CRO resigns or is terminated by the Borrower and is not promptly replaced with another firm acceptable to the Lender, on terms and conditions acceptable to the Lender

then, and in every such event, and at any time thereafter during the continuance of such event, the Lender may by notice to Borrower, take any or all of the following actions, at the same or different times:  (i) terminate the Commitment, and thereupon the Commitment shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower, (iii) file the Lender's own plan or reorganization of the Borrower and (iv) seek modification and lifting of the automatic stay (which the Borrower shall consent to) to permit the Lender to foreclose on all of its Collateral.

## ARTICLE VII: **MISCELLANEOUS**

Section 7.1. <u>Notices</u>. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by U.S. mail or sent by telecopy (with confirmed receipt or followed by overnight delivery) to the addresses (or telecopy numbers) set forth on the signature pages hereof. Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt or, if mailed, the fifth Business Day following the date so mailed, if earlier. Any delivery after normal business hours or on a non-Business Day shall be deemed delivery on the next succeeding Business Day. Refusal to accept delivery shall be deemed to be receipt.

Section 7.2. <u>Amendment and Waiver</u>. No alteration, modification, amendment or waiver of any terms and conditions of any of the Credit Documents shall be effective or enforceable against the Lender unless set forth in a writing signed by the Lender. Without limiting the generality of the foregoing, the making of any Loan shall not be construed as a waiver of any Default or any condition precedent, regardless of whether the Lender may have had notice or knowledge of such Default or such unsatisfied condition precedent at the time.

Section 7.3. <u>Expenses; Indemnity; Damage Waiver</u>.

(a) Borrower shall pay all reasonable out-of-pocket expenses incurred by the Lender, including but not limited to fees and disbursements of counsel for the Lender, in connection with the negotiation and preparation of any Credit Documents, any amendments, modifications or waivers of the provisions thereto requested or agreed to by the Borrower (whether or not the transactions contemplated hereby or thereby shall be consummated), the addition or release of any collateral or the enforcement or protection of the Lender's rights in connection with any Credit Document, including its rights under this Section in connection with the Loans made hereunder or any workout, restructuring or negotiations in respect thereof. Borrower hereby authorizes and directs the Lender to pay any legal fees relating to this Agreement from the proceeds of any borrowings hereunder and any accounts of Borrower maintained with the Lender.

(b) The Borrower shall indemnify, jointly and severally, the Lender and each affiliate, director, officer, employee, agent and advisor of the Lender (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees and disbursements of counsel for any Indemnitee (the "<u>Losses</u>"), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of, any actual or prospective claim, litigation, investigation or proceeding relating to (i) the execution or delivery of any Credit Document, the performance of the parties hereto of their respective Obligations thereunder or the consummation of the Transactions or (ii) the Loans or the use of the proceeds therefrom, in each case, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such Losses are determined by a final judgment of a court of competent jurisdiction to have been incurred by reason of gross negligence, bad faith or willful misconduct of such Indemnitee.

(c) To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in

21

connection with, or as a result of, any Credit Document or any agreement or instrument contemplated thereby, the Transactions, each Loan or the use of the proceeds thereof.

(d)    All amounts due under this Section shall be payable promptly after written demand therefor. The Obligations of the Borrower under this Section shall survive payment in full of the Loans.

Section 7.4.  <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that the Borrower may not assign or otherwise transfer any of its rights or Obligations hereunder and any such attempted assignment or transfer by the Borrower shall be null and void.

Section 7.5.  <u>Survival</u>.  All covenants, agreements, representations and warranties made by the Borrower in any Credit Document and in the certificates or other instruments delivered in connection with or pursuant to any Credit Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of each Credit Document and the making of the Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loans or any fee or any other amount payable under any Credit Document is outstanding and unpaid. The provisions of Sections 7.3, 7.13, 7.14 and 7.15 shall survive and remain in full force and effect regardless of the consummation of the Transactions, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 7.6.  <u>Right of Setoff</u>.  If any amount payable hereunder or under any other Credit Document is not paid as and when due, the Borrower hereby authorizes the Lender and each affiliate of the Lender to proceed, to the extent permitted by applicable law, without prior notice, by right of setoff, bankers' lien, counterclaim or otherwise, against any assets of the Borrower in any currency that may at any time be in the possession of the Lender or such affiliate, at any branch or office, to the full extent of all amounts payable to the Lender hereunder or thereunder. The Lender shall give prompt notice to the Borrower after any exercise of the Lender's rights under the preceding sentence, but the failure to give such notice shall not affect the validity of any of the Lender's actions.

Section 7.7.  <u>Severability</u>.  Any provision of any Credit Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without effecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 7.8.  <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)    This Agreement and any claim, controversy or dispute related to or in connection with this Agreement, any Credit Document or any of the Transactions contemplated hereby or thereby, the relationship of the parties hereto and the interpretation and enforcement of the rights and duties of the parties hereto shall be governed by and construed in accordance with the laws of the State of New York except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing.

(b)    THE BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK IN

22

ANY ACTION, SUIT OR PROCEEDING BROUGHT AGAINST IT AND RELATED TO OR IN
CONNECTION WITH THIS AGREEMENT, ANY CREDIT DOCUMENT OR ANY OF THE
TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND CONSENTS TO THE
PLACING OF VENUE IN NEW YORK COUNTY OR OTHER COUNTY PERMITTED BY LAW.
TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER HEREBY WAIVES
AND AGREES NOT TO ASSERT BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, IN
ANY SUCH SUIT, ACTION OR PROCEEDING ANY CLAIM THAT IT IS NOT PERSONALLY
SUBJECT TO THE JURISDICTION OF SUCH COURTS, THAT THE SUIT, ACTION OR
PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF THE
SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT ANY CREDIT DOCUMENT OR
INSTRUMENT REFERRED TO HEREIN MAY NOT BE LITIGATED IN OR BY SUCH COURTS.
TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER AGREES NOT TO
SEEK AND HEREBY WAIVES THE RIGHT TO ANY REVIEW OF THE JUDGMENT OF ANY
SUCH COURT BY ANY COURT OF ANY OTHER NATION OR JURISDICTION WHICH MAY
BE CALLED UPON TO GRANT AN ENFORCEMENT OF SUCH JUDGMENT. EXCEPT AS
PROHIBITED BY LAW, THE BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO
A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY
ARISING OUT OF, UNDER OR IN CONNECTION WITH ANY CREDIT DOCUMENT.

(c)    Each party to this Agreement irrevocably consents to service of process in the
manner provided for notices in Section 7.1. Nothing in this Agreement will affect the right of any
party to this Agreement to serve process in any other manner permitted by law.

Section 7.9. Headings. Article and Section headings used herein are for convenience of
reference only, are not part of this Agreement and shall not affect the construction of, or be taken into
consideration in interpreting, this Agreement.

Section 7.10. Counterparts. This Agreement may be executed in counterparts (and by
different parties hereto on different counterparts), each of which shall constitute an original, but all of
which when taken together shall constitute a single contract. Delivery of an executed counterpart of a
signature page of this Agreement or of any other Credit Document by facsimile or electronic
transmission shall be effective as delivery of a manually executed counterpart of this Agreement or of
such other Credit Document.

Section 7.11. No Reliance. The Borrower acknowledges that it is making its own
independent decision to enter into the transactions under the Credit Documents and has determined that
such transactions are appropriate and proper based upon its own judgment and upon advice from such
advisers as it has deemed necessary. The Borrower acknowledges that it is not relying on any
communication (written or oral) from any Indemnitee (as defined in Section 7.3(b)) as investment or tax
advice or as a recommendation to enter into such transactions and specifically agrees and acknowledges
that any information and explanation relating to the terms and conditions of such transactions shall not
be considered investment or tax advice or a recommendation from any Indemnitee to enter into such
transactions. No communication (written or oral) from any Indemnitee regarding such transactions shall
be deemed to be an assurance or guarantee as to the expected results, benefits, outcomes or
characteristics (economic, tax or otherwise) of such transactions. The Borrower acknowledges that it is
capable of assessing the merits of and understands (on its own behalf or through independent
professional advice), and accepts, the terms, conditions and risks of such transactions and that it is also
capable of assuming and assumes the risks of such transactions. The Borrower acknowledges that no
Indemnitee is acting as a fiduciary or an adviser to the Borrower in respect of such transactions.

23

Section 7.12. Tax Disclosure. Notwithstanding anything herein to the contrary, each party may disclose without limitation of any kind (a) any information with respect to the U.S. federal and state income tax treatment of the transactions contemplated hereby and any facts that may be relevant to understanding such tax treatment, which facts shall not include for this purpose the names of the parties or any other Person named herein, or information that would permit identification of the parties or such other Persons, or any pricing terms or other nonpublic business or financial information that is unrelated to such tax treatment or facts and (b) all materials of any kind (including opinions or other tax analyses) relating to such tax treatment or facts that are provided to any of the Persons referred to above.

Section 7.13. Release of Pre-Petition Claims.

(a) Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond 30 days after the date of the Interim Financing Order, in consideration of the agreements of the Lender contained herein and the making of any Loans by the Lender, the Borrower, pursuant to this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Pre-Petition Lender and its respective successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (the Pre-Petition Lender and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which the Borrower, or any of its respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, the other Credit Documents.

(b) Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond 30 days after the date of the Interim Financing Order, the Borrower, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Borrower and Guarantor pursuant to this Section 7.13. If the Borrower violates the foregoing covenant, the Borrower agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

Section 7.14. Release of Post-Petition Claims.

(a) Upon (a) the receipt by the Lender of payment in full of all Obligations, including the Pre-Petition Indebtedness, in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to the Lender to secure any Post-Petition Obligations, including the Pre-Petition Indebtedness, that survive or continue beyond the termination of the Credit Documents, and (b) the termination of any obligations to provide Loans, in consideration of the agreements of the Lender contained herein and the making of any Loans by the Lender, the Borrower hereby covenants and agrees at the time of the entry of an order approving an asset sale or otherwise to execute and deliver in favor of

24

the Lender a valid and binding termination and release agreement, in form and substance satisfactory to the Lender (from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Credit Documents or the applicable Financing Order), the terms of which shall be approved in a sale order or other order of the court. If the Borrower violates such covenant, the Borrower agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

Section 7.15. <u>Releases Generally</u>.

(a)     The Borrower understands, acknowledges and agrees that the releases set forth above in Sections 7.13 and 7.14 may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)     The Borrower agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 7.13 and, when made, Section 7.14.

**Remainder of Page Intentionally Left Blank**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWER:**

**PACIFICA MESA STUDIOS, LLC**

By _____
    Name:
    Title:

**Notice Address for Borrower:**

**See Schedule I**

*[Signature Page to Credit Agreement]*

KL2 2660773.5

26

**LENDER:**

**LV HOLDINGS, LLC**, as successor in interest
to Amalgamated Bank of New York, as Trustee
of the Longview Ultra Construction Loan
Investment Fund


By_____
Name:
Title:

**Notice Address:**

LV Holdings, LLC, as successor in interest to
Amalgamated Bank of New York, as trustee of
Longview Ultra I Construction Loan Investment
Fund
c/o Amalgamated Bank
275 Seventh Avenue, 14th floor
New York, NY 10001
Attention: _____

*[Signature Page to Credit Agreement]*

State of _California_                 )
                                      ) ss.
County of _Los Angeles_               )

On _August 2_ , 2010, before me, a Notary Public, personally appeared
___Harold A. Katersky, who___ , ~~personally known to me or~~ proved to me on the basis of
satisfactory evidence to be the person whose name is subscribed to the within instrument and
acknowledged to me that he/~~she~~ executed the same in his/~~her~~ authorized capacity, and that by his/~~her~~
signature on the instrument the person, or the entity upon behalf of which the person acted, executed the
instrument.

Witness my hand and official seal.

SEAL

*JENNIFER LONG
Commission # 1766151
Notary Public - California
Los Angeles County
My Comm. Expires Sep 8, 2011*

_Jennifer Long_
Notary Public

State of _____                 )
                                      ) ss.
County of _____                )

On _____ , 2010, before me, a Notary Public, personally appeared
_____ , personally known to me or proved to me on the basis of
satisfactory evidence to be the person whose name is subscribed to the within instrument and
acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her
signature on the instrument the person, or the entity upon behalf of which the person acted, executed the
instrument.

Witness my hand and official seal.

SEAL                                  _____
                                      Notary Public

[*Signature Page to Credit Agreement*]

KL2 2660773.5

60X

## SCHEDULE I TO CREDIT AGREEMENT

| Name | Address | State of Organization | Organizational I.D. # |
|------|---------|----------------------|----------------------|
| Pacifica Mesa Studios, LLC | 5236 Colodny Drive, Suite 101 Agoura Hills, CA 91301 | California | 200529110246 |

Notice with copies to:
Pacifica Mesa Studios, LLC
5236 Colodny Drive, Suite 101
Agoura Hills, CA 91301

and

Ezra Brutzkus Gubner LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Attn: Steven Gubner, Esq.

056972

**THIRD REAFFIRMATION OF PAYMENT GUARANTY AGREEMENT**, dated as of July 21, 2010 (this "Agreement"), by HAROLD A. KATERSKY and DANA ARNOLD (individually and collectively, the "Guarantor"), whose address is 120 Broadway, Suite 200, Santa Monica, California 90401, in favor of LV HOLDINGS, LLC, as successor in interest to Amalgamated Bank of New York, as Trustee of the Longview Ultra Construction Loan Investment Fund. Capitalized terms not defined herein shall have the meanings set forth in the Credit Agreement (as defined below).

## RECITALS

WHEREAS, Lender and Pacifica Mesa Studios, LLC entered into that certain Debtor-in-Possession Credit Agreement, dated as of July 21, 2010 (the "Credit Agreement"), pursuant to which Lender committed to loan to Borrower, subject to the satisfaction of certain conditions, covenants and milestones, the stated principal amount of $3,000,000;

WHEREAS, the Pre-Petition Indebtedness was secured, in part, by a Payment Guaranty Agreement dated July 7, 2006, and reaffirmed January 31, 2008 (as reaffirmed or amended from time to time, the "Payment Guaranty"), executed by Guarantor in favor of Lender;

WHEREAS, as a condition to the extension of Loans under the Credit Agreement and the refinancing of certain of the Pre-Petition Indebtedness, Lender has required that Guarantor reaffirm their obligations under the Payment Guaranty;

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt of which is hereby acknowledged, Guarantor hereby agrees, warrants, represents and reaffirms to Lender as follows:

## ARTICLE I: REAFFIRMATION

Section 1.1. General. Guarantor hereby ratifies, confirms and reaffirms in all respects all of its obligations to the Lender as evidenced by the Payment Guaranty and all of its obligations to the Lender arising under any other instrument or agreement creating, evidencing, or securing any of its obligations to the Lender. Guarantor agrees that the Payment Guaranty remains in full force and effect and guarantees payment, among other things, of the Loans under the Credit Agreement in the principal amount from time to time outstanding of $3,000,000, together with accrued and unpaid interest, and that Guarantor has not been released from any of their obligations or liability under the Payment Guaranty.

Section 1.2. Representations and Warranties. Guarantor hereby represents and warrants to the Lender that, after giving effect to this Agreement, the representations and warranties set forth in the Payment Guaranty are true and correct in all material respects on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date.

## ARTICLE II: CONDITIONS

Section 2.1. Conditions. This Agreement shall not become effective until the Lender shall have received a counterpart of this Agreement executed by Guarantor and consent of each spouse thereof.

## ARTICLE III: MISCELLANEOUS

Section 3.1. No Waiver. Except as otherwise provided herein, this Agreement shall not (a) constitute a modification, acceptance or waiver with respect to any other term, provision or condition

EXHIBIT  B

of the Credit Agreement or any other Credit Document, or the Existing Credit Agreement, Existing Mortgage or Security Documents (as defined in the Existing Mortgage) ("Existing Credit Documents") or (b) prejudice any right or remedy that the Lender may now have or may have in the future under or in connection with the Credit Agreement or any other Credit Document or Existing Credit Document. All other obligations of Guarantor and rights of the Lender under any Credit Document or Existing Credit Document shall remain in full force and effect.

Section 3.2.  Credit Document.  This Agreement is a Credit Document.

Section 3.3.  Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that no Guarantor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender (and any attempted assignment or transfer by any Guarantor without such consent shall be null and void).

Section 3.4.  Governing Law.  This Agreement and any claim, controversy or dispute related to or in connection with this Agreement, any Credit Document or any of the transactions contemplated hereby or thereby, the relationship of the parties hereto and the interpretation and enforcement of the rights and duties of the parties hereto shall be governed by and construed in accordance with the laws of the State of New York.

Section 3.5.  Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or of any other Credit Document by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or of such other Credit Document.

**Remainder of Page Intentionally Left Blank**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

*GUARANTORS:*

By _____
HAROLD A. KATERSKY

By _____
DANA ARNOLD

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Los Angeles_                    }

On _August 2, 2010_ before me, _Jennifer Long, Notary Public_,
<span>Date</span>            <span>Here Insert Name and Title of the Officer</span>

personally appeared _Harold A. Katersky_
                    <span>Name(s) of Signer(s)</span>

_____

**JENNIFER LONG**
Commission # 1766181
Notary Public - California
Los Angeles County
My Comm. Expires Sep 5, 2011

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Jennifer Long_
                <span>Signature of Notary Public</span>

<span>Place Notary Seal Above</span>

───────────────── **OPTIONAL** ─────────────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____
_____
_____

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____
_____
_____

© 2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org    Item #5907    Reorder: Call Toll-Free 1-800-876-6827

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Los Angeles_ }

On _August 2, 2010_ before me, _Jennifer Long, Notary Public_,
        Date                                Here Insert Name and Title of the Officer

personally appeared _Dana Arnold_
                              Name(s) of Signer(s)

_____

**[Notary Seal]**
JENNIFER LONG
Commission # 1766151
Notary Public - California
Los Angeles County
My Comm. Expires Sep 5, 2011

who proved to me on the basis of satisfactory evidence to
be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws
of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _Jennifer Long_
                      Signature of Notary Public

Place Notary Seal Above

---

**—— OPTIONAL ——**

*Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Individual | ☐ Individual |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Attorney in Fact | ☐ Attorney in Fact |
| ☐ Trustee | ☐ Trustee |
| ☐ Guardian or Conservator | ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

| In re:<br>PACIFICA MESA STUDIOS, LLC, etc., et al.<br><br>Debtor(s). | CHAPTER 7<br><br>CASE NUMBER: 1:10-bk-18827-GM |
|---|---|

### PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**

A true and correct copy of the foregoing document described as **EXHBIITS A AND B IN SUPPORT OF FINAL ORDER (I) AUTHORIZING DEBTOR (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364, (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (II) GRANTING CERTAIN PROTECTIONS TO PREPETITION LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:** On **August 16, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows:

> Honorable Geraldine Mund
> United States Bankruptcy Court
> 21041 Burbank Boulevard, Suite 342
> Woodland Hills, CA  91367

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 16, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows:

| | |
|---|---|
| Robert T. Schmidt, Esq. rschmidt@kramerlevin.com | Monika J. Machen, Esq.  mmachen@polsinelli.com |
| Linda S. Koffman, Esq.  lkoffman@gphlaw.com | Louis Puccini, Jr., Esq.  puccinilaw@puccinilaw.com |
| Mark J. Nora, Esq.        mnora@polsinelli.com | Sara Chenetz    chenetz@blankrome.com |
| Michael I Gottfried    mgottfried@lgbfirm.com | S. Margaux Ross    margaux.ross@usdoj.gov |
| Peter F Jazayeri    jazayeri@blankrome.com | |

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 16, 2010 | NIKOLA A. FIELDS | /s/ Nikola A. Fields |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

| | |
|---|---|
| In re: Pacifica Mesa Studios, LLC<br><br>Debtor(s). | CHAPTER  11<br><br>CASE NUMBER 1:10-bk-18827-GM |

### NOTE TO USERS OF THIS FORM:

**1)** Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3) Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4) Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **FINAL ORDER (I) AUTHORIZING DEBTOR (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364, (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (II) GRANTING CERTAIN PROTECTIONS TO PREPETITION LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364** was entered on the date indicated on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **<u>August 16, 2010</u>**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Sara Chenetz                    chenetz@blankrome.com
- Michael I. Gottfried        mgottfried@lgbfirm.com, msaldana@lgbfirm.com
- Peter F. Jazayeri            jazayeri@blankrome.com
- S. Margaux Ross            margaux.ross@usdoj.gov
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐  Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐  Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

Robert T. Schmidt, Esq. rschmidt@kramerlevin.com    Monika J. Machen, Esq.   mmachen@polsinelli.com
Linda S. Koffman, Esq.  lkoffman@ghplaw.com            Louis Puccini, Jr., Esq.  puccinilaw@puccinilaw.com
Mark J. Nora, Esq.        mnora@polsinelli.com

☐  Service information continued on attached page