1  Steven T. Gubner – State Bar No. 156593
   Robyn B. Sokol, SBN 159506
2  **EZRA BRUTZKUS GUBNER LLP**
   21650 Oxnard Street, Suite 500
3  Woodland Hills, CA  91367
   Telephone: 818.827.9000
4  Facsimile:  818.827.9099
   Email:  sgubner@ebg-law.com
5        rsokol@ebg-law.com

6  Attorneys for Pacifica Mesa Studios, LLC,
   Debtor and Debtor In Possession

7
                    **UNITED STATES BANKRUPTCY COURT**
8
                    **CENTRAL DISTRICT OF CALIFORNIA**
9
                    **SAN FERNANDO VALLEY DIVISION**
10

11  In re                                  Case No. 1:10-bk-18827-GM

12  PACIFICA MESA STUDIOS, LLC, a          Chapter 11
    California limited liability company
13                                         **DEBTOR'S FIRST AMENDED**
          Debtor and Debtor-in-Possession. **DISCLOSURE STATEMENT**
14                                         **DESCRIBING CHAPTER 11 PLAN OF**
                                           **REORGANIZATION**
15
                                           Filing Date:  December  13,  2010
16
                                           Confirmation Hearing
17                                         Date:    February 24 and 25, 2011
                                           Time:    9:00 a.m.
18                                         Place:   Courtroom 303
                                                    U.S. Bankruptcy Court
19                                                  21041 Burbank Blvd.
                                                    Woodland Hills, CA 91367
20

21

22

23

24

25

26

27

28

332753

**I.**

**INTRODUCTION**

Pacifica Mesa Studios, LLC., a California limited liability company,  (the "Debtor" or "Pacifica") is the debtor in this Chapter 11 bankruptcy case.  On July 20, 2010, the Debtor commenced the bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Code" or "Bankruptcy Code"), 11 U.S.C. §§ 101 *et seq.*

Chapter 11 allows the Debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization ("Plan")[1].  The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor is the party proposing the Plan sent to you in the same envelope as this document.

THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

This is a reorganizing plan.  In other words, the Debtor seeks to accomplish payments under the Plan by restructuring its debt and providing the First Lien Lender, as the holder of the First Lien Lender Claims, the New Membership Interests.  The Plan sets forth the Debtor's proposal for: (i) the funding of Plan Distributions, including through the Exit Financing Facility as and to the extent the Debtor and the First Lien Lender so elect; (ii) the continuation of the Debtor's operations by the Reorganized Debtor; (iii) the treatment of Allowed Claims against the Debtor including making certain distributions to trade creditors and other unsecured creditors; (iv) the termination of the existing Equity Interests in the Debtor; and (v) the issuance of new equity interests in the Reorganized Debtor, the New Membership Interests.  The Plan provides that Equity Interests in the Debtor will be cancelled and that all assets of the Debtor on the Effective Date will vest in the Reorganized Debtor.   The membership interests in the Reorganized Debtor shall be issued to the First Lien Lender or its designee.  The Reorganized Debtor will continue the business operations of the Debtor.

The First Lien Lender supports the Plan.

---

[1]    All capitalized terms not defined herein, shall have the definition ascribed to them in Article II of the Plan.

1    The Effective Date of the Plan is a Business Day on or after the Confirmation Date

2    specified by the Debtor and consented to by the First Lien Lender on which (i) no stay of the

3    Confirmation Order is in effect and (ii) all conditions to the effectiveness of the Plan have been

4    satisfied or waived in accordance therewith by the relevant Persons.  It is anticipated that the

5    Effective Date will be in March 2011.

6    **Purpose of this Document**

7    This Disclosure Statement summarizes the Plan and tells you certain information relating

8    to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

9    **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

10   **KNOW ABOUT:**

11   **(1)    WHO CAN VOTE OR OBJECT;**

12   **(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (*i.e.*, what your claim**

13   **will receive if the Plan is confirmed) AND HOW THIS TREATMENT**

14   **COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN**

15   **LIQUIDATION;**

16   **(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS**

17   **DURING THE BANKRUPTCY;**

18   **(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER**

19   **OR NOT TO CONFIRM THE PLAN;**

20   **(5)    WHAT IS THE EFFECT OF CONFIRMATION; AND**

21   **(6)    WHETHER THE PLAN IS FEASIBLE.**

22   This Disclosure Statement cannot tell you everything about your rights. You should

23   consider consulting your own lawyer to obtain more specific advice on how the Plan will affect

24   you and what is the best course of action for you.

25   Be sure to read the Plan as well as the Disclosure Statement. If there are any

26   inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

27   The Code requires a Disclosure Statement to contain "adequate information" concerning

28   the Plan. The Bankruptcy Court ("Court") has approved this Disclosure Statement as including

1    adequate information, i.e., containing enough information to enable parties affected by the Plan

2    to make an informed judgment about the Plan.  Any party can now solicit votes for or against the

3    Plan.

4    **A.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

5    THE   COURT   HAS   NOT   YET   CONFIRMED   THE   PLAN   DESCRIBED   IN   THIS

6    DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT

7    YET BINDING ON ANYONE.   HOWEVER, IF THE COURT LATER CONFIRMS THE

8    PLAN,  THEN  THE  PLAN  WILL  BE  BINDING  ON  THE  DEBTOR  AND  ON  ALL

9    CREDITORS AND INTEREST HOLDERS IN THIS REORGANIZATION CASE.

10        1.    Time and place of the Confirmation Hearing.

11        The hearing where the Court will determine whether or not to confirm the Plan will take

12    place on February 24, 2011 at 10:00 a.m. and if need be continue through February 25, 2011 at

13    10:00 a.m., in Courtroom 303, United States Bankruptcy Court, 21041 Burbank Blvd.,

14    Woodland Hills, CA 91367.

15        2.    Deadline For Voting For or Against the Plan.

16        If you are entitled to vote, it is in your best interest to vote timely on the enclosed ballot

17    and return the ballot to Robyn B. Sokol, Ezra Brutzkus Gubner, LLP, 21650 Oxnard Street, Suite

18    500, Woodland Hills, CA 91367, Tel. (818) 827-9000, or by fax to (818) 827-9099.

19        Your ballot must be received by 5:00 p.m., PST, on February 11, 2011 or it will not be

20    counted.

21        3.    Deadline For Objecting to the Confirmation of the Plan.

22        Objections to the confirmation of the Plan must be filed with the Court and served by

23    February 10, 2011, upon: (a) Robyn B. Sokol, Esq., Ezra Brutzkus Gubner, LLP, 21650 Oxnard

24    Street Suite 500, Woodland Hills, CA 91367, counsel for the Debtor as approved by order of

25    the Court; (b) Robert T. Schmidt, Esq., Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of

26    the Americas, New York, New York 10036, counsel for the DIP Lender and the First Lien

27    Lender; (c) Michael I. Gottfried, Esq., Landau Gottfried & Berger LLP, 1801 Century Park

28    East, Suite 1460, Los Angeles, California  90067, counsel for the DIP Lender and the First Lien

-4-

332753

1    the First Lien Lender; and (d)  Monika J. Machen, Esq., Polsinelli Shughart PC, 161 N. Clark

2    Street, Suite 4200, Chicago, IL 60601, counsel for Workers Realty Trust II, L.P.; and (e) Sara

3    L. Chenetz, Esq., Blank Rome LLP, 1925 Century Park East, 19th Floor, Los Angeles, CA

4    90067, counsel for Workers Realty Trust II, L.P.

5        4.    <u>Identity of Person to Contact for More Information Regarding the Plan</u>.

6        Any interested party desiring further information about the Plan should contact Robyn B.

7    Sokol, Ezra Brutzkus Gubner, LLP, 21650 Oxnard Street Suite 500, Woodland Hills, CA 91367,

8    Tel. (818) 827-9000, or by fax to (818) 827-9099, who is counsel for the Debtor.

9    **B.    Disclaimer**

10       The financial data relied upon in formulating the Plan is based on the Debtor's books and

11   records, which, unless otherwise indicated, are unaudited. The Debtor represents that everything

12   stated in the Disclosure Statement is true to the Debtor's best knowledge. The Court has not yet

13   determined whether or not the Plan is confirmable and makes no recommendation as to whether

14   or not you should support or oppose the Plan. **The information contained herein is based**

15   **upon the opinions and beliefs of the Debtor unless specifically stated otherwise.**

16   **II.**

17   **BACKGROUND**

18   **A.    Description and History of the Debtor's Business**

19       The Debtor is a California limited liability company formed for the purpose of

20   developing and running a state-of-the art production complex in Albuquerque, New Mexico.

21   The Debtor is owned on a 50/50 basis by members Harold Katersky ("Katersky") and Dana

22   Arnold ("Arnold").

23       The Debtor owns and runs a production complex in Albuquerque, New Mexico

24   comprised of eight large soundstages – four 24,000 sq. ft. stages with 55-foot clear height, two

25   18,000 sq. ft. stages with 45-foot clear height and two 18,000 sq. ft. stages with 35-foot clear

26   height – plus office space, back lot space, mill, storage and set construction space, an HD digital

27   screening room, fitness center and the full spectrum of production support services, all situated

28   on a 28-acre campus setting.

1      The Debtor is the largest film studio in New Mexico. The Debtor currently employs 12

2  people and hires 20 to 30 full time employees that work for other companies on site. Plus, each

3  production brings hundreds of jobs to Albuquerque, New Mexico. The Debtor serves the major

4  Hollywood studios, as well as independent producers, and all members of the entertainment

5  community who create, finance and produce and distribute media content.

6      The Debtor funded its studio with an initial loan from Amalgamated Bank of New York,

7  as Trustee of the Longview Ultra Construction Loan Investment Fund ("Amalgamated") in the

8  amount of $58,700,000. This loan was later increased to $75,300,000. The Amalgamated loan

9  is secured by all assets of the Debtor and guarantees from Katersky and Arnold. The balance on

10  the Amalgamated loan is approximately $84,000,000. The Debtor also executed an Agreement

11  for Participating Loan with Workers Realty Trust II, L.P., a Delaware limited partnership

12  ("Workers"), dated as of April 12, 2006 (as amended), pursuant to which Workers agreed to lend

13  the Debtor up to $16.2 million.

14      Workers, the Debtor and Amalgamated are each a party to the Amended and Restated

15  Intercreditor and Subordination Agreement ("Intercreditor Agreement"). Under the Intercreditor

16  Agreement, Workers has subordinated all of its claims and all of its liens to Amalgamated,

17  except with respect to the New Market Tax Credit proceeds ("NMTC Proceeds"). Workers also

18  contends that its claims are secured by the membership interests of the Debtor which were

19  pledged to Workers by Arnold and Katersky. Amalgamated holds a first position lien secured by

20  all of the Debtor's assets in the principal amount of approximately $75.3 million and the

21  Debtor's assets are worth significantly less than $75.3 million. Furthermore, the NMTC

22  Proceeds upon which Workers holds a first position lien have no value. The NMTC Proceeds

23  have no value because based upon the Debtor's current financial statements and the fact that the

24  Debtor's assets are over encumbered by the liens of Amalgamated and Workers, the Debtor is

25  not qualified to receive NMTC Proceeds and therefore will not receive any NMTC Proceeds.

26  Workers disputes the Debtor's contention that the NMTC Proceeds have no value. Workers

27  through its counsel conceded that the NMTC Proceeds have no value in a letter dated July 19,

28  2010. In this letter counsel for Workers stated that "it is [Debtor's] existing defaults that

332753

1   preclude the successful closing of any New Market Tax Credit transaction…" Workers disputes

2   that this statement is a "concession" that the NMTC Proceeds have no value; rather, Workers

3   contends that the NMTC Proceeds were not available to the Debtor as of July 19, 2010. The

4   NMTC Proceeds have not been available to the Debtor since July 19, 2010 and remain

5   unavailable to the Debtor. Based on the Debtor's financial condition the Debtor cannot qualify

6   for NMTC Proceeds.

7       Based on the foregoing the Debtor believes that Workers is an unsecured creditor.

8       The Debtor believes the value of its personal property and real property does not exceed

9   $54 million.

10  **B.    Principals/Affiliates of Debtor's Business**

11      The Debtor is a California limited liability company formed for the purpose of

12  developing and running a state-of-the art production complex in Albuquerque, New Mexico.

13  The Debtor is owned on a 50/50 basis by members Katersky and Arnold.

14  **C.    Management of the Debtor Before and After Commencement of the Bankruptcy**

15      **Case**

16      Immediately prior to the commencement of the case the Debtor was managed and

17  operated by Katersky and Arnold. Pacifica Ventures, LLC provides management services to the

18  Debtor through a management agreement. Pacifica Ventures, LLC continues to manage and

19  operate the Debtor.   The Debtor's management team prior to the filing and during the pendency

20  of the case consists of the following parties with the following duties:

21      Katersky is the Chief Executive Officer and Managing Member of the Debtor. He is

22  directly involved and responsible for the handling of the Debtor's financial documents and the

23  Debtor's financial affairs, and oversees the financial management, government planning, and

24  future development of the Debtor's studio.

25      Arnold is a Member and President of the Debtor. Arnold supervises and oversees the day-

26  to-day management of operations, is responsible for the future marketing and public relations

27  planning, and in coordination with Katersky, is responsible for the public and government affairs

28  of the Debtor's studio.

1   Andrew Katersky is Vice President, Finance for the Debtor. He is responsible for

2   handling all financial aspects of the Debtor's studio projects. He is responsible for oversight of

3   the studio property, accounting and finance staff, and interacts with lenders and equity investors

4   on behalf of the Debtor.

5   Matt Rauchberg is Senior Vice President of the Debtor. He is responsible for overseeing

6   the legal affairs and development planning of the studio. Mr. Rauchberg also provides significant

7   marketing and financial affairs support.

8   Wayne Rauschenberger is the Chief Operating Officer and General Manager of the

9   Debtor pursuant to the Consulting Services Agreement dated March 1, 2010. Mr.

10  Rauschenberger is responsible for managing the day-to-day operations of the Debtor's studio

11  and all employees, contractors, consultants, vendors and customers of the Debtor, including

12  budgets, contract negotiations, and cost control. Mr. Rauschenberger is paid $4,000 per week,

13  plus expenses including travel and accommodations while in Albuquerque, New Mexico.

14  James Luongo is the General Manager of Stages and Offices at the Debtor's studio

15  working closely with Wayne Rauschenberger in the day-to-day operations of the studio property.

16  Curtis Neeld is the Controller for the Debtor. He is responsible for the day to day

17  accounting of the Debtor's studio.

18  **D.    Events Leading to Chapter 11 Filing**

19  Following is a brief summary of the circumstances that led to the filing of this Chapter 11

20  case:

21  Upon the completion of the studio, the economy "tanked" and the Debtor was no longer

22  able to honor its commitments to Amalgamated and Workers. The Debtor diligently searched

23  for investors but was unsuccessful.

24  During this time, Debtor believes that its former officers were among other things

25  breaching their fiduciary duty and interfering with the Debtor's economic advantage by profiting

26  (receiving fees and compensation) for placing shows in facilities that competed with the Debtor;

27  using the Debtor's client lists to solicit customers for their own benefit and not the benefit of the

28  Debtor; and wrongfully using the Debtor's name, resources and confidential and proprietary

1   information to solicit and direct the Debtor's customers and potential customers to facilities that

2   competed with the Debtor.  The Debtor believes that these actions directly impacted the Debtor's

3   business operations and significantly impacted the need for the Debtor to seek bankruptcy

4   protection.  At the time of the Debtor's bankruptcy filing a lawsuit was pending against the

5   Debtor's former officers and others in the Superior Court of the State of California, Los Angeles

6   County, Case No. SC107724, titled <u>Pacifica Mesa Studios, LLC, et al. v. Nick Smerigan, Jeremy</u>

7   <u>Hariton, Jason Hariton, Roadtown Enterprise, LTD, Number Two, Inc. et al.</u> ("Smerigan Case")

8   On or about September 21, 2010, this law suit was removed to the Bankruptcy Court by the

9   Debtor's filing of a Notice of Removal to the United States Bankruptcy Court by Pacifica Mesa

10  Studios, LLC and designated Adversary case 1:10-ap-01400.  The defendants to this case may

11  seek to remand the case back to State Court.  Any such motion will be opposed by the Debtor.

12  The defendants to this case dispute each and every claim made against them by the Debtor in the

13  Smerigan Action.

14          The Debtor believes that another factor that led to the decline in business operations was

15  the uncertainty created by Workers' repeated notices to foreclose upon and sell 100% of the

16  ownership interests of the Debtor.  Since April 2010, Workers has been noticing foreclosure

17  sales for the Membership Interests and all assets of the Debtor.  Workers noticed a sale of the

18  Membership Interests for July 23, 2010, which prompted the Debtor to file for Bankruptcy

19  protection.   The Debtor believes that these actions on the part of Workers have created

20  uncertainty in the entertainment industry and have directly harmed the Debtor's business

21  operations.  Workers disagrees with the Debtor's opinion.

22  **E.      Significant Events During the Bankruptcy**

23          1.      <u>Bankruptcy Proceedings.</u>

24      The following is a chronological list of significant events which have occurred during the

25  administration of this case:

26

27

28      .

1

a.    Administrative Matters.

2    The Debtor has and is continuing to comply with all of its duties under the Bankruptcy

3    Code, Federal Bankruptcy Rules, and all applicable guidelines of the Office of the United States

4    Trustee.

5    The Debtor completed its initial filing requirements, including the filing of its Schedules

6    of Assets and Liabilities and Statement of Financial Affairs, and the 7- Day Package.

7    On August 6, 2010, the Debtor served Notices of Setting Insider Compensation for Dana

8    Arnold, President and Member of the Debtor, Andrew Katersky, Vice President Finance for the

9    Debtor, and Pacifica Ventures, LLC, the manager of the Debtor (the "Insider Compensation

10    Notices"). No oppositions to the Insider Compensation Notices were filed, and compensation

11    was allowed effective August 24, 2010.

12    On August 19, 2010, Katersky, the Managing Member of the Debtor appeared with the

13    Debtor's counsel at the Meeting of Creditors and Initial Debtor Interview with the Office of the

14    United States Trustee. The United States Trustee's Office concluded the Meeting of Creditors at

15    that time.

16    On August 19, 2010, the Court issued an Order Setting Scheduling and Case

17    Management Conference and Filing of Monthly Reports. That status conference occurred on

18    September 28, 2010.

19    On September 7, 2010, the Debtor filed its Motion By Pacifica Mesa Studios, LLC,

20    Debtor And Debtor-In-Possession, For Order Establishing A Bar Date For Filing Proofs Of

21    Claim And Approving Form And Manner Of Notice Of Bar Date. By and through this motion,

22    the Debtor established a bar date of November 5, 2010. On October 7, 2010, the Debtor served a

23    notice of bar date on all creditors, interest holders and parties in interest.

24

b.    Employment of Professionals.

25    The Court approved the employment by the Estate of Ezra Brutzkus Gubner, LLP, as

26    insolvency counsel for the Debtor. The employment of Ezra Brutzkus Gubner, LLP was

27    approved as of July 21, 2010 by Court Order entered on August 24, 2010.

28    ///

1    On July 29, 2010, the Debtor filed an application to employ William J. Hoffman and

2    Trigild Inc. as its Chief Restructuring Officer (the "CRO Application"), a requirement of the

3    Debtor's primary lender, Amalgamated, as part of the cash collateral agreement and DIP Loan

4    Agreement. The Order approving the CRO Application was entered on September 7, 2010.

5    The Debtor plans on filing an application to employ Nagler & Associates as special

6    litigation counsel with respect to the Smerigan Case. If the employment of Nagler & Associates

7    is approved by the Court, then Nagler & Associates shall provide services to the Estate with

8    respect to the Smerigan Case.

9                c.    Adversary Proceedings or other Actions.

10    The Debtor is or was a party to the following adversary actions, relevant to the

11    administration of the Estate:

12        LLC/Pacifica Mesa Studios, LLC, etc., v New Vista Investment Group, LLC, Workers

13        Realty Trust II, L.P.,CRA Realty Investors Company, Commonwealth Realty Advisors,

14        Inc.,Harold A. Katersky, Hilary Katersky, Dana Arnold, Randee Arnold and Does 1

15        through 10, inclusive:

16    On July 21, 2010, the debtor commenced an adversary proceeding entitled In re Pacifica

17    Mesa Studios, LLC/Pacifica Mesa Studios, LLC, etc., v New Vista Investment Group, LLC,

18    Workers Realty Trust II, L.P.,CRA Realty Investors Company, Commonwealth Realty Advisors,

19    Inc., Harold A. Katersky, Hilary Katersky, Dana Arnold, Randee Arnold and Does 1 through 10,

20    inclusive by the filing of the Complaint for: 1. Breach of Fiduciary Duty; 2. Aiding and

21    Abetting Breach of Duty of Loyalty; 3. Aiding and Abetting Intentional Interference With

22    Prospective Economic Advantage; 4. Breach of Implied Covenant of Good Faith; 5. Non-

23    Disclosure re Breach of Fiduciary Duty; 6. Declaratory Relief and Temporary Restraining

24    Order; and 7. Preliminary Injunction Section 105 Injunction and Extension of the Automatic

25    Stay ("Complaint"). This adversary proceeding has been assigned adversary case number 1:10-

26    ap-01286 – GM ("Adversary Proceeding").

27    The Complaint asserts seven claims for relief. While a review of the full Complaint is

28    essential to a full understanding of its allegations, in summary, the Complaint asserts claims for

-11-

1    relief arising out of events occurring prior to the bankruptcy filing with regard to the Debtor's

2    filming and production facilities for motion picture and television production owned and

3    operated in Albuquerque, New Mexico. It is alleged that the Debtor funded this studio initially

4    with a loan from Amalgamated and that this loan is secured by a first priority lien on the Debtor's

5    assets. It is further alleged that thereafter, the debtor entered into a further loan with Workers, a

6    defendant, and that the Debtor, Amalgamated and Workers then entered into an agreement

7    among themselves affecting the lenders' lien priorities and security rights, the Intercreditor

8    Agreement. Amalgamated is not a defendant.

9        The Complaint further alleges that certain specified individuals who had been employed

10    in varying capacities by the Debtor and in some instances its related entity breached their duties

11    to the Debtor by soliciting business of the Debtor for their own gain, charging false services and

12    expenses to the Debtor, and acting in competition with the Debtor when their duties precluded

13    such conduct. A fuller recitation of the Debtor's allegations can be found in the Complaint.

14        Finally, the Complaint alleges that the lender defendants (all named defendants except for

15    the Katerskys and the Arnolds) participated with the specified individuals in their breaches of

16    duties to the Debtor. The Complaint seeks damages for the conduct alleged and for a declaration

17    of rights that the conduct alleged against the lender defendants has absolved the Debtor of any

18    obligations it may have owed to them, and that any obligations the Katerskys and the Arnolds

19    may have had to the lender defendants as guarantors of the Debtor's obligations are also

20    absolved. The Katerskys and the Arnolds are named as defendants in this claim for relief alone,

21    their interests in the relief sought coincide with the Debtor's.

22        The Complaint also asserts a claim for relief seeking preliminary relief to preclude any

23    foreclosure on the Katersky and Arnold membership interests in the Debtor, which membership

24    interests had been given as security for their guaranties to Workers. Such membership interests

25    constitute 100% of the membership interests in the Debtor.

26        On June 21, 2010, the Debtor filed its "Emergency Motion for an Order Extending the

27    Automatic Stay to Members of the Debtor or in the Alternative for Entry of a Temporary

28    Restraining Order and Order to Show Cause re Preliminary Injunction Restraining Purported

1   Foreclosure of Members' Interest in Debtor" ("Injunction Motion")   At the hearing conducted on

2   the Injunction Motion, the Court granted the relief requested on a preliminary basis.   At the

3   continued hearing on the Injunction Motion the Court granted the relief sought.   On August 27,

4   2010, the United States Bankruptcy Court in this adversary proceeding entered a preliminary

5   injunction on motion of the Debtor enjoining (pending any further order of Court) the foreclosure

6   on the membership interests. Previously, on motion, the Court had entered a temporary

7   restraining order to the same effect on July 30, 2010.

8       A response to the Complaint by the lender defendants was due September 17, 2010.

9   Defendants New Vista Investment Group, LLC, Workers, CRA Realty Investors Company, and

10  Commonwealth Realty Advisors, Inc filed a Motion to Dismiss Complaint Pursuant to Fed. R.

11  Bankr. P. 7012 and 7019 and Fed. R. Civ. P. 12(B)(6), 12(B)(7), and 19 ("Motion to Dismiss").

12  The Debtor filed an opposition to the Motion to Dismiss.  The hearing on the Motion to Dismiss

13  occurred on October 20, 2010.  By Order entered on November 12, 2010, the Court ruled that

14  Count I (breach of fiduciary duty), Count II (aiding and abetting breach of fiduciary duty), Count

15  III (aiding and abetting tortious interference with prospective economic advantage), and Count

16  IV (breach of fiduciary duty-nondisclosure) of the Complaint are each dismissed, without

17  prejudice to a good faith amendment and that Count V (breach of covenant of good faith and fair

18  dealing) is dismissed with prejudice.  The Court denied the Motion to Dismiss with respect to

19  Claim VI (Declaratory Relief) and Claim VII (Injunctive Relief).

20      PACIFICA MESA STUDIOS, LLC, a California limited liability company; and

21      PACIFICA VENTURES, a California limited liability company, v. NICK SMERIGAN,

22      an individual; JEREMY HARITON, an individual; JASON HARITON, an individual;

23      ROADTOWN ENTERPRISES, LTD., a corporation;  NUMBER TWO INC., a

24      corporation, BURN & RAVE ENTERPRISES, LTD.; and DOES 1 through 100,

25      inclusive:

26      The Debtor and it's management company, Pacifica Ventures, LLC, filed a suit against

27  the former chief operating officer of the Debtor's New Mexico studio and two former employees

28  alleging that these former employees, among other things,  worked to establish competing

1  studios in other states while employed to operate and market the debtor's Albuquerque studios,

2  misappropriated Debtor's funds and resources, and other charges, resulting in significant

3  financial damage to the Debtor and contributed to the resulting defaults on the Debtor's secured

4  obligations.  This action was filed in the Superior Court of California, County of Los Angeles,

5  Case No. SC 107724, the Smerigan Case. The defendants to the Smerigan Case deny each and

6  every claim and related allegations made against them by in this law suit.

7       Burn & Rave Enterprises, LTD and Jeremy Hariton filed a cross complaint for slander

8  and invasion of privacy claims naming the Debtor, Pacifica Ventures LLC, Pacifica Ventures

9  International, LLC, Hal Katersky, Dana Arnold, Matt Rauchberg and William Waltman and

10  Roes 1-25 as cross-defendants.  Roadtown Enterprises, Ltd. and Nick Smerigan  filed a cross

11  complaint for slander and invasion of privacy claims naming the Debtor, Pacifica Ventures LLC,

12  Pacifica Ventures International, LLC, Hal Katersky, Dana Arnold, Matt Rauchberg and William

13  Waltman and Roes 1-25 as cross-defendants.  The cross-defendants to this action deny each and

14  every claim and each and every one of the related allegations made against them in this law suit.

15       The Smerigan Case was removed to the Bankruptcy Court by and through the filing of a

16  notice of removal on or about September 21, 2010.  The Smerigan Case is now currently pending

17  before the Bankruptcy Court as Adversary Case 1:10-ap-01400.  RoadTown Enterprises, Ltd.,

18  Nick Smerigan, Burn & Rave Enterprises, Ltd. and Jeremy Hariton filed a motion for remand

19  which is set for hearing on Decmeber 15, 2010.  By and through this motion these defendants

20  seek to remand the case back to State Court.  The Debtor filed an opposition to this Motion.

21       At this early stage of litigation it is difficult to ascertain the value of the Smerigan Case.

22  The Smerigan Case, like all of the other assets of the Debtor, will vest in the Reorganized Debtor

23  on the Effective Date.

24       DIGITAL MEDIA GROUP, LLC, ELLIOTT LEWITT, DEBRA ROSEN, and MARK

25       BARHYTE  v. HAROLD KATERSKY, DANA ARNOLD, LEE TOMLINSON, NICK

26       SMERIGAN,  THE CULVER STUDIOS, ALBUQUERQUE STUDIOS,  PACIFICA

27       MESA STUDIO LLC, PACIFICA VENTURES LLC,  PACIFICA STUDIO

28       MANAGEMENT PARTNERS LLC,  PACIFICA STUDIO EQUITY PARTNERS LLC,

1  PACIFIC COAST CAPITAL PARTNERS, PCCP LB STUDIO CITY LOS ANGELES

2  LLC, PCCP STUDIO CITY LOS ANGELES LLC, PCCP., PRODUCTIONS LCC,

3  JAMES K. TRUMP JR, BUILD NEW MEXICO, UNION DEVELOPMENT

4  CORPORATION, ABC CORPORATIONS, XYZ PARTNERSHIPS/LIMITED

5  PARTNERSHIPS, JANE DOE AND RICHARD ROE:

6  The Debtor as well as its developer, managers and several individuals, are defendants in a

7  suit brought by Digital Media Group and its principals in New Mexico, County of Bernalillo,

8  Second Judicial District Court. By and through this action, the plaintiffs allege that they are

9  entitled to a portion of the profits of the Debtor. In 2005, these plaintiffs were parties to a two-

10  page Letter of Intent (LOI) with Pacifica Ventures, LLC to develop a studio project at the

11  Albuquerque Rail Yard. This LOI was specific to the rail yard project, gave the named

12  defendants in this lawsuit no obligation to include these plaintiffs in any other projects, and

13  subsequently expired under its own terms. When the defendants withdrew from the Rail Yard

14  project, plaintiffs were free to continue to develop the Rail Yard without defendant's

15  involvement. Given the fact that the Debtor is currently in bankruptcy, the fact that its secured

16  obligations are in default and the secured creditors' claims are significantly greater than the value

17  of the Debtor, even if plaintiffs' are successful, their damages would be $0.00. The Debtor may

18  remove this case to Bankruptcy Court.

19  MESA DEL SOL, LLC, v. PACIFICA MESA STUDIOS, LLC, No. CV-2008-09403 and

20  MESA DEL SOL, LLC v. PACIFICA MESA STUDIOS, LLC, No. CV-2010-06207:

21  Mesa del Sol, LLC is the master developer of the 13,000 acre planned community in

22  which the Debtor's studios sit adjacent to the first town center, and the successor to the entity

23  from which the Debtor purchased (in 2006) the land upon which the studios sit. These disputes

24  arise from the Debtor's option to purchase additional land on the Mesa, the Debtor's exclusives

25  on the Mesa, and the permitted uses of certain portions of the property known as the "liner land"

26  which are slated for future development facing the town center. A mediated settlement

27  conference in December 2009 led to a settlement agreement that covered numerous issues,

28

1    including some issues not actually included in the current litigation, but the parties have been

2    unable to finalize said settlement.

3          On May 21, 2010, Mesa del Sol LLC filed an additional lawsuit seeking recovery of

4    $278,567.23 in costs associated with the initial installation of electrical infrastructure at the

5    Debtor's studios.  The draft settlement agreement between the parties addressed this issue as

6    well.

7                    d.      Use of Cash Collateral and DIP Financing.

8          On July 21, 2010, the Debtor filed an emergency motion for Debtor in Possession

9    financing and use of cash collateral (the "Financing Motion") and an emergency motion for

10   authorization to pay pre-petition wages, permit employees to use accrued prepetition vacation

11   time, and to pay employees' prepetition reimbursable expenses and related relief (the "Wage

12   Motion," collectively with the Financing Motion and Injunction Motion, the "Emergency

13   Motions").

14         On July 23, 2010, hearings were held on the Emergency Motions.  The Financing Motion

15   was opposed by the Debtor's junior lender, Workers.  The Court granted the Emergency Motions

16   and issued a TRO in the Adversary Proceeding.  The Order on the Wage Motion was entered on

17   July 30, 2010.

18         A continued hearing for final approval of the Financing Motion and Injunction Motion

19   was held on August 13, 2010.  The Debtor filed a Supplemental Statement regarding the

20   Financing Motion on August 6, 2010.  On August 6, 2010, Workers filed its opposition to the

21   Financing Motion.  At the hearing on August 13, 2010, the Court issued a final order approving

22   the Financing Motion and the Injunction Motion.  On August 17, 2010, the Court entered the

23   Final Order authorizing debtor to obtain postpetition financing, to use cash collateral, and

24   granting certain protections to the prepetition lender.

25         2.      Current and Historical Financial Conditions.

26         The Historical Financial conditions of the Debtor are discussed above and summarized in

27   the Albuquerque Studios Historical Performance attached hereto as part of Exhibit B.    The

28

1  Albuquerque Studios Historical Performance sets forth the actual revenues and expenses of the

2  Debtor for years ending 2007, 2008 and 2009.

3    The Debtor's Operating Reports for July 2010 through October 2010 are attached hereto

4  as part of Exhibit B.  These reports detail the Debtor's revenues from business operations as well

5  as all of the Debtor's expenses since the commencement of the Reorganization Case.

6    The identity and fair market value of the estate's assets are listed in Exhibit A.  The

7  Debtor believes that its assets have a value no greater than $54,000,000.

8    3. Actual and Projected Recovery of Preferential or Fraudulent Transfers.

9    Debtor does not believe any preferential avoidance actions or fraudulent transfer actions

10  exist.  Based on a review of the Debtor's books and records it appears that all transfers made

11  within 90 days of the bankruptcy filing as well as transfers made to "insiders" as that term is

12  defined under 11 U.S.C. §101(31) were made in the ordinary course of the Debtor's business.

13  To the extent avoidance actions exit with respect to the defendants in the Smerigan Case, these

14  claims will be pursued in the pending actions in which these parties are already named

15  defendants.

16    4. Procedures Implemented to Resolve Financial Problems.

17    In its attempt to fix the problems that led to the bankruptcy filing, Debtor has

18  implemented the following:

19    a. Terminated the prior officers which the Debtor alleges redirected critical projects and

20     clients.

21    b. Working closely with Amalgamated on a business plan.

22    c. Increased marketing efforts.

23    d. The Bankruptcy Court has entered an order enjoining Workers from taking any

24     actions with respect to the Membership Interests.

25

26

27

28

# III.

## SUMMARY OF THE PLAN OF REORGANIZATION

**A.     What Creditors Will Receive Under the Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

**B.     Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired, and claimants with such claims do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has not placed the following claims in a class:

1.     Administrative Expenses.

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(2).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.   The following chart lists all of the Debtor's § 507(a)(2) administrative claims and their treatment under the Plan (see Exhibit F for detailed information about each administrative expense claim:

| Name | Amount Owed | Treatment |
|---|---|---|
| Ezra Brutzkus Gubner LLP ("EBG") – Insolvency counsel for the Debtor. | $100,000[2] | Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Reorganized Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on or as soon as reasonably practicable after the later of the Effective Date and the date such Claim becomes an Allowed Administrative Expense Claim; *provided, however*, that Allowed Administrative Expense Claim representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, or liabilities arising under obligations incurred by the Debtor, as Debtor in Possession, in accordance with the Budget (as defined in the DIP Loan Agreement), shall be paid by the Reorganized Debtor in the ordinary course of business, |

---

[2]     This is merely an estimate of the amount remaining unpaid as of the Effective Date and does not represent the total fees and costs incurred in the Reorganization Case. The amounts actually due may be more or less.

| | | consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions. |
|---|---|---|
| Office of the United States Trustee | $0 (estimated) | Paid in full on the Effective Date. |
| Clerk's Office Fees | $15,000 | Paid in full on the Effective Date. |
| Trigild, Inc., Chief Restructuring Officer | $72,000 (estimated) | Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Reorganized Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on or as soon as reasonably practicable after the later of the Effective Date and the date such Claim becomes an Allowed Administrative Expense Claim; *provided, however*, that Allowed Administrative Expense Claim representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, or liabilities arising under obligations incurred by the Debtor, as Debtor in Possession, in accordance with the Budget (as defined in the DIP Loan Agreement), shall be paid by the Reorganized Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions. |
| Other Administrative Claims [Nagler & Associates – special litigation counsel] | $ 40,000 | Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Reorganized Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on or as soon as reasonably practicable after the later of the Effective Date and the date such Claim becomes an Allowed Administrative Expense Claim; *provided, however*, that Allowed Administrative Expense Claim representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, or liabilities arising under obligations incurred by the Debtor, as Debtor in Possession, in accordance with the Budget (as defined in the DIP Loan Agreement), shall be paid by the Reorganized Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions. |
| **TOTAL** | $227,000 | |

1    Court Approval of Fees Required:

2        The Court must rule on all fees listed in this chart before the fees will be owed.  For all

3    fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and

4    serve a properly noticed fee application, which the Court must approve.  Only the amount of fees

5    allowed by the Court will be owed and required to be paid under the Plan.

6        As indicated above, the Debtor will need to pay one hundred percent (100%) of

7    Administrative Claims on or as soon as reasonably practicable after the Effective Date of the

8    Plan unless the claimant has agreed to be paid later or the Court has not yet ruled on the Claim.

9    As indicated elsewhere in this Disclosure Statement, Debtor will have approximately $4,474,000

10   of Cash on hand on the Effective Date of the Plan (which amount shall be reduced to the extent

11   the DIP Lender agrees to convert the DIP Financing Claims into the Exit Financing Facility, to

12   forgive amounts outstanding under the DIP Loan Agreement or otherwise to not require the

13   payment of the DIP Financing Claims).  Thus, sufficient Cash will be available to satisfy the

14   Administrative Claims on the Effective Date.

15       2.    Priority Tax Claims.

16       Priority tax claims are certain unsecured income, employment and other taxes described

17   by Code Section 507(a)(8).  The Code requires that each holder of such a 507(a)(8) priority tax

18   claim receive the present value of such claim in deferred cash payments, over a period not

19   exceeding six years from the date of the assessment of such tax.  The Debtor believes that no

20   Section 507(a)(8) priority tax claims exist, other than the claim of Bernalillo County for real

21   property taxes which is treated as a secured tax claim in Class 2.   New Mexico has filed a proof

22   of claim for $3,726.55 for pre-petition taxes due based upon revenues received by the Debtor.

23   The Debtor believes that it is current on all of its taxes based on revenues due to the State of New

24   Mexico.  To the extent New Mexico is owed $3,726.55 for pre-petition taxes, then these taxes

25   are Priority Tax Claims entitled to the treatment set forth above.

26   **C.    Classified Claims and Interests**

27       The Plan classifies Claims and Interests—except for Administrative Claims and Priority

28   Tax Claims, which are not classified.  A Claim or Interest is classified in a particular Class only

to the extent that the Claim or Interest falls within the Class description.  To the extent that part

of the Claim or Interest falls within a different Class description, the Claim or Interest is

classified in that different Class.  The following table summarizes the Classes of Claims and

Interests under the Plan:

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | First Lien Lender Claims | Impaired.  The First Lien Lender or its designee will receive the New Membership Interests. | Yes | ___Unknown but significantly less than 100% |
| 4 | Second Lien Lender Claims | Impaired; no distribution. | No (deemed to reject) | 0 |
| 5 | Other Secured Creditors

Class 5A
Class 5B | Unimpaired. | No (deemed to accept) | 100% |
| 6 | General Unsecured Claims | Impaired.  Each holder of a General Unsecured Claim will receive its pro rata share of $50,000 in Cash. | Yes | 10% - 20% |
| 7 | Equity Interests in the Debtor | Impaired; no distribution. | No (deemed to reject) | 0 |

As set forth above, Classes 1, 2 and 5 are Unimpaired by the Plan, and Holders of Claims

in Classes 1, 2 and 5 are conclusively presumed to have accepted the Plan.  Classes 3 and 6 will

receive Distributions under the Plan but are Impaired by the Plan; accordingly, Holders of

Allowed Claims in Class 3 and Class 6 shall be entitled to vote to accept or reject the Plan.

Holders of Claims in Class 4 and Interest Holders in Class 7 will neither retain nor receive any

property under the Plan and, as such, are Impaired and are deemed to reject the Plan.

The treatment in the Plan is in full and complete satisfaction of the legal, contractual, and

equitable rights that each entity holding an Allowed Claim or an Allowed Interest may have in or

against the Debtor or its property. This treatment supersedes and replaces any agreements or rights those entities have in or against the Debtor or its property. All Distributions under the Plan will be tendered to the Person holding the Allowed Claim or Allowed Interest. **EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM OR INTEREST THAT IS NOT AN ALLOWED CLAIM OR ALLOWED INTEREST.**

    1.   Classes of Priority Unsecured Claims.

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The Debtor believes that no priority unsecured claims exist at this time, but provides the following treatment for such claims:

| Class # | DESCRIPTION | INSIDER | IMPAIRED | TREATMENT |
|---|---|---|---|---|
| 1 | The Debtor does not believe any Code Sections 507(a)(3), (4), (5), (6), and (7) Claims exist. | No | No Claims in this Class are not entitled to vote on the Plan. | Except to the extent that a holder of an Allowed Other Priority Claim against the Debtor has agreed to a different treatment of such Claim, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the holder of such Claim. |

2.    Classes of Secured Claims.

Secured claim are claims secured by liens on property of the estate.  The following chart lists all classes containing Debtor's secured pre-petition claims and their treatment under the Plan:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Allowed Secured Tax Claims<br><br>Priority of security int.=1st position<br><br>Collateral description = 28 acre campus consisting of 3 parcels located at 5650 University Blvd., SE, Albuquerque, NM 87106, APNs 101605128311440-102, 710561, and 446187 ("Real Property").<br>Collateral value = approximately $51,000,000<br><br>Principal owed = $334,995.36<br><br>Interest and Penalties owed =  $20,099.70 | Not an Insider | Y<br><br>This Class is Unimpaired.<br><br>This Class is not entitled to vote on the Plan. | On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtor but with the consent of the First Lien Lender, (i) such treatment that leaves unaltered the legal, equitable and contractual rights to which the holder of such Allowed Secured Tax Claim is entitled, or (ii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code.  The Debtor and the Reorganized Debtor specifically reserve the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.<br><br>It is anticipated that the Debtor will satisfy the outstanding taxes on the Effective Date or as soon thereafter as reasonably practicable. |
| 3 | Allowed Secured and Unsecured Claims of Amalgamated – First Lien Lender Claims<br><br>Collateral description = Movie production complex on the Real Property and all personal property of the Debtor except the motor vehicles.<br><br>Collateral value = approximately $54,000,000<br><br>Priority of security int.= 2nd position on Real Property and 1st position on all personal property of the Debtor except the motor vehicles. | Not an Insider | Y<br><br>This Class is Impaired.<br><br>This Class is entitled to vote on the Plan. | On the Effective Date, the First Lien Lender, as the holder of the First Lien Lender Claims against the Debtor, or its designee, shall receive all of the New Membership Interests.  The Plan shall not affect (i) any of the rights or Claims of the First Lien Lender against any Person (including the guarantors of the First Lien Lender Claims) other than the Debtor or (ii) the Intercreditor Agreement or any rights or obligations of the First Lien Lender or the Second Lien Lender thereunder, all of which rights, Claims, Intercreditor Agreement, rights and obligations shall survive and not be affected by the confirmation and consummation of the Plan. |

| | | | | |
|---|---|---|---|---|
| | Principal owed = $74,135,131.40, plus interest, fees, costs and expenses.<br><br>Total claim amount = Approximately $84,000,000 | | | |
| 4 | Allowed Secured and Unsecured Claims of Workers – Second Lien Lender Claims<br><br>Collateral description = Real Property, New Market Tax Credits and all personal property of the Debtor<br><br>Collateral value = $54,000,000<br><br>Priority of security int.= 1st as to the New Market Tax Credits (which have a value of $0.00) , 2nd with respect to the personal and 3rd with respect to the Real Property (which are valued at approximately $54,000,000).<br><br>Total claim amount = approximately $23,000,000 | Not an Insider | Y<br><br>This Class is Impaired.<br><br>This Class is not receiving any distribution or retaining any property under the Plan and therefore is deemed to reject, and is not entitled to vote on, the Plan. | Pursuant to the Intercreditor Agreement, and except as to the proceeds, if any, of the New Market Tax Credits, (i) all of the Second Lien Lender Claims are subject and subordinate in all respects to the First Lien Lender Claims, and (ii) any payment or distribution in respect of the Second Lien Lender Claims shall be paid or delivered to the First Lien Lender.  The Second Lien Lender Claims in respect of the proceeds, if any, of the New Market Tax Credits are not subordinated to the First Lien Lender Claims as and to the extent provided in the Intercreditor Agreement, but the Debtor asserts that the New Market Tax Credit Proceeds do not have any value.<br><br>Accordingly, no holder of Second Lien Lender Claims shall receive or retain any interest or property on account of any Second Lien Lender Claims against the Debtor.  The Plan shall not affect (i) any of the rights or Claims of the Second Lien Lender against any Person (including the guarantors of the Second Lien Lender Claims) other than the Debtor or (ii) the Intercreditor Agreement or any rights or obligations of the First Lien Lender or the Second Lien Lender thereunder, all of which rights, Claims, Intercreditor Agreement, rights and obligations shall survive and not be affected by the confirmation and consummation of the Plan. |
| 5A | Allowed Secured Claim #1 of New Mexico Educators Federal Credit Union<br><br>Collateral description = 2009 Ford F – 150 truck<br><br>Collateral value = $15,000<br><br>Priority of security int.= 1st<br><br>Principal owed = | Not an Insider | This Class is unimpaired and not entitled to vote on the Plan. | Except to the extent that the holder of Secured Claim #1 of New Mexico Educators Federal Credit Union agrees to different treatment, at the sole option of the Reorganized Debtor, but only with the consent of the First Lien Lender, in full satisfaction of and in exchange for such Secured Claim, (i) such Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of such Secured Claim to demand or receive payment of such Secured Claim prior to the stated maturity of such Secured Claim from and after the occurrence of a default, (ii) the |

| | $26,944.32 | | | legal, equitable and contractual rights to which such Secured Claim entitles the holder thereof shall be unaltered by this Plan, (iii) the holder of such Secured Claim shall receive Cash in an amount equal to such Secured Claim, including any interest on such Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the Effective Date, or (iv) the holder of such Secured Claim shall receive the Collateral securing its Secured Claim in full and complete satisfaction of such Secured Claim as soon as practicable after the Effective Date. |
| 5B | Allowed Secured Claim of New Mexico Educators Federal Credit Union<br><br>Collateral description = 2008 Ford Explorer<br><br>Collateral value = $19,000<br><br>Priority of security int.= 1st<br><br>Principal owned = $25,160.26 | Not an Insider | This Class is unimpaired and not entitled to vote on the Plan. | Except to the extent that the holder of Secured Claim #2 of New Mexico Educators Federal Credit Union agrees to different treatment, at the sole option of the Reorganized Debtor, but only with the consent of the First Lien Lender, in full satisfaction of and in exchange for such Secured Claim, (i) such Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of such Secured Claim to demand or receive payment of such Secured Claim prior to the stated maturity of such Secured Claim from and after the occurrence of a default, (ii) the legal, equitable and contractual rights to which such Secured Claim entitles the holder thereof shall be unaltered by this Plan, (iii) the holder of such Secured Claim shall receive Cash in an amount equal to such Secured Claim, including any interest on such Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the Effective Date, or (iv) the holder of such Secured Claim shall receive the Collateral securing its Secured Claim in full and complete satisfaction of such Secured Claim as soon as practicable after the Effective Date. |

3.    Class of General Unsecured Claims.

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a). The following chart identifies the Plan's treatment of the class containing Debtor's general unsecured claims:

| CLASS # | DESCRIPTION | IMPAIRED | TREATMENT |
|---|---|---|---|
| 6 | General Unsecured Claims<br><br>Amount of Claims: approximately $250,000 - $450,000.<br><br>As provided above, the Allowed Unsecured Claims of the First Lien Lender and the Second Lien Lender are treated in Classes 3 and 4, respectively. | This Class is Impaired.<br><br>Claims in this Class are entitled to vote on the Plan. | Each holder of an Allowed General Unsecured Claim shall receive on or as soon as reasonably practicable after the later of the Effective Date and the date such Claim becomes Allowed, such holder's pro rata share of the GUC Cash.<br><br>It is anticipated that Allowed Claims in this class will receive a 10%-20% distribution on their Allowed Claim. The pro rate Distribution received will depend on whether or not certain litigation is settled or favorable judgments are obtained. |

4.    Classes of Interest Holders.

Interest holders are the parties who hold ownership (i.e., equity interest) in the Debtor. If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders. If the Debtor is a partnership, the interest holders include both general and limited partners. If the Debtor is an individual, the Debtor is the sole interest holder. The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 7 | Debtor's Membership Interests | Yes. | Holders of Equity Interests in the Debtor shall not receive or retain any interest or property on account of such Equity Interests. On the Effective Date, all such Equity Interests shall be cancelled and extinguished. |

**D.    Means of Performing The Plan**

1.    Authorization and Issuance of New Membership Interests.

The Reorganized Debtor is authorized to issue the New Membership Interests without the need for any further corporate action, and the Reorganized Debtor will issue the New Membership Interests to the First Lien Lender on the Effective Date.

     2.     Amendment and Restatement of Operating Agreement.

On the Effective Date, the Reorganized Debtor shall be deemed to have adopted, and the First Lien Lender, as the sole member of the Reorganized Debtor, and the initial managers of the Reorganized Debtor shall enter into the Amended and Restated Operating Agreement.

     3.     Termination of the DIP Loan Agreement.

On the Effective Date, and unless the DIP Lender elects to convert the DIP Financing Claims into the Exit Financing Facility or otherwise agrees, (a) the Reorganized Debtor shall indefeasibly pay, in full in Cash by wire transfer or immediately available funds, all amounts owed under the DIP Loan Agreement, and the commitments there under shall be terminated, and (b) upon payment or satisfaction in full of all obligations under the DIP Loan Agreement in accordance with the terms thereof, all liens and security interests granted to secure such obligations shall be deemed terminated and shall be of no further force and effect.

     4.     Management Agreement and Post–Effective Date Management.

On the Effective Date, the Reorganized Debtor and the Managers shall enter into the Management Agreement, pursuant to which the Managers shall manage the business of the Reorganized Debtor, and be compensated therefore, in accordance with the terms and conditions set forth therein.  It is anticipated that Debtor's current management team will remain in place Post-Petition and provide similar services to the Reorganized Debtor on the terms set forth in the Management Agreement.   The First Lien Lender and the Managers are currently negotiating the terms of the Management Agreement.  The Management Agreement will not confer rights and benefits on the Equity Interest Holders on account of their extinguished ownership interests.

     5.     Cancellation of Existing Securities and Agreements.

Except (i) for purposes of evidencing a right to distributions under the Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtor, or (iii) as otherwise provided under the Plan, on the Effective Date, all the agreements and other documents evidencing (a) the Claims or rights of any holder of a Claim against the Debtor, including all instruments and notes evidencing such Claims, (b) the Equity Interests in the Debtor, and (c) any options or warrants to purchase Equity Interests in the Debtor, obligating the

1    Debtor to issue, transfer or sell Equity Interests or any other equity of the Debtor, shall be

2    cancelled.

3            6.    Board of Directors.

4            The First Lien Lender shall designate the initial managers of the Reorganized Debtor, and

5    the identities of such managers shall be disclosed in the Plan Supplement.

6            7.    Officers.

7            The First Lien Lender shall designate the initial officers of the Reorganized Debtor, if

8    any, and the identities of such officers shall be disclosed in the Plan Supplement.

9            8.    Continued Existence and Vesting of Assets in the Reorganized Debtor.

10           Except as provided in the Plan, the Debtor will, as the Reorganized Debtor, continue to

11   exist after the Effective Date as a separate entity, with all of the powers of a limited liability

12   company under applicable law and without prejudice to any right to alter or terminate such

13   existence (whether by merger, dissolution or otherwise) under applicable state law. Except as

14   provided in the Plan, as of the Effective Date, all property of the Debtor's estate, and any

15   property acquired by the Debtor or the Reorganized Debtor under the Plan, will vest in the

16   Reorganized Debtor, free and clear of all claims, liens, charges, other encumbrances and

17   interests. On and after the Effective Date, the Reorganized Debtor may operate its business and

18   may use, acquire and dispose of property and compromise or settle any claims without

19   supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy

20   Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the

21   Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may pay the

22   charges that it incurs on or after the Effective Date for professional fees and expenses,

23   disbursements, expenses or related support services without application to, or approval of, the

24   Bankruptcy Court.

25   **E.    Distributions**

26           1.    Distribution Record Date.

27           As of the close of business on the Distribution Record Date, the various transfer registers

28   for each of the Classes of Claims or Equity Interests as maintained by the Debtor, or its agents,

1  shall be deemed closed, and there shall be no further changes in the record holders of any of the

2  Claims or Equity Interests.  Neither the Debtor nor the Reorganized Debtor shall have any

3  obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the

4  Distribution Record Date.  The Debtor, the Reorganized Debtor and any party responsible for

5  making distributions under the Plan pursuant to Section 6.7 thereof shall be entitled to recognize

6  and deal for all purposes thereunder only with those record holders stated on the transfer ledgers

7  as of the close of business on the Distribution Record Date, to the extent applicable.

8           2.     Date of Distributions.

9           Except as otherwise provided in the Plan, any distributions and deliveries to be made

10  under the Plan shall be made on the Effective Date or as soon thereafter as is reasonably

11  practicable.  In the event that any payment or act under the Plan is required to be made or

12  performed on a date that is not a Business Day, then the making of such payment or the

13  performance of such act may be completed on or as soon as reasonably practicable after the next

14  succeeding Business Day, but shall be deemed to have been completed as of the required date.

15          3.     Postpetition Interest on Claims.

16          Except as provided in the DIP Loan Agreement or the Final Order (as defined in the DIP

17  Loan Agreement), or as required by applicable bankruptcy law, postpetition interest shall not

18  accrue on or after the Commencement Date on account of any Claim.

19          4.     Disbursing Agent.

20          All distributions under the Plan shall be made by the Reorganized Debtor (or such other

21  entity designated by the Reorganized Debtor), as Disbursing Agent, on or after the Effective

22  Date or as otherwise provided in the Plan.  The Disbursing Agent shall not be required to give

23  any bond or surety or other security for the performance of its duties unless otherwise ordered by

24  the Bankruptcy Court.

25          5.     Powers of Disbursing Agent.

26          The Disbursing Agent shall be empowered to (i) effect all actions and execute all

27  agreements, instruments and other documents necessary to perform its duties under the Plan, (ii)

28

1    make all distributions contemplated thereby, and (iii) exercise such other powers as may be

2    vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan.

3                   6.      Surrender of Instruments.

4           As a condition to receiving any distribution under the Plan, each holder of an instrument

5    or note must surrender such instrument or note to the Disbursing Agent or its designee.  Any

6    holder of such instrument or note that fails to (i) surrender such instrument or note or (ii) execute

7    and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent

8    and furnish a bond in form, substance and amount reasonably satisfactory to the Disbursing

9    Agent before the first anniversary of the Effective Date shall be deemed to have forfeited all

10   rights and Claims and may not participate in any distribution under the Plan.  Any distribution so

11   forfeited shall become the property of the Reorganized Debtor.

12                  7.      Delivery of Distributions.

13          Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim

14   shall be made to the Disbursing Agent, who shall transmit such distribution to the applicable

15   holders of Allowed Claims.  In the event that any distribution to any holder is returned as

16   undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address

17   of such holder, but no distribution to such holder shall be made unless and until the Disbursing

18   Agent has determined the then-current address of such holder, at which time such distribution

19   shall be made to such holder without interest; *provided* that such distributions shall be deemed

20   unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1)

21   year from the Effective Date.  After such date, all unclaimed property or interest in property shall

22   revert to the Reorganized Debtor, and the Claim of any other holder to such property or interest

23   in property shall be discharged and forever barred.

24                  8.      Manner of Payment Under Plan of Reorganization.

25          All distributions of Cash and New Membership Interests to the creditors of the Debtor

26   under the Plan shall be made by the Reorganized Debtor or the Disbursing Agent.  Any

27   distributions that revert to the Reorganized Debtor or are otherwise cancelled (such as to the

28

1   extent any distributions have not been claimed within one year or are canceled pursuant to

2   Section 6.7 of the Plan) shall revest solely in the Reorganized Debtor.

3           At the option of the Reorganized Debtor, any Cash payment to be made under the Plan

4   may be made by a check or wire transfer or as otherwise required or provided in applicable

5   agreements.

6                   9.      Setoffs.

7           The Debtor and the Reorganized Debtor may, but shall not be required to, set off against

8   any Claim (for purposes of determining the Allowed amount of such Claim on which distribution

9   shall be made), any claims of any nature whatsoever that the Debtor or the Reorganized Debtor

10  may have against the holder of such Claim, but neither the failure to do so nor the allowance of

11  any Claim under the Plan shall constitute a waiver or release by the Debtor or the Reorganized

12  Debtor of any such claim the Debtor or the Reorganized Debtor may have against the holder of

13  such Claim.

14                  10.     Minimum Distributions.

15          No distribution of less than $10.00 on account of an Allowed Claim shall be made by the

16  Reorganized Debtor to any holder of a Claim unless a request therefore is made in writing to the

17  Reorganized Debtor.

18                  11.     Distributions After Effective Date.

19          Distributions made after the Effective Date to holders of Disputed Claims that are not

20  Allowed Claims as of the Effective Date but which later become Allowed Claims shall be

21  deemed to have been made on the Effective Date.

22                  12.     Allocation of Distributions Between Principal and Interest.

23          To the extent that any Allowed Claim entitled to a distribution under the Plan is

24  comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be

25  allocated to the principal amount (as determined for federal income tax purposes) of the Claim

26  first, and then to accrued but unpaid interest.

27  **F.      Retention of Causes of Action/Reservations of Rights.**

28          Nothing contained in the Plan or in the Confirmation Order shall be deemed to be a

1  waiver or the relinquishment of any rights or causes of action that the Debtor or the Reorganized

2  Debtor may have or which the Reorganized Debtor may choose to assert on behalf of its estate

3  under any provision of the Bankruptcy Code or any applicable non-bankruptcy law or rule,

4  common law, equitable principle or other source of right or obligation, including, without

5  limitation, (i) any and all Claims against any Person, to the extent such Person asserts a

6  crossclaim, counterclaim and/or Claim for setoff which seeks affirmative relief against the

7  Debtor, the Reorganized Debtor, their managers, officers, directors or representatives; and (ii)

8  the turnover of any property of the Debtor's estate.  Nothing contained in the Plan or in the

9  Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of

10  action, right of setoff or other legal or equitable defense which the Debtor had immediately prior

11  to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.

12  The Reorganized Debtor shall have, retain, reserve and be entitled to assert all such claims,

13  causes of action, rights of setoff and other legal or equitable defenses which it had immediately

14  prior to the Commencement Date fully as if the Reorganization Case had not been commenced,

15  and all of the Reorganized Debtor's legal and equitable rights respecting any Claim left

16  unimpaired by this Plan may be asserted after the Confirmation Date to the same extent as if the

17  Reorganization Case had not been commenced.

18  **G.    Disputed Claims**

19              1.    Objections to Claims.

20          The Debtor and the Reorganized Debtor shall be entitled to file objections to all Claims

21  that are not Allowed by the Plan or a Final Order.  Any objections to Claims shall be served and

22  filed on or before March 31, 2011 or such later date as may be ordered by the Bankruptcy Court.

23              2.    Payments and Distributions with Respect to Disputed Claims.

24          Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed

25  Claim, no payment or distribution provided under the Plan shall be made on account of such

26  Claim unless and until such Disputed Claim becomes an Allowed Claim.

27

28

1            3.     <u>Estimation of Claims</u>.

2            The Debtor and the Reorganized Debtor may at any time request that the Bankruptcy

3 Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code,

4 regardless of whether an objection was previously filed with the Bankruptcy Court with respect

5 to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the

6 Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation

7 concerning any objection to any Claim, including, without limitation, during the pendency of any

8 appeal relating to any such objection. In the event that the Bankruptcy Court estimates any

9 Disputed Claim, the amount so estimated shall constitute either the allowed amount of such

10 Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the

11 estimated amount constitutes a maximum limitation on the amount of such Claim, the

12 Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such

13 Claim. All of the aforementioned objection, estimation and resolution procedures are intended to

14 be cumulative and not exclusive of one another. Except as provided in the Plan, Claims may be

15 estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism

16 approved by the Bankruptcy Court.

17            4.     <u>Distributions Relating to Disputed Claims</u>.

18            Notwithstanding any provision in the Plan to the contrary, except as otherwise agreed by

19 the Reorganized Debtor in its sole discretion, no partial payments and no partial distributions

20 will be made with respect to a Disputed Claim until the resolution of any such disputes by

21 settlement or Final Order. To the extent that a Disputed Claim becomes an Allowed Claim after

22 the Effective Date, a distribution shall be made to the holder of such Allowed Claim in

23 accordance with the provisions of the Plan. As soon as reasonably practicable after the date that

24 the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final

25 Order, the Disbursing Agent shall provide to the holder of such Claim, the distribution to which

26 such holder is entitled under the Plan.

27

28

1              5.       Preservation of Rights to Settle Claims.

2              In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor

3    shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing)

4    all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether

5    known or unknown, that the Debtor or its estate may hold against any person or entity without

6    the approval of the Bankruptcy Court, subject to the terms of Section 7.1 of the Plan, the

7    Confirmation Order and any contract, instrument, release, indenture or other agreement entered

8    into in connection herewith.  The Reorganized Debtor may pursue such retained claims, rights or

9    causes of action, suits or proceedings, as appropriate, in accordance with its best interests.

10             6.       Disallowed Claims.

11             All claims held by persons or entities against whom or which the Debtor or the

12   Reorganized Debtor has commenced a proceeding asserting a cause of action under sections 542,

13   543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed"

14   claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be

15   entitled to vote to accept or reject the Plan.  Claims that are deemed disallowed pursuant to this

16   section shall continue to be disallowed for all purposes until the avoidance action against such

17   party has been settled or resolved by Final Order and any sums due to the Debtor or the

18   Reorganized Debtor from such party have been paid.

19   **H.      Risk Factors.**

20             The proposed Plan has the following risks:

21             1.       Possibility of default under the terms of the Plan.

22             2.       Failure of the Debtor to enter into an Exit Financing Facility if it and the First

23   Lien Lender elect to pursue an Exit Financing Facility.

24             3.       The First Lien Lender may elect not to enter into an Exit Financing Facility with

25   the Debtor.  If the First Lien Lender does not provide the Exit Financing Facility and the Debtor

26   does not otherwise have sufficient funds to make the payments provided for in the Plan, the Plan

27   cannot proceed.

28             4.       The First Lien Lender may elect to foreclose on its collateral.

# IV.

## OTHER PLAN PROVISIONS.

**A.    Executory Contracts and Unexpired Leases.**

    1.    <u>Assumption</u>.

All executory contracts and unexpired leases to which the Debtor is a party, including, without limitation, the Management Services Agreement dated as of March 1, 2007, between the Debtor and Pacifica Ventures LLC, are being rejected pursuant to the Plan except for an executory contract or unexpired lease that (i) previously has been assumed or rejected pursuant to Final Order of the Bankruptcy Court, (ii) is specifically designated as a contract or lease to be assumed on the Schedule of Assumed Contracts filed as part of, or prior to the filing of, the Plan Supplement, or (iii) is the subject of a separate assumption or rejection motion filed by the Debtor, with the consent of the First Lien Lender, under section 365 of the Bankruptcy Code prior to the Confirmation Date.

Except to the extent that different treatment has been agreed to by the nondebtor party or parties to any executory contract or unexpired lease to be assumed, the Debtor, with the consent of the First Lien Lender, shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days of the Confirmation Date, file and serve a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. The parties to such executory contracts or unexpired leases to be assumed by the Debtor shall have fifteen (15) days from service to object to the cure amounts listed by the Debtor. If there are any objections filed, the Bankruptcy Court shall hold a hearing. The Debtor shall retain its right, with the consent of the First Lien Lender, to reject any of its executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults.

The Debtor is considering assuming those executory contracts and unexpired leases set forth in Exhibit D and Exhibit C, respectively. The Debtor believes the "cure amounts" for such agreements are as set forth in the Exhibits D and C and total approximately $298,000. The

1   Debtor shall file a final list of those executory contracts and unexpired leases that the Debtor

2   intends to assume as part of, or prior to the filing of, the Plan Supplement.

3        2.    Rejection.

4        In the event that the rejection of an executory contract or unexpired lease by the Debtor

5   pursuant to the Plan results in damages to the other party or parties to such contract or lease, a

6   Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be

7   forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor or their

8   respective properties or interests in property as agents, successors or assigns, unless a proof of

9   claim is filed with the Bankruptcy Court and served upon counsel for each of the Debtor, the

10  Reorganized Debtor and the First Lien Lender on or before the date that is 30 days after the

11  Confirmation Date or such later rejection date that occurs as a result of a dispute concerning

12  amounts necessary to cure any defaults.

13       Effective immediately before the Effective Date, each executory contract or unexpired

14  lease of the Debtor that (i) is not identified in the Plan as being assumed; (ii) has not been

15  assumed by order of the Bankruptcy Court; (iii) is not the subject of a motion to assume pending

16  as of the Effective Date, which motion is ultimately granted and an order is entered providing for

17  such assumption; or (iv) is listed in the Plan as a lease or executory contract to be rejected will be

18  rejected, to the extent, if any, that such agreements constitute executory contracts or unexpired

19  leases, and without conceding that they constitute executory contracts or unexpired leases or that

20  the Debtor has any liability under them.

21       The Order of Confirmation shall constitute an Order of the Bankruptcy Court approving

22  all such rejections as of the Effective Date.  Rejection Claims shall be classified in Class 6. Any

23  claim for damages arising from the rejection under the Plan of an executory contract or

24  unexpired lease must be filed within thirty (30) days after the Effective Date or be forever barred

25  and unenforceable against the Debtor, the Reorganized Debtor, and their properties and barred

26  from receiving any distribution under the Plan.

27       To the extent not already rejected, the Debtor will reject the Lexis Nexis contract.

28

1  **B.**      **Changes in Rates Subject to Regulatory Commission Approval.**

2          This Debtor is not subject to governmental regulatory commission approval of its rates.

3  **C.**      **Releases.**

4          Pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and its present

5  members, officers, directors, employees, agents, advisors, representatives, successors or assigns,

6  and any Professionals (acting in such capacity) employed by any of the foregoing entities will

7  neither have nor incur any liability to any person for their role in soliciting acceptance or

8  rejection of the Plan.

9          Releases by Debtor. As of the Confirmation Date, but subject to occurrence of the

10  Effective Date, for good and valuable consideration, the adequacy of which is confirmed by the

11  Plan, the Debtor, the Reorganized Debtor and any person seeking to exercise the rights of the

12  Debtor's estate, including, without limitation, any successor to the Debtor or any estate

13  representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall

14  be deemed to unconditionally forever release, waive and discharge all claims, obligations, suits,

15  judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever (other

16  than for gross negligence, willful misconduct, intentional fraud or criminal conduct) in

17  connection with or related to the Debtor, the Reorganization Case or the Plan (other than the

18  rights of the Debtor and the Reorganized Debtor to enforce the Plan and the contracts,

19  instruments, indentures and other agreements or documents delivered or assumed under the

20  Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or

21  unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise,

22  that are based in whole or part on any act, omission, transaction, event or other occurrence taking

23  place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor,

24  the Reorganization Case or the Plan, and that may be asserted by or on behalf of the Debtor or

25  the Reorganized Debtor against the Released Parties.

26          Releases by Holders of Claims and Equity Interests. As of the Effective Date, and except

27  as otherwise provided in the Plan, for good and valuable consideration, the adequacy of which is

28  confirmed by the Plan, (i) each holder of a Claim that votes in favor of the Plan (or is deemed to

1    accept the Plan), and (ii) to the fullest extent permissible under applicable law, as such law may

2    be extended or integrated after the Effective Date, each holder of a Claim or Equity Interest that

3    does not vote to accept the Plan or is deemed to reject the Plan, as applicable, shall be deemed to

4    unconditionally, forever release, waive and discharge each of the Released Parties, from any and

5    all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and

6    liabilities whatsoever in connection with or related to the Debtor, the Reorganization Case or the

7    Plan whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or

8    unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise,

9    that are based in whole or part on any act, omission, transaction, event or other occurrence taking

10   place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor,

11   the Reorganization Case or the Plan; *provided, however,* that the foregoing shall not operate as a

12   waiver or release from any causes of action arising out of the gross negligence, willful

13   misconduct, intentional fraud or criminal liability of any such person or entity.

14   **D.    Exculpation.**

15          Notwithstanding anything provided in the Plan, as of the Effective Date, none of (i) the

16   Debtor or the Debtor's current managers, directors, officers, employees, affiliates, agents,

17   financial advisors, investment bankers, Professionals, accountants and attorneys; or (ii) the First

18   Lien Lender or the DIP Lender or any of their respective agents, financial advisors, investment

19   bankers, Professionals, accountants and attorneys, shall have or incur any liability for any claim,

20   cause of action or other assertion of liability for any act taken or omitted to be taken in

21   connection with, or arising out of, the Reorganization Case, the negotiation, formulation,

22   dissemination, confirmation, consummation or administration of the Plan, or property to be

23   distributed under the Plan, or any other act or omission in connection with the Reorganization

24   Case, the Plan or any contract, instrument, indenture or other agreement or document related

25   thereto or to the Plan or delivered there under or under the Plan; *provided, however*, that the

26   foregoing shall not affect the liability of any person that otherwise would result from any such

27   act or omission to the extent that such act or omission is determined by a Final Order of a court

28   of competent jurisdiction to have constituted willful misconduct, intentional fraud or criminal

1    conduct; provided, however, that nothing in this provision of the Plan shall be deemed to prohibit

2    the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits,

3    judgments, demands, debts, rights, causes of action or liabilities they may have against any

4    employee (other than any director or officer) that is based upon an alleged breach of a

5    confidentiality, non-compete or any other contractual or fiduciary obligation owed to the Debtor

6    through the Effective Date; provided, further, however, that this provision of the Plan shall not

7    operate as a waiver or release from any claims or causes of action arising out of (i) the gross

8    negligence, willful misconduct, intentional fraud or criminal liability of any Person, and (ii) as to

9    the directors of the Debtor, a breach of fiduciary duty prior to the Commencement Date.

10   **E.      Exemption from Stamp, Transfer and Other Taxes.**

11           Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange

12   of assets under the Plan by the Debtor, the creation of any mortgage, deed of trust, or other

13   security interest, the making or assignment of any lease or sublease, or the making or delivery

14   of any deed or instrument of transfer under, in furtherance of, or in connection with the Plan,

15   shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

16   **F.      Injunction Enjoining Holders of Claims Against Debtor and Reorganized Debtor.**

17           The Plan is the sole means for resolving, paying or otherwise dealing with Claims and

18   Interests.  To that end, except as expressly provided in the Plan, at all times on and after the

19   Effective Date, all Persons who have been, are, or may be holders of Claims against or Interests

20   in the Debtor arising prior to the Effective Date, shall be permanently enjoined from taking any

21   of the following actions, on account of any such Claim or Interest, against the Debtor, its Estate,

22   the Reorganized Debtor or its property (other than actions brought to enforce any rights or

23   obligations under the Plan and any adversary proceedings or contested matters pending in the

24   Reorganization Case as of the Effective Date): (1)  commencing, conducting or continuing in

25   any manner, directly or indirectly any suit, action, or other proceeding of any kind against the

26   Debtor, its Estate, the Reorganized Debtor, their successors, or their respective property or

27   assets; (2) enforcing, levying, attaching, executing, collecting, or otherwise recovering by any

28   manner or means whether directly or indirectly any judgment, award, decree, or order against

1  the Debtor, its Estate, the Reorganized Debtor, their successors, or their respective property or

2  assets;  (3) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any

3  lien, security interest or encumbrance against the Debtor, its Estate, the Reorganized Debtor,

4  their successors, or their respective property or assets; and (4) proceeding in any manner in any

5  place whatsoever against the Debtor, its Estate, the Reorganized Debtor, their successors, or

6  their respective property or assets, that does not conform to or comply with the provisions of the

7  Plan.

8  **G.    Section 1145 Exemption**.

9         Pursuant to section 1145 of the Bankruptcy Code, the issuance under the Plan of the New

10  Membership Interests shall be exempt from registration under the Securities Act.

11  **H.    Plan Supplement**.

12         A draft form of the Plan Documents to be entered into as of the Effective Date and any

13  other appropriate documents, all of which shall be acceptable to the First Lien Lender, shall be

14  contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court by no later

15  than five Business Days prior to the Confirmation Hearing.  Upon its filing with the Bankruptcy

16  Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court

17  during normal court hours.

18  **I.    No Admissions**.

19         Except as specifically provided in the Plan, nothing contained in the Plan shall be

20  deemed or construed in any way as an admission by the Debtor or its Estate with respect to any

21  matter set forth in the Plan, including the amount or allowability of any claim, or the value of

22  any property of the Estate.

23         Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the

24  Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan

25  will: (a) be deemed to be an admission by the Debtor with respect to any matter discussed in the

26  Plan, including liability on any Claim or the propriety of any Claim's classification;

27  (b) constitute a waiver, acknowledgement, or release of any Claims, Interests, or any claims

28  held by the Debtor; or (c) prejudice in any manner the rights of the Debtor or the Estate in any

1  further proceedings.

2  **J.    Severability of Plan Provisions.**

3  If, before Confirmation, the Court holds that any Plan term or provision is invalid, void, or

4  unenforceable, the Court may alter or interpret that term or provision so that it is valid and

5  enforceable to the maximum extent possible consistent with the original purpose of that term or

6  provision.      That term or provision will then be applicable as altered or interpreted.

7  Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and

8  provisions will remain in full force and effect and will in no way be affected, impaired, or

9  invalidated. The Confirmation Order will constitute a judicial determination providing that each

10  Plan term and provision, as it may have been altered or interpreted in accordance with this

11  Section, is valid and enforceable under its terms.

12  **K.    Governing Law.**

13         The rights and obligations arising under the Plan and any agreements, contracts,

14  documents, or instruments executed in connection with the Plan will be governed by, and

15  construed and enforced in accordance with, California law without giving effect to California

16  law's conflict of law principles, unless a rule of law or procedure is supplied by: (a) federal law

17  (including the Bankruptcy Code and the Bankruptcy Rules); or (b) an express choice-of-law

18  provision in any document provided for, or executed under or in connection with, the Plan.

19  **L.    Retention of Jurisdiction.**

20         On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all

21  matters arising in, arising under, and related to the Reorganization Case for, among other things,

22  the following purposes:  (a) to hear and determine motions and/or applications for the

23  assumption or rejection of executory contracts or unexpired leases and the allowance,

24  classification, priority, compromise, estimation or payment of Claims resulting therefrom; (b) to

25  determine any motion, adversary proceeding, application, contested matter and other litigated

26  matter pending on or commenced after the Confirmation Date; (c) to ensure that distributions to

27  holders of Allowed Claims are accomplished as provided in the Plan; (d) to consider Claims or

28  the allowance, classification, priority, compromise, estimation or payment of any Claim; (e) to

1  enter, implement or enforce such orders as may be appropriate in the event the Confirmation

2  Order is for any reason stayed, reversed, revoked, modified or vacated; (f) to issue injunctions,

3  enter and implement other orders and take such other actions as may be necessary or appropriate

4  to restrain interference by any person with the consummation, implementation or enforcement of

5  the Plan, the Confirmation Order or any other order of the Bankruptcy Court; (g) to hear and

6  determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy

7  Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, this

8  Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in

9  such a manner as may be necessary to carry out the purposes and effects thereof; (h) to hear and

10  determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for

11  awards of compensation for services rendered and reimbursement of expenses incurred prior to

12  the Confirmation Date; (i) to hear and determine disputes arising in connection with the

13  interpretation, implementation or enforcement of the Plan, the Confirmation Order, any

14  transactions or payments contemplated by the Plan or the Confirmation Order, or any agreement,

15  instrument or other document governing or relating to any of the foregoing; (j) to take any action

16  and issue such orders as may be necessary to construe, enforce, implement, execute and

17  consummate the Plan or to maintain the integrity of the Plan following consummation; (k) to

18  hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution

19  procedures to resolve personal injury, employment litigation and similar claims pursuant to

20  section 105(a) of the Bankruptcy Code; (l) to determine such other matters and for such other

21  purposes as may be provided in the Confirmation Order; (m) to hear and determine matters

22  concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the

23  Bankruptcy Code (including any requests for expedited determinations under section 505(b) of

24  the Bankruptcy Code); (n) to hear and determine any other matters related to the Plan and not

25  inconsistent with the Bankruptcy Code and title 28 of the United States Code; (o) to enter a final

26  decree closing the Reorganization Case; (p) to recover all assets of the Debtor and property of

27  the Debtor's estate, wherever located; and (q) to hear and determine any rights, Claims or causes

28

1  of action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any

2  federal statute or legal theory.

3  **M.    No Waiver**.

4  Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of any

5  Person to object to any Claim for purposes of voting, the failure of any Person to object to a

6  Claim or Administrative Expense Claim prior to Confirmation or the Effective Date, the failure

7  of any Person to assert a Right of Action prior to Confirmation or the Effective Date, the

8  absence of a proof of Claim having been Filed with respect to a Claim, nor any action or

9  inaction of any person with respect to a Claim, Administrative Expense Claim, or Right of

10  Action other than a legally effective express waiver or release shall be deemed a waiver or

11  release of the right of the Debtor or its successors or representatives, before or after solicitation

12  of votes on the Plan or before or after Confirmation or the Effective Date to (a) object to or

13  examine such Claim or Administrative Expense Claim, in whole or in part or (b) retain and

14  either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce

15  any Right of Action.

16  **N.    Tax Consequences**

17  CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN

18  MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN

19  ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible

20  tax consequences is intended solely for the purpose of alerting readers about possible tax issues

21  the Plan may present to the Debtor. The Debtor CANNOT and DOES NOT represent that the tax

22  consequences contained below are the only tax consequences of the Plan because the Tax Code

23  embodies many complicated rules which make it difficult to state completely and accurately all

24  the tax implications of any action.

25  The following are the tax consequences which the Plan will have on the Debtor's tax

26  liability:

27  Certain significant federal income tax consequences of the Plan under the Tax Code are

28  described below. Due to the unsettled nature of several of the tax issues presented by the Plan

1  (including the changes made to the Tax Code over the past 10 years), the difference in the nature

2  of the claims of the various creditors, their taxpayer status, residence and methods of accounting

3  (including creditors within the same class) and prior actions taken by creditors with respect to

4  their claims, as well as the possibility that events subsequent to the date hereof could change the

5  federal income tax consequences of the transactions the federal income tax consequences

6  described below are subject to significant uncertainties. Furthermore, this discussion does not

7  address the tax consequences of the Plan to persons not resident in the United States.

8  **CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH**

9  **THEIR OWN TAX ADVISORS REPSECTING THE INDIVIDUAL TAX**

10  **CONSEQUENCES OF THE PLAN, INCLUDING FEDERAL, STATE AND LOCAL**

11  **TAXES.**

12       As a result of the implementation of the Plan, the Debtor's aggregate outstanding

13  indebtedness will effectively be reduced to zero at some point in time. In general, the Tax Code

14  provides that a taxpayer that realizes a "discharge of indebtedness" must include the amount of

15  discharged indebtedness in taxable gross income to the extent that indebtedness discharged

16  exceeds any consideration given for such discharge. Any claims against Debtor that are

17  discharged solely by payment to a creditor of cash under the Plan, or waiver of such claim by the

18  creditor, will result in the creation of a discharge of indebtedness to the extent that the face

19  amount of the debt discharged (plus accrued interest) exceeds the payment made in cancellation

20  hereof. To the extent implementation of the Plan results in payment of creditor claims in full, the

21  Debtor should not realize income from discharge of indebtedness, except to the extent of interest

22  discharge. Furthermore, § 108(e)(2) of the Tax Code provides that there is no income from

23  discharge of indebtedness to the extent that payment of the liability would have given rise to a

24  deduction. The Tax Code further provides that a discharge of indebtedness is not required to be

25  included in a taxpayer's gross income if (i) such taxpayer is in a title 11 case and such discharge

26  of indebtedness is pursuant to a plan approved by the Bankruptcy Court, or (ii) such taxpayer is

27  insolvent, and the amount by which the taxpayer is insolvent immediately before the discharge

28  equals or exceeds the amount of such discharged indebtedness. Accordingly, the Debtor should

1  not be required to include in income any amount resulting from any discharge of such

2  indebtedness.

### V.

### CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan by claimants, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are <u>not</u> the only requirements for confirmation

**A.    Who May Vote or Object**

    **1.    Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below, not everyone is entitled to vote to accept or reject the Plan.

    **2.    Who May Vote to Accept/ Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if the creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

        **a.    What Is an Allowed Claim/Interest**

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is

1    filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court,

2    after notice and hearing, either overrules the objection or allows the claim or interest for voting

3    purposes.

4         THE BAR DATE FOR FILING A PROOF OF CLAIM OR INTEREST IN THE

5    REORGANIZATION CASE IS November 5, 2010.   A notice of the claims bar date was served

6    upon all creditors and interested parties on October 7, 2010.   A creditor or interest holder may

7    have an allowed claim or interest even if a proof of claim or interest was not timely filed. A

8    claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not

9    scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the

10   claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the

11   interest. Consult Exhibits F through H to see how the Debtor has characterized your claim or

12   interest, but note that the Debtor and other parties in interest have the right to object to your

13   claim or interest regardless of how it is characterized in such Exhibits.

14        **b.**    **What Is an Impaired Claim/Interest**

15        As noted above, an allowed claim or interest only has the right to vote if it is in a class

16   that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or

17   contractual rights of the members of that class. For example, a class comprised of general

18   unsecured claims is impaired if the Plan fails to pay the members of the class 100% of what they

19   are owed.

20        In this case, the Debtor believes that Claims in Classes 3, 4 and 6 and Equity Interests in

21   Class 7 are impaired.  Holders of Allowed Claims in Classes 3 and 6 are therefore entitled to

22   vote to accept or reject the Plan.  Holders of Claims in Classes 4 and Equity Interests in Class 7

23   do not vote as they are deemed to have rejected the Plan because they are not receiving or

24   retaining any value under the Plan.  The Debtor believes that Class 1, Class 2, Class 5A and

25   Class 5B are unimpaired and that holders of Allowed Claims in Classes 1, 2, 5A and 5B

26   therefore do not have the right to vote to accept or reject the Plan. Parties who dispute the

27   Debtor's characterization of their claim or interest as being impaired or unimpaired may file an

28   objection to the Plan contending that the Debtor has incorrectly characterized the class.

### 3.    Who is Not Entitled to Vote

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted that Plan. Claims entitled to priority pursuant to Code sections 507(a)(2), (a)(3), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE THE RIGHT TO OBJECT TO CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim. In this case, the Debtor believes that no creditor is entitled to cast more than one ballot in respect of its Claim. While the claims of the First Lien Lender (Class 3) and the Second Lien Lender (Class 4) consist of secured and unsecured claims, each of these Creditors are separately classified and any unsecured claim is addressed in such class. The unsecured claims of the First Lien Lender and the Second Lien Lender are not included in the class of General Unsecured Claims (Class 6) as Class 6 claims consist solely of claims arising from business operations. The unsecured claims of Class 3 and Class 4 Claimants differ significantly from the unsecured Claims of Class 6 Claimants, including as a result of the subordination provisions included in the Intercreditor Agreement, and must be separately classified.

### 5.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class,

1   and (2) all impaired classes have voted to accept the Plan unless the Plan is eligible to be

2   confirmed by "cramdown" on non-accepting classes, as discussed later in Section 7 herein.

3          **6.**    **Votes Necessary for a Class to Accept the Plan**

4         A class of claims is considered to have accepted the Plan when more than one-half (1/2)

5   in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted

6   in favor of the Plan. A class of interests is considered to have accepted the Plan when at least

7   two-thirds (2/3) in amount of the interest holders of such class which actually voted, voted to

8   accept the Plan.

9          **7.**    **Treatment of Nonaccepting Classes**

10        As noted above, even if all impaired classes do not accept the proposed Plan, the Court

11   may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required

12   by the Code. The process by which nonaccepting classes are forced to be bound by the terms of

13   the Plan is commonly referred to as "cramdown". The Code allows the Plan to be "crammed

14   down" on nonaccepting classes of claims or interests if it meets all requirements except the

15   voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair

16   and equitable" toward each impaired class that has not voted to accept the Plan as referred to in

17   11 U.S.C. § 1129(b) and applicable case law.

18          **8.**    **Request for Confirmation Despite Nonacceptance by Impaired Classes**

19        Classes 3, 4, 6 and 7 are impaired classes. If any of these classes fails to accept the Plan,

20   the Debtor will seek "cramdown" as a remedy, provided that at least one impaired class votes to

21   accept the Plan. The Debtor will be required to "cramdown" the Plan at least with respect to

22   Classes 4 and 7 because Classes 4 and 7 are deemed to have rejected the Plan.

23 **B.**    **Liquidation Analysis**

24        Another confirmation requirement is the "Best Interest Test", which requires a liquidation

25   analysis. Under the Best Interest Test, if a claimant or interest holder does not vote to accept the

26   Plan, then that claimant or interest holder must receive or retain under the Plan property of a

27   value not less than the amount that such holder would receive or retain if the Debtor were

28   liquidated under Chapter 7 of the Bankruptcy Code.

1        In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured

2  creditors are paid first from the sales proceeds of properties on which the secured creditor has a

3  lien, Administrative claims are paid next. Next, unsecured creditors are paid from any remaining

4  sales proceeds, according to their rights to priority. Unsecured creditors with the same priority

5  share in proportion to the amount of their allowed claim in relationship to the amount of total

6  allowed unsecured claims. Finally, interest holders receive the balance that remains after all

7  creditors are paid, if any.

8        For the Court to be able to confirm the Plan, the Court must find that all creditors and

9  interest holders who do not accept the Plan will receive at least as much under the Plan as such

10  holders would receive under a Chapter 7 liquidation.

11        The Debtor maintains that this requirement is met here for the following reasons: Under

12  the Plan, creditors holding Allowed General Unsecured Claims will receive Distributions of

13  approximately 10% - 20% depending upon the outcome of pending litigation. Under a Chapter 7

14  liquidation, these creditors will receive no Distribution at all. In a Chapter 7 liquidation, the

15  Debtor's assets would be sold, assuming an interested buyer exists, and the proceeds from the

16  sale, if any, would go to satisfy secured creditors with asserted claims in excess of $100 Million.

17  If a buyer cannot be located to purchase the Debtor's assets in an amount sufficient to satisfy the

18  asserted secured claims, then Amalgamated will move for relief from the automatic stay so that

19  they may pursue their state court rights and remedies including, but not limited to, foreclosing on

20  all assets of the Debtor. Even if a buyer is located to purchase the Debtor's assets and the

21  purchase price is sufficient to satisfy all secured claims, the related administrative costs including

22  the Trustee fees and Trustee's counsels' fees will prevent creditors holding General Unsecured

23  Claims from received a distribution. Thus, under a liquidation scenario, it is anticipated that the

24  only claimants that will receive a distribution will be the Allowed secured creditors and their

25  distribution will depend upon the sales price obtained for the Debtor's assets through a

26  bankruptcy sale or foreclosure sale. Any such sale will necessarily include costs of sale and

27  significant capital gains tax liability. Thus, creditors holding General Unsecured Claims will not

28  receive a distribution in a Chapter 7 liquidation.

1         Attached hereto as Exhibit E is a "Liquidation Analysis." The following is a summary of

2 the analysis of the Estate if liquidated in Chapter 7 case:

3 **LIQUIDATION ANALYSIS[3]:**

4 CURRENT ASSETS (as of November 19, 2010)

| | | | |
|---|---|---|---|
| a. | Cash on hand | $ | 111,719.84 |
| b. | Accounts Receivable | $ | 424,962.28 |

7 FIXED ASSETS – The Studio – Real Property and personal property[4]   $  53,000,000.00

8 **TOTAL ASSETS**                       $  53,536,682.12

**Less:**
Bernalillo County Tax Claim                  ($355,095.00)

**Less:**
Amalgamated                     ($84,000,000.00)

**Less:**
Workers                        ($23,000,000.00)

**Less:**
ESTIMATED Chapter 7 trustee fees and expenses    ( $1,500,000.00)

**Less:**
ESTIMATED cost of Sale on Real Property       ( $3,000,000.00)

**Less:**
    Chapter 11 administrative expenses         ( $300,000.00)

**Less:**
Priority claims, excluding administrative expense claims    ($10,000.00)

(1) Balance for unsecured claims              $   -0-
(2) Total amount of unsecured claims          $52,900,000

**Percentage of their claims which unsecured creditors would receive or retain in a ch. 7 liquidation = -0-**

**Percentage of their claims which unsecured creditors will receive or retain under the Plan: = approximately 10% - 20%**

---

[3]     The valuations contained herein are based on the Debtor's personal knowledge. The Debtor does not have any current real estate appraisals or valuations of its assets either on a liquidation basis or a "going concern basis". The Debtor has not received any reasonable offers to purchase its business or its assets, despite aggressive marketing efforts on the part of the Debtor both prepetition and post petition.

[4]     This number is rounded up. The specific values of the Personal Property are set forth in Exhibits A and E.

Below is a demonstration, in tabular format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or holder would receive under a Chapter 7 liquidation.

| CLAIMS & CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Class 1 | 100% | -0- |
| Class 2 | 100% | 100% |
| Class 3 | Unknown but significantly less than 100%. It is difficult to ascertain the value of the distribution Class 3 will receive under the Plan. | 64% |
| Class 4 | -0- | -0- |
| Class 5<br><br>Class 5A and Class 5B | 100% | 100% |
| Class 6 | Approximately 10% - 20% depending on the outcome of pending litigation. The Debtor believes that it will successfully defend all pending litigation and disputed claims and the distribution will be closer to 20%. | -0- |
| Class 7 | -0- | -0- |

## C.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date. The Debtor maintains that this aspect of feasibility is satisfied as illustrated here:

| | | |
|---|---|---|
| 1 | Cash Debtor will have on hand by Effective Date | $4,474,000.00[5] |
| 2 | **To Pay:** Administrative Claims | (    $ 212,000) |
| 3 | **To Pay:** Statutory costs & charges | ($ 15,000) |
| 4 | **To Pay:** Other Plan Payments due on Effective Date | ($3,703,095.06) |
| 5 | "Cure Payments" ($ 298,000), Real Property Tax Claims ($ 355,095.06), Class 6 Distribution ($ 50,000), Satisfaction of DIP Facility ($3,000,000). | |
| 7 | Balance after paying these amounts | $543,904.94 |

The Sources of the cash Debtor will have on hand by the Effective Date, as shown above are:

| | |
|---|---|
| $   170,000.00 | Cash in DIP account and Balance of DIP Facility |
| $4,304,000.00 | Exit Financing Facility, as and to the extent the Debtor and the First Lien Lender so elect – Of this amount $3,000,000 is for satisfaction of the DIP Facility. |
| $ 4,474,000.00[6] | **Total** |

As demonstrated above, the Debtor will have sufficient cash on the Effective Date to meet all Effective Date Distributions. The Effective Date Distributions will be made to Classes 1, 2, and 6, Allowed Administrative Claims, OUST Fees, court costs and "cure payments" on assumed leases.

The second aspect considers whether the Debtor will have enough Cash over the life of the Plan to make the required Plan payments. As all required payments are due on the Effective Date or as soon thereafter as possible this requirement is satisfied. No Plan Distributions will be made by the Reorganized Debtor nor are Plan Distributions dependant upon the business

---

[5] This amount shall be reduced to the extent the DIP Lender agrees to convert the DIP Financing Claims into the Exit Financing Facility, to forgive amounts outstanding under the DIP Loan Agreement or otherwise to not require the payment of the DIP Financing Claims.

[6] This amount shall be reduced to the extent the DIP Lender agrees to convert the DIP Financing Claims into the Exit Financing Facility, to forgive amounts outstanding under the DIP Loan Agreement, or otherwise to not require the payment of the DIP Financing Claims.

1    operations of the Reorganized Debtor. The Exit Financing Facility, if any, and cash on hand on

2    the Effective Date will provide sufficient Cash to satisfy all Plan obligations.

3        The Debtor is only conferring with the First Lien Lender regarding the Exit Financing

4    Facility and will not be obtaining the Exit Financing Facility from anyone other than the First

5    Lien Lender.

6                                    **VI.**

7                    **EFFECT OF CONFIRMATION OF PLAN**

8    **A.      Discharge.**

9        The Plan provides that upon confirmation of the Plan, and except as otherwise provided

10   in the Plan, Debtor shall be discharged of liability for payment of debts incurred before

11   confirmation of the Plan, to the extent specified in 11 U.S.C. § 1141. However, any liability

12   imposed by the Plan will <u>not</u> be discharged.

13   **B.      Revesting of Property in the Debtor.**

14       On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all

15   property of the Debtor's estate shall vest in the Reorganized Debtor free and clear of all Claims,

16   liens, encumbrances, charges and other interests, except as provided in the Plan.    The

17   Reorganized Debtor may operate its businesses and may use, acquire and dispose of property

18   free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if

19   there were no pending case under any chapter or provision of the Bankruptcy Code, except as

20   provided in the Plan.

21   **C.      Plan Modification**.

22       The Plan may be amended, modified or supplemented by the Debtor or the Reorganized

23   Debtor with the consent of the First Lien Lender and the DIP Lender in the manner provided for

24   by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional

25   disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation

26   Date, the Debtor with the consent of the First Lien Lender may institute proceedings in the

27   Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan

28

1  or the Confirmation Order with respect to such matters as may be necessary to carry out the

2  purposes and effects of the Plan.

3       Prior to the Effective Date, the Debtor with the consent of the First Lien Lender may

4  make appropriate technical adjustments and modifications to the Plan without further order or

5  approval of the Bankruptcy Court.

6       Notwithstanding any reference herein or in the Plan to documents in the forms annexed to

7  the Plan or filed as part of the Plan Supplement, the Debtor or the Reorganized Debtor may

8  revise those forms with the consent of the First Lien Lender and any party in interest that is

9  entitled to vote on the Plan and is adversely affected thereby.

10  **D.    Business Operations and Post- Confirmation U.S. Trustee Fees.**

11       The Reorganized Debtor shall continue to operate its business free of supervision by the

12  United States Trustee and shall no longer be required to file Monthly Operating Reports but shall

13  be obligated to pay fees pursuant to 28 U.S.C. section 1930(a)(6) until the entry of a final decree

14  closing this Chapter 11 case.

15  **E.    Post - Confirmation Status Report.**

16       Within 120 days of the entry of the order confirming the Plan, the Debtor shall file a

17  status report with the Court explaining what progress has been made toward consummation of

18  the confirmed Plan. The status report shall be served on the United States Trustee, the twenty

19  largest unsecured creditors, and those parties who have requested special notice. Further status

20  reports shall be filed every 120 days and served on the same parties.

21  **F.    Post-Confirmation Conversion/ Dismissal.**

22       A creditor or party in interest may bring a motion to convert or dismiss the case under §

23  1112(b) after the Plan is confirmed and before substantial consummation of the Plan, if there is a

24  default in performing the Plan. If the Court orders the case converted to Chapter 7 after the Plan

25  is confirmed, then all property which had been property of the Chapter 11 Estate, and which had

26  not been revested in the Reorganized Debtor, if any, and which remains property of the Estate,

27  will vest in the Chapter 7 estate.  For avoidance of doubt, any property that vests in the

28  Reorganized Debtor shall remain property of the Reorganized Debtor.  With respect to any

1  property that is property of the chapter 7 estate, the automatic stay will be reimposed upon the

2  revested property only to the extent that relief from stay was not previously granted by the Court

3  during this Case.

4      The order confirming the Plan may also be revoked under very limited circumstances.

5  The Court may revoke the order if the order of confirmation was procured by fraud and if the

6  party in interest brings an adversary proceeding to revoke confirmation

7  within 180 days after the entry of the order of confirmation.

8  **G.    Final Decree.**

9      Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the

10  Debtor, or other party as the Court shall designate in the Plan Confirmation Order, shall file a

11  motion with the Court to obtain a final decree to close the case.

12

13  Dated: December 10, 2010                    EZRA BRUTZKUS GUBNER, LLP

14

15                                    By: /s/ Robyn B. Sokol
                                          Robyn B. Sokol
16                                        Attorneys for Pacifica Mesa Studios, LLC,
                                          Debtor and Debtor In Possession
17

18

19

20

21

22

23

24

25

26

27

28