Polsinelli Shughart PC
Jerry L. Switzer, Jr. (admitted *pro hac vice*)
Monika J. Machen (admitted *pro hac vice*)
161 N. Clark Street, Suite 4200
Chicago, IL  60601
Telephone:   (312) 819-1900
Facsimile:    (312) 819-1910
jswitzer@polsinelli.com
mmachen@polsinelli.com

-and-

Blank Rome LLP
Sara L. Chenetz (SBN 206936)
Peter F. Jazayeri (SBN 199626)
1925 Century Park East, Suite 1900
Los Angeles, CA  90046
Telephone:   (424) 239-3400
Facsimile:    (424) 239-3399
chenetz@blankrome.com
jazayeri@blankrome.com

*Attorneys for Workers Realty Trust II, L.P.*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>PACIFICA MESA STUDIOS, LLC, a California limited liability company,<br><br>    Debtor and Debtor-in-Possession. | Case No. 1:10-bk-18827-GM<br><br>Chapter 11<br><br>**WORKERS REALTY TRUST II, L.P.'S [PROPOSED] DISCLOSURE STATEMENT RELATING TO CHAPTER 11 PLAN OF REORGANIZATION FOR PACIFICA MESA STUDIOS, LLC**<br><br>Dated:  March 25, 2011<br><br><u>Confirmation Hearing:</u><br>Date:      July _____, 2011<br>Time:      ___:00 a.m.<br>Place:     Courtroom 303<br>              U.S. Bankruptcy Court<br>              21041 Burbank Boulevard<br>              Woodland Hills, CA  91367 |

# TABLE OF CONTENTS

DISCLAIMER ........................................................................................................... vi

I. INTRODUCTION ...................................................................................................1

    A.    General Background ...................................................................................1

    B.    Overview of the Plan .................................................................................1

    C.    Purpose of This Document.........................................................................2

    D.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing..............3
        1.    Time and place of the Confirmation Hearing. ...............................3
        2.    Deadline For Voting For or Against the Plan. ...............................3
        3.    Deadline For Objecting to the Confirmation of the Plan...............3
        4.    Identity of Person to Contact for More Information Regarding the
                Plan. ...............................................................................................4

    E.    Disclaimer .................................................................................................4

    F.    Recommendation .......................................................................................4

II. BACKGROUND....................................................................................................5

    A.    Debtor's Business and Prepetition Operations .........................................5

    B.    The Debtor's Secured Prepetition Indebtedness ......................................5

    C.    Management of the Debtor Before and After Commencement of the
        Reorganization Case ..................................................................................6

    D.    Events Leading to Chapter 11 Filing ........................................................7

    E.    Significant Events During the Bankruptcy ...............................................8
        1.    Bankruptcy Proceedings. ...............................................................8
            a.    Administrative Matters. ....................................................8

            b.    Employment of Professionals. ..........................................8

            c.    Use of Cash Collateral and DIP Financing. ....................8

            d.    Employee Wages and Benefits Motion.............................9

            e.    Administrative Expenses ..................................................9

            f.    Appointment of a Trustee .................................................9

            g.    Current and Historical Financial Condition of the Debtor............10

i

h.      Actual and Projected Recovery of Preferential or
        Fraudulent Transfers ..........................................................11

2.      The Debtor's Litigation with Workers.......................................11
        a.      Adversary Proceeding ...........................................11

b.      The TRO and Preliminary Injunction Preventing Workers
        from Pursuing its Foreclosure Sale of the Old Membership
        Interests; Lifting of the Preliminary Injunction ...........................13

3.      Other Adversary Proceedings and Non-Bankruptcy Actions. ...................14
        a.      Pacifica Mesa Studios, LLC, et al. v. Smerigan, et al...................14

b.      Digital Media Group, LLC, et al. v. Katersky, et al. ...................15

c.      Mesa del Sol, LLC v. Pacifica Mesa Studios, LLC ......................15

4.      The Debtor's Plan and Disclosure Statement; Termination of
        Exclusivity ................................................................16

III. SUMMARY OF THE PLAN OF REORGANIZATION ......................................17

A.      Classification and Treatment of Claims and Equity Interests..............17
        1.      Administrative, Professional Fee, Priority Tax, and DIP Facility
                Claims ..............................................................17
                a.      Administrative Claims ..........................................17

                        i.      Treatment of Administrative Claims ....................17

                        ii.     Bar Date for Administrative Claims ....................18

                b.      Professional Compensation and Reimbursement Claims .............18

                c.      Priority Tax Claims.............................................19

                d.      DIP Facility Claims.............................................19

        2.      Classified Claims and Equity Interests .............................20
                a.      Class 1 – Other Priority Claims ................................21

                b.      Class 2 – Secured Tax Claims ..................................22

                c.      Class 3 – First Lien Lender Secured Claim. ................23

                d.      Class 4 – First Lien Lender Unsecured Claim ..............23

                e.      Class 5 – Second Lien Lender Secured Claim..............24

                f.      Class 6 – Second Lien Lender Unsecured Claim........................25

ii

g.      Class 7A and 7B – Credit Union Secured Claims .........................26

h.      Class 8 – Mesa del Sol Secured Claim ...........................26

i.      Class 9 – General Unsecured Claims.................................28

j.      Class 10 – Equity Interests in the Debtor.......................28

3.      Discharge of Claims..................................................................29

B.      Means of Performing The Plan ..........................................................29
1.      Authorization and Issuance of New Membership Interests ......29
2.      Authorization and Consummation of New Senior Secured Loan
        Documents ..................................................................................29
3.      Authorization and Issuance of New Conversion Warrants.........30
4.      Amendment and Restatement of Operating Agreement .............30
5.      Termination of the DIP Loan Agreement ..................................30
6.      Exit Financing Facility...............................................................30
7.      New Management Agreement .....................................................30
8.      Cancellation of Existing Securities and Agreements..................31
9.      Board of Directors.......................................................................31
10.     Officers........................................................................................31
11.     Continued Existence and Vesting of Assets in the Reorganized
        Debtor ..........................................................................................31

C.      Funding of Distributions .....................................................................32
1.      Distribution Record Date ............................................................32
2.      Date of Distributions...................................................................32
3.      Postpetition Interest on Claims ...................................................32
4.      Disbursing Agent.........................................................................33
5.      Powers of Disbursing Agent .......................................................33
6.      Surrender of Instruments.............................................................33
7.      Delivery of Distributions.............................................................33
8.      Manner of Payment Under Plan of Reorganization....................34
9.      Setoffs .........................................................................................34
10.     Minimum Distributions................................................................34
11.     Distributions After Effective Date ..............................................35
12.     Allocation of Distributions Between Principal and Interest ........35

D.      Conditions Precedent to the Effective Date ........................................35
1.      Conditions Precedent to the Effective Date ................................35
2.      Effect of Failure of Conditions to Effective Date ......................35

E.      Treatment of Disputed Claims ............................................................36
1.      Objections to Claims....................................................................36
2.      Payments and Distributions with Respect to Disputed Claims...36
3.      Estimation of Claims....................................................................36
4.      Distributions Relating to Disputed Claims. ................................37

iii

|     |     | 5. | Preservation of Rights to Settle Claims. | 37 |
|     |     | 6. | Disallowed Claims. | 38 |
|     | F. | Executory Contracts and Unexpired Leases. | | 38 |
|     |     | 1. | General Treatment | 38 |
|     |     | 2. | Cure of Defaults | 38 |
|     |     | 3. | Rejection Claims | 39 |
|     |     | 4. | Debtor's Indemnification Obligations | 39 |
|     |     | 5. | Insurance Policies | 40 |
|     | G. | Miscellaneous Provisions of the Plan | | 40 |
|     |     | 1. | Plan Supplement | 40 |
|     |     | 2. | No Admissions. | 40 |
|     |     | 3. | Severability of Plan Provisions. | 41 |
|     |     | 4. | Governing Law. | 41 |
|     |     | 5. | Retention of Jurisdiction. | 41 |
|     |     | 6. | No Waiver. | 43 |
|     |     | 7. | Plan Modification | 43 |
|     |     | 8. | Business Operations and Post-Confirmation U.S. Trustee Fees | 43 |
|     |     | 9. | Post-Confirmation Status Report | 44 |
|     |     | 10. | Post-Confirmation Conversion/ Dismissal | 44 |
|     |     | 11. | Final Decree | 45 |
|     | H. | Risk Factors | | 45 |
|     |     | 1. | Bankruptcy Risks | 45 |
|     |     | 2. | Risk Factors affecting the value of the securities to be offered under the Plan and/or the recoveries under the Plan | 45 |
|     |     | 3. | Economic Risks | 45 |

IV. EFFECT OF CONFIRMATION OF PLAN .............................................................. 46

|     | A. | Vesting of Assets | 46 |
|     | B. | Discharge of Claims and Termination of Equity Interests | 46 |
|     | C. | Discharge | 47 |
|     | D. | Term of Injunctions or Stays | 47 |
|     | E. | Injunction Against Interference with Plan | 48 |
|     | F. | Injunction Enjoining Holders of Claims Against Debtor and Reorganized Debtor. | 48 |
|     | G. | Releases | 49 |
|     | H. | Exculpation. | 50 |
|     | I. | Retention of Causes of Action/Reservation of Rights. | 51 |

iv

CHIDM-119638.5

135100.01600/95036976v.1

    J.      Solicitation of the Plan ........................................................................52

    K.     Exemption from Stamp, Transfer and Other Taxes. ...............................52

V. CONFIRMATION REQUIREMENTS AND PROCEDURES ................................52

    A.     Requirements of Section 1129(a) of the Bankruptcy Code ...................53
        1.     Section 1129(a) Factors, Generally.............................................53
        2.     Liquidation Analysis/"Best Interests of Creditors" Test ............53
        3.     Feasibility....................................................................................55

    B.     Confirmation Procedures .......................................................................55
        1.     Who May Vote on the Plan or Object to Confirmation of the Plan...........55
        2.     What Is an Allowed Claim/Equity Interest ................................56
        3.     What Is an Impaired Claim/Equity Interest ...............................56
        4.     Who is Not Entitled to Vote........................................................57
        5.     Who Can Vote In More Than One Class .....................................57
        6.     Votes Necessary to Confirm the Plan .........................................58
        7.     Votes Necessary for a Class to Accept the Plan .........................58
        8.     Treatment of Nonaccepting Classes............................................58
        9.     Request for Confirmation Despite Nonacceptance by Impaired
            Classes.........................................................................................58

VI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ..............................59

    A.     Federal Income Tax Consequences to the Debtor ..................................59

    B.     Federal Income Tax Consequences to Creditors ...................................60
        1.     Recognition of Gain or Loss .......................................................60
        2.     Accrued Interest ..........................................................................61
        3.     Backup Withholding ....................................................................61

    C.     Federal Income Tax Consequences to Holders of Equity Interests .......62

    D.     General Disclaimer .................................................................................62

VII. CONCLUSION AND RECOMMENDATION ...............................................63

**Exhibits to the Disclosure Statement:**

Exhibit A:     [Proposed] Plan of Reorganization

Exhibit B:     Debtor's Annual Historical Financials and Monthly Operating Reports

Exhibit C:     Liquidation Analysis

CHIDM-119638.5

135100.01600/95036976v.1

## DISCLAIMER

**PLEASE NOTE THAT THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA UNDER SECTION 1125 OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION HAS BEEN MADE BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.**

CHIDM-119638.5

135100.01600/95036976v.1

# I.  INTRODUCTION

Workers Realty Trust II, L.P. ("Workers" or the "Second Lien Lender"), a Secured Creditor of the Debtor (as defined below), hereby submits this disclosure statement (this "Disclosure Statement") pursuant to Section 1125 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code") in connection with the solicitation of acceptances of its plan of reorganization (the "Plan") for Pacifica Mesa Studios, LLC (the "Debtor" or "Pacifica").  A copy of the proposed Plan is included herewith as **Exhibit A**.  Capitalized terms not defined herein shall bear the meaning ascribed to them in the Plan.  This Disclosure Statement should be read in conjunction with the Plan.

## A.  *General Background*

On July 20, 2010 (the "Commencement Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor's bankruptcy case (the "Reorganization Case") is currently pending in the United States Bankruptcy Court for the Central District of California, San Fernando Valley (the "Bankruptcy Court") before the Honorable Geraldine Mund.

## B.  *Overview of the Plan*

Workers is proposing a reorganizing plan for the Debtor.  In other words, Workers seeks to accomplish payments under the Plan by restructuring the Debtor's indebtedness to the First Lien Lender, as the Holder of the First Lien Lender Claims.  The Plan also provides that Workers shall retain its Liens, Claims and interests in the New Markets Tax Credit Proceeds (as discussed below).  The Plan sets forth Workers' proposal for:  (i) the funding of distributions under the Plan, including through new capital contributions to be made by the New Member, cash on hand as of the Effective Date, and the Exit Financing Facility, if any; (ii) the continuation of the Debtor's operations by the Reorganized Debtor; (iii) the treatment of Allowed Claims against the Debtor, including making certain distributions to trade Creditors and other Unsecured Creditors of the Estate (specifically, Holders of Claims in Class 9 [General Unsecured Claims] will receive a distribution of ***20-40%*** on their Allowed Claims); (iv) the termination of the existing Equity

1

CHIDM-119638.5

135100.01600/95036976v.1

Interests in the Debtor; and (v) the issuance of New Membership Interests in the Reorganized Debtor. The Plan provides that Equity Interests in the Debtor will be cancelled and that all Property of the Debtor on the Effective Date will vest in the Reorganized Debtor. The New Membership Interests in the Reorganized Debtor shall be issued to ABQ Studio Investors, LLC, in its capacity as the New Member. The Reorganized Debtor will continue the business operations of the Debtor through Raleigh Entertainment Holdings, LLC ("Raleigh" or "New Manager"), as the New Manager of Albuquerque Studios (as defined below) under the Plan.

The Effective Date of the Plan shall be the first Business Day on or after the Confirmation Date specified by the Second Lien Lender on which (i) no stay of the Confirmation Order is in effect and (ii) the conditions to the effectiveness of the Plan, as specified in Section 9.1 of the Plan, have been satisfied or waived in accordance therewith by the Second Lien Lender. It is anticipated that the Effective Date will occur in July 2011.

**C.    *Purpose of This Document***

Section 1125 of the Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning its related plan. This Disclosure Statement summarizes the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan. This Disclosure Statement is intended to provide information on the following:

(i)    who can vote on or object to the plan;

(ii)    what the treatment of your Claim or Equity Interest will be under the Plan (*i.e.*, what your Claim or Equity Interest will receive if the Plan is confirmed) and how this treatment compares to what your Claim or Equity Interest would receive if the Debtor were liquidated;

(iii)    the history of the Debtor and significant events during the Reorganization Case;

(iv)    what factors the Bankruptcy Court will consider when deciding whether or not to confirm the Plan;

(v)    what is the effect of confirmation of the Plan; and

2

(vi)    whether the Plan is feasible.

This Disclosure Statement cannot tell you everything about your rights. You should consult your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND EQUITY INTEREST HOLDERS IN THIS REORGANIZATION CASE.

**D.    *Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing***

**1.    Time and place of the Confirmation Hearing**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place on July __, 2011, at __:00 a.m. in Courtroom 303, United States Bankruptcy Court, 21041 Burbank Blvd., Woodland Hills, CA 91367.

**2.    Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to vote timely on the enclosed ballot and return the ballot to Sara L. Chenetz, Esq., Blank Rome LLP, 1925 Century Park East, Suite 1900, Los Angeles, CA 90046, counsel for Workers.

Your ballot must be received by 5:00 p.m. (Prevailing Pacific Time) on June __, 2011 or it will not be counted.

**3.    Deadline For Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Court and served by _____, 2011, upon: (a) Jerry L. Switzer, Jr., Esq., Polsinelli Shughart PC, 161 N. Clark Street, Suite 4200, Chicago, IL 60601, counsel for Workers; Sara L. Chenetz, Esq., Blank Rome LLP,

3

CHIDM-119638.5

135100.01600/95036976v.1

1925 Century Park East, Suite 1900, Los Angeles, CA 90046, counsel for Workers; (c) Robyn B. Sokol, Esq., Ezra Brutzkus Gubner, LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367, counsel for the Debtor; (d) Robert T. Schmidt, Esq., Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, NY 10036, counsel for the DIP Lender and the First Lien Lender; (e) Michael I. Gottfried, Esq., Landau Gottfried & Berger LLP, 1801 Century Park East, Suite 1460, Los Angeles, CA  90067, counsel for the DIP Lender and the First Lien Lender; and (f) S. Margaux Ross, Office of the United States Trustee, 21051  Warner Center Lane, Suite 115, Woodland Hills, CA 91367, counsel for the United States Trustee.

**4.      Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact Jerry L. Switzer, Jr., Esq. at Polsinelli Shughart PC, 161 N. Clark Street, Suite 4200, Chicago, Illinois 60601, Tel. (312) 819-1900, counsel for Workers.

**E.    *Disclaimer***

The financial data relied upon in formulating the Plan is based on certain limited information received by Workers from the Debtor as well as the monthly operating reports ("Monthly Operating Reports") filed by the Debtor with the Bankruptcy Court.   Workers represents that everything stated in the Disclosure Statement is true to Workers' best knowledge. However, Workers cannot vouch for the accuracy of the information supplied by the Debtor. The information contained herein and in the Plan is based upon the opinions and beliefs of Workers, unless specifically stated otherwise.

**F.    *Recommendation***

The Plan represents the efforts of Workers to maximize the immediate cash distribution to Holders of Allowed Claims. Workers believes that the Plan offers the highest and best recovery for Creditors of the Debtor.  The Plan provides superior treatment to the Claims of Creditors than that provided under the Debtor's Plan (as defined herein) and proposes new and experienced management to replace the Debtor's current management team.   **WORKERS**

4

CHIDM-119638.5

135100.01600/95036976v.1

**RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO <u>ACCEPT THE PLAN</u>.**

## II.  BACKGROUND

*A.      Debtor's Business and Prepetition Operations*

The Debtor is a California limited liability company formed for the purpose of developing and running a state-of-the art production complex in Albuquerque, New Mexico ("<u>Albuquerque Studios</u>").  The Debtor is currently owned on a 50/50 basis by members Harold Katersky ("<u>Katersky</u>") and Dana Arnold ("<u>Arnold</u>" and, together with Katersky, the "<u>Old Members</u>").

Albuquerque Studios is comprised of eight large soundstages – four 24,000 sq. ft. stages with 55-foot clear height, two 18,000 sq. ft. stages with 45-foot clear height and two 18,000 sq. ft. stages with 35-foot clear height plus office space, back lot space, mill, storage and set construction space, an HD digital screening room, fitness center and the full spectrum of production support services, all situated on a 28-acre campus setting.

Albuquerque Studios is the largest film studio in the State of New Mexico ("<u>New Mexico</u>").  The Debtor currently employs 12 people and hires 20 to 30 full time employees that work for other companies on-site.  Plus, each production brings hundreds of jobs to Albuquerque, New Mexico.  The Debtor serves the major Hollywood studios, as well as independent producers, and all members of the entertainment community who create, finance and produce and distribute media content.

*B.      The Debtor's Secured Prepetition Indebtedness*

The Debtor funded its studio with an initial loan from Amalgamated Bank of New York, as Trustee of the Longview Ultra Construction Loan Investment Fund ("<u>Amalgamated</u>" or the "<u>First Lien Lender</u>") in the amount of $58,700,000.  This loan was later increased to $75,300,000.  The Amalgamated loan is secured by all of the Debtor's Property and guarantees from the Old Members.  Amalgamated has filed a proof of claim against the Debtor in the amount of $82,655,227.57 (the "<u>First Lien Lender Claims</u>"), which amount includes principal,

CHIDM-119638.5

135100.01600/95036976v.1

interest, late charges, fees, costs and expenses.  Amalgamated has conceded in its proof of claim that "[t]he amount of [its] claims against the Debtor exceeds the value of the collateral securing such claim."

The Debtor also executed that certain Agreement for Participating Loan (as amended) with Workers, dated as of April 12, 2006, pursuant to which Workers lent the Debtor $16.2 million.  The balance on the loan due to Workers, including principal, interest, fees and charges as of the Commencement Date, is no less than $24,528,515.03 (the "Second Lien Lender Claims").

Workers, the Debtor and Amalgamated are each a party to that certain Amended and Restated Intercreditor and Subordination Agreement dated June 26, 2006 (as amended, the "Intercreditor Agreement").  Under the Intercreditor Agreement, Workers has subordinated all of its Claims and Liens to Amalgamated, except with respect to the New Markets Tax Credit Proceeds.  Workers' Claim is also secured by the Old Membership Interests in the Debtor which were pledged to Workers by the Old Members.

**C.    *Management of the Debtor Before and After Commencement of the Reorganization Case***

Immediately prior to the commencement of the Reorganization Case, the Debtor was managed and operated by the Old Members.  Pacifica Ventures, LLC ("Pacifica Ventures"), an affiliate of the Debtor, provides management services to the Debtor through a management agreement.  Pacifica Ventures currently manages and operates the Debtor.

Workers believes that the Debtor's financial woes were caused, in large part, because of the failings of the Old Members who, among other things, did not provide adequate managerial oversight and supervision to the Debtor and also financially mismanaged the Debtor and its business.  In addition, Workers is aware that the Old Members are involved in various other studios and projects that compete (and will compete) with the Debtor.  For these reasons (among others), Workers does not believe that current management is qualified to run the Debtor's business.

CHIDM-119638.5

135100.01600/95036976v.1

Workers proposes to replace current management with Raleigh, a leading and well-recognized movie studio operator.  Raleigh currently manages approximately 2.5 million square feet of studio facilities around the world, including locations in Los Angeles, Atlanta, Baton Rouge, Detroit and Budapest.  Raleigh successfully obtained consecutive 95% annual occupancies across 33 sound stages and 44 occupied stages across its studio portfolio in 2010. Raleigh intends to appoint and fully support an on-site director of studio operations and team that will service the day-to-day operations of Albuquerque Studios.  Workers strongly believes that Raleigh's reputation and track record will be able to maximize the Company's revenues and bring stability to the Debtor's operations.  In addition, Workers believes that Raleigh will be able to provide superior management to the Reorganized Debtor (as opposed to Pacifica Ventures, the Debtor's proposed manager for the Reorganized Debtor).

**D.      *Events Leading to Chapter 11 Filing***

In September 2008, construction of Albuquerque Studios was completed.  However, the Debtor was unable to fully occupy the studio.  This, among other things, including financial and operational mismanagement of the Debtor by the Old Members, resulted in the Debtor defaulting on its loan obligations to both Amalgamated and Workers.  Workers thereafter noticed a public foreclosure sale of the Old Membership Interests for July 23, 2010, which allegedly prompted the Debtor to file for bankruptcy protection.

The Debtor alleges that another contributing factor to its bankruptcy filing was that certain of its former officers and employees were, among other things, breaching their fiduciary duty to the Debtor and diverting corporate opportunities for themselves.  The Debtor alleges that these actions directly impacted the Debtor's business operations and significantly impacted the need for the Debtor to seek bankruptcy protection.  At the time of the Debtor's bankruptcy filing, a lawsuit was pending against certain of the Debtor's former officers and others in the Superior Court of the State of California, Los Angeles County (the "Smerigan Case", described more fully below).

7

**E.    *Significant Events During the Bankruptcy***

1.    **Bankruptcy Proceedings**

a.    <u>Administrative Matters</u>

The Debtor filed for relief pursuant to Chapter 11 of the Bankruptcy Code on July 20, 2010.  No trustee or creditors committee has been appointed in the Reorganization Case as of the date hereof.

The Court previously set a Bar Date of November 5, 2010.  The Debtor currently has through and until March 31, 2011 to file objections to Claims.

b.    <u>Employment of Professionals</u>

On the Commencement Date, the Debtor filed an application to retain and employ Ezra Brutzkus Gubner, LLP ("<u>EBG</u>") as its bankruptcy counsel.  On August 24, 2010,  the Bankruptcy Court entered an order approving the retention and employment of EBG by the Debtor.

On July 29, 2010, the Debtor filed an application to retain and employ William J. Hoffman and Trigild Inc. as its Chief Restructuring Officer, a requirement of the Debtor's DIP Lender.  The Order approving the retention and employment of Mr. Hoffman and Trigild Inc. was entered on September 7, 2010.

On March 11, 2011, the Debtor filed an application to retain and employ William F. Wolf and Squar/Milner as Accountants for the Debtor.  As of the date of this filing, the objection deadline to oppose the application has not yet passed and an order granting the application has not yet been entered by the Bankruptcy Court.

c.    <u>Use of Cash Collateral and DIP Financing</u>

On the Commencement Date, the Debtor filed an emergency motion for debtor-in-possession financing and use of cash collateral (the "<u>DIP Financing Motion</u>").  An initial hearing on the DIP Financing Motion was held on July 23, 2010.  At the initial hearing on the DIP Financing Motion, Workers opposed certain relief requested in the DIP Financing Motion.

8

On August 6, 2010, the Debtor filed a Supplemental Statement regarding the DIP Financing Motion. On that same date, Workers filed a written objection to final approval of the DIP Financing Motion upon the terms proposed by the Debtor.

A continued hearing for final approval of the DIP Financing Motion was held on August 13, 2010 (the "Final Hearing"). On August 17, 2010, the Court entered a final order authorizing the Debtor (i) to obtain postpetition financing, (ii) to use cash collateral, and (iii) granting certain protections to Amalgamated, in its capacity as the prepetition lender, in accordance with the modified terms stated on the record at the Final Hearing.

The Debtor's most recent Monthly Operating Report for February 2011 indicates that approximately $2.334 million is owed to the DIP Lender.

d.    Employee Wages and Benefits Motion

On the Commencement Date, the Debtor filed a motion for authorization to (i) pay pre-petition wages, (ii) permit employees to use accrued prepetition vacation time, and (iii) pay employees' prepetition reimbursable expenses and related relief. The Bankruptcy Court entered an order granting the foregoing motion on July 30, 2010.

e.    Administrative Expenses

Administrative expenses payable in the Reorganization Case include, among other things, fees and expenses of attorneys, accountants, and other professionals retained by the Debtor (collectively, the "Professionals"). As of February 28, 2011, approximately $783,000 had been paid to Professionals on account of work performed subsequent to the Commencement Date.

Additional administrative expenses include the fees payable to the United States Trustee ("U.S. Trustee") pursuant to 28 U.S.C. § 1930. As of February 28, 2011, $13,000 has been paid toward quarterly U.S. Trustee's fees. Any unpaid fees due to the U.S. Trustee will be paid in full on the Effective Date.

f.    Appointment of a Trustee

On January 5, 2011, the Bankruptcy Court issued an "Order to Show Cause Why a Chapter 11 Trustee Should Not be Appointed" (the "Order to Show Cause"). On February 15,

9

2011, Workers filed a reply in support of the Order to Show Cause. On that same day, each of Amalgamated and the Debtor filed oppositions to the Order to Show Cause. On February 24, 2011, Workers filed a response to the opposition briefs filed by the Debtor and Amalgamated. On March 1, 2011, the Court held a hearing on its Order to Show Cause. At the hearing, the Court ruled that it would not appoint a Chapter 11 Trustee in the Reorganization Case at that time and placed the Order to Show Cause off-calendar pending further developments in the case.

g.      Current and Historical Financial Condition of the Debtor

The Debtor's Disclosure Statement contains certain historical financial information pertaining to the Debtor's business, including (i) historical performance metrics for 2007, 2008 and 2009 and (ii) certain of the Debtor's Monthly Operating Reports. Such materials, as well as additional Monthly Operating Reports through February 2011, have been attached hereto as **Exhibit B**. The Monthly Operating Reports purportedly detail the Debtor's revenues from business operations as well as all of the Debtor's expenses since the Commencement Date. Workers has not been involved in the preparation of such materials and is unable to verify the accuracy of the financial information provided by the Debtor in its filings. Workers makes no representation with respect to the accuracy or truthfulness of the information contained in Exhibit B.

Based on the analysis of its investment banker, Duff & Phelps Securities, LLC ("Duff & Phelps"), Workers believes the current enterprise value (the "Reorganization Enterprise Value") of the Debtor's Property and business is approximately $27.5 million and the liquidation value of the Debtor's Property is less than $10 million. The foregoing valuations are based on the limited information that has been provided to Workers and is subject to change based on further inspection of the Debtor's Property and books and records. The Reorganization Enterprise Value assumes that the current tax and economic incentives for the film industry in New Mexico remain in place. However, Workers understands that New Mexico is currently considering extensive changes to its film industry tax incentive regime which, if enacted, may

CHIDM-119638.5

135100.01600/95036976v.1

negatively impact the Debtor and its business.    Any negative change in the film industry tax incentive regime in New Mexico will decrease the Reorganization Enterprise Value.

> h.        Actual and Projected Recovery of Preferential or Fraudulent Transfers

The Debtor has stated in its Disclosure Statement that it does not believe that it has Claims against Creditors arising under preferential or fraudulent transfer theories.    Workers has not been able to verify the accuracy of such statement.

Under the Plan, such Avoidance Actions shall vest in the Reorganized Debtor.    The Reorganized Debtor shall have the right to continue to pursue and commence various Causes of Action post-Confirmation, including any Avoidance Actions.    The fact that a Creditor is not listed in the Plan or has not already been the subject of an Avoidance Action is no guarantee that such    Creditor    is    free    from    liability,    or    that    the    Debtor    or    the Reorganized Debtor are waiving the right to pursue such Avoidance Action against such Creditor.

> **2.        The Debtor's Litigation with Workers**

> a.        Adversary Proceeding

On July 21, 2010, the Debtor commenced an adversary proceeding (the "Second Lien Lender Adversary Proceeding"; Adv. Proc. No. 1:10-ap-01286 GM) styled *Pacifica Mesa Studios, LLC v. New Vista Investment Group, LLC, Workers Realty Trust II, L.P., CRA Realty Investors Company, Commonwealth Realty Advisors, Inc., Harold A. Katerskv, Hilary Katersky, Dana Arnold, Randee Arnold and Does 1 through 10*, by the filing of a complaint (the "Complaint") for:  breach of fiduciary duty (Count I); aiding and abetting breach of duty of loyalty (Count II); aiding and abetting intentional interference with prospective economic advantage (Count III); breach of fiduciary duty for failure to disclose (Count IV); breach of implied covenant of good faith and fair dealing (Count V); declaratory relief and temporary restraining order (Count VI); and Section 105 injunction and extension of the automatic stay (Count VII).

11

At its core, the Complaint alleged that the lender defendants (*i.e.*, Workers, New Vista, CRA Realty, and Commonwealth, collectively referred to herein as the "Lender Defendants") exerted undue control and influence over the Debtor thereby acquiring a fiduciary duty to the Debtor.  The Complaint further alleged that the Lender Defendants acted in concert with and encouraged certain of the Debtor's purported insiders to harm the Debtor.  The Complaint sought damages for the conduct alleged and for a declaration of rights that the Debtor and guarantors were absolved of any obligation to Workers as a result.  The Debtor also sought a temporary restraining order and preliminary injunction to restrain Workers from proceeding with its foreclosure against the Old Membership Interests.

On September 17, 2011, the Lender Defendants filed a motion to dismiss (the "Motion to Dismiss") the Complaint pursuant to FED. R.  BANKR. P. 7012 and 7019 and FED. R. CIV. P. 12(b)(6), 12(b)(7), and 19, arguing, among other things, that the Debtor had failed to set forth sufficient facts to support its claims against the Lender Defendants.  At the hearing on the Motion to Dismiss, the Bankruptcy Court:  (i) dismissed Count V, with prejudice; (ii) dismissed Counts I, II, III and IV without prejudice and granted the Debtor leave to file a good faith amendment with respect to those counts; and (iii) suspended ruling on the motion to dismiss with respect to Counts VI and VII until such time as the Debtor amended the Complaint.

On December 10, 2010, the Debtor filed an amendment to the Complaint (the "First Amended Complaint").  The First Amended Complaint also names certain of the Debtor's former officers and employees as defendants.  The Bankruptcy Court has currently suspended all responsive pleading deadlines in the Adversary Proceeding.  In the event of reinstatement of such deadlines in the Second Lien Lender Adversary Proceeding, the Lender Defendants intend to seek dismissal of the First Amended Complaint with respect to the counts applicable to Lender Defendants.

Under the Plan, the Reorganized Debtor will dismiss the Second Lien Lender Adversary Proceeding, with prejudice.

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

b. The TRO and Preliminary Injunction Preventing Workers from Pursuing its Foreclosure Sale of the Old Membership Interests; Lifting of the Preliminary Injunction

On June 21, 2010, the Debtor filed its "Emergency Motion for an Order Extending the Automatic Stay to Members of the Debtor or in the Alternative for Entry of a Temporary Restraining Order and Order to Show Cause re Preliminary Injunction Restraining Purported Foreclosure of Members' Interest in Debtor" (the "Injunction Motion") seeking to enjoin Workers from foreclosing on its pledge of the Old Membership Interests in the Debtor.

On July 30, 2010, the Bankruptcy Court entered a Temporary Restraining Order pursuant to Section 105(a) of the Bankruptcy Code preventing Workers from proceeding with a public sale of the Old Membership Interests. Based on the Debtor's statements that an injunction was needed in aid of the Debtor's reorganization efforts, the Bankruptcy Court entered a preliminary injunction (the "Preliminary Injunction") enjoining Workers' foreclosure on the Old Membership Interests on August 27, 2010.

On October 15, 2010, the Debtor filed its plan (the "Debtor's Plan") and disclosure statement (as amended, the "Debtor's Disclosure Statement") proposing a liquidating plan. On December 14, 2010, Workers filed its "Motion to Dissolve Preliminary Injunction" in light of the fact that pursuant to the terms of the Debtor's Plan, the Debtor was no longer reorganizing. On January 10, 2011, the Bankruptcy Court entered an order lifting the Preliminary Injunction which permitted Workers to foreclose upon the Old Membership Interests.

On January 25, 2010, Workers issued a renewed notice of public foreclosure sale of the Old Membership Interests and set the date for such sale for Monday, February 7, 2011.

On February 3, 2011, Amalgamated commenced an action against Workers in the Second Judicial District Court for the County of Bernalillo in the State of New Mexico ("New Mexico State Court"), Case No. CV 2011-01312 (the "New Mexico Action") seeking, among other things, to enjoin the foreclosure sale until such time as its and Workers' respective rights under the Intercreditor Agreement are adjudicated.

13

On February 4, 2011, Workers filed a notice of removal thereby removing the New Mexico Action to the United States District Court for the District of New Mexico (Case No. 1:11-cv-0016-BB-KBM).   On February 11, 2011, Amalgamated filed a motion to remand the New Mexico Action back to New Mexico State Court.  On February 15, 2011 Workers filed a motion to transfer venue of the New Mexico Action to the Bankruptcy Court.

At this time, Workers has agreed to adjourn the foreclosure sale pending resolution of the transfer and remand motions.  Amalgamated and Workers have entered into a stipulation to extend the time to submit responsive pleadings to the applicable motions through mid-May 2011.

### 3.     Other Adversary Proceedings and Non-Bankruptcy Actions

#### a.     <u>Pacifica Mesa Studios, LLC, et al. v. Smerigan, et al.</u>

Prior to the Commencement Date, the Debtor and its management company, Pacifica Ventures, filed a lawsuit (*i.e.*, the Smerigan Case) against the former chief operating officer of the Albuquerque Studios and two former employees alleging that these former employees, among other things, established competing studios in other states while employed by the Debtor and misappropriated the Debtor's funds and resources, resulting in significant financial damage to the Debtor and contributing to the resulting defaults on the Debtor's secured obligations.  This action was filed in the Superior Court of California, County of Los Angeles, Case No. SC 107724.  The defendants deny each and every claim and related allegations made against them in this lawsuit.

Burn & Rave Enterprises, LTD. Jeremy Hariton. Roadtown Enterprises, Ltd.  and Nick Smerigan filed a cross-complaint for slander and invasion of privacy claims naming the Debtor, Pacifica Ventures, Pacifica Ventures International, LLC, the Old Members, Matt Rauchberg and William Waltman and Does 1-25 as cross-defendants.  The cross-defendants deny each and every claim and related allegations made against them in this lawsuit.

The Smerigan Case was removed to the Bankruptcy Court by and through the filing of a notice of removal on or about September 21, 2010. Upon the motion of certain of the defendants

14

in the Smerigan Case, the Bankruptcy Court remanded the Smerigan Case back to California Superior Court.

At this early stage of litigation it is difficult to ascertain the value of the Smerigan Case. The Smerigan Case, like all of the other Property of the Debtor, will vest in the Reorganized Debtor on the Effective Date.

b.    Digital Media Group, LLC, et al. v. Katersky, et al.

The Debtor as well as its developer, managers and several individuals, are defendants in a suit brought by Digital Media Group, LLC and its principals in New Mexico State Court.  By and through this action, the plaintiffs allege that they are entitled to a portion of the profits of the Debtor.  The Debtor's Disclosure Statement provides the following synopsis of the litigation:

In 2005, these plaintiffs were parties to a two-page Letter of Intent (LOI) with Pacifica Ventures to develop a studio project at the Albuquerque Rail Yard.  This LOI was specific to the rail yard project, gave the named defendants in this lawsuit no obligation to include these plaintiffs in any other projects, and subsequently expired under its own terms.  When the defendants withdrew from the Rail Yard project, plaintiffs were free to continue to develop the Rail Yard without defendants' involvement.  Given the fact that the Debtor is currently in bankruptcy, the fact that its secured obligations are in default and the secured creditors' claims are significantly greater than the value of the Debtor, even if plaintiffs are successful, their damages would be $0.00.

Workers has not reviewed the underlying complaint, the allegations therein, or the defenses thereto.  Workers neither confirms nor denies the Debtor's representations.  The Debtor has indicated that it may remove this case to the Bankruptcy Court.

c.    Mesa del Sol, LLC v. Pacifica Mesa Studios, LLC

Mesa del Sol, LLC ("Mesa del Sol") is the master developer of the 13,000 acre planned community (the "Mesa") in which Albuquerque Studios sit adjacent to the first town center, and the successor to the entity from which the Debtor purchased (in 2006) the land upon which the

15

studios sit.   These disputes arise from the Debtor's option (the "<u>Mesa del Sol Option</u>") to purchase additional land on the Mesa (the "<u>Mesa del Sol Option Parcel</u>"), the Debtor's exclusives on the Mesa, and the permitted uses of certain portions of the property known as the "liner land" which are slated for future development facing the town center.   The Debtor provided an earnest money deposit of $100,000 to Mesa del Sol (the "<u>Mesa del Sol Earnest Money</u>") in connection with the option.   On May 21, 2010, Mesa del Sol filed an additional lawsuit seeking recovery of $278,567.23 in costs associated with the initial installation of electrical infrastructure at Albuquerque Studios.

The Plan proposes to resolve the litigation with Mesa del Sol by releasing 75% of the Mesa del Sol Earnest Money to Mesa del Sol, and providing a Class 9 General Unsecured Claim to Mesa del Sol to the extent that the amount of Mesa del Sol's total Claim against the Debtor exceeds the portion of the Mesa del Sol Earnest Money to be distributed to Mesa del Sol, as provided in Section 4.9 of the Plan.   In addition, the Debtor and the Reorganized Debtor shall acknowledge and agree that the Debtor did not properly exercise the Mesa del Sol Option and such option expired prior to the Commencement Date and is no longer in force or effect; (ii) the Debtor, the Estate and the Reorganized Debtor have no right, title, claim or interest in, to or against the Mesa del Sol Option Parcel, whether under the Mesa del Sol Option or otherwise; and (iii) Pacifica's Exclusive Uses, as such term is defined and as set forth in Article II of the Mesa del Sol Declaration, terminated prior to the Commencement Date and are no longer in force or effect.

### 4.      The Debtor's Plan and Disclosure Statement; Termination of Exclusivity

On October 15, 2010, the Debtor filed the Debtor's Plan along with its Disclosure Statement thereon.   Workers filed an objection to the Debtor's Disclosure Statement contesting, among other things, the adequacy of the Debtor's Disclosure Statement and the confirmability of the Debtor's Plan.   On November 30, 2010, the Court held a hearing on the adequacy of the Debtor's Disclosure Statement.   The Court approved the Debtor's Disclosure Statement, with certain modifications stated on the record.   On December 13, 2010, the Debtor filed its First

16

Amended Disclosure Statement. The Debtor's Plan and Disclosure Statement have been sent to Creditors. The Debtor has represented to the Bankruptcy Court and other parties in interest that it has received the requisite votes needed to confirm its Plan. Workers has not verified the Debtor's statement.

The confirmation hearing on the Debtor's Plan was originally set for February 24 & 25, 2011. As described above, on January 4, 2011, the Bankruptcy Court lifted the Preliminary Injunction and permitted Workers to proceed with its foreclosure sale against the Old Membership Interests. On that same day, the Bankruptcy Court terminated the Debtor's exclusive periods to file a plan and solicit acceptances thereon. The Bankruptcy Court also suspended the confirmation proceedings in connection with the Debtor's Plan until further court order. As of the date of this filing, the Bankruptcy Court has not reset the confirmation hearing relating to the Debtor's Plan. Workers anticipates that the confirmation hearing on the Debtor's Plan will coincide with the confirmation hearing on Workers' Plan.

### III.  SUMMARY OF THE PLAN OF REORGANIZATION

*The summary of the Plan contained herein is qualified in its entirety by reference to the Plan and the exhibits to this Disclosure Statement and the Plan. It is the Plan and orders by the Bankruptcy Court, and not this Disclosure Statement, that govern the rights and obligations of the parties. To the extent of any inconsistencies between this Disclosure Statement and the Plan, the terms and conditions set forth in the Plan shall govern and control.*

**A.**    ***Classification and Treatment of Claims and Equity Interests***

    **1.**    **Administrative, Professional Fee, Priority Tax, and DIP Facility Claims**

        a.    <u>Administrative Claims</u>

            i.    <u>Treatment of Administrative Claims</u>

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Debtor or the Reorganized Debtor shall pay to each Holder of an Allowed Administrative Expense Claim, in full satisfaction of such Claim, Cash equal to the

17

Allowed amount of such Claim on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim is Allowed; *provided, however,* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, shall be paid by the Reorganized Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

The Debtor's Disclosure Statement states that approximately $15,000 of Administrative Expense Claims will be due and outstanding as of the effective date of the Debtor's Plan. For purposes of its Plan, Workers assumes such figure as the amount of Administrative Expense Claims that will be due and outstanding as of the time of the Effective Date under the Plan.

ii.      Bar Date for Administrative Claims

Administrative Expense Claims arising, accruing and/or incurred by the Debtor or the Estate on and after the Commencement Date shall be filed with the Bankruptcy Court no later than forty five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Any such Administrative Expense Claims filed after this deadline shall be automatically deemed Disallowed in full.

b.      Professional Compensation and Reimbursement Claims

All Professionals seeking an allowance and payment of Professional Fee Claims shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred no later than forty five (45) days after the Effective Date. Except to the extent that a Holder of an Allowed Professional Fee Claim agrees to a different treatment, the Debtor or the Reorganized Debtor shall pay to each Holder of an Allowed Professional Fee Claim, in full satisfaction of such Claim, Cash equal to the Allowed amount of such Claim on or as soon as reasonably practicable after the date such Claim is Allowed.

The Debtor's Disclosure Statement states that approximately $172,000 of Professional Fee Claims will be due and outstanding as of the effective date of the Debtor's Plan. For

18

purposes of Workers' Plan, Workers assumes such figure as the amount of Professional Fee Claims that will be due and outstanding as of the time of the Effective Date under the Plan.

c.   <u>Priority Tax Claims</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, the Debtor or the Reorganized Debtor shall pay to each Holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, equal monthly installments of Cash totaling in the aggregate the Allowed amount of such Claim, together with interest thereon at the applicable rate under Section 511 of the Bankruptcy Code, payable over the period starting (a) on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date that such Claim is Allowed, and (b) ending on the date that is five (5) years after the Commencement Date.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.  Any non-Secured Claim asserted by a governmental unit on account of any penalties shall not be a Priority Tax Claim, but shall be a General Unsecured Claim and shall be included in Class 9 under the Plan and shall receive the treatment set forth in Section 4.10 of the Plan.

The Debtor's Disclosure Statement states that approximately $3,700 in Priority Tax Claims *may* be due and outstanding to the State of New Mexico, Bernalillo County for unpaid real estate taxes as of the effective date of the Debtor's Plan.  For purposes of Workers' Plan, Workers assumes such figure as the amount of Priority Tax Claims that may be due and outstanding as of the time of the Effective Date under the Plan.

d.   <u>DIP Facility Claims</u>

Except to the extent that the Holder of the DIP Financing Claim agrees to a different treatment, the Debtor or the Reorganized Debtor shall pay to the Holder of the DIP Financing Claim, in full satisfaction of such Claim, Cash equal to the Allowed amount of such Claim on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim is Allowed; *provided, however,* that at the election of the DIP Lender and the Debtor or the Reorganized Debtor, with the consent of the Second Lien Lender, the DIP Financing Claim

19

shall be converted into the Exit Financing Facility on terms and pursuant to documentation acceptable to the DIP Lender and the Debtor or the Reorganized Debtor, with the consent of the Second Lien Lender.

The Debtor's current Monthly Operating Report for February 2011 reflects that approximately $2.334 million is due to the DIP Lender. For purposes of Workers' Plan, Workers assumes such figure as the amount of the DIP Financing Claim that will be due and outstanding as of the time of the Effective Date under the Plan.

### 2.    Classified Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must designate classes of claims and equity interests, each of which must contain only substantially similar claims or equity interests. The Plan and this Disclosure Statement state whether each Class of Claims and Equity Interests is Impaired or Unimpaired. The following describes the Claims and Equity Interests in the Debtor's Reorganization Case and the manner in which they are classified and treated under the Plan.

The Plan classifies Claims and Equity Interests, except for Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims, which are not classified, as set forth above. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest falls within the Class description. To the extent that part of the Claim or Equity Interest falls within a different Class description, the Claim or Equity Interest is classified in that different Class. The following table summarizes the Classes of Claims and Equity Interests under the Plan:

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Impaired. | Yes | 100% |
| 2 | Secured Tax Claims | Impaired. | Yes | 100% |
| 3 | First Lien Lender Secured Claim | Impaired. | Yes | 100% |

20

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 4 | First Lien Lender Unsecured Claim | Impaired. | Yes | 1-2% |
| 5 | Second Lien Lender Secured Claim | Impaired. | Yes | 100% |
| 6 | Second Lien Lender Unsecured Claim | Impaired. | Yes | 1-2% |
| 7A | Credit Union Secured Claim No. 1 | Impaired. | Yes | 100% |
| 7B | Credit Union Secured Claim No. 2 | Impaired. | Yes | 100% |
| 8 | Mesa de Sol Secured Claim | Impaired. | Yes | 75% |
| 9 | General Unsecured Claims | Impaired. | Yes | 20-40% |
| 10 | Equity Interests in the Debtor | Impaired. | No (deemed to reject Plan) | 0% |

a.    <u>Class 1 – Other Priority Claims</u>

- *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a different treatment, the Debtor or the Reorganized Debtor shall pay to each Holder of an Allowed Other Priority Claim, in full satisfaction of such Claim, (a) if Class 1 accepts the Plan, twelve (12) equal monthly installments of Cash totaling in the aggregate the Allowed amount of such Claim, plus interest thereon at the rate of five percent (5%) per annum (or such other interest rate established by Final Order of the Bankruptcy Court pursuant to Section 1129(a)(9)(B)(i) of the Bankruptcy Code), starting on or as soon as reasonably practicable after the later of (i) the Effective Date

21

and (ii) the date such Claim becomes Allowed, or (b) if Class 1 rejects the Plan, Cash equal to the Allowed amount of such Claim on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim is Allowed.

- *Voting*:  Class 1 is Impaired, and the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

- *Amount of Claim*:  The Debtor's Disclosure Statement indicates that there are no Holders of Class 1 Claims.

     b.     <u>Class 2 – Secured Tax Claims</u>

- *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a different treatment, the Debtor or the Reorganized Debtor shall pay to each Holder of an Allowed Secured Tax Claim, in full satisfaction of such Claim, equal monthly installments of Cash totaling in the aggregate the Allowed amount of such Claim, together with interest thereon at the applicable rate under Section 511 of the Bankruptcy Code, payable over the period starting (a) on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date that such Claim is Allowed, and (b) ending on the date that is five (5) years after the Commencement Date.  All Allowed Secured Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

- *Voting*:  Class 2 is Impaired, and the Holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.

- *Amount of Claim*:  The Debtor's Disclosure Statement indicates that the sole Class 2 Claim totals approximately $355,000.

CHIDM-119638.5

135100.01600/95036976v.1

c.      Class 3 – First Lien Lender Secured Claim

- *Treatment:*  On the Effective Date, the First Lien Lender, as the Holder of the *Allowed First* Lien Lender Secured Claim, shall receive the New Senior Secured Loan Documents in full satisfaction of such Claim. The Plan shall not affect (i) any of the rights or claims of the First Lien Lender against any Person (including the Old Members and their respective wives, as guarantors of the First Lien Lender Claims) other than the Debtor or the Reorganized Debtor, or (ii) the Intercreditor Agreement or any rights or obligations of the First Lien Lender or the Second Lien Lender thereunder, all of which such rights, claims and obligations shall survive and not be affected by the Plan.

- *Voting:*  Class 3 is Impaired, and the Holder of the Class 3 Claim is entitled to vote to accept or reject the Plan.

- *Amount of Claim*:  Reorganization Enterprise Value, less the Allowed amounts of the DIP Financing Claim and the Secured Tax Claims as of the Effective Date.

d.      Class 4 – First Lien Lender Unsecured Claim

- *Treatment*:  On the Effective Date, the First Lien Lender, as the Holder of the Allowed First Lien Lender Unsecured Claim, shall receive a New Conversion Warrant in full satisfaction of such Claim, which shall entitle such Holder to receive its pro rata share of up to ten percent (10%) of the fully diluted New Membership Interests in and to the Reorganized Debtor.  The Plan shall not affect (i) any of the rights or claims of the First Lien Lender against any Person (including the Old Members, and their respective wives, as guarantors of the First Lien Lender Claims) other than the Debtor or the Reorganized Debtor, or (ii) the Intercreditor Agreement or any rights or obligations of the

23

First Lien Lender or the Second Lien Lender thereunder, all of which such rights, claims and obligations shall survive and not be affected by the Plan.

- *Voting*:   Class 4 is Impaired, and the Holder of the Class 4 Claim is entitled to vote to accept or reject the Plan.

- *Amount of Claim*:   The First Lien Lender Claims less the amount of the Class 3 Claim.

    e.    <u>Class 5 – Second Lien Lender Secured Claim</u>

- *Treatment*:   On the Effective Date, the Second Lien Lender, as the Holder of the Allowed Second Lien Lender Secured Claim, shall receive and retain, in full satisfaction of such Claim, all of its existing rights, entitlements, Claims and Liens against the Debtor and its Property arising under the Second Lien Lender Loan Documents, which shall be Reinstated and rendered Unimpaired solely to the extent of the New Markets Tax Credit Proceeds arising on or after the Effective Date.  For avoidance of any doubt, the Second Lien Lender's rights and Claims against and Lien on the New Markets Tax Credit Proceeds shall be senior in priority to all other Liens or Claims against the Reorganized Debtor or its Property with respect to such proceeds, including, without limitation, (a) the Lien to be granted in favor of the Exit Lender under the Exit Financing Facility, if any, and (b) the Lien to be granted in favor of the First Lien Lender under the New Senior Secured Loan Documents.  The Plan shall not affect (i) any of the rights or claims of the Second Lien Lender against any Person (including the Old Members and their respective wives, as guarantors of the Second Lien Lender Claims) other than the Debtor or the Reorganized Debtor (except as expressly set forth immediately above),

CHIDM-119638.5

135100.01600/95036976v.1

or (ii) the Intercreditor Agreement or any rights or obligations of the First Lien Lender or the Second Lien Lender thereunder, all of which such rights, claims and obligations shall survive and not be affected by the Plan.

- *Voting*:  Class 5 is Impaired, and the Holder of the Class 5 Claim is entitled to vote to accept or reject the Plan.

- *Amount of Claim*:  The value of the New Market Tax Credit Proceeds, which value shall be determined by the Bankruptcy Court at or prior to the Confirmation Hearing.

f.    <u>Class 6 – Second Lien Lender Unsecured Claim</u>

- *Treatment*:  On the Effective Date, the First Lien Lender, as the Holder of the Allowed Second Lien Lender Unsecured Claim as assignee of the Second Lien Lender pursuant to Section 16 of the Intercreditor Agreement, shall receive a New Conversion Warrant in full satisfaction of such Claim, which shall entitle such Holder to receive its pro rata share of up to ten percent (10%) of the fully diluted New Membership Interests in and to the Reorganized Debtor.  The Plan shall not affect (i) any of the rights or claims of the Second Lien Lender against any Person (including the Old Members and their respective wives, as guarantors of the Second Lien Lender Claims) other than the Debtor or the Reorganized Debtor, or  (ii) the Intercreditor Agreement or any rights or obligations of the First Lien Lender or the Second Lien Lender thereunder, all of which such rights, claims and obligations shall survive and not be affected by the Plan.

- *Voting*:  Class 6 is Impaired, and the Holder of the Class 6 Claim is entitled to vote to accept or reject the Plan.

CHIDM-119638.5

135100.01600/95036976v.1

- *Amount of Claim*:  The Second Lien Lender Claims less the Class 5 Claim.

g.    Class 7A and 7B – Credit Union Secured Claims

- *Treatment*:  Except to the extent that the Holder of a Class 7 Claim agrees to a different treatment, the Debtor or the Reorganized Debtor shall pay to the Holder of a Class 7 Claim, in full satisfaction of its Claim, equal monthly installments of Cash totaling in the aggregate the value of the Collateral securing such Claim as of the Effective Date (as set forth in the Schedules and the Disclosure Statement, or as otherwise established by Final Order of the Bankruptcy Court), plus interest thereon at the rate of four and 90/100 percent (4.9%) per annum (or such other interest rate established by Final Order of the Bankruptcy Court pursuant to Section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code), starting on or as soon as reasonably practicable after the Effective Date and ending on August 25, 2012.  To the extent that the Credit Union's total Claim against the Debtor exceeds the value of the Collateral securing such Claim, such deficiency Claim shall constitute a General Unsecured Claim and shall be included in Class 9 under the Plan and shall receive the treatment set forth in Section 4.10 of the Plan.

- *Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

- *Amount of Claim*:  The Debtor's Disclosure Statement indicates that the Holders of Class 7 Claims are owed approximately $34,000.

h.    Class 8 – Mesa del Sol Secured Claim

- *Treatment*:  Except to the extent that the Holder of the Allowed Mesa del Sol Secured Claim agrees to a different treatment, the Holder of

26

the Allowed Mesa del Sol Secured Claim shall receive, in full satisfaction of such Claim, seventy five percent (75%) of the Mesa del Sol Earnest Money on or as soon as reasonably practicable after the Effective Date.  The Reorganized Debtor shall receive the remaining twenty five percent (25%) of the Mesa del Sol Earnest Money.  Mesa del Sol and the Debtor or the Reorganized shall submit a joint written direction to the Title Company (as such term is defined in the Mesa del Sol Purchase Agreement) to disburse the Mesa del Sol Earnest Money consistent with the terms of Section 4.9 of the Plan.  To the extent that the amount of Mesa del Sol's total Claim against the Debtor exceeds the portion of the Mesa del Sol Earnest Money to be distributed to Mesa del Sol under the Plan, such deficiency Claim shall constitute a General Unsecured Claim and shall be included in Class 9 under the Plan and shall receive the treatment set forth in Section 4.10 of the Plan.   In addition, the Debtor and the Reorganized Debtor shall acknowledge and agree, and the Confirmation Order shall provide, that (i) the Debtor did not properly exercise the Mesa del Sol Option and such Option expired prior to the Commencement Date and is no longer in force or effect, (ii) the Debtor, the Estate and the Reorganized Debtor have no right, title, claim or interest in, to or against the Mesa del Sol Option Parcel, whether under the Mesa del Sol Option or otherwise, and (iii) Pacifica's Exclusive Uses, as such term is defined and as set forth in Article II of the Mesa del Sol Declaration, terminated prior to the Commencement Date and are no longer in force or effect.

- *Voting*:  Class 8 is Impaired, and the Holder of the Class 8 Claim is entitled to vote to accept or reject the Plan.

27

- *Amount of Claim*:  The sole Holder of the Class 8 Claim contends that it is owed approximately $100,000.

    i.    <u>Class 9 – General Unsecured Claims</u>

- *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment, the Debtor or the Reorganized Debtor shall pay to each Holder of an Allowed General Unsecured Claim, in full satisfaction of such Claim, such Holder's *pro rata* share of the GUC Cash on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed.

- *Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

- *Amount of Claim*:  The Debtor's Disclosure Statement indicates that the Holders of Class 9 Claims are owed approximately $250,000 to $450,000.

    j.    <u>Class 10 – Equity Interests in the Debtor</u>

- *Treatment*:  Holders of Equity Interests in the Debtor shall not receive or retain any Equity Interest or Property on account of such Equity Interests.  On the Effective Date, all such Equity Interests, including, without limitation, the Old Membership Interests, shall be cancelled and extinguished.

- *Voting*:  Class 10 is Impaired.  Because Holders of Class 10 Equity Interests will receive nothing under the Plan, Class 10 is deemed to reject the Plan.

- *Amount of Equity Interests*:  The Old Members each own 50% of the Old Membership Interests in the Debtor.

CHIDM-119638.5

135100.01600/95036976v.1

### 3.    Discharge of Claims

The treatment in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Holder of an Allowed Claim or an Allowed Equity Interest may have in or against the Debtor or its Property. This treatment supersedes and replaces any agreements or rights those entities have in or against the Debtor or its Property. All distributions under the Plan will be tendered to the Person holding the Allowed Claim or Allowed Equity Interest. **EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM OR EQUITY INTEREST THAT IS NOT AN ALLOWED CLAIM OR AN ALLOWED EQUITY INTEREST.**

**B.    *Means of Performing The Plan***

### 1.    Authorization and Issuance of New Membership Interests

The Debtor or the Reorganized Debtor is authorized to issue the New Membership Interests without the need for any further corporate action, and the Debtor or the Reorganized Debtor shall issue the initial New Membership Interests to the New Member as of the Effective Date such that the New Member shall own and hold one-hundred percent (100%) of the membership interests in and to the Reorganized Debtor as of such date. The New Member shall receive the New Membership Interests in and to the Reorganized Debtor in consideration for the capital contributions to be made by the New Member on and after the Effective Date to fund the payment in full of the Reorganized Debtor's obligations under the Plan. The Reorganized Debtor shall issue certain additional New Membership Interests to the First Lien Lender, as the Holder of the First Lien Lender Unsecured Claim and the Second Lien Lender Unsecured Claim, if, when and as required by the New Conversion Warrants.

### 2.    Authorization and Consummation of New Senior Secured Loan Documents

The Debtor or the Reorganized Debtor is authorized to enter into the New Senior Secured Loan Documents and consummate all related transactions with the First Lien Lender as of the Effective Date without the need for any further corporate action.

29

### 3.    Authorization and Issuance of New Conversion Warrants

The Debtor or the Reorganized Debtor is authorized to issue the New Conversion Warrants without the need for any further corporate action, and the Debtor or the Reorganized Debtor shall issue the New Conversion Warrants to the First Lien Lender, as the Holder of the First Lien Lender Unsecured Claim and the Second Lien Lender Unsecured Claim, as of the Effective Date.

### 4.    Amendment and Restatement of Operating Agreement

On the Effective Date, the Reorganized Debtor shall be deemed to have adopted, and the New Member, as the sole initial member of the Reorganized Debtor and as the initial manager of the Reorganized Debtor, shall enter into the Amended and Restated Operating Agreement.

### 5.    Termination of the DIP Loan Agreement

Unless the DIP Lender and the Debtor or the Reorganized Debtor, with the consent of the Second Lien Lender, elect to convert the DIP Financing Claim into the Exit Financing Facility, or otherwise agree upon payment in full of the Allowed DIP Financing Claim as otherwise provided in the Plan, all obligations under the DIP Loan Agreement shall be deemed satisfied and discharged, and all Liens granted to secure such obligations shall be deemed terminated, and such obligations and Liens shall be of no further force and effect.

### 6.    Exit Financing Facility

The Debtor or the Reorganized Debtor, at the election of the Second Lien Lender, is authorized to enter into the Exit Financing Facility and consummate all related transactions with the Exit Lender as of the Effective Date without the need for any further corporate action.

### 7.    New Management Agreement

On the Effective Date, the New Manager and the New Member and/or the Reorganized Debtor shall enter into the New Management Agreement, pursuant to which the New Manager shall manage and operate the Albuquerque Studios for and on behalf of the Reorganized Debtor, and be compensated therefor, in accordance with the terms and conditions set forth therein.

CHIDM-119638.5

135100.01600/95036976v.1

### 8.    Cancellation of Existing Securities and Agreements

Except (i) for purposes of evidencing a right to distributions under the Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtor or the Reorganized Debtor, or (iii) as otherwise provided under the Plan, on the Effective Date, all the agreements and other documents evidencing (a) the Claims or rights of any Holder of a Claim against the Debtor, including all instruments and notes evidencing such Claims, (b) the Equity Interests in the Debtor, and (c) any options or warrants to purchase Equity Interests in the Debtor, obligating the Debtor to issue, transfer or sell Equity Interests or any other equity of the Debtor, shall be cancelled.  Without limiting the generality of the foregoing, the Senior Lien Lender Loan Documents shall be cancelled as of the Effective Date.

### 9.    Board of Directors

The Second Lien Lender shall designate the initial board of directors of the Reorganized Debtor and the identities of such directors shall be disclosed in the Plan Supplement.

### 10.    Officers

The Second Lien Lender shall designate the initial officers of the Reorganized Debtor and the identities of such officers shall be disclosed in the Plan Supplement.

### 11.    Continued Existence and Vesting of Assets in the Reorganized Debtor

Except as provided in the Plan, the Debtor shall, as the Reorganized Debtor, continue to exist on and after the Effective Date as a separate entity, with all of the powers of a limited liability company under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. Except as provided in the Plan, as of the Effective Date, all Property of the Debtor and the Estate shall vest in the Reorganized Debtor, free and clear of all Claims, Causes of Action, Liens, charges, other encumbrances and interests.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire and dispose of Property and compromise or settle any Claims and Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions

CHIDM-119638.5

135100.01600/95036976v.1

expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees and expenses, disbursements, expenses or related support services without application to, or approval of, the Bankruptcy Court.

## C. *Funding of Distributions*

### 1. Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtor, or its agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. Neither the Debtor nor the Reorganized Debtor shall have any obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Reorganized Debtor and any party responsible for making distributions pursuant to Section 6.7 of the Plan shall be entitled to recognize and deal for all purposes under the Plan only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 2. Date of Distributions

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is reasonably practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 3. Postpetition Interest on Claims

Except as provided in the DIP Loan Agreement or the order of the Bankruptcy Court approving the same, or as required by applicable bankruptcy law, postpetition interest shall not accrue on or after the Commencement Date on account of any Claim.

32

### 4.    Disbursing Agent

All distributions under the Plan shall be made by the Reorganized Debtor (or such other entity designated by the Reorganized Debtor, with the consent of the Second Lien Lender), as Disbursing Agent, on or after the Effective Date or as otherwise provided in the Plan.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 5.    Powers of Disbursing Agent

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated by the Plan, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan.

### 6.    Surrender of Instruments

As a condition to receiving any distribution under the Plan, each Holder of an instrument or note must surrender such instrument or note to the Disbursing Agent or its designee.  Any Holder of such instrument or note that fails to (i) surrender such instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance and amount reasonably satisfactory to the Disbursing Agent before the first (1st) anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan. Any distribution so forfeited shall become Property of the Reorganized Debtor.

### 7.    Delivery of Distributions

Subject to FED. R. BANKR. P. 9010, all distributions to any Holder of an Allowed Claim shall be made to the Disbursing Agent, who shall transmit such distribution to the applicable Holders of Allowed Claims. In the event that any distribution to any Holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution

33

shall be made to such Holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed Property or interest in Property shall revert to the Reorganized Debtor, and the Claim of any other Holder to such Property or interest in Property shall be discharged and forever barred.

### 8.        Manner of Payment Under Plan of Reorganization

All distributions of Cash, the New Senior Secured Loan Documents, the New Conversion Warrants and the New Membership Interests to the Creditors of the Debtor and other parties in interest under the Plan shall be made by the Reorganized Debtor or the Disbursing Agent.  Any distributions that revert to the Reorganized Debtor or are otherwise cancelled (such as to the extent any distributions have not been claimed within one (1) year or are canceled pursuant to Section 6.7 of the Plan) shall revest solely in the Reorganized Debtor.

At the option of the Debtor or the Reorganized Debtor, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 9.        Setoffs

The Debtor or the Reorganized Debtor may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against the Holder of such Claim.

### 10.       Minimum Distributions

Subject to Section 6.9 of the Plan, no distribution of less than $10.00 on account of an Allowed Claim shall be made by the Debtor or the Reorganized Debtor to any Holder of a Claim unless a request therefor is made in writing to the Debtor or the Reorganized Debtor.

CHIDM-119638.5

135100.01600/95036976v.1

**11.** **Distributions After Effective Date**

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

**12.** **Allocation of Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**D.** *Conditions Precedent to the Effective Date*

**1.** **Conditions Precedent to the Effective Date**

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent: (a) the Confirmation Order, in form and substance satisfactory to the Second Lien Lender, shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto; (b) all actions, documents and agreements necessary to implement this Plan shall have been effected or executed; and (c) the Debtor shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents necessary to implement this Plan and that are required by law, regulation or order.

The conditions precedent specified above may be waived in whole or in part by the Second Lien Lender in its sole and absolute discretion. Any such waiver may be made at any time, without notice or leave or order of the Bankruptcy Court, and must be in writing. The Reorganized Debtor or the Second Lien Lender shall promptly file written notice of the Effective Date and serve such notice on all Creditors and parties in interest in the Reorganization Case.

**2.** **Effect of Failure of Conditions to Effective Date**

If the conditions precedent specified in Section 9.1 of the Plan have not been satisfied or waived by sixty (60) days after the Confirmation Date, then, unless otherwise ordered by the

CHIDM-119638.5

135100.01600/95036976v.1

Bankruptcy Court, (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtor and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) all of the Debtor's obligations with respect to the Claims and the Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any other entity in any further proceedings involving the Debtor or otherwise.

**E.    *Treatment of Disputed Claims***

**1.    Objections to Claims**

The Debtor or the Reorganized Debtor, with the consent of the Second Lien Lender, shall be entitled to file objections to all Claims that are not Allowed by the Plan or a Final Order.  Any objections to Claims shall be served and filed no later than one-hundred twenty (120) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court.  This Claim objection deadline shall apply notwithstanding the prior order of the Bankruptcy Court setting an earlier deadline.

**2.    Payments and Distributions with Respect to Disputed Claims**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**3.    Estimation of Claims**

The Debtor or the Reorganized Debtor may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating

36

to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Except as provided in the Plan, Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 4. Distributions Relating to Disputed Claims

Notwithstanding any provision in the Plan to the contrary, except as otherwise agreed by the Debtor or the Reorganized Debtor in its sole discretion, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until the resolution of any such disputes by settlement or Final Order.  To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim, the distribution to which such Holder is entitled under the Plan.

### 5. Preservation of Rights to Settle Claims

In accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all Causes of Action, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person without the approval of the Bankruptcy Court, subject to the terms of Section 7.1 of the Plan, the Confirmation Order and any contract, instrument, release, indenture or other agreement entered into in connection herewith.  The Reorganized Debtor may pursue such retained Causes of Action, as appropriate, in accordance with its best

37

interests.    Notwithstanding the foregoing, on or as soon as reasonably practicable after the Effective Date, the Debtor or the Reorganized Debtor shall cause the Second Lien Lender Adversary Proceeding to be dismissed, with prejudice, with each party to bear its own costs.

**6.      Disallowed Claims**

All Claims held by Persons against whom or which the Debtor or the Reorganized Debtor has commenced an Avoidance Action shall be deemed Disallowed Claims pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims shall not be entitled to vote to accept or reject the Plan.  Claims that are deemed Disallowed pursuant to this Section 7.6 of the Plan shall continue to be Disallowed for all purposes until the Avoidance Action against such Holder has been settled or resolved by Final Order and any sums due to the Debtor or the Reorganized Debtor from such Holder have been paid.

**F.      *Executory Contracts and Unexpired Leases***

**1.      General Treatment**

All executory contracts and unexpired leases to which the Debtor is a party, including, without limitation, (a) the Management Services Agreement dated as of March 1, 2007, between the Debtor and Pacifica Ventures and (b) any and all lighting and grip contracts between the Debtor and New Mexico Lighting & Grip Company, are rejected except for an executory contract or unexpired lease that (i) previously has been assumed or rejected pursuant to Final Order of the Bankruptcy Court, (ii) is specifically designated as a contract or lease to be assumed by the Debtor as of the Effective Date on the Schedule of Assumed Contracts, or (iii) is the subject of a separate assumption or rejection motion filed by the Debtor, with the consent of the Second Lien Lender, under Section 365 of the Bankruptcy Code prior to the Confirmation Date.

**2.      Cure of Defaults**

Except to the extent that different treatment has been agreed to by the nondebtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 8.1 of the Plan, the Debtor, with the consent of the Second Lien Lender, shall, pursuant to the provisions of Sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the

38

requirements of Section 365 of the Bankruptcy Code, within fifteen (15) days prior to the Confirmation Date, file and serve a schedule (which may consist or be part of the Schedule of Assumed Contracts) with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases listed in the Schedule of Assumed Contracts, or otherwise, to be assumed by the Debtor as of the Effective Date.  The nondebtor parties to such executory contracts or unexpired leases to be assumed by the Debtor shall have ten (10) days from service to object to the cure amounts listed in such schedule.  If there are any objections filed, the Bankruptcy Court shall hold a hearing to resolve the dispute(s) regarding the cure amount(s), which may consist or be part of the Confirmation Hearing.  The Debtor shall retain its right, with the consent of the Second Lien Lender, to reject any of its executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults.

### 3.    Rejection Claims

In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor or their respective Property or interests in Property, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Reorganized Debtor and the Second Lien Lender on or before the date that is thirty (30) days after entry of a Final Order (which may consist of the Confirmation Order) rejecting such contract or lease.

### 4.    Debtor's Indemnification Obligations

Confirmation of the Plan shall not affect any right of the Debtor's employees to seek to recover under any insurance policies of the Debtor that exist upon such Confirmation; *provided, however,* that the Debtor or the Reorganized Debtor shall have no obligation under any document or agreement (i) to indemnify any of the Debtor's current or former managers, directors, officers, agents and/or employees in respect of any past, present or future action, suit or proceeding against the Debtor, the Reorganized Debtor or such managers, directors, officers,

39

agents and/or employees, or (ii) to maintain or perform any obligations under any such insurance policies.

### 5. Insurance Policies

All insurance policies pursuant to which the Debtor has any obligations in effect as of the Confirmation Date shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtor or the Reorganized Debtor and shall continue in full force and effect.  All other insurance policies shall vest in the Reorganized Debtor.

### G. *Miscellaneous Provisions of the Plan*

#### 1. Plan Supplement

A draft form of the Plan Documents to be entered into as of the Effective Date and any other appropriate documents, all of which shall be acceptable to the Second Lien Lender, shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court by no later than five (5) Business Days prior to the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

#### 2. No Admissions

Except as specifically provided in the Plan, nothing contained in the Plan or this Disclosure Statement shall be deemed or construed in any way as an admission by Workers with respect to any matter set forth in the Plan, including the amount or allowability of any Claim, or the value of any property of the Estate.

Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan will:  (a) be deemed to be an admission by Workers with respect to any matter discussed in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgement, or release of any Claims, Equity Interests, or any claims held by Workers; or (c) prejudice in any manner the rights of Workers in any further proceedings.

CHIDM-119638.5

135100.01600/95036976v.1

**3.     Severability of Plan Provisions**

If, before Confirmation, the Court holds that any Plan term or provision is invalid, void, or unenforceable, the Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.   That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.  The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with the Plan, is valid and enforceable under its terms.

**4.     Governing Law**

The rights and obligations arising under the Plan and any agreements, contracts, documents, or instruments executed in connection with the Plan will be governed by, and construed and enforced in accordance with, California law without giving effect to California law's conflict of law principles, unless a rule of law or procedure is supplied by:  (a) federal law (including the Bankruptcy Code and the Bankruptcy Rules); or (b) an express choice-of-law provision in any document provided for, or executed under or in connection with, the Plan.

**5.     Retention of Jurisdiction**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Reorganization Case for, among other things, the following purposes:   (a) to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom; (b) to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date; (c) to ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan; (d) to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim; (e) to

41

enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated; (f) to issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court; (g) to hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, this Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof; (h) to hear and determine all applications for allowance and payment of Professional Fee Claims; (i) to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan or the Confirmation Order, or any agreement, instrument or other document governing or relating to any of the foregoing; (j) to take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation; (k) to determine such other matters and for such other purposes as may be provided in the Confirmation Order; (l) to hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under Section 505(b) of the Bankruptcy Code); (m) to hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and Title 28 of the United States Code; (n) to enter a final decree closing the Reorganization Case; (o) to recover all Property of the Debtor and the Estate, wherever located; and (p) to hear and determine any rights, claims or causes of action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

CHIDM-119638.5

135100.01600/95036976v.1

**6.      No Waiver**

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of any Person to object to any Claim for purposes of voting, the failure of any Person to object to a Claim or Administrative Expense Claim prior to Confirmation or the Effective Date, the failure of any Person to assert a Right of Action prior to Confirmation or the Effective Date, the absence of a proof of Claim having been Filed with respect to a Claim, nor any action or inaction of any person with respect to a Claim, Administrative Expense Claim, or Right of Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Debtor or its successors or representatives, before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date to (a) object to or examine such Claim or Administrative Expense Claim, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Right of Action.

**7.      Plan Modification**

The Plan may be amended, modified or supplemented by Workers, as Plan proponent, in the manner provided for by Section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to Section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, Workers may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.  Prior to the Effective Date, Workers may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court. Notwithstanding any reference herein or in the Plan to documents in the forms annexed to the Plan or filed as part of the Plan Supplement, Workers may revise those forms with the consent of any party in interest that is entitled to vote on the Plan and is adversely affected thereby.

**8.      Business Operations and Post-Confirmation U.S. Trustee Fees**

The Reorganized Debtor shall continue to operate its business free of supervision by the U.S. Trustee and shall no longer be required to file Monthly Operating Reports but shall be

43

CHIDM-119638.5

135100.01600/95036976v.1

obligated to pay fees pursuant to 28 U.S.C. § 1930(a)(6) until the entry of a final decree closing this Chapter 11 case.

**9.    Post-Confirmation Status Report**

Within one-hundred and twenty (120) days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the U.S. Trustee, the twenty largest Unsecured Creditors, and those parties who have requested special notice. Further status reports shall be filed every one-hundred and twenty (120) days and served on the same parties until the entry of a final decree closing the Reorganization Case.

**10.    Post-Confirmation Conversion/ Dismissal**

A Creditor or party in interest may bring a motion to convert or dismiss the Reorganization Case under Section 1112(b) of the Bankruptcy Code after the Plan is confirmed and before substantial consummation of the Plan, if there is a default in performing the Plan. If the Court orders the Reorganization Case converted to Chapter 7 after the Plan is confirmed, then all Property which had been property of the Chapter 11 Estate, and which had not been revested in the Reorganized Debtor, if any, and which remains Property of the Estate, will vest in the Chapter 7 estate. For avoidance of doubt, any Property that vests in the Reorganized Debtor shall remain the property of the Reorganized Debtor. With respect to any Property that is property of the Chapter 7 estate, the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Court during the Reorganization Case.

The Confirmation Order may also be revoked under very limited circumstances. The Court may revoke the Confirmation Order if such order was procured by fraud and if the party in interest brings an adversary proceeding to revoke Confirmation of the Plan within one-hundred and eighty (180) days after the entry of the Confirmation Order and otherwise in accordance with the applicable provisions of the Bankruptcy Code.

CHIDM-119638.5

135100.01600/95036976v.1

### 11.    Final Decree

Once the estate has been fully administered as referred to in FED. R. BANKR. P. 3022, the Reorganized Debtor, or other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the Reorganization Case.

## H.    *Risk Factors*

The proposed Plan has the following risks:

### 1.    Bankruptcy Risks

- Workers may not be able to secure the votes needed to confirm the Plan.

- Workers may not be able to satisfy the confirmation requirements of Section 1129 of the Bankruptcy Code.

- The Debtor may default under the DIP Loan Agreement thereby triggering the DIP Lender's right to foreclose against the Debtor's Property.

### 2.    Risk Factors affecting the value of the securities to be offered under the Plan and/or the recoveries under the Plan

- The Reorganization Enterprise Value of the Debtor proposed by Workers may not be accepted by the Bankruptcy Court.

- The Debtor may not be able to generate sufficient income to service its debt or to meet operational needs.

- New ownership and management will control the Reorganized Debtor.

### 3.    Economic Risks

- Turmoil in the film industry could affect the ability of the Reorganized Debtor to draw new business.

45

CHIDM-119638.5

135100.01600/95036976v.1

- Uncertainty regarding the availability of certain tax and economic incentives in the New Mexico could lower the business prospects for the Reorganized Debtor.

## IV.  EFFECT OF CONFIRMATION OF PLAN

**A.**      ***Vesting of Assets***

On the Effective Date, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all Property of the Debtor and the Estate shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges and other interests, except as expressly provided in the Plan. The Reorganized Debtor may operate its businesses and may use, acquire and dispose of Property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan.

**B.**      ***Discharge of Claims and Termination of Equity Interests***

Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made under the Plan shall discharge all existing debts of and Claims against, and terminate all Equity Interests in, the Debtor of any kind, nature or description whatsoever, or any of its Property, to the fullest extent permitted by Section 1141 of the Bankruptcy Code.  Except as expressly provided in the Plan, on the Effective Date, all existing Claims against and Equity Interests in the Debtor shall be, and shall be deemed to be, discharged and terminated, and all Holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtor or any of its Property, any other or further Claim or Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a proof of Claim or proof of Equity Interest. Notwithstanding any provision in the Plan, any valid setoff or recoupment rights held against the Debtor shall not be affected by the Plan and shall be expressly preserved in the Confirmation Order.

46

*C.*     ***Discharge***

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each Holder (as well as any trustees and agents on behalf of each Holder) of a Claim against the Debtor, or Equity Interest in the Debtor, and any affiliate of such Holder shall be deemed to have forever waived, released and discharged the Debtor, to the fullest extent permitted by Section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date. On the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtor.  Except as otherwise expressly provided in the Plan, all Persons who have held, now hold or may hold Claims against or Equity Interests in the Debtor and all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates, are permanently enjoined from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to such Claim against or Equity Interest in the Debtor or the Reorganized Debtor, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor or the Reorganized Debtor, or (iii) creating, perfecting or enforcing any Lien of any kind against the Debtor or the Reorganized Debtor or against the Property or interests in Property of the Debtor or the Reorganized Debtor.  Such injunction shall extend to any successors of the Debtor and Reorganized Debtor and their respective Property and interest in Property.

*D.*     ***Term of Injunctions or Stays***

Unless otherwise expressly provided, all injunctions or stays arising under or entered during the Reorganization Case under Section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

47

CHIDM-119638.5

135100.01600/95036976v.1

*E.        Injunction Against Interference with Plan*

Upon the entry of the Confirmation Order, all Holders of Claims and Equity Interests and other parties in interest, including, without limitation, the Debtor, the DIP Lender, the First Lien Lender, the Second Lien Lender, and the Old Members, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

*F.        Injunction Enjoining Holders of Claims Against Debtor and Reorganized Debtor*

The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Equity Interests.  To that end, except as expressly provided in the Plan, at all times on and after the Effective Date, all Persons who have been, are, or may be Holders of Claims against or Equity Interests in the Debtor arising prior to the Effective Date, shall be permanently enjoined from taking any of the following actions, on account of any such Claim or Equity Interest, against the Debtor, its Estate, the Reorganized Debtor or its property (other than actions brought to enforce any rights or obligations under the Plan and any adversary proceedings or contested matters pending in the Reorganization Case as of the Effective Date):   (1) commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtor, its Estate, the Reorganized Debtor, their successors, or their respective property or assets; (2) enforcing, levying, attaching, executing, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtor, its Estate, the Reorganized Debtor, their successors, or their respective property or assets; (3) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien, security interest or encumbrance against the Debtor, its Estate, the Reorganized Debtor, their successors, or their respective Property or assets; and (4) proceeding in any manner in any place whatsoever against the Debtor, its Estate, the Reorganized Debtor, their successors, or their respective Property or assets, that does not conform to or comply with the provisions of the Plan.

48

## G.    *Releases*

Pursuant to Section 1125(e) of the Bankruptcy Code, Workers and its present members, officers, directors, employees, agents, advisors, representatives, successors or assigns, and any Professionals (acting in such capacity) employed by any of the foregoing entities will neither have nor incur any liability to any person for their role in soliciting acceptance or rejection of the Plan.

<u>Releases by Debtor</u>.   As of the Confirmation Date, but subject to occurrence of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, the Debtor, the Reorganized Debtor and any Person seeking to exercise the rights of the Estate, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, shall be deemed to unconditionally forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever (other than for gross negligence, willful misconduct, intentional fraud or criminal conduct) in connection with or related to the Debtor, the Reorganized Debtor, the Reorganization Case or the Plan (other than the rights of the Debtor and the Reorganized Debtor, with the consent of the Second Lien Lender, to enforce the Plan and the contracts, instruments, indentures and other agreements or documents delivered or assumed under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Reorganization Case or the Plan, and that may be asserted by or on behalf of the Debtor or the Reorganized Debtor against the Released Parties; *provided, however*, that nothing in Section 10.6(a) of the Plan shall be deemed to prohibit the Debtor or the Reorganized Debtor, with the consent of the Second Lien Lender, from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee that is based upon an alleged

49

breach of a confidentiality, non-compete or any other contractual or fiduciary obligation owed to the Debtor through the Effective Date; *provided, further, however*, that Section 10.6(a) of the Plan shall not operate as a waiver or release from any claims or causes of action arising out of (i) the gross negligence, willful misconduct, intentional fraud or criminal liability of any Person, and (ii) as to the officers, directors and managers of the Debtor, a breach of fiduciary duty or other tortious conduct on or prior to the Effective Date.

<u>Releases by Holders of Claims and Equity Interests</u>.  As of the Effective Date, and except as otherwise expressly provided in the Plan, for good and valuable consideration, the adequacy of which is confirmed, (i) each Holder of a Claim that votes in favor of the Plan (or is deemed to accept the Plan), and (ii) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Holder of a Claim or Equity Interest that does not vote to accept the Plan or is deemed to reject the Plan, as applicable, shall be deemed to unconditionally, forever release, waive and discharge each of the Released Parties, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtor, the Reorganized Debtor, the Reorganization Case or the Plan whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Reorganization Case or the Plan; *provided, however,* that the foregoing shall not operate as a waiver or release from any causes of action arising out of the gross negligence, willful misconduct, intentional fraud or criminal liability of any such Person.

## H.     *Exculpation*

Notwithstanding anything provided in the Plan, as of the Effective Date, none of the Released Parties shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Case, the negotiation, formulation, dissemination, Confirmation, consummation

CHIDM-119638.5

135100.01600/95036976v.1

or administration of the Plan, or Property to be distributed under the Plan, or any other act or omission in connection with the Reorganization Case, the Plan or any contract, instrument, indenture or other agreement or document related thereto or hereto or delivered thereunder or under the Plan; *provided, however*, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that such act or omission is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud or criminal conduct.

## I.      *Retention of Causes of Action/Reservation of Rights*

Except as expressly provided in the Plan, nothing in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtor or the Reorganized Debtor may have or which the Reorganized Debtor, with the consent of the Second Lien Lender, may choose to assert on behalf of the Estate under any provision of the Bankruptcy Code or any applicable non-bankruptcy law or rule, common law, equitable principle or other source of right or obligation, including, without limitation, (i) any and all claims or causes of action against any Person, to the extent such Person asserts a crossclaim, counterclaim and/or Claim for setoff which seeks affirmative relief against the Debtor or the Reorganized Debtor; and (ii) the turnover of any Property of the Estate; *provided, however*, that Section 10.8(a) of the Plan shall not apply to any claims released in Section 10.6(a) in the Plan.

Nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff or other legal or equitable defense which the Debtor had immediately prior to the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan.  The Reorganized Debtor shall have, retain, reserve and be entitled to assert, with the consent of the Second Lien Lender, all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses which it had immediately prior to the Commencement Date fully as if the Reorganization Case had not been commenced, and all of the Reorganized Debtor's legal and equitable rights respecting any Claim

51

left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Reorganization Case had not been commenced.

### J.    Solicitation of the Plan

As of and subject to the occurrence of the Confirmation Date:  (i) the Second Lien Lender shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, Sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Second Lien Lender and its managers, directors, officers, partners, limited partners, employees, affiliates, agents, financial advisors, investment bankers, accountants and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### K.    Exemption from Stamp, Transfer and Other Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of assets under the Plan by the Debtor, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### V.  CONFIRMATION REQUIREMENTS AND PROCEDURES

The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.   Workers DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.  Persons or entities concerned with confirmation of the Plan should consult with their own attorneys because the law on confirming a plan is very complex.

52

### A.    Requirements of Section 1129(a) of the Bankruptcy Code

#### 1.    Section 1129(a) Factors, Generally

The Bankruptcy Court will confirm the Plan only if it finds that all of the applicable requirements enumerated in Section 1129(a) of the Bankruptcy Code have been met or, if all of the requirements of Section 1129(a) other than the requirements of Section 1129(a)(8) have been met (*i.e.*, that all Impaired Classes have accepted the Plan), that all of the applicable requirements enumerated in Section 1129(b) of the Bankruptcy Code have been met.

Among other things, Sections 1129(a) and (b) require that the Plan be (i) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan does not "discriminate unfairly" and is "fair and equitable" as to each such Class, (ii) feasible, and (iii) in the "best interests" of Holders of Claims and Equity Interests that are Impaired under the Plan.

Under the Plan, Class 10 is not receiving any distribution and is deemed to have rejected the Plan pursuant to Section 1129(g) of the Bankruptcy Code.  Therefore, as to such Class and any other Class that votes to reject the Plan, Workers is seeking confirmation of the Plan in accordance with Sections 1129(a) and (b) either under the terms provided in the Plan or upon such terms as may exist if the Plan is modified in accordance with Section 1127(d).

#### 2.    Liquidation Analysis/"Best Interests of Creditors" Test

Section 1129(a)(7) of the Bankruptcy Code sets forth the "best interests" test and requires a liquidation analysis.  Under the this test, if a Holder of a Claim or Equity Interest does not vote to accept the Plan, then that Holder must receive or retain under the Plan property of a value not less than the amount that such Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien, administrative expense claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same

CHIDM-119638.5

135100.01600/95036976v.1

priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims.  Finally, equity interest Holders receive the balance that remains after all creditors are paid, if any.

For the Bankruptcy Court to be able to confirm the Plan, the Court must find that all Creditors and equity interest Holders who do not accept the Plan will receive at least as much under the Plan as such Holders would receive under a Chapter 7 liquidation.

To assist the Bankruptcy Court in making the findings required under Section 1129(a)(7) of the Bankruptcy Code, Workers, together with its investment banker, Duff & Phelps, has prepared a Liquidation Analysis, a copy of which is attached hereto as **Exhibit C**.

The Liquidation Analysis demonstrates that Creditors would be treated better under the Plan than if the Debtor were liquidated.  Under the Plan, Creditors holding Allowed General Unsecured Claims will receive distributions of approximately ***20%-40%.***  Under a Chapter 7 liquidation, these same Creditors will receive no distribution at all.  In a Chapter 7 liquidation, the Debtor's Property would be sold, assuming an interested buyer exists, and the proceeds from the sale, if any, would go to satisfy Secured Creditors with asserted Claims in excess of $100 million.  If a buyer cannot be located to purchase the Debtor's Property in an amount sufficient to satisfy the asserted Secured Claims, then Workers believes that Amalgamated will move for relief from the automatic stay so that it may pursue its state court rights and remedies including, but not limited to, foreclosing on all of the Debtor's Property.  Even if a buyer is located to purchase the Debtor's Property and the purchase price is sufficient to satisfy all Secured Claims, the related administrative costs, including the Trustee fees and Trustee's counsel's fees, will prevent Creditors holding General Unsecured Claims from receiving a distribution.  Thus, under a liquidation scenario, it is anticipated that the only Creditors that will receive a distribution will be the Allowed Secured Creditors and their distribution will depend upon the sale price obtained for the Debtor's Property through a bankruptcy sale or foreclosure sale.  Any such sale will necessarily include costs of sale and significant capital gains tax

54

liability.  <u>Thus, Creditors holding General Unsecured Claims will not receive a distribution in a Chapter 7 liquidation.</u>

### 3. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that that confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtor, or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan.   In order to demonstrate that the Plan meets this "feasibility" requirement, Workers has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and to retain sufficient cash and resources to conduct its business.

Workers believes that the Plan meets the feasibility requirement set forth in Section 1129(a)(11) of the Bankruptcy Code.  Specifically, in connection with the formulation of the Plan and for purposes of satisfying the feasibility requirements, Workers, through Duff & Phelps, analyzed the Debtor's ability to satisfy its financial obligations while maintaining sufficient cash and other resources to conduct its business.  Based on this analysis by Duff & Phelps, Workers believes that the Plan is in fact feasible.  However, Workers notes that Duff & Phelps has had access to only limited financial information of the Debtor.  Until Workers obtains full access to the Debtor's studio facilities and books and records, it will be unable to confirm the accuracy of the financial information it has received to date and upon which the financial projections for and valuation of the Debtor are currently based.

### B. Confirmation Procedures

#### 1. Who May Vote on the Plan or Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below, not everyone is entitled to vote to accept or reject the Plan.  A Creditor or Equity Interest Holder has a right to vote for or against the Plan if the Creditor or Equity Interest Holder has a Claim or Equity Interest (as applicable( which is both (1) Allowed, at minimum, for voting purposes and (2)(a) classified in an Impaired Class and (b) not deemed to reject.

## 2.    What Is an Allowed Claim/Equity Interest

As noted above, a Creditor or Equity Interest Holder must first have an <u>Allowed Claim or equity interest</u> have the right to vote.  Generally, any proof of Claim or interest will be Allowed unless a party in interest brings a motion objecting to the Claim.  When an objection to a Claim or interest is filed, the Holder of the Claim or Equity Interest or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or Equity Interest for voting purposes.

The bar date for filing a proof of claim or equity interest in the Reorganization Case was November 5, 2010.  The Debtor served a notice of the Bar Date upon all Creditors and interested parties on or about October 7, 2010.  A Creditor or Equity Interest Holder may have an Allowed Claim or Equity Interest even if a proof of claim or interest was not timely filed.  A Claim is deemed Allowed if (1) it is scheduled on the Debtor's schedules and such Claim is not scheduled as disputed, contingent, or unliquidated and (2) no party in interest has objected to the Claim.  An Equity Interest is deemed Allowed if it is scheduled and no party in interest has objected to the Equity Interest.

## 3.    What Is an Impaired Claim/Equity Interest

As noted above, an Allowed Claim or Equity Interest only has the right to vote if it is in a Class that is Impaired under the Plan.  A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.  For example, a Class comprised of General Unsecured Claims is Impaired if the Plan fails to pay the members of the Class 100% of what they are owed.

In this case, Workers believes that Claims in Classes 1 through 9 and Equity Interests in Class 10 are Impaired.  Holders of Allowed Claims in Classes 1 through 9 are therefore entitled to vote to accept or reject the Plan.  Equity Interests in Class 10 do not vote as they are deemed to have rejected the Plan because they are not receiving or retaining any value under the Plan. Parties who dispute Workers' characterization of their Claim or Equity Interest as being

56

Impaired or Unimpaired may file an objection to the Plan contending that Workers has incorrectly characterized such Claim.

### 4.    Who is Not Entitled to Vote

The following four types of Claims are not entitled to vote:  (1) Claims that have been disallowed; (2) Claims in Unimpaired Classes; (3) Claims entitled to priority pursuant to Sections 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code; and (4) Claims in Classes that do not receive or retain any value under the Plan.  Claims in Unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted that Plan.  Claims entitled to priority pursuant to Sections 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan.  Even if your Claim is the type described above, you may still have the right to object to confirmation of the Plan.

### 5.    Who Can Vote In More Than One Class

A Creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim.  In this case, Workers believes that the First Lien Lender is entitled to cast more than one ballot in respect of its Claims (including its right to vote on account of the Second Lien Lender Unsecured Claim (Class 6)).  The Unsecured Claims of the First Lien Lender and the Second Lien Lender are not included in the Class of General Unsecured Claims (Class 9) as Class 6 Claims consist solely of Claims arising from business operations.  The Unsecured Claims of Class 4 and Class 6 Creditors differ significantly from the Unsecured Claims of Class 9 Creditors, including as a result of the subordination provisions included in the Intercreditor Agreement, and must be separately classified.

CHIDM-119638.5

135100.01600/95036976v.1

**6.    Votes Necessary to Confirm the Plan**

If Impaired Classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at least one Impaired Class has accepted the Plan without counting the votes of any insiders within that Class,  and (2) all Impaired Classes have voted to accept the Plan unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later herein.

**7.    Votes Necessary for a Class to Accept the Plan**

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan.  A Class of Equity Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the Equity Interest Holders of such Class which actually voted, voted to accept the Plan.

**8.    Treatment of Nonaccepting Classes**

As noted above, even if all Impaired Classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Code.  The process by which nonaccepting Classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown".  The Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or Equity Interests if it meets all requirements except the voting requirements of Section 1129(a)(8) of the Bankruptcy Code and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan as referred to in Section 1129(b) of the Bankruptcy Code and applicable case law.

**9.    Request for Confirmation Despite Nonacceptance by Impaired Classes**

Classes 1 through 10 are Impaired Classes.  If any of these Classes fails to accept the Plan, Workers will seek "cramdown" as a remedy, provided that at least one Impaired Class votes to accept the Plan.  Workers will be required to "cramdown" the Plan at least with respect to Class 10 because Class 10 is deemed to have rejected the Plan.  Because no Class of Equity

58

Interests junior to Class 10 will receive any value under the Plan, the Plan satisfies Section 1129(b)(2)(c)(ii) of the Bankruptcy Code.

## VI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES

*IRS CIRCULAR 230 NOTICE:  To ensure compliance with IRS Circular 230, Holders of Claims and Equity Interests are hereby notified that:  (a) any discussion of U.S. Federal tax issues contained or referred to in this Disclosure Statement (including any attachment) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on a taxpayer under the Internal Revenue Code, (b) any such discussion is written in connection with the promotion or marketing of the transactions or matters addressed herein, and (c) taxpayers should seek advice based on their particular circumstances from an independent tax advisor.*

**A.    Federal Income Tax Consequences to the Debtor**

Certain significant federal income tax consequences of the Plan under the Tax Code are described below.  Due to the unsettled nature of several of the tax issues presented by the Plan (including the changes made to the Tax Code over the past 10 years), the difference in the nature of the claims of the various creditors, their taxpayer status, residence and methods of accounting (including creditors within the same class) and prior actions taken by creditors with respect to their claims, as well as the possibility that events subsequent to the date hereof could change the federal income tax consequences of the transactions the federal income tax consequences described below are subject to significant uncertainties.  Furthermore, this discussion does not address the tax consequences of the Plan to persons not resident in the United States.

As a result of the implementation of the Plan, the Debtor's aggregate outstanding indebtedness will be significantly reduced.  In general, the Tax Code provides that a taxpayer that realizes a "discharge of indebtedness" must include the amount of discharged indebtedness in taxable gross income to the extent that indebtedness discharged exceeds any consideration given for such discharge.  Any Claims against Debtor that are discharged solely by payment to a Creditor of cash under the Plan, or waiver of such Claim by the Creditor, will result in the

59

creation of a discharge of indebtedness to the extent that the face amount of the debt discharged (plus accrued interest) exceeds the payment made in cancellation hereof.  To the extent implementation of the Plan results in payment of Creditor Claims in full, the Debtor should not realize income from discharge of indebtedness, except to the extent of interest discharge. Furthermore, § 108(e)(2) of the Tax Code provides that there is no income from discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction.  The Tax Code further provides that a discharge of indebtedness is not required to be included in a taxpayer's gross income if (i) such taxpayer is in a Title 11 case and such discharge of indebtedness is pursuant to a plan approved by the Bankruptcy Court, or (ii) such taxpayer is insolvent, and the amount by which the taxpayer is insolvent immediately before the discharge equals or exceeds the amount of such discharged indebtedness.  Accordingly, the Debtor should not be required to include in income any amount resulting from any discharge of such indebtedness.

**B.**       ***Federal Income Tax Consequences to Creditors***

    **1.**       **Recognition of Gain or Loss**

A Creditor will recognize gain or loss on the exchange of such Creditor's Claim for cash and any other considerations received pursuant to the Plan in an amount equal to the difference between (i) the amount realized in respect of such Claim (other than amounts attributable to accrued interest) and (ii) the Creditor's tax basis in such Claim.  In general, the amount realized in respect of a Claim will equal the sum of any cash and aggregate fair market value of any other consideration received for such Claim pursuant to the Plan.

The character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes), the tax status of the Creditor, whether the Claim constitutes a capital asset in the hands of the Creditor and how long it has been held, whether the Claim was acquired at a

CHIDM-119638.5

135100.01600/95036976v.1

market discount, and whether and to what extent the Creditor had previously claimed a bad debt deduction.

Because consideration for Claims may be distributed at various times on or after the Effective Date, Creditors may be required to treat a portion of the consideration received after the Effective Date as imputed interest. Creditors should consult their tax advisors regarding the effect of distributions of consideration after the Effective Date on the timing, character, and amount of income, gain, or loss recognized by such Creditors. For example, Creditors may recognize ordinary income in the amount of treated as imputed interest and may recognize a larger capital loss or smaller capital gain in respect of their Claims.

## 2.    Accrued Interest

A Creditor will recognize ordinary income to the extent that any consideration received pursuant to the Plan is allocable to accrued but unpaid interest not previously included in such Creditor's taxable income. If the amount of accrued but unpaid interest previously included in such Creditor's taxable income exceeds the amount of consideration allocable to such interest, the Creditor should be treated as recognizing an ordinary loss.

Pursuant to the Plan, consideration received in respect of a Claim will be allocated first to the principal amount of such Claim, with any excess allocated to unpaid accrued interest. However, there is no assurance that the Internal Revenue Service would respect this allocation for federal income tax purposes. Creditors are urged to consult their tax advisors regarding the allocation and treatment of consideration received for accrued but unpaid interest for tax purposes.

## 3.    Backup Withholding

All distributions to Creditors under the Plan are subject to any applicable withholding tax requirements. Under federal income tax law, payments to the Creditors, may, under certain circumstances, be subject to "backup withholding" at a rate that is currently 28%. Back up withholding generally applies if the Creditor (a) fails to furnish its social security number or other taxpayer identification number ("TIN") and to state that the Holder is a U.S. citizen or

CHIDM-119638.5

135100.01600/95036976v.1

other person, (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax; provided the Creditor timely provides the required information to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

## C.    *Federal Income Tax Consequences to Holders of Equity Interests*

Under the Plan, all Equity Interests in the Debtors will be cancelled, and the Holders thereof will not be entitled to any distribution under the Plan. Each Holder of an Equity Interest in the Debtors will be entitled to recognize a loss on his Equity Interests at the time such Equity Interests became worthless for tax purposes, in an amount equal to his tax basis in the Equity Interests. If the Equity Interests were held as a capital asset, the loss will be a long-term capital loss, if the Equity Interest Holder's holding period is greater than one year, or a short-term capital loss, if the Equity Interest Holder's holding period is not greater than one year.

## D.    *General Disclaimer*

**The foregoing is not intended to be a substitute for careful tax planning, particularly since certain of the federal income tax consequences of the Plan will not be the same for all Holders of Claims and Equity Interests due to their individual circumstances. Each Holder of a Claim or Equity Interest is strongly urged to consult with its own tax advisor in determining the federal, state, local, and foreign income and other tax consequences of the transactions contemplated by the Plan.**

CHIDM-119638.5

135100.01600/95036976v.1

1

## VII.  CONCLUSION AND RECOMMENDATION

2

Workers believes that the confirmation and consummation of the Plan is preferable to all

3

other alternatives.

4

WORKERS URGES ALL HOLDERS OF CLAIMS TO ACCEPT THE PLAN BY

5

RETURNING THE ENCLOSED BALLOT TO WORKERS SO THAT THEY WILL BE

6

RECEIVED BY 5:00 P.M. (PREVAILING PACIFIC TIME) ON _____, 2011.

7

DATED:  March 25, 2011                    BLANK ROME LLP

8

9

10

By:   /s/ Sara L. Chenetz
     Sara L. Chenetz

11

12

-and-

13

Jerry L. Switzer, Jr. (admitted *pro hac vice*)
Monika J. Machen (admitted *pro hac vice*)
Polsinelli Shughart PC

14

161 N. Clark Street, Suite 4200

15

Chicago, IL  60601
Telephone:  (312) 819-1900

16

Facsimile:  (312) 819-1910

17

jswitzer@polsinelli.com
mmachen@polsinelli.com

18

*Attorneys for Workers Realty Trust II, L.P.*

19

20

21

22

23

24

25

26

27

28

63

CHIDM-119638.5

135100.01600/95036976v.1