1  Steven T. Gubner – State Bar No. 156593
   Robyn B. Sokol – State Bar No. 159506
2  EZRA BRUTZKUS GUBNER LLP
   21650 Oxnard Street, Suite 500
3  Woodland Hills, CA 91367
   Telephone: 818-827-9000
4  Facsimile:  818-827-9099

5  Attorneys for Pacifica Mesa Studios, LLC,
   Debtor and Debtor in Possession
6

7                    **UNITED STATES BANKRUPTCY COURT**

8                    **CENTRAL DISTRICT OF CALIFORNIA**

9                    **SAN FERNANDO VALLEY DIVISION**

10

11                                          | Case No. 1:10-bk-18827-GM

12  In re                                   | Chapter 11

13  PACIFIC MESA STUDIOS, LLC,              | **DEBTOR'S SUPPLEMENT TO PLAN OF**
                                            | **REORGANIZATION UNDER CHAPTER**
14             Debtor.                      | **11 OF THE BANKRUPTCY CODE**

15

16                                          | <u>**Confirmation Hearing:**</u>
                                            | **Date:** July 7, 2011
17                                          | **Time:** 9:00 a.m.
                                            | **Place:** Courtroom 303
18                                          |              21041 Burbank Blvd.
19                                          |              Woodland Hills, CA 91367

20

21

22         **PLEASE TAKE NOTICE** that Pacifica Mesa Studios, LLC, the Debtor and Debtor in

23  Possession (the "Debtor"), hereby supplements its *Plan of Reorganization Under Chapter 11 of*

24  *the Bankruptcy Code* (the "Plan"), to include the following exhibits:

25         **Exhibit 1**- Management Agreement, attached hereto as Exhibit 1;

26         **Exhibit 2**- Amended and Restated Operating Agreement of the Reorganized Debtor,

27                  attached hereto as Exhibit 2;

28

1    **Exhibit 3**- Schedule of Assumed Contracts, attached hereto as Exhibit 3; and

2    **Exhibit 4**- Notice of Technical Amendment to Debtor's Plan of Reorganization Under

3    Chapter 11 of the Bankruptcy Code, attached hereto as Exhibit 4.

4    **PLEASE TAKE FURTHER NOTICE** that the managers of the Reorganized Debtor shall be

5    James Freel and Joseph LoMonaco.

6

7    Dated: June 29, 2011                           EZRA BRUTZKUS GUBNER LLP

8

9                                                   By: /s/ Robyn B. Sokol
                                                        Robyn B. Sokol
10                                                      Attorneys for Pacifica Mesa Studios, LLC,
                                                        Debtor and Debtor in Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Agreement") is made as of July __, 2011, by and between PACIFICA MESA STUDIOS, LLC, a California limited liability company ("Company"), and ABQ STUDIOS MANAGEMENT, LLC, a California limited liability company ("Manager").

## RECITALS

WHEREAS, Company owns the real property and improvements commonly known as Albuquerque Studios, located at 5650 University Boulevard SE, Albuquerque, New Mexico (the "Property");

WHEREAS, the Property consists of, and Company is in the business of leasing and licensing, film and television studio facilities (the "Studio"), and Manager is a recognized expert in providing management services for such facilities; and

WHEREAS, Company wishes to retain Manager, as an independent contractor, to perform certain management services related to the Studio and the Property, subject to Company's oversight and Company's approval rights as provided herein, and Manager desires to perform such services, in each case on the terms and conditions set forth herein:

NOW, THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, it is hereby mutually agreed by and between the parties hereto as follows:

1.  Appointment of Manager.  Company appoints Manager to manage the Studio and the Property on behalf of Company for the purpose of conducting the management activities set forth in this Agreement, all upon the terms and conditions set forth in this Agreement. Manager hereby accepts such appointment.

2.  Term.  The term of this Agreement shall begin on the date hereof and shall remain in full force and effect for a period of one year, and shall be renewed automatically and without notice thereafter for successive one-year periods, unless terminated in accordance with Section 11 hereof.

3.  Manager's Duties and Obligations.  Manager shall perform all services, acts or things necessary or advisable to manage and conduct the business of Company and the facilities of Company entrusted to it, subject always to applicable law, and all limitations and conditions established and directions and instructions given by Company. Notwithstanding anything to the contrary contained herein, Manager shall not have any rights, power or authority except to the extent expressly set forth herein, and all such rights, power and authority shall be subject to all limitations and conditions established and directions and instructions given by Company.  Manager shall exercise the highest degree of professional skill and competence in performing its obligations set forth in this Agreement.  Manager shall use due diligence in the exercise of the duties of Manager so as to conduct the operation of the Studio and the Property in an efficient manner satisfactory to Company.  Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Company's assets.

**EXHIBIT "1"**

4.    <u>Management Activities</u>.  Manager shall, to the best of its ability and experience, perform the services and have the duties listed in this Section and in addition, upon Company's request, Manager shall perform any additional services that are customary or appropriate for the management of a film and television production studio, in each case subject to the further instruction and direction of Company (collectively, the "Management Activities").  Subject to the further instruction and direction of Company, the Manager shall, without limitation:

(a)    Manage the lease and licensing of the Studio to third parties ("Lessees"), with any lease or license of more than 50,000 sq. ft. or for a duration of longer than one month requiring the prior written consent of Company; and manage the day to day activities of the Studio and the Property and Company's contractors, consultants, suppliers, vendors, and customers;

(b)    Consult and coordinate with Company in and in connection with the marketing of the Studio and all negotiations with, and issues that relate to, current, future and potential Lessees and purchasers.  Company shall advise Manager regarding any hiring of appraisers or brokers in connection with the valuation or sale of the Property;

(c)    Be wholly responsible for the hiring and firing of all personnel of Company, whether as direct employees or as consultants, in each case subject to consultations with and the approval of Company.  Manager shall cause Company to employ at all times a sufficient number of competent employees and/or consultants to operate Company's business, and the number of employees and consultants and their respective job descriptions shall be included in the Approved Budget or approved by Company in writing upon consultation with Manager from time to time.  All such employees shall be employees or consultants of Company, and not of Manager.  All employees of Company who are employed as of July 1, 2011, shall be retained in their employment for a minimum period from the date of this Agreement until the earlier of December 31, 2011, and the date the Company sells the Property (except in those instances where said employee has violated the general employment policies, and by such actions or for any other reason is terminated for cause).  All matters pertaining to the employment, supervision, compensation, promotion, training and discharge of employees and consultants are the sole responsibility of Manager with the continuing consultation and approval of Company;

(d)    Work with customers and Lessees and plan their needs for a successful experience at the Studio;

(e)    Negotiate contracts with all vendors, suppliers, customers and Lessees, subject to its obligation provided herein to consult with Company;

(f)    Cooperate with any consultant, advisor, representative or agent of Company;

- 2 -

(g) Consult with Company regarding recommendations for improving operations and controlling costs;

(h) Prepare and present an annual plan for capital expenditures at the Studio, which plan shall be subject to Company approval;

(i) Meet with Government officials, community leaders and others outside the Studio on community outreach programs; act as a liaison to government officials at the local, municipal, county, state and national levels; and retain and supervise the activities of lobbyists approved by Company; in each case in consultation with and subject to the written approval of Company and consistent with and in furtherance of the strategies, business plan, policies and goals established by Company;

(j) Participate in civic, governmental and community activities as a representative of the Studio in consultation with and subject to the written approval of Company;

(k) Participate in appropriate trade associations;

(l) Report on a regular basis to Company, including as and to the extent provided in Schedule 1 hereto;

(m) Collect all fees and other amounts arising from the Studio and the Property and pay such fees and amounts to Company immediately upon receipt or, to the extent directed by Company, deposit such fees and amounts in one or more bank accounts designated by Company (including the Operating Account as defined in Section 6(e)) immediately upon receipt;

(n) Promptly notify Company of any claim against Company;

(o) Retain accountants, attorneys, architects, engineers, tradesmen and other professionals, independent contractors and advisors, in each case in consultation with and with the advice and consent of Company;

(p) Cause Company to perform all of its obligations under any lease, contract or other agreement to which Company is a party;

(q) Comply with and cause Company, the Studio and the Property and the use, occupation and operation thereof to comply with all applicable laws, ordinances, rules, regulations, orders and requirements of all federal, state and local governments, courts, departments, commissions, agencies, boards and officers, and any other body exercising functions similar to those of any of the foregoing, and obtain and maintain all necessary certificates, licenses, operating or zoning permits and/or other required governmental permits.  Manager shall advise Company immediately, with confirmation in writing, of the service upon Manager or Company of any and all notices, letters and other communications setting out or claiming a violation of the foregoing or any other potential liability of

- 3 -

Company or the Property, as well as any summons, subpoena or other legal document, and shall immediately forward to Company copies of the same;

(r)     Supervise and, subject to the limitations herein regarding commencement of lawsuits or other legal proceedings, enforce the obligations of others to Company;

(s)     Cause the Property to be maintained in a good and safe condition;

(t)     Enter into such service and maintenance (including preventative maintenance) contracts Manager deems reasonably necessary or appropriate for the operation and maintenance of the Property and the performance of Manager's duties hereunder, including without limitation contracts to service the equipment and systems located in or servicing the Property, contracts for cleaning, and contracts to supply utilities, all in accordance with the Approved Budget;

(u)     Cause ordinary and necessary repairs to be made to the Property and all equipment and systems located in or servicing the Property. Manager shall consult with and secure the written consent of Company in respect of the incurrence of any expenditure in excess of $25,000 for any one repair or $75,000 in the aggregate for any group of related repairs in any twelve-month period, except as provided in the remainder of this clause or as otherwise provided in the Approved Budget. Notwithstanding the foregoing, Manager may incur up to $100,000 in making or causing to be made, without Company's prior written consent, repairs which in Manager's reasonable opinion are immediately necessary for the preservation or protection of the Premises or as otherwise required to avoid the suspension of any services required to be provided by Company to Lessees under any existing leases or licenses of the Studio ("Emergency Repairs"); provided, however, that in each such instance Manager shall, (i) before making or causing to be made any such Emergency Repair (or as soon as possible thereafter), use reasonable efforts and all practical means under the circumstances to notify Company of the emergency situation, and (ii) at all times act reasonably and responsibly and in accordance with proper management practice;

(v)     Take or cause to be taken all reasonable precautions against fire, vandalism, burglary and trespass to and adverse possession of the Property, including without limitation, maintaining a security system for the Property to the extent such a system has been installed in the Property;

(w)     Conduct complete visual inspections of the Property no less frequently than once per calendar month and provide written report to Company regarding any defects in the physical condition of the Property, the corrective action taken and the current status of any unremedied problem, which report, together with a narrative description of all complaints regarding the physical condition of the Property by Lessees, the corrective action taken and current status of any unremedied problems, shall be delivered to Company within ten (10) days after each inspection;

- 4 -

(x)     Perform the duties set forth on Schedule 3 regarding insurance;

(y)     Cooperate with Company (and any designated brokers or prospective purchasers) in the event Company shall decide to assign, sell, hypothecate or otherwise transfer part or all of its interest in the Property; and

(z)     Perform and comply with all of the other duties relating to the Management Activities and the conduct thereof required or appropriate to be performed in consultation with and upon the advice and consent of Company.  Manager shall provide Company with comprehensive, reasonably detailed and accurate information regarding the Management Activities.

5.     <u>Limitation of Manager's Powers and Authority</u>.

(a)     <u>Expenditures</u>.  Except as otherwise specifically directed by Company or as provided herein, Manager is not authorized to incur any obligation or make any expenditure that is inconsistent with the then-current Approved Budget or the written directions or instructions of Company.

(b)     <u>Conflict of Interest; Affiliates of Manager</u>.  Manager shall deal at arm's-length with all Lessees and with all suppliers, vendors, customers, contractors, subcontractors and other parties that provide services or materials to or for the benefit of Company or the Property and shall act in the best interests of Company at all times.  Manager shall not enter into any contract or other agreement with or purchase supplies or services from any affiliate of Manager or a party related to or affiliated with an affiliate of Manager on behalf of Company or otherwise relating to the Property without first obtaining the prior written consent of Company after notifying Company of such relationship and providing Company with at least two (2) written unaffiliated third party bids that demonstrate that the cost of such goods or services offered by the affiliated party is not greater than the amount offered to be charged by such unaffiliated third parties.  For purposes of this Agreement, "affiliate" shall mean, with respect to an entity, any person or entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified entity, and "control," when used with respect to any specified entity, means the power to direct the management and policies of such entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(c)     <u>Management</u>. Notwithstanding any provision of this Agreement to the contrary, without the prior written approval of Company, Manager shall not:

(i)     Sell, assign, transfer, encumber or otherwise convey or dispose of any property or other asset of Company;

(ii)     Retain on behalf of Company employees, or accountants, attorneys, architects, engineers, tradesmen or other professionals, independent contractors or advisors, on behalf of Company;

KL2 2704460.7

(iii)      Institute or defend lawsuits or other legal proceedings on behalf of Company;

(iv)      Accept service of process on behalf of Company;

(v)      Settle or compromise on behalf of Company any litigation or insurance claim;

(vi)      Execute, enter into, terminate, modify, amend or waive any provision of, or enter into any agreement regarding, (x) any lease, license or other agreement regarding the use of the Studio, (y) any agreement for goods or services that provides for more than $25,000 in payments, compensation or other consideration, except in respect of Emergency Repairs as and to the extent provided in Section 4(u), or (z) any other material agreement;

(vii)      Pledge the credit of Company;

(viii)      Execute any letter, agreement or instrument on behalf of Company which obligates Company for the payment of any fee or commission to any real estate agent or broker;

(ix)      Borrow money or execute any promissory note or other obligation or mortgage, deed of trust, security agreement or other encumbrance in the name of or on behalf of Company or otherwise incur any liability or obligation on behalf of Company;

(x)      Permit any officer or employee of Manager or any third party to handle, have access to or be responsible for monies or personal property of Company or bank accounts related to the Property (including the Operating Account), unless the same are bonded or insured.  Manager shall provide Company with written evidence of such bonding or insurance in form and content satisfactory to Company;

(xi)      Disburse or lend any of the funds of Company except pursuant to the Approved Budget and with the consent of Company, as provided in Section 6(g); or

(xii)      Enter into any agreement, which is not on an arm's-length basis, or not on commercial terms or not in the ordinary course of business.

(d)      <u>No Litigation</u>.  Neither Manager nor any affiliate of Manager shall initiate, pursue, investigate or undertake any litigation, suit, cause of action or claim against any person or entity relating to or arising in connection with the Studio or the Property and based on any actions, omissions or circumstances occurring or existing prior to the date hereof, if any of the foregoing could in any way adversely affect Company's business, operations, prospects or relationships with Lessees, vendors, suppliers or customers.

6.      Approval Rights; Non-Interference.

   (a)     Company Approval Rights.  Company's approval rights under this Agreement may be exercised by any of Company's managers or officers, and Manager's obligation to consult with Company shall include consultation with such managers and officers.  Company may indicate its written consent or approval via electronic mail.

   (b)     Sole Manager; Non-Interference.  Notwithstanding any provision of this Agreement to the contrary, Manager shall have sole management responsibility of the Property during the term of this Agreement, subject to the oversight, control and approval rights of Company.  At no time will Company or its members, agents or representatives (other than Manager), or any of their affiliates, in any way converse, interview, socialize, market services, or contact the Lessees before, during or after their tenancy on the Property, in each case in connection with the operation of Company's business, without the prior written approval of Manager.  Furthermore, Company, its members, agents and representatives shall refrain from contacting any employees of Manager, other than the individuals listed on Schedule 4, for any reason at any time during the term of this Agreement without prior notice to Manager and its prior written approval.

7.      Financial and Accounting Duties.  In addition to the obligations set forth in Section 4 hereof, Manager shall also perform as part of the Management Activities the duties set forth on Schedule 2 hereto as well as the following:

   (a)     Pro Forma Budgets.  Manager shall prepare and submit to Company for its approval on the earlier of (i) no later than thirty (30) days after Company's request and (ii) at least sixty (60) days prior to the beginning of each Operating Year (as defined below), a proposed business plan and a proposed pro forma budget (in such form and detail as is acceptable to Company) setting forth all estimated receipts and disbursements relating to the Management Activities for the upcoming period beginning January 1 and ending December 31, except for the initial pro forma budget, which shall be provided by Manager to Company on the date hereof and which shall cover August 1, 2011, through December 31, 2011, and shall include all anticipated capital expenditures as well as operating costs.  Each such period is referred to in this Agreement as an "Operating Year."  Manager shall make changes to such business plan and pro forma budget as are required by Company within ten (10) days following each rejection or request by Company, until such business plan and budget is approved in writing by Company.  Such approved budget shall be defined herein as the "Approved Budget".

   (b)     Approved Budget.  Manager shall implement the Approved Budget.  Unless directed otherwise by Company, Manager, without the written approval of Company, is authorized for the account of Company to incur the obligations provided for in the Approved Budget, [which will include a Schedule of Pre-approved Contracts]; provided, however, that the prior written consent of

- 7 -

Company shall be required for each and every agreement or contractual arrangement for goods or services involving: (a) a sum in excess of $100,000 in any twelve-month period to any one person or to any group of persons affiliated with each other, or (b) a term of more than one year.  Each such agreement shall contain a provision giving Company the right to terminate such contract, with or without cause, on not more than thirty (30) days' prior written notice.

(i)     Manager shall use diligence and employ all reasonable efforts to (x) maximize the revenue received from the Studio and the Property, and (y) ensure that the actual costs of operating the Property shall not exceed the line items set forth on the Approved Budget, as such Approved Budget may be modified from time to time pursuant to this Agreement, and Manager shall not be authorized to advance or pay for costs in excess of any such line item or to incur any liability for or on behalf of Company which might cause any such line item to be exceeded without the approval in writing of Company.

(c)     <u>Limitations of Approved Budgets</u>.

(i)     Except as otherwise provided in this Agreement or as otherwise directed by Company in writing, Manager shall incur costs and expenses on its own behalf and on behalf of Company in connection with the Management Activities during any Operating Year only within the limitations established by the Approved Budget for such Operating Year, and in recognition of, and consistent with the fact that, the Approved Budget covers a full year.  Notwithstanding the foregoing, Manager shall not be required to obtain Company's prior written approval with respect to the payment of costs or expenses relating to utility charges and real estate taxes which, if not incurred and promptly paid, would adversely and materially affect the use, operation and maintenance of the Property.

(ii)    In addition, if any Operating Year shall commence before Company shall have approved the proposed pro forma budget for such year, Manager shall use its reasonable judgment in incurring costs and expenses relating to the operation and maintenance of the Property until an Approved Budget for such Operating Year shall be in effect, and in doing so, shall be guided by the Approved Budget for the previous Operating Year.  In such a case, Manager shall be subject to the same financial limitations established by such prior Approved Budget as if the operations portion of such budget had been in effect for the then-current Operating Year, together with an increase in such Approved Budget equal to the actual increase in expenses associated with real estate taxes and assessments, insurance premiums and utilities relating to the Property, until a revised budget is approved in writing by Company.

(d)     <u>Modifications to Approved Budgets</u>.  Notwithstanding the foregoing, if Manager reasonably determines that the funds provided in the Approved Budget are or will

- 8 -

be at any time during the Operating Year insufficient to satisfy the Management Activities, Manager shall notify Company as soon as reasonably possible after making such determination and propose such modifications to the Approved Budget as Manager shall deem necessary (along with reasonable explanations of the reasons therefor).  The Approved Budget shall be deemed so modified only to the extent such modifications are approved in writing by Company.

(e)     Books and Records; Reports.  Manager shall establish and maintain such books of account, records and other documentation reflecting the operations and financial condition of the Property and provide to Company such reports at such times as are specified in Schedule 1 attached to and made a part hereof.   Manager shall establish, maintain, supervise and direct the maintenance of the accounting and reporting system as required by Company.  The books of account, together with all records, correspondence, files, computer files, programs or electronic records of any kind and other documents or other media relating to the operation and management of the Property, shall be and remain the property of Company, and shall at all times be open to the inspection of Company and Company's auditors, officers and duly authorized agents.  No deviations from such accounting and reporting system shall be made without the prior written consent of Company.

(f)     Operating Account.  Except as otherwise directed by Company, Manager shall open and maintain in Company's name a segregated account for the Property (the "Operating Account") at Bank of the West (the current operating account for the Property as of the execution of this Agreement).  All funds deposited into the Operating Account shall be and remain the property of Company, and Manager shall have no legal, equitable or other interest therein.  Manager shall make such disbursements from the Operating Account as are in accordance with the Approved Budget and as Manager shall reasonably deem necessary in connection with the Management Activities.  Disbursements from the Operating Account may be made only by Company or a duly designated employee of Manager. Company's representatives will have signatory authority over the Operating Account.

(g)     Payment of Expenses.  Manager shall disburse and pay from the Operating Account (i) all costs and expenses of maintaining and operating the Property, subject to any restrictions imposed by this Agreement generally, and (ii) any other charge or expense that Company directs Manager in writing to pay; provided, however, that (x) prior to any such disbursement or payment, Manager shall deliver to Company the relevant bill or statement that is being paid, together with reasonably detailed explanation of the service or goods that were provided; and (y) each check or other payment shall require the signature of a manager, officer or duly authorized representative of Company.

8.      Disclosure of Confidential Information.

(a)     Except to the extent necessary to perform the Management Activities, Manager may not use or disclose to any person or entity, either directly or indirectly, any of

the trade or business secrets, proprietary information or other privileged or confidential information of Company without obtaining prior Company approval, including without limitation information regarding Lessees (collectively, "Confidential Company Information").  To the extent Manager needs to disclose Confidential Company Information to any person or entity in the performance of the Management Activities, Manager shall cause each recipient of any such Confidential Company Information to enter into a Nondisclosure Agreement with respect thereto which shall be acceptable in form and substance to Company.  The provisions of this Section shall survive the expiration and termination of this Agreement.

(b)    Except to the extent necessary to operate the Company's business, Company may not disclose to any person or entity, either directly or indirectly, any of the trade or business secrets, proprietary information or other privileged or confidential information of Manager that is identified in writing to Company as such without obtaining prior Manager approval, in each case only to the extent related to the manner in which Manager manages the lease and licensing of the Studio to Lessees (collectively, "Confidential Manager Information").  Notwithstanding the foregoing, any trade or business secrets, proprietary information or other privileged or confidential information of Manager that relate to the Studio or the Property shall not constitute Confidential Manager Information.  To the extent Company needs to disclose Confidential Manager Information to any person or entity in the operation of the Company's business, Company shall cause each recipient of any such Confidential Information to enter into a Nondisclosure Agreement with respect thereto which shall be acceptable in form and substance to Manager.  The provisions of this Section shall survive the expiration and termination of this Agreement.

9.    <u>Fees</u>.

(a)    <u>Management Fee</u>.  As a management fee for the services performed pursuant to this Agreement, Company agrees to pay Manager during the term of this Agreement (i) a monthly fee ("Management Fee") of $25,000, and (ii) an incentive fee in respect of each fiscal year equal to 20% of the Net Operating Income for such fiscal year to the extent such Net Operating Income exceeds $4 million.  For purposes of this calculation, Net Operating Income in any fiscal year means the annual gross revenue received by Company in such fiscal year from all sources of income (including but not limited to rents, lighting & grip and other vendors, telecom and production services) reduced by (x) the monthly cost of sales directly attributable to the specific sources of income and revenue and (y) the actual expenses in such fiscal year of operating the Studio and the Property, but excluding finance charges, interest payments, capital improvements, contingencies, reserves, corporate/income taxes and depreciation.

(b)    <u>Expense Reimbursement</u>.  Manager shall be entitled to be reimbursed for all reasonable and actual out of pocket expenditures required to be made by Manager as provided in this Agreement and as set forth in the Approved Budget ("Manager

Expenses"), but Manager Expenses shall not include and Manager shall not be reimbursed for the following:

(i)     Manager's office overhead expenses;

(ii)    Manager's cost of providing the services of all executive personnel necessary to fulfill Manager's duties under this Agreement;

(iii)   All costs of gross salary and wages, payroll taxes, insurance, worker's compensation, and other benefits of office personnel employed by Manager;

(iv)    All costs of forms, papers, ledgers, and other equipment used by Manager;

(v)     All costs of electronic data processing equipment or any pro rata charge therefor;

(vi)    All costs attributable to losses arising from criminal acts, willful misconduct, negligence or fraud on the part of Manager or Manager's employees, officers, agents or representatives;

(vii)   Cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account; and

(viii)  General accounting and reporting services, as such services are considered to be within the reasonable scope of Manager's responsibility to Company.

(c)     Statement for Management Expenses.  Manager shall submit to Company on a monthly basis an itemized statement of Manager Expenses incurred by Manager in the immediately preceding calendar month, together with receipts for and the details of such Manager Expenses and other supporting documentation.  Company shall pay Manager the amount shown on the statement within five (5) days following Company's receipt of the statement, except to the extent Company disputes the reasonableness of any such Manager Expenses or such Manager Expenses are not included or do not comply with the Annual Budget.

(d)     The compensation provided in this Section 9 is the sole compensation agreed to between Manager and Company and to which Manager shall be entitled.

10.   Default; Termination.

(a)     Termination Without Cause. This Agreement may be terminated without cause or cost by Manager upon ninety (90) days' prior written notice.  This Agreement may be terminated without cause or cost by Company upon thirty (30) days' prior written notice.

- 11 -

(b)    Termination For Cause.  Company may terminate this Agreement, at any time, effective as of the date designated in a notice of termination from Company to Manager, without cost to Company (other than payment to Manager of all sums due through the date of termination pursuant to Section 10(d)), in the event (i) Manager shall not follow the direction of Company, or (ii) Manager shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager, and such default shall continue for a period of thirty (30) days after notice thereof by Company to Manager; provided, however, that if such default relates to the payment of monies by Manager, such breach must be cured within ten (10) days.

(c)    Automatic Termination.  This Agreement shall terminate immediately and automatically and without cost to Company if any of the following shall occur:

    (i)    The Property is condemned or acquired by eminent domain;

    (ii)    The Property is sold, exchanged or otherwise transferred (except to an affiliate of Company or other entity under common control with or of Company);

    (iii)    Company files a petition for bankruptcy, reorganization or arrangement under any federal, state or local statute, or makes an assignment for the benefit of creditors, has appointed a receiver, liquidator or trustee of the Property that is not affiliated with Manager, is adjudicated to be a bankrupt or insolvent, acknowledges in writing its inability to pay its debts, or otherwise takes advantage of any federal, state or local insolvency statute;

    (iv)    A petition in bankruptcy, reorganization or arrangement is commenced involuntarily against Manager and Manager shall fail to dismiss the same within sixty (60) days; or

    (v)    Manager or any agent or employee of Manager commits gross negligence, willful misconduct or any criminal or fraudulent act, including, without limitation, the misappropriation of funds or commingling of any monies referred to in this Agreement.

(d)    Survival of Obligations.  Upon the expiration or earlier termination of this Agreement, (i) Company's appointment of Manager hereunder shall cease and terminate and, except as otherwise specifically provided under this Agreement or as requested by Company to provide transition services, Company and Manager shall have no further obligation or liability to the other, (ii) Manager shall no longer have any authority to represent Company or take or cause to be taken any actions on Company's behalf, and (iii) excluding amounts owed to Company by Manager and deductions or setoffs taken by Company due to Manager's defaults hereunder, Company shall pay to Manager all fees payable and reimbursable Manager Expenses hereunder which shall have accrued through the date of

- 12 -

termination.  In no event shall Company be liable for any fees or other amounts due to Manager for any period following the date of termination except in regards to any mutually agreed transition services and associated fees.  The provisions of this Section shall survive any such expiration or termination.

(e)     Return of Company's Property.  Within five (5) business days after the expiration or earlier termination of this Agreement, Manager shall (i) pay over to Company without setoff or deduction any balance of funds held by Manager on the behalf of Company (including without limitation, the balance of the Operating Account) pursuant to this Agreement, (ii) deliver to Company all records, books, papers, accounts, agreements, documents and other property described in Section 6(e) hereof or that are otherwise pertinent to the Studio or the management of the Property, including all files, electronic or otherwise, equipment and any other property which is owned by Company or to which Company is legally entitled, and (iii) assign, transfer and convey to Company, or such other party or parties as may be designated by Company, all contracts, equipment and personal property relating to or used in the Management Activities, except for any such equipment or personal property paid for and owned by Manager that previously has been identified in a writing delivered to Company.  The provisions of this Section shall survive the expiration and termination of this Agreement.

11.     Indemnity.

(a)     Manager's Indemnity.  Manager shall defend, indemnify and hold harmless Company and its affiliates and their respective principals, officers, directors, shareholders, members, managers, partners, attorneys, employees and agents from and against any and all liabilities, claims, suits, damages, judgments, costs and expenses of whatever nature, including reasonable attorneys' fees and disbursements, by reason of or arising out of (i) any failure of Manager to perform any obligations of Manager under this Agreement, (ii) any malfeasance or misfeasance on the part of Manager, any of Manager's employees, officers, managers, agents or representatives or any personnel, contractors or other third parties (including affiliates of Manager) hired by Manager, (iii) any acts of Manager or Manager's employees, officers, agents or representatives beyond the scope of Manager's authority hereunder and not otherwise authorized by Company, or (iv) the negligence, recklessness, willful misconduct, fraud or criminal acts of Manager or its employees, officers, agents or representatives.

(b)     Company's Indemnity.  Company shall defend, indemnify and hold harmless Manager and its principals, officers, directors, shareholders, members, managers, partners, attorneys, employees and agents from and against any and all losses, liabilities, claims, suits, damages, judgments, costs and expenses of whatever nature, including reasonable attorneys' fees and disbursements, by reason of or arising out of (i) any failure of Company to perform any obligations of Company under this Agreement; (ii) the negligence, recklessness, willful misconduct, fraud or criminal acts of Company and/or its managers (other than the Manager) and officers; or (iii) Manager being the Manager of the Property as and to the extent

- 13 -

provided herein, but not if any such losses, liabilities, claims, suits, damages, judgments, costs or expenses relate to or arise in connection with any actions or omissions of Manager or the performance of the Management Activities by Manager.

(c)     Survival.  The provisions of this Section shall survive the expiration and termination of this Agreement.

12.     Assignment.  Manager may not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Company, which consent may be withheld by Company in its sole discretion.

13.     Limitation of Liability.

(a)     Anything in this Agreement to the contrary notwithstanding, Manager accepts and agrees that each of the covenants, undertakings and agreements herein made on the part of Company, while in form purporting to be covenants, undertakings and agreements of Company, are, nevertheless, made and intended not as personal covenants, undertakings and agreements by it, its partners, managers, members, officers, employees or agents for the purpose of binding it or them personally or its or their assets, but are made and intended for the purpose of binding only Company's interest in the Property, and that no personal liability or personal responsibility is assumed by, nor shall it at any time be asserted or enforceable against, Company or its partners, managers, members, officers, employees pr agents or their respective heirs, legal representatives, successors and assigns on account of this Agreement or on account of any covenant, undertaking or agreement of Company in this Agreement, all such personal liability and personal responsibility, if any, being expressly waived and released by Manager; and Manager further agrees not to seek or enforce any judgments against Company beyond the interests of Company in the Property.

(b)     The provisions of this Section shall survive the expiration of the term or termination of this Agreement.

14.     Access. Company hereby grants to Manager the right to enter into and upon the Property (subject to the rights of Lessees) at any and all times during the term of this Agreement for the limited purpose of performing its obligations under this Agreement with respect to operating or managing the Property.  Company specifically reserves the right to enter into and upon the Property at any and all times during the term of this Agreement for any and all purposes.

15.     Representations and Warranties.

(a)     Manager hereby represents and warrants to Company as follows:

(i)     (w) Manager is a limited liability duly organized, validly existing and (A) in good standing under the laws of the State of California and (B) in good standing and qualified to do business in New Mexico; (x) Manager has the

power and authority to execute this Agreement and perform its obligations hereunder; (y) Manager's execution and delivery of and performance of its obligations under this Agreement have been duly authorized, this Agreement has been duly executed and delivered and constitutes the valid and binding obligations of Manager, enforceable in accordance with its terms; and (z) Manager has taken all actions required for the consummation of the transactions contemplated by this Agreement.

(ii)   Manager is fully familiar with the Studio and the Property and their operations.

(iii)   Manager possesses all necessary skill, ability and experience necessary to manage the Property in accordance with the terms of this Agreement, and possesses all necessary licenses and/or certifications required to perform the functions elaborated herein.

(b)   Company hereby represents and warrants to Manager that (i) Company has the power and authority to execute this Agreement and perform its obligations hereunder; (ii) Company's execution and delivery of and performance of its obligations under this Agreement have been duly authorized, this Agreement has been duly executed and delivered and constitutes the valid and binding obligations of Company, enforceable in accordance with its terms; and (iii) Company has taken all actions required for the consummation of the transactions contemplated by this Agreement.

16.   <u>No Agency</u>.  Manager shall be responsible for all of Manager's employees, the supervision of any persons performing services in connection with the performance of any of Manager's obligations relating to the Management Activities, and for determining the manner and timing of performance of its obligations hereunder.  Manager is acting under this Agreement as an independent contractor and nothing herein contained, nor any acts by Manager or Company, nor any other fact or circumstances, shall be construed as to establish Manager as an agent, employee, partner, member or joint venturer of or with Company.

17.   <u>Miscellaneous</u>.

(a)   <u>Indulgences, Etc</u>.  Neither the failure nor any delay on the part of either party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

- 15 -

(b)     <u>Controlling Law; Jurisdiction</u>.  This Agreement and all questions relating to its validity, interpretation, performance and enforcement (including, without limitation, provisions concerning limitations of actions), shall be governed by and construed in accordance with the laws of the State of New York, notwithstanding any of its conflict-of-laws doctrines to the contrary, and without the aid of any canon, custom or rule of law requiring construction against the draftsman.  Each party also hereby irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any proceeding in any court located in the State of New York and further waives any claim that any such proceeding which has been brought in any such court has been brought in an inconvenient forum.

(c)     <u>JURY TRIAL</u>.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

(d)     <u>Notices</u>.  Unless stated otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received only when delivered personally, by courier service such as Federal Express, or by other messenger against receipt, by facsimile, or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, addressed as set forth below:

If to Company:          Pacifica Mesa Studios, LLC
                        c/o Amalgamated Bank
                        275 Seventh Avenue, 14th Floor
                        New York, NY 10001
                        Attention:  James T. Freel and Joseph LoMonaco
                        Telecopier:  (212) _____

With copy to:           Kramer Levin Naftalis & Frankel
                        1177 Avenue of the Americas
                        New York, New York  10036
                        Attention:  Jay A. Neveloff, Esq.
                        Telecopier:  (212) 715-8000

If to Manager:

With copy to:

Any party may alter the address to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section for the giving of notice.

(e)    <u>Binding Nature of Agreement</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(f)    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.  For purposes of the foregoing, signatures by any means of electronic transmission shall have the same force and effect as original signatures.

(g)    <u>Provisions Separable</u>.  The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

(h)    <u>Entire Agreement</u>.  This Agreement contains the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.  This Agreement may not be modified or amended other than by an agreement in writing in writing signed by both parties.

(i)    <u>Section Headings</u>.  The section headings in this Agreement are for convenience only, form no part of this Agreement and shall not affect its interpretation.

(j)    <u>Gender</u>.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context indicates is appropriate.

(k)    <u>Number of Days</u>.  In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period falls on a Saturday, Sunday or holiday on which federal banks are or may elect to be closed, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or such holiday.

(l)    <u>Mechanics' Liens</u>.  Manager shall not file, and shall use commercially reasonable efforts to ensure that no other party files, any materialman's or mechanic's lien against the Property or any portion thereof.  Manager shall require all contractors to post bonds in amounts sufficient to prevent the filing of any materialman's or mechanic's liens on the Property.

- 17 -

(m)    <u>Office of Foreign Asset Control (OFAC)</u>.  Pursuant to United States Presidential Executive Order 13224 and related regulations of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury, persons and entities in the United States are prohibited from transacting business with persons or entities who, from time to time are determined to have committed, or to pose a risk of committing or supporting, terrorist acts, narcotics trafficking, money laundering and related crimes.  The prohibited persons and entities are identified on a list of Specially Designated Nationals and Blocked Persons (the "List"), published and regulated by OFAC. The names, including aliases, of these persons or entities are updated frequently.  In addition, OFAC enforces other executive orders which, from time to time, impose restrictions on transactions with, or involving certain countries.  Manager hereby certifies and represents that neither it, nor any of its members, managers, officers, employees, agents or representatives is on the List or is acting for, or on behalf any person or entity on the List.  Manager further acknowledges its obligation to remain in compliance with existing and future regulations promulgated by OFAC throughout the term of the Agreement.

[signatures appear on next page]

KL2 2704460.7

       IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered under seal by their proper and duly authorized officers on the date first above written.

PACIFICA MESA STUDIOS, LLC


By: _____
Name:  James T. Freel
Title:   Manager


ABQ STUDIOS MANAGEMENT, LLC


By: _____
Name: _____
Title: _____

- 19 -

## SCHEDULE 1

### MANAGER'S REPORTING REQUIREMENTS

|     | TASK | DUE |
| --- | --- | --- |
| 1. | INCOME & EXPENSE STATEMENT (Monthly and YTD Actual vs. Budget) | Monthly/not later than 1st day following month end |
| 2. | STATEMENT OF CASH FLOW (Monthly and YTD Actual vs. Budget) | Monthly/not later than 1st day following month end |
| 3. | [AGED ACCOUNTS RECEIVABLE | Monthly/not later than 1st day following month end] |
| 4. | DETAILED OPERATING AND CAPITAL BUDGET | Annual/60 days prior preliminary |
| 5. | COPIES OF BANK STATEMENTS FOR OPERATING ACCOUNT OR ACCESS TO ON-LINE STATEMENTS | Monthly/not later than 1st day following month end |
| 6. | SIGNIFICANT OCCURRENCES REPORT (INCLUDING LEGAL ACTIONS OR PROCEEDINGS AFFECTING OR RELATING TO THE PROPERTY) | Promptly upon knowledge thereof |
| 7. | PROPERTY INVENTORY | Annually and upon request |
| 8. | FINAL ACCOUNTING | Within 30 days following the termination of this Agreement |

- 20 -

## SCHEDULE 2

## FINANCIAL SERVICES

1.      General Scope.  Manager shall perform the financial and accounting duties listed in this
Agreement, and any additional financial and accounting duties directed by Company.

2.      Delivery Upon Termination.  Except for any information or financial data that is (i)
required or deemed necessary to comply with any disclosure obligations under any
federal or state securities laws or other laws applicable to Manager or the Property, or for
Manager to comply with any requests of governmental authorities (including any court
orders or subpoenas); (ii) generally available to the public; (iii) necessary to disclose in
order to operate and manage the Property; or (iv) proprietary systems or software of
Manager, any books, records, accounting and reporting system and ancillary accounting
records, correspondence, and documents related to Lessees or the operation of the
Property (including, without limitation, any electronic data or computer files) shall (a) at
all times be strictly confidential; (b) be Company's sole property; (c) not be removed
from the offices located at 5650 University Boulevard SE, Albuquerque, New Mexico
87106 without Company's prior written consent; and (d) be accessible by an authorized
representative of Company, upon forty-eight (48) hours' notice, to examine, copy and
audit in accordance with Paragraph 4 of this Schedule 2.  On the date of termination of
this Agreement, Manager shall deliver to Company (or Company's designee) copies of
Manager's on-site records related to the Property and any records maintained by Manager
off-site but which are related to the Property.

3.      Audit.  Company shall have the right to conduct an audit of all or any portion of the
books and records relating to the operation of the Property.  Manager shall promptly
correct all accounting method deficiencies and errors disclosed by Company's audits and
shall timely inform Company in writing of all corrective actions taken.  Company's
audits shall be at Company's sole cost and expense unless an error on the part of Manager
or Manager's accountants is discovered which affects Company, in which case Manager
shall bear the reasonable out-of-pocket costs incurred by Company for the audit not to
exceed $2,500 (provided however, Manager shall not be responsible for the costs of any
contingent fee audit).  Any adjustments in amounts due and owing from Company or
Manager shall be paid within fifteen (15) calendar days following Manager's receipt of
the results of the audit.

4.      Verification and Payment of Bills; Discounts.

        (a)     Manager shall obtain and verify bills for and pay on behalf of Company all
                expenses for capital improvements, real estate taxes, personal property taxes,
                local taxes, if any, insurance premiums, other operating expenses, association
                dues assessments and other impositions applicable to the Property.  Manager shall
                pay such bills before delinquency, prior to the addition thereto of interest, fines or
                penalties and to the extent funds are made available by Company therefor, to
                permit Company to obtain the advantage of any available discounts.  All
                payments made by Manager pursuant to the foregoing sentence shall be made on

- 21 -

behalf of Company and at Company's expense and shall be paid by Manager from the Operating Account.  Manager shall advise Company in writing, not less than twenty (20) days prior to the delinquency date of any such tax or assessment, of any such imposition which cannot be paid by Manager out of the Operating Account.  Manager shall fully cooperate with Company and Company's tax consultants in coordination and monitoring tax appeals filed on behalf of Company.

(b)    Manager shall review all invoices tendered for payment with respect to services rendered or materials and supplies provided for the operation of the Property. Manager shall pay to the persons entitled thereto the taxes, insurance premiums and other expenses payable out of the assessments. Manager agrees to use due diligence to pay all invoices in a timely manner in order to take advantage of any discounts and avoid payment of late charges.

(c)    On behalf and in the name of Company, Manager shall contract for and pay amounts due for water, electricity, gas, other fuels, pest control, building services and maintenance, repairs and such other services, commodities or contracts as may be required for the operation and maintenance of the Property, and the fulfillment of Company's obligations under any leases or licenses with Lessees.

(d)    Manager, at Company's request and expense, shall timely pay all insurance premiums for insurance on the Property.

(e)    Take such action as may be reasonably necessary (and within the Approved Budget) to comply with all obligations undertaken by Company in connection with the Property including, but not limited to, all governmental regulations applicable to the operation and maintenance of the Property.

KL2 2704460.7

## SCHEDULE 3

## INSURANCE

1.  <u>Company's Insurance</u>.

    (a)    To the extent instructed to do so by Company. Manager shall procure and maintain in full force and effect at all times insurance requested by Company that (a) is in the name of Company; (b) complies with requirements and standards established by Company, and is otherwise reasonably satisfactory to Company; (c) provides that Company and Manager be notified at least thirty (30) days before any or all coverages may be modified or cancelled; (d) contains a waiver of subrogation clause; and (e) requires written notice of a default to be delivered to Company and provides at least sixty (60) days to cure any such default.

    (b)    Manager shall promptly investigate and make a full written report to Company and the insurance carrier(s) as to all alleged accidents and/or claims for damages relating to ownership, operation, management and maintenance of the Property and the estimated costs of repair or replacement.  All such reports shall be delivered to Company within forty-eight (48) hours after the occurrence of any such accident, claim, damage or destruction. Manager shall acquaint itself with all terms and conditions of the insurance policies covering the Property and cooperate with the insurance carrier and make available all reports required by the insurance carrier(s) and shall do nothing to jeopardize the rights of Company and/or any other party insured under said policies.

    (c)    Manager shall provide Company with an annual review of the insurance program, the topics of which shall include (without limitation) the need to carry any additional coverages and the adequacy of the various policy limits.  Manager shall make recommendations to Company as to any changes deemed advisable or necessary by Manager (provided, however, that Company shall make the final determination as to the adequacy thereof), but Manager shall not vary or change any portion of the insurance program without the prior written approval of Company.

2.  <u>Insurance to Be Carried by Manager</u>.

    (a)    Manager shall maintain, in consultation with Company, at Company's cost and expense, insurance coverage which complies with the following minimum requirements (as such requirements may be modified by Company from time to time):

        (i)    Workers' Compensation Insurance in accordance with applicable law and employers liability with a limit of $1,000,000 per accident and per disease and disease aggregate.

- 23 -

(ii) Commercial General Liability Insurance, on an "occurrence" basis with limits of liability equal to $3,000,000 ($1,000,000 per occurrence and $2,000,000 aggregate per location), including coverage for bodily injury and property damage (contractual liability exclusions deleted), personal injury (contractual liability exclusions deleted), contractual liability specifically insuring (to the extent permitted by law) the indemnifying portions of this Agreement and broad form property damage.

(iii) Comprehensive Automobile Liability Insurance covering all hired and non-owned vehicles with limits of liability equal to $1,000,000 each occurrence for personal injury and property damage combined.

(iv) Crime insurance with limits not less than $_____ *[[**2 months of the average daily balance of Company's checking account(s)]]*

(v) Professional liability insurance, covering errors and omissions of its employees and hires, with limits not less than $1,000,000.

(b) If any work under this Agreement is subcontracted, Manager shall include in each subcontract a provision that the subcontractor, at the subcontractor's expense, shall procure and maintain during the term of the subcontract, workers' compensation insurance in accordance with the laws of the State of New Mexico; employers' liability insurance applicable to and covering all persons engaged in the performance of any work required under this Agreement, with limits of liability of not less than $1,000,000; and commercial general liability insurance, including contractor's protective liability insurance with no exclusion for bodily injury to any employee of any contractor or subcontractor with combined limits of liability of not less than $1,000,000 for bodily injury, property damage, and personal injury, and such other insurance as may be required by Company. Manager will evaluate and make recommendations whether such limits should be increased with respect to any particular contract based upon the services to be performed. All contracts must contain contractual indemnification in favor of Manager and Company and must state that coverage carried is primary with respect to any other policies carried by Company or Manager and shall name Company and Manager as additional insureds.

(c) Manager shall properly supervise the work of its managers, employees, agents and representatives. During the term of this Agreement, Manager shall obtain and maintain fidelity bond(s) with respect to all such persons in an amount equal to the greater of three times the Gross Revenues or $[1,000,000]. The fidelity bond may be a blanket bond covering all such personnel and other employees of Manager and third party coverage. The bond shall: (1) specify that any loss involving funds of Company shall be payable to both Manager and Company; and (2) be endorsed to provide that no modification, amendment, lapse, or cancellation of the bond will be effective unless thirty (30) days' prior written notice of such cancellation has been given to Company and to Manager. Manager shall provide Company with a true and certified copy of such bond pertaining to

its initial personnel within thirty (30) days after the date of execution of this Agreement and true and certified copies of updates to such bond or replacement bonds reflecting changes in such personnel within fifteen (15) days of such changes. Subject to Company's prior written consent, Manager, in lieu of such fidelity bond, may provide Company satisfactory assurance of insurance coverage as to such matter. The cost of such fidelity bond or coverage shall be borne solely by Manager, and Company shall not bear any portion of such expense. Manager shall add any lender designated by Company as an additional insured.

(d)     The limits of liability of the insurance coverage specified in this Schedule 3, may be provided by any combination of primary insurance policies and excess liability "umbrella" insurance policies. Company shall be named loss payee or additional insured as applicable as to the coverage maintained by Manager by endorsements acceptable to Company in form and content. Insurers providing the foregoing coverage shall be rated A VIII or better by the latest A.M. Best's insurance key rating guide. Manager shall deliver to Company certificates of insurance or other evidence of the minimum levels of insurance set forth above prior to the commencement of any services under this Agreement. All policies required under this Schedule shall contain severability of interest provisions. Manager or its insurer shall provide thirty (30) days' prior written notice to Company in the event of cancellation or termination of the insurance policies required by Manager hereunder. Notwithstanding the expiration or early termination of this Agreement, Manager's insurance carriers shall remain obligated under the policies for matters which accrued during the term of this Agreement which are within the scope of the requirements of insurance coverage set forth in this Schedule.

3.     Insurance to Be Carried by Lessees.  [TBD]

4.     Waiver of Subrogation.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, COMPANY AND MANAGER HEREBY WAIVE ANY AND ALL RIGHTS OF RECOVERY, CLAIM, ACTION OR CAUSE OF ACTION AGAINST THE OTHER, ITS AGENTS, EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, SERVANTS OR SHAREHOLDERS FOR ANY LOSS OR DAMAGE TO THE OTHER'S PROPERTY BY REASON OF FIRE, THE ELEMENTS, OR ANY OTHER CAUSE WHICH IS COVERED OR COULD BE COVERED BY STANDARD "ALL-RISKS" PROPERTY INSURANCE (INCLUDING COMPREHENSIVE BOILER AND MACHINERY COVERAGE), REGARDLESS OF CAUSE OR ORIGIN, INCLUDING NEGLIGENCE OF THE OTHER PARTY HERETO, ITS AGENTS, EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MANAGERS, MEMBERS, SERVANTS OR SHAREHOLDERS. EACH PARTY'S PROPERTY INSURANCE POLICIES SHALL CONTAIN PROVISIONS WHERE THE INSURER WAIVES THEIR RIGHT OF SUBROGATION AGAINST SUCH OTHER PARTY.

KL2 2704460.7

## SCHEDULE 4

## MANAGER DESIGNEES

Dana Arnold

Harold Katersky

[[others?]]

KL2 2704460.7

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**PACIFICA MESA STUDIOS, LLC**

**a California limited liability company**

This Limited Liability Company Operating Agreement (this "Agreement") of Pacifica Mesa Studios, LLC, a California limited liability company (the "Company"), dated as of July __, 2011, is entered into by and between by ABQ Studios, LLC, a New Mexico limited liability company (the "Member"), and James T. Freel and Joseph LoMonaco (collectively, the "Managers"), with reference to the following facts:

WHEREAS, the Articles of Organization of the Company were filed with the Secretary of State of the State of California on October 17, 2005;

WHEREAS, the Company has been governed by that certain Amended and Restated Operating Agreement dated as of June __, 2006 (the "Original Agreement").

WHEREAS, the Member desires to amend and restate the Original Agreement to provide for the regulation and establishment of the affairs of the Company, the conduct of its business and the relations between the Members, the Managers and the Company.

NOW, THEREFORE, in consideration of the covenants and the promises made herein, the parties hereto hereby agree as follows:

1.    Definitions.

All capitalized terms used in this Agreement are equally applicable to both the singular and plural derivations of the defined terms:

"Act" means the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as amended from time to time.

"Managers" means the initial Managers identified in the Preamble and all selected Managers, pursuant to Paragraph 7 of this Agreement.

"Member" means the initial Member identified above and all new or substitute Members, pursuant to Paragraph 12 of this Agreement.

2.    Organization.

2.1    Formation. The Company was formed pursuant to the Act upon the filing of the Articles of Organization with the California Secretary of State on October 17, 2005.

**EXHIBIT "2"**

2.2    <u>Name</u>.  At the time of its formation, the name of the Company was "The Pacifica Yard Studios, LLC."  The Company's name was changed to "Pacifica Mesa Studios, LLC" by filing a Limited Liability Company Certificate of Amendment with the Secretary of State on or about February 7, 2006.  The Company may conduct business under any other name the Managers deem necessary or desirable to comply with local law.

2.3    <u>Purpose</u>.  The Company's business and purpose shall consist solely of the ownership, operating and management of the production complex located in Albuquerque, New Mexico (the "Property"), and such activities as are necessary, incidental or appropriate in connection therewith, and to engage in any lawful act or activity under the Act, on the terms and conditions and subject to the limitations set forth in this Agreement

2.4    <u>Term</u>.  The Company's existence commenced on the date the Articles were filed with the Secretary and shall continue until dissolved pursuant to Paragraph 11 of this Agreement.

2.5    <u>Registered Office and Principal Place of Business</u>.  The Company shall continuously maintain a registered office in the State of California as required by the Act.  The Company's initial registered office and principal place of business shall be located at CT Corporation, 818 W Seventh Street, 2nd Floor, Los Angeles, CA 90017, or at such other location as the Managers may determine from time to time.  The Company may also have such offices, anywhere within or without the State of California, as the Managers may determine from time to time.

2.6    <u>Registered Office and Agent</u>.  The Company shall continuously maintain a registered agent in the State of California as required by the Act.  The registered agent shall be as stated in the Articles or as otherwise determined by the Managers from time to time.

2.7    <u>Filing of Other Certificates</u>.  The Managers shall execute, file, publish and record all certificates, notices, statements, and other instruments and amendments thereto for the formation and operation of a limited liability company as the Managers deem appropriate.  The Managers are authorized to register the Company to transact intrastate business in such jurisdictions as the Managers deem appropriate and in connection therewith to execute and file statements of information and similar required documents.

2.8    <u>Tax Classification:  Requirement of Separate Books and Records and Segregation of Assets and Liabilities</u>.  The Managers and the Member acknowledge that because the Company has a single Member pursuant to Treasury Regulations Section 301.7701-3, the Company shall be disregarded as an entity separate from its owner for federal income tax purposes until the effective date of any election it may make to change its classification for federal income tax purposes to that of a corporation by filing IRS Form 8832, Entity Classification Election, or until the Company has more than one Member, in which case it would be treated as a partnership for federal income tax purposes (provided that the Company has not elected on Form 8832 to be treated as a corporation).  In all events, however, the Company shall keep books and records separate from those of its Member and shall at all times segregate and account for all of its assets and liabilities separately from those of its Member.

KL2 2706659.2

2.9    Qualification in Other Jurisdictions.  The Member shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business and in which such qualification or registration is required by law or deemed advisable by the Company.  The Managers and any other person designated pursuant to Paragraph 7.3 hereof, may execute, deliver and file any certificates or other documents (and any amendments and/or restatements thereof) necessary for the Company to do business in a jurisdiction in which the Company may wish to conduct business and to establish any branch of the Company.

3.    Member.

3.1    Member's Name.  The Member's name and current business address are as follows:

Name:  ABQ Studios, LLC a New Mexico limited liability company

Address: c/o Amalgamated Bank, 275 Seventh Avenue, 14th Floor, New York, NY 10001

3.2    Member Meetings.  No annual or regular Member meetings are required.

3.3    Member Rights.  Without limiting any other right that the Member may have as a member or otherwise, when, and so long as, the Member is a member of the Company, it shall have the following rights:

(a)    The Member shall have the right, exercisable by written notice to the Company and each of the other members, if any, to designate at least one Manager of the Company and each of its direct or indirect subsidiaries.  The Member may at any time direct that the person(s) designated by it to serve as a Manager be removed, with or without cause.  If the person designated by the Member dies, resigns or is removed by the Member, the Member shall have the right to designate a successor(s). The Company shall take all appropriate action to cause the designation to, or removal from, the managing board of any direct or indirect subsidiary of the Company of any person that the Member may designate in accordance with this Section.

(b)    The Member shall have the right to consult with and advise management of the Company and each of its direct or indirect subsidiaries, and to receive all material provided to members of their managing boards.

(c)    The Member shall have the right to visit and inspect the properties of the Company and each of its direct or indirect subsidiaries, examine and copy their books of record and account, and discuss their affairs, finances and accounts with their officers and independent public accountants, all at such reasonable times as the Member may desire, and the Member's representative(s) may meet with the senior management of the Company and such subsidiaries to discuss their operations and prospects.

(d)    The Member shall have the right, exercisable by written notice to the Company, to designate one observer (an "ABQ Studios Observer") to attend meetings and committees of the managing board of the Company, if any, and each of its direct or indirect

subsidiaries.  The Company and each of its direct or indirect subsidiaries shall give such ABQ Studios Observer a written notice of each meeting or committee at the same time and in the same manner as the members of the board receive notice of such meetings or committees.  The Company and each of its direct or indirect subsidiaries shall permit such ABQ Studios Observer to attend as an observer all meetings or committees of such board.  Such ABQ Studios Observer shall be entitled to receive all written materials and other information given to directors in connection with such meetings at the same time such materials and information are given to members of such board or committees.

4.      Capital Contributions.  The Member has made a capital contribution to the Company. The Member is not required to make any additional contribution to the capital of the Company, but may make such additional contributions in the Member's sole and absolute discretion.

5.      Limited Liability.  No Manager or Member or any of their respective affiliates, or any of their respective officers, directors, manager, members, employees or agents, shall be personally liable for the debts, obligations, losses, liabilities or expenses of the Company, except as expressly set forth in this Agreement or provided by applicable law.  Any provision of this Agreement stating circumstances under which a Member may be required to return a distribution from the Company is intended only to state the current law, not to create additional obligations. No allocation of losses or any item thereof to a Member shall create any implication that a Member is liable for anything other than the Member's capital contribution.

6.      Distributions.

        6.1     Payment.  Distributions shall be made at such times, and from time to time as the Managers may determine.

        6.2     Restrictions on Distributions.   Notwithstanding Paragraph 6.1, no distribution shall be made if, after giving effect to the distribution:  (a) the Company would not be able to pay its debts as they become due in the usual course of business; or (b) the Company's total assets would be less than the sum of its total liabilities.

7.      Management.

        7.1     Managers.   James T. Freel and Joseph LoMonaco shall serve as the initial Managers of the Company.  The Company's business, property and affairs shall be managed and all Company powers shall be exercised by or under the direction of the Managers.

        7.2     Removal of a Manager; Vacancies.  Any Manager may be removed at any time, for any reason, by the affirmative vote of the Member.  Any vacancy occurring as a result of such removal or as a result of the resignation or death of the Manager shall be filled by the affirmative vote of the Member.

        7.3     Powers.  The Managers shall have all necessary powers to manage and carry out the Company's purposes, business, property and affairs, including, without limitation, the power to exercise on behalf, and in the name, of the Company all of the powers described in Act Section 17003.  Any Manager may (i) authorize by written action any person to enter into and perform any agreement on behalf of the Company, and (ii) appoint individuals, with such titles

as such Manager may select, to act on behalf of the Company, with such power and authority as such Manager may delegate from time to time to any such individuals.

8.   Competing Activities.   The Managers and Member may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  The Company shall not have any right in or to such other ventures or activities, or to the income or proceeds derived therefrom.  Neither the Managers nor the Member is obligated to present any opportunity to the Company.

9.   Allocations of Profits and Losses.  All of the net profits and net losses of the Company for each Fiscal Year shall be allocated to the Member.

10.   Accounting, Records and Reports.

10.1   Fiscal Year.  The Company's fiscal year shall be the calendar year.

10.2   Method of Accounting.  The Company's accounting records shall be kept on a method to be determined by the Managers upon advice of the Company's accountants.

10.3   Books and Records.  The Managers shall keep books and records of the Company that reflect all material Company transactions and are appropriate and adequate for the Company's business.

10.4   Bank Accounts.  All Company funds shall be deposited in the Company's name in one or more banks, money funds, bank certificates of deposit, or government securities to be designated by the Managers.  All deposits into and withdrawals from any such Company account shall be made by a Manager or such persons as the Managers may designate, subject to the limitations provided in this Agreement.

10.5   Tax Filings.  The Managers shall prepare and timely file the income tax returns for the Company with the appropriate authorities.  The Managers shall also prepare and timely file, with the appropriate authorities, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other applicable laws, rules, regulations.

11.   Dissolution.

11.1   Dissolution Events.  The Company shall dissolve, dispose of its assets, and wind up its affairs upon the first to occur of the following (each, a "Dissolution Event"):  (a) the Member's written consent, (b) the entry of a decree of judicial dissolution under Section 17351 of the Act, or (c) December 31, 2049.

11.2   Certificate of Dissolution.  As soon as possible following the occurrence of a Dissolution Event, the Managers shall (a) execute a Certificate of Dissolution (the "Certificate") in such form as shall be prescribed by the Secretary, and (b) file the Certificate as required by the Act.

11.3    Procedures upon Dissolution.

(a)    General.  Upon dissolution, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors pursuant to the appropriate provisions of the Act and the procedures set forth in this Paragraph 11.3.

(b)    Control of Winding Up.  The Managers shall have all the duties and responsibilities associated with winding up the Company's affairs.  The Managers shall determine the time, manner, and terms of the sale of the Company's assets, consistent with her fiduciary responsibilities and having due regard to the activity and condition of the relevant market and general financial and economic conditions.

(c)    Liquidating Distributions.  Following the Company s dissolution, the Company's assets shall be applied to satisfy claims of creditors and distributed to the Member in liquidation as provided in the Act.

11.4    Certificate of Cancellation.  On completion of the Company's winding up, the Managers shall file a Certificate of Cancellation in the office of, and on a form prescribed by, the Secretary.

12.    Transfers, New Members and Assignments.

12.1    Transfer and Assignment of Interests.  No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of the Member's interest in the Company without the prior written consent of all Members.  The Member assigning its interest in the Company shall not be released from any liability the assigning Member may have to the Company or to any third party solely as a result of such assignment.

12.2    New or Substitute Members.  A new Member or a transferee of a Member's interest shall have the right to become a new or substitute Member only if such person (a) executes an instrument accepting and adopting all of the terms and provisions of this Agreement, (b) pays all reasonable costs and expenses in connection with the admission of the new Member or the transferee as a substitute Member, and (c) obtains the prior written consent of all of the Members.  The admission of a new Member or a transferee in violation of this Paragraph shall be null and void.

12.3    Assignment of Economic Interests.  The assignee of a Member's economic interest shall not have any right to vote or to participate in the management and affairs of the Company or to become or exercise any rights of a Member.

13.    Indemnification of Manager and Member.  The Company shall indemnify the Member, its members and managers, the Managers and their respective affiliates, and all of their respective officers, directors, partners, managers, members, employees and agents, and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding because he or she is or was a Manager, Member, or affiliate, or any of their respective officers, managers, members, employees, affiliates, or other agent of any Manager or Member or that, being, or having been such a Manager, Member,

KL2 2706659.2

affiliate, officer, manager, member, employee, affiliate or agent, he or she is or was serving at the Company's request as a manager, director, officer, affiliate, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, to the fullest extent permitted by applicable law; provided, however, that nothing in this Paragraph 13 shall entitle a party to be indemnified in the case of such party's fraud, bad faith or gross negligence.

14.   <u>Miscellaneous</u>.

14.1   <u>Successors and Assigns</u>.  This Agreement shall be binding on and inure to the benefit of the Managers and the Member and their respective successors and assigns.

14.2   <u>Parties in Interest</u>.  Except as expressly provided in this Agreement, nothing in this Agreement shall (a) confer any rights or remedies on any persons other than the parties and their respective successors and assigns, (b) relieve or discharge the obligation of any third person to any party, or (c) shall give any third person any right of subrogation or action against any party.

14.3   <u>Amendments</u>.  This Agreement shall not be amended except in a writing signed by the Managers and the Member.

14.4   <u>Governing Law</u>.  The rights and obligations of the Managers and Member shall be governed by, and this Agreement shall be construed and enforced in accordance with, the laws of the State of California.

14.5   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement concerning the Company's affairs and the conduct of its business, and supersedes all prior agreements and understandings, whether oral or written.  The Company shall have no oral operating agreements.

14.6   <u>Severability</u>.  If any provision of this Agreement, or the application of such provision to any person or circumstances, is held invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall continue in full force without being impaired or invalidated.

14.7   <u>Counterparts</u>.  This Agreement may be executed in several counterparts, and all counterparts so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

[Signatures on following page]

IN WITNESS WHEREOF, the undersigned have made and entered into this Agreement to be effective as of the date and year set forth above.


SOLE MEMBER:          ABQ STUDIOS, LLC


By: _____
Name: _____
Title: _____


MANAGERS:


_____
James T. Freel


_____
Joseph LoMonaco

-8-

**SCHEDULE OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS TO BE ASSUMED[1]**

| Name of Other Party | Description |
|---|---|
| | |
| 1680 PR | Tenant lease |
| Adam Barth / Absolut Video | Tenant lease |
| Chris Hicks | Tenant lease |
| Entertainment Partners (Michael K. Wofford) | Tenant lease |
| Kissen Studio Rentals, Inc. (Richard Kissen) | Tenant lease |
| New Cingular Wireless | Wireless communications site license |
| ReelzChannel LLC | Office and mill space lease |
| Star Waggons | Mill, warehouse and parking space |
| Vincent Productions | Tenant lease |
| JLS Security | Tenant lease |
| Axium International | Lease Agreement ("Breaking Bad" production) |
| FTP Productions | License Agreement ("Scoundrels") |
| Topanga Productions | License Agreement ("Breaking Bad") |
| Vincent Productions | License agreement ("Fright Night") |
| Assembled Productions, LLC | License Agreement |
| Administaff Companies II, L.P. | Personnel management services |
| Black Swan and Associates, Inc. | Marketing consulting services |
| Cisco Systems Capital Corp | Computer equipment financing and maintenance |
| Database Works | Software service agreement for Gateworks software |

---

[1] This schedule is subject to change in the discretion of the First Lien Lender.

**EXHIBIT "3"**                                            37

| Name of Other Party | Description |
|---|---|
| JLS Security | 24 hour security services |
| ThyssenKrupp Elevator Corporation | Extended warranty service agreement |
| Travelers Insurance | Insurance policies |
| Wayne Rauschenberger | General Manager (COO).  Pacifica Ventures also a party. |
| Western States Fire Protection Co. | Quarterly automatic sprinkler equipment inspection |
| Xerox Corporation | Equipment leases and maintenance agreements (multiple) |
| E. Wireless dba MNM Location Services (RockBottom) | Exclusive referral program |
| NBC West, LLC (NM Lighting & Grip) | Revenue sharing agreement re studio equipment |
| First Call/NES Rentals (n/k/a Hertz Equipment Rental) | Revenue sharing agreement re heavy equipment rentals |
| Canteen Co. of New Mexico | Revenue sharing agreement re vending machines |
| City of Albuquerque/Union Development Corp. | Revenue sharing agreement re film location promotion for rail yard site |

1   Steven T. Gubner – State Bar No. 156593
    Robyn B. Sokol – State Bar No. 159506
2   EZRA BRUTZKUS GUBNER LLP
    21650 Oxnard Street, Suite 500
3   Woodland Hills, CA 91367
    Telephone: 818-827-9000
4   Facsimile:  818-827-9099
    Email:  sgubner@ebg-law.com
5            rsokol@ebg-law.com

6   Attorneys for Pacifica Mesa Studios, LLC,
    Debtor and Debtor in Possession

7

8                   UNITED STATES BANKRUPTCY COURT
9              FOR THE CENTRAL DISTRICT OF CALIFORNIA
                    SAN FERNANDO VALLEY DIVISION
10

11  | | |
    |---|---|
    | In re | Case No. 1:10-bk-18827-GM |
    | PACIFIC MESA STUDIOS, LLC, | Chapter 11 |
    | Debtor. | **NOTICE OF TECHNICAL AMENDMENT TO DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE** |

18      **PLEASE TAKE NOTICE**  that on October 15, 2010, Pacifica Mesa Studios, LLC, the

19  Debtor and Debtor in Possession (the "Debtor") filed its *Plan of Reorganization Under*

20  *Chapter 11 of the Bankruptcy Code* (the "Plan")[Docket Number 87].

21      **PLEASE TAKE FURTHER NOTICE** that pursuant Section 12.5(b) of the Plan, the

22  Debtor, with the consent of the First Lien Lender, may make appropriate technical adjustments

23  and modifications to the Plan.

24      **PLEASE TAKE FURTHER NOTICE** that pursuant to Section 12.5(b) of the Plan by

25  and through this notice and with the consent of the First Lien Lender, the Debtor hereby makes

26  the following technical amendment to Section 1.31 of the Plan which defines "First Lien

27  Lender" by replacing this definition with the following definition:

28

424439                          **EXHIBIT "4"**

                                                                    39

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***First Lien Lender*** means Amalgamated Bank of New York, as Trustee of the Longview Ultra Construction Loan Investment Fund, and, as to the distribution of the New Membership Interests, also means an entity to be designated by it to receive such New Membership Interests.

Dated: June 24, 2011

EZRA BRUTZKUS GUBNER LLP

By: _____
         Robyn B. Sokol
Attorneys for Debtor and Debtor in Possession

| In re:<br>PACIFICA MESA STUDIOS, LLC, etc., et al.<br><br>Debtor(s). | CHAPTER  7<br><br>CASE NUMBER: 1:10-bk-18827-GM |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**

A true and correct copy of the foregoing document described as **DEBTOR'S SUPPLEMENT TO PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 30, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Sara Chenetz          chenetz@blankrome.com
- Paul M. Brent          snb300@aol.com
- Michael I. Gottfried      mgottfried@lgbfirm.com, msaldana@lgbfirm.com
- Peter F. Jazayeri        jazayeri@blankrome.com
- Monika J. Machen        mmachen@polsinelli.com
- S. Margaux Ross        margaux.ross@usdoj.gov
- Jerry L Switzer          jswitzer@polsinelli.com
- United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **June 30, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows.

**Via U.S. Mail**
Honorable Geraldine Mund
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA  91367

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.

- Sara Chenetz            chenetz@blankrome.com
- Paul M. Brent            snb300@aol.com
- Michael I. Gottfried        mgottfried@lgbfirm.com, msaldana@lgbfirm.com
- Peter F. Jazayeri          jazayeri@blankrome.com
- Monika J. Machen          mmachen@polsinelli.com

1

- S. Margaux Ross    margaux.ross@usdoj.gov
- Jerry L Switzer    jswitzer@polsinelli.com

2

3                                              ☐ Service information continued on attached page

4   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and
    correct.

5

    June 29, 2011            NIKOLA A. FIELDS            /s/ Nikola A. Fields
6   ─────────────            ─────────────────          ─────────────────────────
    Date                     Type Name                  Signature

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28